EXHIBIT 1

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF ALAMEDA**



## SEARCH WARRANT

THE PEOPLE OF THE STATE OF CALIFORNIA TO:     WARRANT NO._____
Any peace officer in Alameda County

The affidavit below, sworn to and subscribed before me, has established probable cause for this search warrant which you are ordered to execute as follows:

**Place(s) to be searched:** Described in Exhibit 1A, *attached* hereto and incorporated by reference.
**Property to be seized:** Described in Exhibit 1B, *attached* hereto and incorporated by reference.
**Night service:** [If initialed by judge] for good cause, night service is authorized:_____
**Disposition of property:** Any item seized during the lawful service of this Search Warrant shall be disposed in accordance with law upon adjudication of the case. The officers serving this search warrant are also hereby authorized, without necessity of further court order, to return seized items to any known victims(s) if such items have been photographically documented.

_8/26/08  11:30a_
Date and Time

_Judge of the Superior Court_

## ♦ AFFIDAVIT ♦

**Affiant's name and agency:**
Detective Bill Kasiske #35, University of California Police Department, Berkeley

**Incorporation:** The facts in support of this warrant are contained in the Statement of Probable Cause which is incorporated by reference. Incorporated by reference and attached hereto are Exhibit 1A, describing the places(s) to be searched; and Exhibit 1B, describing the evidence to be seized.

**Evidence type:** (Penal Code § 1524)
☐ *Stolen or embezzled property.*
☒ Property or things used as a means of committing a felony.
☐ Property or things in the possession of any person with the intent to use it as a means of committing a public offense, or in the possession of another to whom he or she may have delivered it for the purpose of concealing it or preventing its being discovered.
☒ Property or things that are evidence that tends to show a felony has been committed, or tends to show that a particular person has committed a felony.
☐ Property or things consisting of evidence that tends to show that sexual exploitation of a child, in violation of Penal Code § 311.3, or possession of matter depicting sexual conduct of a person under the age of 18 years, in violation of Penal Code § 311.11 has occurred or is occurring.
☐ **Night Service:** [If checked] Authorization for night service is requested based on information contained in the Statement of Probable Cause, filed herewith.

**Declaration:** I declare under penalty of perjury that the information within my personal knowledge contained in this affidavit, including all incorporated documents, is true.

_08/26/08  11:25AM_
Date and Time

Det. Bill Kasiske #35, Affiant



UC 000188

# SEARCH WARRANT EXHIBITS

## Exhibit 1A: Places to be Searched

The premises, structures, rooms, receptacles, outbuildings, associated storage areas, and safes situated at:

The Long Haul Infoshop, 3124 Shattuck Avenue, Berkeley, CA. This is a single-story brick building on the west side of Shattuck Avenue. It has a red sign above the door that reads, "Long Haul Infoshop." The front door is glass.

## Exhibit 1B: Property to be Seized

- Any written, typed, or electronically stored documents, papers, notebooks, or logs containing names or other identifying information of patrons who used the computers at the Long Haul Infoshop.

- All electronic data processing and storage devices, computers and computer systems including, but not limited to, central processing units, external hard drives, CDs, DVDs, diskettes, memory cards, PDAs, and USB flash drives.

  Search of all of the above items is for files, data, images, software, operating systems, deleted files, altered files, system configurations, drive and disk configurations, date and time, and unallocated and slack space, for evidence. With respect to computer systems and any items listed above, the Peace Officers are authorized to transfer the booked evidence to a secondary location prior to commencing the search of the items. Furthermore, said search may continue beyond the ten-day period beginning upon issuance of this Search Warrant, to the extent necessary to complete the search on the computer systems and any items listed above.

# EXHIBIT 2

STATE OF CALIFORNIA ) ss.
COUNTY OF ALAMEDA )

**INVENTORY AND AFFIDAVIT
ON SEARCH WARRANT**

I, the undersigned, make this inventory to the attached Search Warrant. Said Warrant was issued on

_____08/26/08_____ , and under its authority I, on _____08/27/08_____ ,
(date)                                                                  (date)
diligently searched the persons and places described as follows, to wit: _3124 SHATTUCK, BERKELEY_

and I there discovered the following:

90 FROM INTERNET ROOM:          **INVENTORY**

:35-18-☐ - MISC. CDS & DISKETTES

:35-1-1 - POWER MACINTOSH G3, S/N XB8292NOCY4

:35-2-1 - ACER PC - NO S/N

:35-3-1 - "2001" PC - S/N 011124106

:35-4-1 - DELL OPTIPLEX GX110 SERVICE TAG: 9585701     (UC)

E35-5-1 - DELL OPTIPLEX GX150 S/N JC32B11

:35-6-1 - POWER MACINTOSH G3, S/N XA8350FYD9B

:35-7-1 - ADS PC S/N 6920191

:35-8-1 - UNKNOWN WHITE PC, S/N 9041DTYZQ724

:35-9-1 - UNKNOWN WHITE PC, NO S/N

:35-10-1 - MACINTOSH PERFORMA S/N RM7362NX95R

:35-11-1 - BLUE/WHITE :MAC S/N YM0173D3J88

35-15-1 - BLACK APPLE HARD DRIVE

35-16-1 - LACIE HARD DRIVE

I, the officer by whom this warrant was executed, do swear that the above inventory contains a true and detailed account of all property take by me on the Warrant.

_____
Signature of Officer (before Magistrate)

_____
Signature of Magistrate
County of Alameda, State of California

Ref.    1534 (e) P.C.
        1535 P.C.
        1537 P.C.

Subscribed and sworn to before me

on: _____
                (date)

EXHIBIT B
C
Kasiske

PENGAD 800-631-6989

UC 000174

STATE OF CALIFORNIA     ) ss.
COUNTY OF ALAMEDA     )

**INVENTORY AND AFFIDAVIT
ON SEARCH WARRANT**

I, the undersigned, make this inventory to the attached Search Warrant. Said Warrant was issued on

08/26/08 _____ , and under its authority I, on _____ 08/27/08 _____ ,
  (date)                                                              (date)
diligently searched the persons and places described as follows, to wit: 3124 SHATTUCK, BERKELEY

and I there discovered the following:
FROM UPSTAIRS OFFICE :
                                **INVENTORY**

35-12-1   - BLUE/WHITE POWER MACINTOSH G3, S/N : SG852887FQZ
35-13-(   - : MAC, S/N QT3101MGNHX
          - MISC. CDS/CASSETTES

I, the officer by whom this warrant was executed, do swear that the above inventory contains a true and detailed account of all property take by me on the Warrant.

_____
Signature of Officer (before Magistrate).

_____
Signature of Magistrate
County of Alameda, State of California

Ref.   1534 (e) P.C.
      1535 P.C.
      1537 P.C.

Subscribed and sworn to before me

on: _____
               (date)

UC 000175

STATE OF CALIFORNIA    ) ss.                  **INVENTORY AND AFFIDAVIT**
COUNTY OF ALAMEDA    )                     **ON SEARCH WARRANT**

I, the undersigned, make this inventory to the attached Search Warrant. Said Warrant was issued on

_08/26/08_ , and under its authority I, on _08/27/08_ ,
    (date)                                           (date)
diligently searched the persons and places described as follows, to wit: _3124 SHATTUCK, BERKELEY_

and I there discovered the following:

**INVENTORY**

FROM DOWNSTAIRS OFFICE - "EAST BAY PRISONER SUPPORT"

:35-14-1 - "EXCEL" COMPUTER, NO 10979

- MISC. CDs

:35-17-1 - SPRINT USB FLASH DRIVE

I, the officer by whom this warrant was executed, do swear that the above inventory contains a true and detailed account of all property take by me on the Warrant.

_____
Signature of Officer (before Magistrate)

_____
Signature of Magistrate
County of Alameda, State of California

Ref.    1534 (e) P.C.
        1535 P.C.           Subscribed and sworn to before me
        1537 P.C.

                         on: _____
                                    (date)

EXHIBIT 3

# STATEMENT OF PROBABLE CAUSE

## Affiant Introduction

Your affiant is currently employed as a Police Officer with the University of California Police Department (UCPD) on the Berkeley campus and has been employed by the UCPD System since January 2003. Your affiant worked as a patrol officer in the Patrol Division from 07/16/03 to 01/31/05 and as a detective in the Criminal Investigations Bureau since 02/01/05.

Your affiant has received formal and informal training, including:

- 1,050 hours, 07/14/03, POST Basic Academy, Alameda County Sheriff's Office Regional Training Center;
- 84 hours, 05/27/05, Institute of Criminal Investigation Core Course
- 40 hours, 11/18/05, Institute of Criminal Investigation Sexual Assault Investigation Course

Your affiant has successfully written and served multiple search warrants.

## Case Background

For several months, multiple UC Berkeley faculty members have been targeted by people who object to research the faculty members have conducted using animals. UCPD has taken numerous reports of vandalism and noisy demonstrations that have taken place at the private residences of the researchers. On 08/02/08 two fire bombings were reported in Santa Cruz. An incendiary device was ignited at the home of a UC Santa Cruz researcher while he was home with his family. A second device burned a vehicle belonging to another UC Santa Cruz researcher. UC Berkeley animal researchers are aware of these attacks as well as similar attacks that occurred against UCLA animal researchers in the previous year.

Since September 2007, UCPD has documented at least nine separate occasions when animal rights activists have targeted ▓▓▓▓▓'s residence. Demonstrations in front of her house have included loud chanting, chalk messages written on her driveway and the street in front of her house, and stickers placed on her property. On 03/10/08, ▓▓▓'s skylight was broken by a garbage can that was thrown onto her roof. There were chalk messages and stickers relating to animal rights that accompanied this vandalism. I was present when animal rights activists demonstrated in front of ▓▓▓'s home on 01/27/08. While I was there, I heard a known activist, :____Redacted____: shout, "What goes around comes around, smash vivisection to the ground." I also heard him shout, "▓▓▓, we are urging you to reconsider your [unknown word] at UC Berkeley. We are the friendly, above-ground activists. We are the ones you want to be dealing with. The next visit may not be from the above-ground activists. The next visit may not be so pretty." I heard another known activist, :____Redacted____: lead a call and response chant. He shouted, "For the animals we will fight." When he said this, the other demonstrators responded by shouting, "We know where you sleep at night." He lead another chant in which he shouted, "Vivisection, lies, and death." The other demonstrators responded by shouting, "Free



CONFIDENTIAL

UC 000278

08-0254 4

the animals, A-L-F." I am familiar with the ALF as an animal rights group that encourages violence and vandalism against people who they believe mistreat animals.

Multiple UC Berkeley professors who conduct research with animals have reported receiving harassing email messages. Between 03/19/08 at 2003 hours and 03/25/08 at 2111 hours, the following professors received harassing email messages: , ████████, ████, ████████, ████████, ████████, ████████, and ████████.

The messages had subject lines such as, "Hey animal killer," and "Why do you torture and kill animals?" The messages contained obscene comments like, "The blood is on your hands you speciesist [sic] scum. They die, you profit. Sick motherfucker." The sender used email accounts falsely created in the names of the professors to send the email messages. The following accounts were used: ████08@yahoo.com (████████████████), ████333@yahoo.com (████████), ████01@yahoo.com (████████████), and ████11@yahoo.com (████████████).

The professors forwarded the harassing messages to me. When ████████ and ████ forwarded their messages, they were able to include the complete header information. I examined the header information and noticed both messages came from the same IP address, which was 208.106.103.213. I traced this IP address back to a company called Sonic.net. On 03/20/08, I wrote a court order to obtain records from Sonic.net. On 03/20/08, I served the order on Sonic.net via fax. I received an email reply from Sonic.net on 03/21/08. I learned that at the time the harassing email messages were sent, the subscriber for IP address 208.106.103.213 was Jessy Palmer and the subscriber's address was 3124 Shattuck Avenue in Berkeley. I recognized this address as belonging to the Long Haul Infoshop. I know that the Long Haul is a resource and meeting center for radical activists. I know that animal rights activists have held meetings at the Long Haul. The Long Haul's website advertises that they offer a computer room with four computers for "activist oriented access."

On 06/15/08, ████ forwarded me six threatening email messages she received. The messages all came from the email address, "████isscum@gmail.com." The messages referenced her home address, ████████████. They contained the following content:

Message #1:
Received: 06/14/08 at 1810 hours
Subject: "let's see"
Message: "im a crazy fuck and im watching YOU
YOU HAD BETTER STOP KILLING THOSE FUCKING ANIMALS OR I WILL SHOW
YOU WHAT I HAVE IN STORE AT ████████████████ AND IT AINT FUCKING
PRETTY"

CONFIDENTIAL

Message #2:
Received: 06/14/08 at 1811 hours
Subject: "do you think"
Message: "do you think that im fucking around you waste of life i know where you work where you live where you shop even i know your credit card number and even what netflix movies you watch
STOP TORTURING ANIMALS OR THINGS GET UGLY"

Message #3:
Received: 06/14/08 at 1811 hours
Subject: "WAIT TO SEE"
Message: "WAIT TO SEE WHAT WE HAVE IN STORE FOR YOU"

Message #4:
Received: 06/14/08 at 1816 hours
Subject: "████████████ – A surprise in store"
Message: "havent you been paying fucking attention to the news and what is happening at UCLA
quit torturing animals or you're next to receive that and MUCH worse you fucking murderous scum"

Message #5:
Received: 06/14/08 at 1817 hours
Subject: "haha"
Message: "haha"

Message #6:
Received: 06/14/08 at 1916 hours
Subject: "my simple demands"
Message: "I HAVE ONE DEMAND. IT IS FOR YOU TO MAKE A PUBLIC ANNOUNCEMENT THAT YOU WILL NEVER AGAIN EXPERIMENT ON ANIMALS

IT WILL BE THE SMARTEST MOVE YOU EVER MADE ████. TRUST ME

EITHER YOU DO THAT OR I WILL FUCK YOUR LIFE UP. IM GIVING YOU THIS LAST CHANCE BECAUSE I HAVE MORE COMPASSION THAN YOU HAVE EVER SHOWN"

I believed the reference to UCLA related to animal rights activity that had taken place at the homes of UCLA researchers. I was aware of multiple incidents of incendiary devices being placed at researchers' homes as well as an incident in which a garden hose was placed through a broken window and used to flood the inside of a researcher's home.

Based on the ongoing harassment at ████'s residence as well as the repeated threatening email messages, I determined that the sender of the messages was in violation of California Penal Code section 646.9(a) [Stalking].

CONFIDENTIAL

On 06/16/08, I wrote a court order to obtain IP address information for the email address
"████████isscum@gmail.com." I served the order on Google via fax on 06/16/08. I received a
response from Google on 07/18/08.     I learned that the person who used
"████████sscum@gmail.com," sent the messages from an internet connection using IP address
208.106.103.213. I recognized this address as the same one that was used to send earlier
harassing email messages. On 07/22/08, I wrote a court order to obtain subscriber information
for this IP address. I served the order on Sonic.net via fax on 07/22/08. I received a response
from Sonic.net on 07/24/08. I learned that the subscriber for this IP address at the time the
messages were sent to ████ was Jessy Palmer and the subscriber's address was 3124 Shattuck
Avenue in Berkeley. I again recognized this as the address of the Long Haul Infoshop.

## Opinions and Conclusions

Based on my training and experience, I know establishments that offer public computer access
often have some type of system for patrons to sign in or register to use the computers. A search
of the Long Haul's premises could reveal logs or sign-in sheets indicating which patrons used the
computers on particular dates. This information would aid in identifying the suspect who sent
the threatening email messages using the Long Haul's computers.

It is likely that the suspect who sent the threatening email messages used the computers for other
purposes as well. A search of the computers at the Long Haul could reveal information the
suspect stored on the computers, websites the suspect accessed, or other email accounts the
suspect used. This information would aid in identifying the suspect. Due to the complexity of
searching computer systems and the need to properly maintain evidence stored on computer
systems, a detailed search would need to be conducted off-site by a computer forensics specialist.

**Declaration:** I declare under penalty of perjury that the information within my personal
knowledge contained in this statement of probable cause is true.

_08/26/08   11:25 AM_
Date and Time

_8/26/08   11:30a_
Date and Time

Det. Bill Kasiske #35, Affiant

Judge of the Superior Court

UC 000281

EXHIBIT 4

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION

4

5   LONG HAUL, INC. and EAST BAY      )
    PRISONER SUPPORT,                 )
6                                     )
                      Plaintiffs,     )
7                                     )
        v.                            )   No. C 09-00168-JSW
8                                     )
    UNITED STATES OF AMERICA; MIGUEL  )
9   CELAYA; KAREN ALBERTS; WILLIAM    )
    KASISKE; WADE MacADAM; TIMOTHY    )
10  ZUNIGA; MIKE HART; LISA SHAFFER;  )
    and DOES 1 - 25,                  )
11                                    )
                      Defendants.     )
12  _____ )

13

14

15

16         DEPOSITION OF JESSE PALMER, taken on behalf

17      of Plaintiffs, at One Market Street, 32nd Floor, San

18      Francisco, California, commencing at 9:35 a.m.,

19      Wednesday, August 4, 2010, before Donna J. Blum,

20      Certified Shorthand Reporter, No. 11133.

21

22

23

24

25

                              2

BARKLEY
Court Reporters

1    before you speak.  Then wait so that I have a chance if

2    I'm going to object.  Then answer the question that she

3    asked please.

4             THE WITNESS:  Thank you.

5    BY MS. ELLIS:

6        Q.  Did you review any e-mails in preparation for

7    this deposition?

8        A.  No.

9        Q.  Other than the e-mails that we discussed

10   previously?

11       A.  Correct.

12       Q.  How -- when was Long Hall started?

13       A.  Long Haul was incorporated as a corporation in

14   1993.

15       Q.  Did Long Haul exist prior to 1993 in some other

16   form?

17       A.  As I understand it, Long Haul existed as the

18   location at 3124 Shattuck beginning in roughly 1979.

19       Q.  And what was the -- did Long Haul exist

20   separately as an entity other than a building space in

21   1979?

22       A.  I believe the first time the word "Long Haul"

23   was used was when they got that building in 1979.

24       Q.  Was Long Haul solely used to describe the

25   building or was there a separate entity that was known as

19

Jesse Palmer

BARKLEY
Court Reporters

1  has a key, and a volunteer who's not a member probably

2  would not have a key.

3  BY MS. ELLIS:

4      Q.  Okay.  And what -- is it a key -- members have a

5  key to the front door?

6      A.  Correct.

7      Q.  Okay.  Do members have a key to any other

8  spaces?

9          Well, first of all, are there locked spaces

10 within the Long Haul building?

11     A.  Correct, yes.

12     Q.  Okay.  As of August 2008, which spaces were

13 locked in Long Haul?

14     A.  The -- there would be three offices downstairs

15 that would have locks on them.  There would be one office

16 upstairs in what we call the middle loft that would have

17 a lock on it.  And then there would be a variety of

18 cabinets and counters, and that there's one -- there's

19 two in the back room and three in the -- in the front

20 room that are locked areas.

21     Q.  And would a member who has a key have access to

22 all of those locked areas?

23     A.  No.

24     Q.  Which of the locked areas would a member who has

25 a key have access to?

24

1      A.   Just the front door.

2      Q.   Who has -- in 2008, who would have had keys to

3   the locked areas that you described?

4      A.   If somebody was a volunteer with Slingshot,

5   which is upstairs, they would have -- they could -- they

6   would not necessarily but they could have a key to that

7   door.

8           Continuing, if they were a volunteer with the

9   Info Shop Project, which is in the front room, they would

10  not necessarily have a combination to get into the

11  counter area.  If you have that combination, then there

12  is a key to a glass cabinet where books are kept, and

13  there's also a book that has a combination for a place

14  where coffee is kept that's locked and place where

15  audio/visual equipment is kept, which is also locked, and

16  a place where tools and paint, maintenance equipment is

17  kept, which is locked.

18          If you -- the three locked offices downstairs,

19  the back one would have just been members of East Bay

20  Prisoner Support would have had a key.  I don't know

21  whether it was a padlock or a combination but would have

22  had access.

23          The middle office, which is where The Needle

24  Exchange was, would have just been people associated with

25  that group.  And, again, I don't know how they do that.

25

Jesse Palmer

BARKLEY
Court Reporters

1         And the front office I think at that time was

2   Cycles for Change, and they would have had exclusive

3   access to that front office.

4       Q.  Were there volunteers of Slingshot who were also

5   volunteers of the Info Shop?

6       A.  Yes.

7            MS. GRANICK:  Objection, vague as to time.

8   BY MS. ELLIS:

9       Q.  In August of 2008.

10      A.  Yes.

11      Q.  Were there volunteers of the Info Shop in August

12  of 2008 who were also volunteers of East Bay Prisoner

13  Support?

14      A.  I'm not sure, but perhaps.

15      Q.  In August of 2008 were there volunteers of the

16  Info Shop who were volunteers of The Needle Exchange?

17      A.  I do not think so.

18      Q.  In August of 2008 were there volunteers of the

19  Info Shop who were volunteers of Cycles for Change?

20      A.  I do not think so.

21      Q.  In August of 2008 were there volunteers of East

22  Bay Prisoner Support who were volunteers of Slingshot?

23      A.  No.

24      Q.  In August of 2008 were there volunteers of East

25  Bay Prisoner Support who were volunteers of The Needle

26

BARKLEY
Court Reporters

1    the key and they weren't going to contribute to try to

2    keep the place up but that they wanted for personal

3    reasons or reasons that didn't have anything to do with

4    keeping it up or that they were just an untrustworthy

5    person, and it would be on a case-by-case basis.

6        Q.  Since you've been a member of Long Haul since

7    1993?

8        A.  (Moves head up and down.)

9        Q.  How many times are you aware that someone has

10   been rejected as an applicant for a membership?

11       A.  That's very hard to say, but it does happen.

12   But, I mean, it's very hard to say over 16 or 17 years.

13   That's a lot of people that got keys.  And so, you know,

14   it's maybe five percent of the people that apply.

15   Something like that.  Ten percent.

16       Q.  Now, are there other key holders at Long Haul

17   who are not members of Long Haul?

18       A.  In general, no.  We make anybody who gets a key

19   a member.

20       Q.  Okay.  So you mentioned in 2008 that there were

21   three offices downstairs.  The one was occupied by East

22   Bay Prisoner Support.  The other one was occupied by The

23   Needle Exchange.  And the final one was occupied by

24   Cycles for Change.  Correct?

25       A.  Uh-huh.

63

Jesse Palmer

BARKLEY
Court Reporters

1   regularly scheduled, held by Stop Cal Vivisection at Long

2   Haul?

3           MS. GRANICK:  My same objections.

4           You can answer.

5           THE WITNESS:  Not that I'm aware of.

6   BY MS. ELLIS:

7       Q.  And you didn't look at -- you didn't review any

8   calendars from 2008 to prepare for this deposition.

9   Correct?

10      A.  I didn't review anything for that deposition.

11      Q.  So it's possible that Stop Cal Vivisection could

12  have held meetings at Long Haul, but you don't remember?

13      A.  It's possible, but I don't remember.

14      Q.  In 2008 who was Long Haul's landlord?

15      A.  The Northern California Land Trust.

16      Q.  And how long had they been Long Haul's landlord?

17      A.  Since before I was involved.

18      Q.  And Long Haul has occupied that building since

19  1978 or '79.  Correct?

20      A.  That's my understanding, yes.

21      Q.  You've testified that Long Haul subleases space

22  to other groups and they did that in 2008.  Correct?

23      A.  Correct.

24      Q.  And other than the membership, monthly

25  membership meetings, is there any other decision-making

71

Jesse Palmer

BARKLEY
Court Reporters

1        A.  No.  Except to the extent that any income that

2    is through Long Haul, you know, all the income goes

3    through the Long Haul's tax ID.  So prior to 1998 it

4    didn't.

5        Q.  So any income that Slingshot obtains goes back

6    to Long Haul?

7        A.  Correct.

8        Q.  And is reflected then on Long Haul's tax

9    returns?

10       A.  Correct.

11       Q.  When did Slingshot have this relationship?  When

12   did that relationship with Long Haul start?

13           MS. GRANICK:  Objection, vague.  Which

14   relationship?

15           MS. ELLIS:  The relationship of being a fiscally

16   sponsored group.

17           THE WITNESS:  I believe in 1993.

18   BY MS. ELLIS:

19       Q.  When long -- when Slingshot moved its offices

20   into Long Haul?

21       A.  (Moves head up and down.)

22           MS. GRANICK:  You have to answer verbally.

23           THE WITNESS:  Oh, correct.

24   BY MS. ELLIS:

25       Q.  And prior to that Long -- Slingshot was not a

                              77

BARKLEY
Court Reporters

1   physically sponsored group of Long Haul.  Correct?

2        A.  Correct.

3        Q.  What was the basis of the decision to make

4   Slingshot a physically sponsored group of Long Haul?

5        A.  You mean in 1993?

6        Q.  Uh-huh.

7        A.  I'm not sure I fully remember.  I think the main

8   reason is that Slingshot had been sponsored by the

9   University of California at Berkeley, and everybody had

10  graduated, and there was no way to -- because we had an

11  office at Eshleman Hall and that office was not viable

12  anymore because there were no students involved in the

13  group, so we needed to find a new office and Long Haul

14  had an office.  So it made sense that the physical

15  trappings of the project would also be taken on by this

16  other organization.

17       Q.  So Slingshot is considered a tenant of Long

18  Haul?

19       A.  No.  Slingshot does not pay rent to Long Haul.

20  Slingshot is considered a project of Long Haul.

21       Q.  When did you first become involved with

22  Slingshot?

23       A.  1988.

24       Q.  When Slingshot was founded?

25       A.  I was not there at the founding, but I got

                            78

BARKLEY
Court Reporters

1  involved about a month later.

2      Q.  And have you been continuously involved with

3  Slingshot ever since then?

4      A.  No.  I was not involved for about a year when I

5  lived on the East Coast.

6      Q.  And other than that year have you been

7  continuously involved?

8      A.  Yes.

9      Q.  Since 1993 has Slingshot been a project of Long

10  Haul?

11      A.  Yes.

12      Q.  Continuously?

13      A.  Yes.

14      Q.  Does Long Haul -- in 2008 did Long Haul provide

15  any funds to Slingshot?

16      A.  I don't -- the question doesn't make sense to me

17  because it's one entity.  Slingshot is a part of the Long

18  Haul.  So I think the answer is no because that doesn't

19  make sense.

20      Q.  So to understand your response, Slingshot is not

21  a -- an organization that is separate from Long Haul?

22      A.  Correct.  Slingshot has no separate legal

23  existence other than as a project of Long Haul.  It has

24  no tax ID number of its own.

25      Q.  What other projects does Long Haul have, did

79

BARKLEY
Court Reporters

1        A.   No.

2        Q.   How many issues does Slingshot normally produce

3   in a year?

4        A.   The last ten years or so we have ordinarily done

5   three per year.

6        Q.   Okay.

7        A.   But sometimes it can be four.

8             MS. ELLIS:  We're going to go on to another

9   topic.  We can go off the record.

10            (Discussion off the record.)

11            (Lunch recess taken.)

12   BY MS. ELLIS:

13        Q.   Are you aware of the organization East Bay

14   Prisoner Support?

15        A.   Yes.

16        Q.   To your knowledge, when did East Bay Prisoner

17   Support form?

18        A.   I don't know.

19        Q.   In 2008 was East Bay Prisoner Support a tenant

20   of Long Haul?

21        A.   Yes.

22        Q.   Do you know what the purpose of East Bay

23   Prisoner Support was?

24        A.   Not precisely.  Generally they send letters and

25   get letters from prisoners.  That's what I know.

1    Q.  In that back upstairs loft area where the

2    computers are held, was the door to that room ever

3    locked?

4    A.  Yes.  At one point there was a group that rented

5    that back loft and then the door was locked.  But once

6    the computers moved up there, then the door was never

7    locked again.

8    Q.  Do you recall which members participated in the

9    decision to allow East Bay Prisoner Support to become a

10    tenant at Long Haul?

11    A.  No.

12    Q.  To the best of your recollection, do you know

13    when that meeting occurred?

14    A.  It sounds like it would be between the date of

15    this e-mail and the date of the police raid, but I can't

16    be more specific.

17    Q.  Do you -- what was the basis of the decision to

18    allow East Bay Prisoner Support to become a tenant at

19    Long Haul?

20    A.  That the Long Haul had a vacant space that a

21    group wanted to use the space and that the group seemed

22    congruent with things that people at that meeting thought

23    were interesting and should happen.

24    Q.  And why did the group think that East Bay

25    Prisoner Support was I think you used the word congruent

Jesse Palmer

BARKLEY
Court Reporters

1     Q.  And is this a true and accurate copy of the

2  inventory sheets that were left behind?

3     A.  I think so, yes.

4     Q.  In paragraph 39 of the first amended complaint

5  the third sentence states that the raid team contacted

6  the landlord who refused to allow them entry.

7         Are you -- do you know whether the -- any of the

8  officers spoke to anyone at Northern California Land

9  Trust?

10    A.  I was told that, yes, that they talked to Ian

11  Winters, who's the executive director of the Land Trust.

12    Q.  Do you know which officers spoke to Mr. Winters?

13    A.  No.

14    Q.  Do you know what was said?

15    A.  No.

16    Q.  Do you know when that conversation allegedly

17  took place?

18    A.  I don't know.

19    Q.  The last sentence of this paragraph states "they

20  then entered through the front door of the homeless

21  action center next door, went through that office to the

22  back of Long Haul, and forced their entry into Long Haul

23  through its secured back door."

24         When it states "its secured back door," how was

25  the back door to Long Haul secured?

148

BARKLEY
Court Reporters

1          MS. GRANICK:  Objection, vague.

2     BY MS. ELLIS:

3          Q.  At the time in August, on August 27, 2008.

4          A.  My understanding is it was secured with a chain

5     at that time.

6          Q.  And if the chain was then lifted up and removed,

7     would that have forced entry into the back door?

8          MS. GRANICK:  Objection, assumes facts not in

9     evidence, calls for speculation, vague.

10          THE WITNESS:  I'm not sure I know what you mean,

11     but if you -- the door was closed.  If the chain was

12     removed, then the door -- then you could swing the door,

13     but while the chain was secured you couldn't swing the

14     door.

15     BY MS. ELLIS:

16          Q.  Okay.  And does Long Haul believe that the door

17     -- that back door was damaged in any way?

18          A.  I don't believe we're alleging that that door

19     was damaged.

20          Q.  On Long Haul's website in August of 2008 did it

21     indicate that East Bay Prisoner Support was a separate

22     tenant of Long Haul?

23          A.  I don't know.

24          Q.  I'm going to show you what's been marked Exhibit

25     80.

149

BARKLEY
Court Reporters

EXHIBIT 5

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                SAN FRANCISCO DIVISION

4

5   LONG HAUL, INC. and EAST BAY      )
    PRISONER SUPPORT,                 )
6                                     )
                     Plaintiffs,      )
7                                     )
        v.                            )   No. C 09-00168-JSW
8                                     )
    UNITED STATES OF AMERICA; MIGUEL  )
9   CELAYA; KAREN ALBERTS; WILLIAM    )
    KASISKE; WADE MacADAM; TIMOTHY    )
10  ZUNIGA; MIKE HART; LISA SHAFFER;  )
    and DOES 1 - 25,                  )
11                                    )
                     Defendants.      )
12  _____  )

13

14

15

16

17        DEPOSITION OF JESSE PALMER, Volume II, taken on

18     behalf of Plaintiffs, at One Market Street, 32nd

19     Floor, San Francisco, California, commencing at

20     9:23 a.m., Friday, August 6, 2010, before

21     Donna J.  Blum, Certified Shorthand Reporter,

22     No. 11133.

23

24

25

                            227

BARKLEY
Court Reporters

1     THE WITNESS:  That defendant participated in the

2  police raid and participated in some way that is revealed

3  in discovery that I don't know plus as alleged in our

4  complaint and the documents that we gave you took

5  computers from the Long Haul.

6     So in terms of communicating with other

7  organizations and the public, to the extent that the

8  public access computers were taken, then they had to be

9  replaced.

10     There's a disruption.  The computer room was not

11  functional for a month as a result and I guess

12  additionally seizing the Slingshot computers.  Then there

13  was things that were being worked on on those computers

14  that we had to recreate those -- that information, those

15  articles.  And then we also had to get new computers for

16  that which meant that it was a severe amount of time was

17  spent dealing with replacing computers and recreating

18  items that had, but for the raid, would have just

19  existed, and we would have been able to just go forward.

20     And if you can ask me a more specific question,

21  I can give you a more specific answer about how that

22  worked.

23  BY MS. ELLIS:

24     Q.  Okay.  Which actions of Karen Alberts that you

25  know of dis- -- other than what's alleged in the

BARKLEY
Court Reporters

1    Zuniga?

2         A.  Correct.

3         Q.  Is the answer true for defendant Lisa Shafer?

4         A.  Correct.

5         Q.  Is the answer true for defendant Mike Hart?

6         A.  Correct.

7             MS. GRANICK:  Just for the record, those

8    questions were subject to the same objection that I had

9    named before.

10   BY MS. ELLIS:

11        Q.  Which communications in particular were

12   disrupted by the execution of the search warrant?

13        A.  I mean, I'm not sure that anybody is capable of

14   knowing all communications because they were disrupted

15   and, therefore, what would have happened in the absence

16   of the raid, it seems like it's speculation.

17            If we had not spent a month or two dealing with

18   the aftermath of this raid, I can anticipate that there

19   would have been events that would have been scheduled,

20   educational events, which is the purpose of the

21   organization, that would, you know -- that were not

22   scheduled as a result.  So that means cafe nights,

23   potentially movies, potentially speakers that would have

24   been presented to the public.  That's one category.

25        Q.  Do you know --

BARKLEY
Court Reporters

1   issue that did not mention that the police had seized the

2   computers that are used to publish the issue.

3      Q.  Okay.  In that same paragraph, paragraph 57, it

4   states that Long Haul's ability to publish Slingshot was

5   disrupted by the seizure of Slingshot storage media.

6         Which storage media was seized?

7      A.  I think what that means is the hard drive

8   contained within the computer that contained not only

9   articles but also general documents that are used in the

10  production of an issue that are used issue to issue.

11     Q.  So there were no separate -- there was no

12  separate storage media other than the computers that were

13  seized -- is that correct? -- that related to the

14  publishing of Slingshot?

15     A.  As I understand it, there was no memory stick

16  other than that I also believe that there were a bag of

17  music CDs that weren't related, but, as you said, it's

18  not related to publishing the issue except to the extent

19  we wanted to listen to that music.

20     Q.  And when you testified earlier on August 4,

21  2010, you stated that articles for Slingshot were kept in

22  a binder.  Is that correct?

23     A.  As of the time of the deadline, which is I'd

24  have to look at the issue before this, but it would be

25  published and it would usually be the week before

291

BARKLEY
Court Reporters

```
 1   publication, then everything that is in the computer is

 2   printed out and put in a binder.

 3          But ordinarily before the date of the deadline,

 4   which is on a Saturday, most materials are in a

 5   computerized form and they're not printed out until that

 6   deadline.

 7      Q.  I'm going to show you deposition Exhibit No. 72.

 8          (Deposition Exhibit 72 was marked for

 9          identification.)

10   BY MS. ELLIS:

11      Q.  Do you recognize this?

12      A.  I do.

13      Q.  What is it?

14      A.  This is an e-mail from me to the Slingshot --

15   it's to the Slingshot e-mail list plus a couple of other

16   individuals.

17      Q.  And when is it dated?

18      A.  This is dated -- this is dated the date of the

19   raid, August 27.

20      Q.  Okay.  In the text of that e-mail, does it

21   state, "We don't need to worry about the Slingshot

22   computer yet.  The deadline isn't until September 13"?

23      A.  That's correct.

24      Q.  And then does it state, "Our e-mail still works,

25   and we don't usually use the office computer much until
```

**BARKLEY**
Court Reporters

1    particular computer files were that I did know, for

2    instance, that the distribution and financial records

3    were not on that computer, and knowing that would be --

4    would be a reassuring fact for those volunteers who

5    didn't have that information of their own knowledge, and

6    I did.  So I shared that information.

7    BY MS. ELLIS:

8        Q.  Okay.  And the information that you shared about

9    saying the only things that were on the computer was the

10   new volunteer flyer and other flyers that are used that

11   information was not correct?

12       A.  In the subsequent --

13           That's correct.  In the subsequent two years I

14   have noticed many files that were only stored on the

15   computers that were seized and in particular back, you

16   know, how do you say it, files from things that had

17   already been published and distributed to the public that

18   we did not have a backup of those files.  And

19   periodically people will ask for an electronic copy of

20   something we've published in hard copy, and many times we

21   do not have that electronic copy.  Sometimes we do.  It's

22   spotty.

23           They were all maintained on those computers, and

24   we lost access to that.

25       Q.  And those are issues that were already

BARKLEY
Court Reporters

1   that correct?

2        A.  Yeah, that's correct.

3        Q.  In paragraph 57 of the first amended complaint

4   it states that, "Long Haul's ability to lend books, sell

5   books, host meetings, and have meetings of Long Haul

6   members and other associates was disrupted by the search

7   of the lending library log, the sales log, the seizure of

8   the property, and the ongoing reasonable belief that Long

9   Haul's face is subject to or will be subject to further

10  police surveillance."

11       How was Long Haul's ability to lend books

12  disrupted by the search of the library lending log?

13       A.  The Long Haul lending library has a form or it's

14  a list.  When somebody takes a book out, they put their

15  name and their contact information and the name of the

16  book and the date that they took the book out in order to

17  get the book, and this has been the case for many years.

18       During the raid we -- Katherine saw police

19  looking at the library logs and looking through those

20  logs, and that was widely disseminated in the press in

21  the wake of the raid that the Long Haul library logs had

22  been examined by the police.

23       Q.  Who disseminated that information?

24       MS. GRANICK:  I don't think he was done with his

25  answer.

313

BARKLEY
Court Reporters

1          Were you done?  I don't think he was done with

2    his answer.

3          MS. ELLIS:  Go ahead.  I'm sorry.

4          THE WITNESS:  It was published in the press, and

5    it was probably distributed by the Long Haul as well

6    because we thought that that was true information that

7    they had looked at those library records.  And in the

8    wake of that some people did not want to sign their name

9    on that list after that because they felt that by putting

10   their name on that list, their name could be taken, you

11   know, and viewed by the police, and that'd make people

12   uncomfortable.

13        Q.  Does Long Haul have any information that the

14   lending log for the library was actually seized and

15   taken?

16        MS. GRANICK:  Objection, calls for a legal

17   conclusion.

18        THE WITNESS:  My information is that it was

19   examined, and my investigation for this deposition I

20   spoke with Katherine Miller, but, in fact, for her

21   recollection you need to depose Katherine Miller

22   precisely what she saw.

23        But my information, based on my investigation,

24   is that they were examining it and viewing it, that they

25   didn't physically take it, but that they were -- had

314

BARKLEY
Court Reporters

1    access, you know, unrestricted access to the information

2    on it.

3         So whether they physically took the pages or

4    just took the information that was written on the pages,

5    I don't think that that -- that -- I think that a

6    reasonable person could still be reasonably worried about

7    in the future borrowing books from Long Haul based on

8    those set of facts.

9    BY MS. ELLIS:

10        Q.  Did any -- did any individuals communicate to

11   Long Haul that they were fearful of putting their name on

12   the library lending log?

13        A.  In my capacity as the 30(b)(6) witness, that was

14   not discussed at a Long Haul meeting.  So I'd say the

15   Long Haul as a corporation doesn't have that.  However,

16   in my capacity as an individual who, in fact, staffs the

17   Long Haul once a week for three hours, and I have staffed

18   since 1993, I can say that, yes, some people do express

19   that concern and do not take out books out of the Long

20   Haul as a result of this police raid.

21        Q.  During your investigation in speaking with

22   Katherine Miller, are you aware whether any police

23   officer took notes of what was contained in the library

24   lending log?

25        A.  I didn't ask that question, and she didn't

315

BARKLEY
Court Reporters

1    answer it, and I don't know the answer, which is why I

2    think she would have that answer better than I would.

3        Q.  Did you, in your preparation for this

4    deposition, did you ask her about her recollections of

5    what she observed?

6        A.  Yes.

7        Q.  During the execution of the search warrant?

8        A.  Yes, I did.

9        Q.  And she did not indicate to you when you were

10   having this discussion about what she observed, that she

11   saw police officers taking notes of what -- of the

12   information that was contained in the library lending

13   log.  Is that correct?

14       A.  That's correct, she did not say that.

15       Q.  How was Long Haul's ability to sell books

16   disrupted by any search, if any, of the sales log?

17       A.  The wording is a bit odd of that sentence, but

18   the sales I think would be impacted by two -- in two

19   respects.

20           The first respect is similar to the library that

21   people whom might have felt comfortable going to the Long

22   Haul before the police raid felt less comfortable going

23   to the Long Haul after the police raid, and, therefore,

24   that would affect the sales.

25           And the other and probably more important aspect

316

BARKLEY
Court Reporters

1  is that organizational time that would have gone into

2  finding books and promoting the books went into dealing

3  with replacing the computers, replacing the locks, and

4  recovering from the raid.

5      Q.  Does Long Haul have any records to indicate the

6  level of sales in September of 2008?

7      A.  We do.

8          MS. ELLIS:  I don't believe that those were

9  produced in discovery.

10         MS. GRANICK:  I'll represent on the record that

11 defense counsel, both Jonathan Lee and my conversations

12 with University counsel, I indicated we have a bunch of

13 financial records, and we agreed temporarily that those

14 were non-responsive.  We do have those.  They are not in

15 a format that you are probably imagining as you sit here

16 today, but we do have some records.

17 BY MS. ELLIS:

18     Q.  Does Long Haul have a basis to demonstrate that

19 the sales of books declined in September 2008 or October

20 2008?

21     A.  I would say that I don't know as the 30(b)(6).

22 Exhibit A is not specific enough for me to make an

23 investigation of that, No. 1.  And, No. 2, I'm not an

24 expert witness or economist to determine that.  However,

25 we do -- the financial records show sales on each day

317

BARKLEY
Court Reporters

1   to assume that everybody who has a key is on that list

2   serve plus some others.

3        Q.  Okay.  When people from the Info Shop or

4   volunteers for the Info Shop need to use the computer at

5   Long Haul, which computer do they use for Info Shop

6   business?

7        A.  They would use the public ones in the back

8   upstairs space.

9        Q.  And was that true in 2008?

10       A.  Correct.

11       Q.  Did -- were the Slingshot computers in the

12  Slingshot office used for any other purpose than

13  Slingshot business?

14       A.  No, just Slingshot.

15       Q.  Do you know whether any members of Slingshot

16  used the Slingshot computers for Long Haul business to

17  maintain member listings or any other types of

18  activities?

19            MS. GRANICK:  Could you just read the question

20  back please?

21            (Record read.)

22            THE WITNESS:  If somebody is a Slingshot person

23  with a key to the Slingshot office, then they could use

24  that computer for Slingshot business or Long Haul

25  business.  They're not supposed to use it for personal

BARKLEY
Court Reporters

1    Seattle because I was in Seattle.  The communications I

2    was having were not like around the water cooler

3    conversations.  They were directed on solving particular

4    problems.  So I wasn't speculating, and I think by the

5    time we got back, there wasn't a lot of speculation.

6         Q.  Do you know when Long Haul received the search

7    warrant and statement of probable cause from Channel 7?

8         A.  I don't -- I saw an e-mail that was produced to

9    you that says the date, but I don't recall what it is

10   without seeing that document.

11        Q.  What's the -- why does Long Haul believe that it

12   is -- well, does Long Haul believe that it is currently

13   subjected to police surveillance?

14        A.  You mean right now at this moment?

15        Q.  Uh-huh.

16        A.  I mean, as the 30(b)(6) witness, I don't think

17   this has been discussed at a meeting.  What Long Haul

18   believes about police surveillance, and as an individual,

19   I don't know.  I haven't seen the discovery, and I'm

20   curious to see the discovery in this case to see what

21   extent there was surveillance.  I'm -- as an individual,

22   I'm kind of agnostic about it.

23        Q.  What do you mean by "agnostic"?

24        A.  I believe that it is possible there's some

25   police surveillance, but I'm not certain that there's

328

BARKLEY
Court Reporters

1    police surveillance.  Either I would hope that we're not

2    -- that the police are smart enough to realize that we're

3    not worth surveilling.

4         Q.  Does Long Haul have any information in its

5    possession to believe that it will be the subject of

6    future surveillance?

7         A.  Again, I haven't seen the discovery, and I think

8    that that would be probative on that part.  I would say

9    it might be vague as to the meaning of information.  I

10   don't think that we have any -- I think it would be

11   difficult for Long Haul to have that kind of information

12   because that would be within the hands of the people

13   doing the surveillance, and we do not have spies within

14   the law enforcement community.

15            So I guess I can say that Long Haul has no spies

16   within the law enforcement community, so we don't, other

17   than through this lawsuit, we don't have any way of

18   knowing whether we'll be the subject of future

19   surveillance.

20        Q.  Does -- did anyone at Long Haul ever notice

21   police cars sitting outside surveilling Long Haul during

22   the period of 2008?

23        A.  As the 30(b)(6) witness, I think it is -- I

24   think it wasn't discussed at a meeting, and I think it

25   was possibly discussed in one of those Slingshot articles

329

BARKLEY
Court Reporters

1    you showed me.

2           So to the extent it's in the Slingshot, then

3    that's some level of knowledge, although not the level of

4    knowledge where it was discussed at a meeting.  And as an

5    individual, there have been times when I have noticed

6    police cars outside Long Haul.

7        Q.  When are those times?

8        A.  I'm not sure I can be specific.  I mean, as I

9    said, I've staffed there for 17 years once a week, and in

10   general you see police cars, and I don't think it's a

11   regular occurrence.

12          I'm not trying to imply that there's always a

13   police car sitting across from Long Haul.  That's not the

14   case at all.  Occasionally there are police cars parked

15   out there.

16          I should mention that there might be a document

17   we produced.  Even there have been a couple of music

18   shows where police arrive to say the music was too loud.

19   So that's actually my most present memory is when we had

20   problems with amplified shows, and so I may have to

21   modify my answer.

22          The Long Haul meeting as a corporation has

23   discussed the issue of police officers shutting down

24   amplified music shows, and we repeatedly tried to get the

25   musicians not to turn up the music so loud or just not

330

BARKLEY
Court Reporters

1   have amplified shows.  That's been a constant.

2       Q.  So other than police responding to amplified

3   shows, how many times in 17 years would you say that

4   you've noticed police cars sitting outside of Long Haul?

5           MS. GRANICK:  This is in his individual

6   capacity?

7           MS. ELLIS:  Uh-huh.

8           THE WITNESS:  In my individual capacity I would

9   say maybe once a year.

10  BY MS. ELLIS:

11      Q.  And do you know what it was related to at any of

12  those times?

13      A.  I've never known, and I have suspected that it

14  probably is that they were having a coffee break

15  sometimes.

16      Q.  I'm going to show you what's been marked as

17  Exhibit 54.

18          (Deposition Exhibit 54 was marked for

19          identification.)

20  BY MS. ELLIS:

21      Q.  Do you recognize this?

22      A.  I do recognize this.

23      Q.  What is it?

24      A.  Well, there's actually a few different e-mails.

25  The e-mail on Bates 170 is an e-mail from the -- doesn't

BARKLEY
Court Reporters

1    disclosures of Long Haul to determine whether the

2    monetary damages have been itemized and specified, and if

3    they have not, they will be, and we will determine how

4    this receipt relates to which specific damage is being

5    claimed by Long Haul.

6              MS. GRANICK:  That is correct.

7    BY MS. ELLIS:

8         Q.  Okay.  Turning to the next page where it states

9    Urban Ore, what receipt is that for?

10        A.  Urban Ore is a place where you can by used

11   building materials in Berkeley, and we bought a new door

12   to replace a door that was damaged.  It's a used door, so

13   they only charged us ten bucks, which is a good deal for

14   a door.

15        Q.  Okay.  And which door are you claiming is

16   damaged?

17        A.  This is, I believe, that East Bay Prisoner

18   Support door.  I'm pretty sure that's the one.

19        Q.  Okay.  And is this a damage that's being claimed

20   by Long Haul?

21        A.  Yes.

22        Q.  Okay.

23        A.  Because Long Haul owns the building and, yeah.

24        Q.  Long Haul replaced that door?

25        A.  Yes.

BARKLEY
Court Reporters

1     Q.  And this is on a Thursday.  Correct?

2     A.  Yes, that's what it says.

3     Q.  And then it says by Saturday hopefully at least

4  a dozen computers.  Is that correct?

5     A.  It says that.  I don't know if that was achieved

6  or not.

7     Q.  All right.  Now we're ready to switch hats.

8         Oh, sorry, last one.

9         You stated that there were articles for the

10  Issue 98 of Slingshot on the Slingshot computer at the

11  time of the seizure.  Do you know how many articles were

12  on there?

13     A.  As the 30(b)(6), I didn't specifically ask any

14  questions.

15         As an individual I recall that there were two

16  individuals who had articles going on there.  And I

17  believe at least one of them was finished.  Was -- I

18  mean, I was told there was a finished article.

19     Q.  So there was one finished article and one

20  article in progress?

21     A.  No, that's not what I said.  There were two

22  people that were working on articles.  And so often one

23  person writes more than one article.  So I know there was

24  one finished article and there was an unknown number of

25  others that were in progress.  I just know there were two

BARKLEY
Court Reporters

1    people that were working -- that did not have their own

2    computer and, therefore, they were having to use the

3    Slingshot computer to work on stuff.

4         Q.  Who were those people?

5         A.  Domnic and Melissa, and I don't know their last

6    names.  I'm sorry.

7         Q.  And do you know whether either of them are

8    members of Long Haul?

9         A.  I'd have to look at the key list, but I'm

10   certain that at least one or the other of people was a

11   member and it's possible they were both members.

12        Q.  Okay.  Now we really are switching hats.

13        A.  Okay.

14        Q.  Okay.  Were you present during the execution of

15   the search warrant?

16        A.  No.

17        Q.  Where were you?

18        A.  I was in Seattle.

19        Q.  When did you return from Seattle?

20        A.  I don't recall.  It seemed like it was a long

21   time because there was a lot happening here.  But I think

22   it was roughly a week after the police raid, but I don't

23   remember the precise time.

24        Q.  But your best estimate was it was --

25        A.  It might have been slightly more than a week.  I

378

BARKLEY
Court Reporters

1    much.  And then we had a couple of inventory sheets that

2    showed the items that had been seized.  And I believe

3    that's all.  I'm not sure what you mean by what we had,

4    but what we had relating to the raid?

5         MS. ELLIS:  Right.

6         THE WITNESS:  That was documents from the

7    Government.  That's all we had.

8    BY MS. ELLIS:

9         Q.  By that point in time you did not have the

10   statement of probable cause which was under seal?

11        A.  Correct.

12        Q.  In the next paragraph it states, "The thing that

13   Greg sent from the Electronic Frontier Foundation is

14   really interesting.  I like the angle but not only were

15   some of the computers akin to library computers but the

16   Slingshot computers were media computers."

17        What did you mean when you said, "I like the

18   angle that not only were some of the computers akin to

19   library computers"?

20        A.  Well, that's a -- there's two parts in that

21   statement.  But I think before the EFF e-mail we had

22   already thought that the way we thought about our

23   computers was that they were similar to a public library

24   computers.  They were at a library.  Members of the

25   public could use them for free.  That is very similar to

381

BARKLEY
Court Reporters

1   a public library where you can use computers for free.

2   We had already thought about that.

3          The part about the EFF is actually the second

4   part which is the Slingshot computers being media

5   computers and being entitled to extra protection under

6   the PPA, and that I hadn't thought of, and that was new

7   to me based on the EFF seeing that.

8          MS. GRANICK:  So if I just -- something for the

9   record.  As a lawyer with EFF, regarding whatever was the

10  thing that Greg sent from the Electronic Frontier

11  Foundation, it's my recollection it was not something

12  that was attorney/client privilege or an attorney/client

13  type of communication at that point in time which is why

14  it's not -- why the substance of this is not redacted.

15         To the extent that anything that the witness

16  said in his answer suggests otherwise, then I would say

17  that's an inadvertant disclosure and should not waive any

18  attorney/client privilege.  I do not believe this

19  paragraph is attorney/client privilege.  That's why it's

20  not redacted.  Anything that he said in that answer

21  should not waive anything that actually was

22  attorney/client privilege.

23         MS. ELLIS:  I understand.

24         MS. GRANICK:  Is that clear?

25         MS. ELLIS:  And that's not how the answer was

382

BARKLEY
Court Reporters