# EXHIBIT 6

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                  SAN FRANCISCO DIVISION

4

5   LONG HAUL, INC. and EAST BAY      )
    PRISONER SUPPORT,                 )
6                                     )
                    Plaintiffs,       )
7                                     )
         v.                           )  No. C 09-00168-JSW
8                                     )
    UNITED STATES OF AMERICA; MIGUEL  )
9   CELAYA; KAREN ALBERTS; WILLIAM    )
    KASISKE; WADE MacADAM; TIMOTHY    )
10  ZUNIGA; MIKE HART; LISA SHAFFER;  )
    and DOES 1 - 25,                  )
11                                    )
                    Defendants.       )
12  _____    )

13

14

15

16

17          DEPOSITION OF WILLIAM SASISKE, taken on behalf

18      of Plaintiffs, at One Market Street, 32nd Floor, San

19      Francisco, California, commencing at 9:04 a.m.,

20      Tuesday, July 27, 2010, before Donna J. Blum,

21      Certified Shorthand Reporter, No. 11133.

22

23

24

25

                              2

BARKLEY
Court Reporters

1       A.   No.

2       Q.   Was the search and seizure that you conducted at

3  Long Haul part of your official responsibilities as a

4  detective with the police department there?

5       A.   Yes.

6       Q.   And when you were there you were part of the

7  Animal Rights Working Group.  Is that right?

8       A.   Yes.

9       Q.   Can you tell me a little bit about the Animal

10  Rights Working Group?

11       A.   What do you mean by a little bit about it?

12       Q.   What is the Animal Rights Working Group?

13       A.   It was a group that we put together within the

14  department that involved investigators, supervisors as

15  well as invited people from outside agencies who were

16  investigating cases related to animal rights activism and

17  crimes surrounding that activism.

18       Q.   Okay.  How long was that --

19            Do you know when that group was formulated or

20  started?

21       A.   I don't remember the exact date.  It would have

22  been around the time -- winter of 2008 perhaps, around

23  February or so approximately.

24       Q.   Okay.  And was there any specific training that

25  was part of becoming a member of that group?

10

1   this.

2        Q.  After receiving this e-mail did you ever use the

3   attached documents with cut and paste search warrant

4   language?

5        A.  This is -- the attachment is not here.

6        Q.  The attachment is not here, but the e-mail

7   references an attachment with search warrant language.

8   What I'm asking is whether you remember using in a --

9   cutting and pasting from the attachment that was sent

10  with that e-mail in your applications for search

11  warrants?

12       A.  I believe I may have used parts of it, some of

13  the language that pertains to receiving or seizing

14  computer -- computers and search warrants, yes.

15       Q.  Okay.  And is that a true and correct copy of

16  the e-mail that you received?

17       A.  Yes.

18       Q.  Let me -- again, I'm going to just take it and

19  keep it in order over here.  But if you'd like to see any

20  of these again, let me know.

21            All right, so I'd like to turn our attention to

22  the investigation that led up to the August search at the

23  Long Haul.

24            So tell me about the March e-mails to professors

25  that instigated the investigation here?

21

William Sasiske

BARKLEY
Court Reporters

1        Q.  So a person who would use the public computer

2    access resource?

3        A.  Yes, in that paragraph that refers to the

4    signing in for the public access computers.

5        Q.  Did you know whether Long Haul had a sign-in

6    process for people to use the public computer room or

7    not?

8        A.  I did not know one way or the other.

9        Q.  And you told the Court that if you could get

10   access to logs or sign-in sheets, that could help you

11   identify who sent the threatening e-mails.  Is that

12   correct?

13       A.  Yes.

14       Q.  You also told the Court that there might be

15   other information on the computers that the patron used

16   which could help identify the person.  Is that correct?

17       A.  Yes.

18       Q.  Okay.  And for that reason you wanted to have

19   those computers looked at by a forensic specialist.  Is

20   that right?

21       A.  Yes.

22       Q.  Let's take a look at the actual search warrant.

23   This is Bates number UC 188 and 89, which is exhibit --

24   our number 8, and it's been marked as Exhibit E.  So let

25   me show you it.

48

1    paste.

2    BY MS. GRANICK:

3        Q.  Okay.  Why don't -- instead of characterizing

4    it, why don't, Sara, if you can remind me, what exhibit

5    number it was?  Let me look at it.

6            MR. SALTIEL:  H.

7            MS. GRANICK:  H.  Okay.

8        Q.  Is that the attachment that came along with the

9    e-mail we discussed that was Exhibit H, and I can re-show

10   it to you if you need to see it --

11           MS. ELLIS:  If you could just, I think that

12   would help.

13           THE WITNESS:  It's been quite a long time since

14   I saw the message and attachment, but, yes, I believe

15   it's most likely this document, it was the attachment to

16   this e-mail.

17   BY MS. GRANICK:

18       Q.  Okay.  And through the language that you used on

19   page -- on Bates number 189, in paragraph two and three

20   of Exhibit 1B the property to be seized, right here on

21   page 189 --

22       A.  Yes.

23       Q.  -- is that language taken from that attachment?

24       A.  It looks like most are -- most or all of it is

25   -- matches with the language in the attachment, yes.

                              52

William Sasiske

BARKLEY
Court Reporters

1           MS. ELLIS:  At the time of the warrant?

2           MS. GRANICK:  Yes.

3           THE WITNESS:  No, I can't think of anything else

4    that I knew about Slingshot.

5    BY MS. GRANICK:

6       Q.  Okay.  Did you have the warrant signed by Judge

7    Ford on August 26?

8       A.  Yes, I did.

9       Q.  And then you convened a meeting on August 27 to

10   prepare for execution of the warrant.  Is that correct?

11      A.  Yes.

12      Q.  Okay.  Who was present at that meeting?

13      A.  It would help me if I looked at the roster, but

14   as I remember, obviously I was there.  Sergeant Karen

15   Alberts was there.

16      Q.  Let me pause you for a moment.  I can find that

17   if that would help you look at it or --

18      A.  Sure, that would help me out.

19      Q.  Just wait a second, and we'll --

20           (Pause in proceedings.)

21   BY MS. GRANICK:

22      Q.  We'll look for it, and then you can be sure

23   whether you missed anybody or not.  But go ahead and say

24   from your recollection --

25           Oh, here, I'll show you this.  It is Bates

63

BARKLEY
Court Reporters

1    number 186, our No. 7.  It's been marked as Exhibit D.

2            Would that help you remember who was at the

3    meeting?

4        A.  Yes.  Thank you.

5        Q.  Okay.

6        A.  So, as I mentioned, Sergeant Karen Alberts;

7    Detective Wade MacAdam, W-a-d-e, M-a-c, capital, A-d-a-m;

8    Detective Tim Zuniga, Z-u-n-i-g-a; Special Agent Mike

9    Hart with the FBI, H-a-r-t; and Special Agent Lisa

10   Shaffer with the FBI, S-h-a-f-f-e-r.

11           And I don't remember for sure, he wouldn't have

12   appeared on the operations plan because he wouldn't

13   actually attend the service of the warrant.  But it's

14   possible Lieutenant Doug Wayne may have been there.  And

15   that's sort of a guess.  I don't remember if he was there

16   or not.  But I just remember at some search warrant

17   briefings the lieutenant might have attended as general

18   practice.  So it's possible he was present during all or

19   part of the briefing, but I don't remember with

20   certainty.

21       Q.  Okay.  Thank you.

22           What about Detective Bower?  He's listed on the

23   exhibit.  Was he there?

24       A.  Right, he's listed there.  The original intent

25   was that he was going to accompany us to serve the search

                            64

1    point?

2         A.  He may have been aware of the investigation.  I

3    don't know for sure.

4              As far as him assisting me with the

5    investigation, no, he wasn't involved with the work of

6    the investigation such as writing the report or applying

7    for the search warrant.

8         Q.  Do you know why -- do you know why Hart was -- I

9    mean, do you know who -- so you don't remember who asked

10   Hart to be present?

11        A.  I don't remember.

12        Q.  But is it fair to say your recollection is that

13   he was involved in other Animal Rights Working Group

14   investigations just more generally?

15        A.  Yes.

16        Q.  Okay.  And what was the role that you

17   anticipated he would play in the execution of this

18   warrant?

19        A.  His role in executing it would have been like

20   any of the other officers there, to assist with security

21   at the scene and to assist with searching the premises

22   once we were inside.

23        Q.  Did he bring any special information or

24   expertise about animal rights investigations to the -- to

25   the investigation of these e-mails?

66

BARKLEY
Court Reporters

1      A.   No problem.

2           Sergeant Alberts was my supervisor, so she was

3      there to supervise the operation and as well as any of

4      the officers there who were responsible for security of

5      the scene as well as searching the premises.

6      Q.   Had Sergeant Alberts looked at the search

7      warrant application prior to this meeting?

8      A.   Yes.

9      Q.   And how did that happen?

10     A.   After I wrote the search warrant and statement

11     of probable cause, I presented it to Sergeant Alberts for

12     review before having it signed by a judge, I showed it to

13     Sergeant Alberts.

14     Q.   Was that department policy to do that?

15     A.   That was a department -- yeah, department

16     policy, department procedure, yes.

17     Q.   Okay.  What about Detective MacAdam, what was

18     his role?

19     A.   His role was assisting with scene security at

20     the scene of the search warrant as well as assisting with

21     searching the premises.

22     Q.   Did you discuss at this meeting that he was

23     going to videotape the search?

24     A.   Yes, yes.  That would be typical for any search

25     warrant.  We would have somebody who would be designated

William Sasiske

BARKLEY
Court Reporters

1   the Berkeley Police Department was present at the

2   execution of the warrant?

3             MS. ELLIS:  Objection, relevance.

4             THE WITNESS:  No, that wasn't unusual based on

5   other search warrants that I'd served in other

6   jurisdictions where the agency of that jurisdiction would

7   not attend.

8   BY MS. GRANICK:

9       Q.  At the meeting on the morning of August 27, did

10  you have a copy of the search warrant available for the

11  other officers to look at?

12      A.  Yes.

13      Q.  Did you have a copy of the statement of probable

14  cause available for the other officers to look at?

15      A.  I'm sure, yes.  It would have been available to

16  them.  Whether or not, I couldn't say whether they did

17  look at it or not.  I don't remember.

18      Q.  Okay.  What was discussed at the meeting about

19  how to gain entry to the Long Haul premises?

20      A.  Well, like any search warrant, we'd talk about,

21  you know, proper techniques and ways to gain entry in a

22  safe manner.

23      Q.  With regards to this particular search, did you

24  have -- did you discuss the particular building or how

25  you were going to get in?

72

BARKLEY
Court Reporters

1    somebody else contacted us.  When we were making our

2    preparations to try to get inside, somebody in the

3    neighboring building came out and ended up assisting us

4    with getting to the back door.

5        Q.  Okay.  Did you talk to the landlord for the Long

6    Haul at all as part of your effort to try to gain entry

7    to the space?

8        A.  I didn't, no.

9        Q.  What was discussed at the meeting about how you

10   were going to gain entry?

11       A.  Well, we discussed our plan for how to enter the

12   property safely, and we had this idea of not entering or

13   trying to enter without causing damage if at all possible

14   to the doors or windows of the property.

15       Q.  What did -- was discussed at the meeting about

16   what the warrant authorized officers --

17          Or let me ask this -- let me be more clear.

18   What was discussed at the meeting about what the warrant

19   -- where the warrant authorized officers to search?

20       A.  Well, officers were shown the warrant, so they

21   could see the exhibit that describes the places to be

22   searched.

23       Q.  Okay.  And that was the information that the

24   officers at the meeting were given?

25       A.  Yes.

75

William Sasiske

BARKLEY
Court Reporters

1   Q. And do you know whether any other information

2 was given to the officers?

3   A. About the location of where?

4   Q. About the places to be searched.

5   A. I don't remember any other information being

6 given.

7   Q. And you don't know whether or not the officers

8 looked at the statement of probable cause. Is that

9 correct?

10   A. Yes. I don't remember if they looked at it or

11 not.

12   Q. Do you remember whether the possibility of there

13 being multiple offices or multiple spaces within the Long

14 Haul address was discussed?

15   A. I'm sorry, multiple spaces or --

16    What was the other part?

17   Q. Or offices within the Long Haul address?

18   A. No, I don't remember that, whether that was

19 discussed.

20   Q. What was discussed at the meeting in terms of

21 what officers were authorized by the warrant to seize?

22   A. Again, officers were referred to in the search

23 warrant, Exhibit 1B, which items were authorized to be

24 seized.

25   Q. Was there anything other than 1B that officers

1    were shown regarding what they were authorized to seize?

2         A.  No.

3         Q.  How long did this planning meeting take?

4         A.  I don't remember exactly.  It wouldn't have been

5    particular -- less than an hour perhaps.

6         Q.  Okay.  And was there anything else that you did

7    that morning to plan for the execution of the warrant?

8              MS. ELLIS:  Other than the briefing you mean?

9              MS. GRANICK:  Other than the briefing.

10             THE WITNESS:  Not that I remember that morning.

11   BY MS. GRANICK:

12        Q.  Do you remember whether the Long Haul website

13   made reference to other organizations that were

14   associated with Long Haul, like East Bay Prisoner Support

15   or Cycles of Change or any other group?

16        A.  What I can remember is what I mentioned before.

17   I saw they had a calendar that posted times when groups

18   would be meeting that listed names of groups or -- that

19   were meeting there.

20        Q.  Did you have information that Long Haul rented

21   out office spaces to different groups at the Long Haul

22   address?

23        A.  No, I didn't have that information.

24        Q.  So as part of your training at the university

25   police department, were you trained in what to do if you

                              77

BARKLEY
Court Reporters

1          MS. ELLIS:  Asked and answered.

2          THE WITNESS:  Yeah, the -- the logs or

3    documents, just what it says here in Exhibit 1B that show

4    names or identifying information of patrons who use the

5    computers at Long Haul, and computers or data storage

6    devices.

7    BY MS. GRANICK:

8        Q.  At the meeting were officers told that the plan

9    was to seize every computer at that address?

10       A.  I don't remember that those words were

11   specifically said, but I would say that that was the

12   plan, that that's what's listed on the search warrant

13   that we'd be seizing all computers.

14       Q.  Did -- at the meeting, the planning meeting,

15   were any limits set or discussed as to where officers

16   could search?

17         MS. ELLIS:  Objection, vague.

18         THE WITNESS:  I don't recall any discussion of

19   limits where we can search.

20   BY MS. GRANICK:

21       Q.  Okay.  Did Lieutenant Wing look at the search

22   warrant affidavit before you presented it to Judge Ford?

23       A.  I believe most likely he did.  It was our

24   procedure that prior to taking any search warrant to a

25   judge, my sergeant would review it and then after that a

                          82

BARKLEY
Court Reporters

1    member of the command staff, a lieutenant or a captain

2    would review it.

3          Lieutenant Wing was the lieutenant who was

4    directly overseeing the investigations, so he would have

5    been the most logical person would be the person who I

6    usually present search warrants to.  Although there were

7    times if Lieutenant Wing was busy or away or something

8    like that, it could be presented to a different member of

9    the senior staff.  But he would be the most likely

10   person.

11       Q.  Did you before the search notify the Berkeley

12   public information office that you were going to conduct

13   the search?

14       A.  I did not.

15       Q.  Okay.  Before seeking the search warrant did you

16   consider alternative means of getting access to the

17   patron identification information that you were seeking?

18          MS. ELLIS:  Objection, vague.

19          THE WITNESS:  I suppose I considered if there

20   were any alternatives.

21   BY MS. GRANICK:

22       Q.  Okay.  Did you consider subpoenaing the

23   information from Long Haul?

24       A.  No.  That didn't seem like a good idea.

25       Q.  Why didn't that seem like a good idea?

83

BARKLEY
Court Reporters

1          THE WITNESS:  My answer might be similar,

2   although, again, with the private entity as opposed to

3   government you have maybe other considerations like who

4   is in the coffee shop and who do they associate with,

5   things like that.

6   BY MS. GRANICK:

7        Q.  So would it be fair to say that you chose to use

8   a search warrant as opposed to a subpoena or to simply

9   ask for voluntary -- voluntary disclosure of the

10  information you were seeking because of the people that

11  associated at the Long Haul?

12          MS. ELLIS:  Objection, vague, speculation,

13  foundation.

14          THE WITNESS:  Because of the people associated

15  with the Long Haul?  What do you mean?

16  BY MS. GRANICK:

17       Q.  Let me try to ask you more broadly.

18          Tell me the factors that led to your decision

19  that you had to use a search warrant and couldn't ask

20  really nicely or use a subpoena to get this information

21  from the Long Haul.

22          MS. ELLIS:  Objection, asked and answered.

23          THE WITNESS:  Okay.  Well, like I mentioned, I

24  was familiar that the Long Haul had allowed Stop Cal

25  Vivisection to host a fundraiser at their premises, that

93

William Sasiske

BARKLEY
Court Reporters

1    they allowed members to use the facility, that members of

2    that group did go to the Long Haul on multiple occasions.

3    So I didn't know whether or not anybody who was a member

4    of Long Haul, whatever that is or who the membership with

5    Long Haul was possibly involved with membership or

6    support of Stop Cal Vivisection Group or the other way

7    around, if anybody in Stop Cal Vivisection participated

8    as a membership and management of the Long Haul.

9         So because I couldn't be sure of that or

10   confident of that, I needed to get the search warrant as

11   opposed to asking for the information which would

12   disclose our investigation.

13   BY MS. GRANICK:

14      Q.  What led you to believe that these e-mails

15   either March or June had been sent by someone affiliated

16   with Stop Cal Vivisection?

17         MS. ELLIS:  Objection, it mis-characterizes his

18   testimony and it assumes facts not in evidence.

19         THE WITNESS:  Without getting into the details

20   of what was going on with investigations, there were --

21   there was a large increase in activity surrounding animal

22   rights activism and harassment starting in September or

23   approximately of 2007 when we took many, many police

24   reports about these home demonstrations that I mentioned,

25   vandalism, threats made against professors, and it was

94

William Sasiske

BARKLEY
Court Reporters

```
 1              (Lunch recess taken.)
 2   BY MS. GRANICK:
 3        Q.  Okay.  We're back on the record for the
 4   deposition.  I assume that nothing's changed, and you're
 5   still able to answer my questions fully and accurately
 6   and under the rules that we talked about before.  Is that
 7   right?
 8        A.  Yes.
 9        Q.  Okay.  Great.
10              So I wanted to talk about the execution of the
11   warrant.
12              What did you do when you arrived at the Long
13   Haul address?
14        A.  So when we -- when I arrived, I was with the
15   other officers.  We prepared to make our entry into the
16   premises first trying to see if there was somebody inside
17   the front doors, like window or Plexiglas kind of a
18   material so you could look inside.  So it was dark
19   inside, didn't see anybody in there.  Knocked at the
20   front door to see if anybody would respond or come to the
21   front door, which nobody did.
22              Then at that point started to try to consider
23   options for how else we would get into the property,
24   other than as we hoped to avoid having to break the door
25   unless we absolutely had to.
```

97

BARKLEY
Court Reporters

1          Am I going too far or just continue?

2      Q.  No.  That's fine.

3          At some point you contacted the office that was

4  next door to the Long Haul address?

5      A.  As I remember rather than I contacted them,

6  somebody from the office came out and saw us there or was

7  just passing by or something more like that rather than

8  knocking.  I'm not positive about that.

9          But in any case spoke with somebody from that

10  office who let us -- who said you can come through our

11  office to go around to the back because there's a back

12  door into the Long Haul, which we hadn't seen before.

13      Q.  And did you go through the neighbor's office

14  space to get to the Long Haul back door?

15      A.  Yes.

16      Q.  Who else came with you to do that?  Did every

17  officer who was there come or did some people remain in

18  the front?

19      A.  Some people remained in the front to keep the

20  front secure, anybody coming or going or anything else

21  like that.

22          I don't remember exactly which people stayed in

23  front and which came to the back door.

24      Q.  Okay.  How did you get in the back door?  Was it

25  locked?

98

BARKLEY
Court Reporters

1        A.   The back door of the Long Haul was not locked.

2    It had a chain that was sort of just draped over.   It

3    wasn't quite a conventional door.   Maybe it had a

4    doorknob, but it had sort of from the inside had some

5    sort of a bar, I guess, if you will, or a piece of metal

6    attached to the door.   I think that had this chain kind

7    of draped over it as if it seemed to be intended for

8    using a chain to padlock the door or lock the door shut.

9    But the chain wasn't actually locked, just sitting across

10   between the door and the wall next to the door.

11           So really the door wasn't locked.   It was just a

12   chain sitting there.

13           So the chain just fell down.   It was removed

14   just by opening the door slightly, and the door was

15   opened basically.

16       Q.   Okay.   And then you and the officers you were

17   with went into the Long Haul space?

18       A.   Again, after standard search warrant procedures

19   of knocking and -- we had knocked previously, but

20   knocking and announcing our presence, police officers

21   were present and had a search warrant demanding entry

22   into the property, after waiting for a response, which

23   there was no response, we did go into the -- into the

24   premises, did a protective sweep of the interior to see

25   if -- make sure there was nobody there hiding or anything

BARKLEY
Court Reporters

1    like that, which there wasn't.  We didn't discover

2    anybody inside.

3         Q.  Protective screen involves having your weapon

4    out when you go through and look for people.  Is that

5    right?

6              MS. ELLIS:  Objection, investigative privilege.

7    BY MS. GRANICK:

8         Q.  Let me ask it a different way.

9              Did you have your weapon out when you went in

10   and did the protective sweep at Long Haul?

11        A.  Yes.

12        Q.  And did the protective sweep include going into

13   -- what areas of Long Haul did you initially enter as

14   part of the protective sweep?

15        A.  Any areas that were accessible, whether it could

16   be a person in that area hiding or even out in the open.

17        Q.  Okay.  Did you eventually -- at that point did

18   you open the front door so that the other officers who

19   are still out there could come in or did you leave that

20   door locked?

21        A.  After the protective sweep you mean?

22        Q.  Yeah.

23        A.  I don't remember if the other officers came in

24   through the front door or if they went around through the

25   back door.  I don't remember how the locking mechanism

                          100

1  worked on that door, if it was something we could unlock

2  and open just to let them in or not.

3      I'm not positive.  I feel like there was

4  probably a lock that we could open.  But whether they

5  came through that door or went around to the back, I

6  don't remember how they got in.

7  Q.  Did you during the protective sweep personally

8  enter into that front area of Long Haul that you can see

9  through the plate glass window?

10      MS. ELLIS:  Objection, vague.

11      THE WITNESS:  When you say that you mean the

12  front area being like the first five feet into the

13  building from the -- from the front window?

14      MS. GRANICK:  Yes.

15      THE WITNESS:  Okay.  I don't remember if I

16  walked through.  Usually the sweep is done fairly quickly

17  just to cover the area as quickly as possible usually,

18  but I don't remember if I went through there.

19  BY MS. GRANICK:

20  Q.  Okay.  So after the protective sweep, what did

21  you do?

22  A.  So once we were confident that the scene was

23  safe and there wasn't anybody there, we had Detective

24  MacAdam do the video, which is standard for us, in

25  serving a search warrant.  He walked through the premises

101

1      A.  I don't remember exactly why that was

2  particularly the first place.  I would say while I was

3  searching I kind of took on the role of finding computers

4  or computer paraphernalia like hard drives and things

5  like that, data storage devices.

6          And I think just in standing around that was the

7  most obvious place I first saw computers.  I think there

8  was the largest collection of computers there.  So just

9  maybe it just seemed like a logical place to start.  I

10  don't remember exactly why I picked that place, but other

11  than it seemed it probably was logical based on the

12  number of computers that were there.

13      Q.  And you previously knew that Long Haul had an

14  Internet room from looking on the website.  Correct?

15      A.  I knew that Long Haul advised or stated on the

16  website that they had a public access computer room.

17      Q.  What did --

18          Did you seize all the computers from the

19  Internet room at that point in time or did you come back

20  for them later?

21          MS. ELLIS:  Later during the execution of the

22  warrant or?

23          MS. GRANICK:  Yes, during the execution of the

24  warrant.

25      Q.  I guess my question is when you were in the

103

William Sasiske

BARKLEY
Court Reporters

1    Internet room, was it at that point that you took the

2    computers?

3         A.   I -- I'm not a hundred percent sure.  I think

4    probably.  I think I just began removing the computers

5    from where they were plugged in or located in that room.

6    As I found computers, generally photographed the item for

7    the most part in the place where I found it, wasn't

8    always practical to be in the exact place for something

9    blocking it or if it's underneath something, but just in

10   general took a photograph of the item, had it unplugged

11   and disconnected, and moved each computer to -- just to a

12   sort of a central area in the downstairs just kind of

13   lined up on the floor sort of in a central area.

14        Q.   Was that internet room locked?

15        A.   No, I don't remember it being locked.

16        Q.   After the Internet room where did you go next?

17        A.   Well, I stayed along the theme of going to

18   computers to get the physical computers or storage

19   devices, computer storage devices, so I don't remember

20   exactly the next room that I went to.  There were a

21   couple of other rooms that had computers in them, so

22   either I walked through and saw them or somebody else

23   maybe called me over and said there's a computer over

24   here.  So I went to photograph and disconnect the

25   computer, so I don't remember specifically which room was

                              104

BARKLEY
Court Reporters

1    next.

2        Q.  Okay.  So let's talk about the rooms not

3    necessarily in chronological order.

4        A.  Okay.

5        Q.  Did you look in the front area of the Long Haul,

6    the space you can see through the plate glass window for

7    computers or digital media while you were executing the

8    warrant?

9            MS. ELLIS:  And this is him personally?

10           MS. GRANICK:  Yes.

11           THE WITNESS:  Yes, I definitely walked through

12   the front area.  That wasn't the primary area.  I wasn't

13   involved in doing any kind of in-depth searching for

14   anything that I could see sitting out.  I didn't see any

15   computers or other devises, storage devices or anything

16   like that in that front area.

17   BY MS. GRANICK:

18       Q.  While you were in that area, did you see

19   newspapers that said Slingshot across the top?

20       A.  I don't remember seeing them.  I mean, it's

21   possible they were there, but I don't remember seeing

22   them or not seeing them.

23       Q.  Okay.  Let's talk about the offices along the

24   hallway on the first floor of the Long Haul.

25           Did you go into every office that was on the

                                105

BARKLEY
Court Reporters

1    first floor along the hallway of the Long Haul?

2        A.  I think I either went in to them or at the very

3    least, you know, stood at the door and looked inside.

4    Again, I didn't perform a -- I don't remember performing

5    a detailed search of those rooms.  But I remember looking

6    in them when I was in the area.

7        Q.  Okay.  Let's start with the office that as you

8    come down the hall of Long Haul is closest to the front

9    door.

10        What do you remember about your search of that

11   office?

12        A.  Closest to the front door on the east side of

13   the building?

14        Q.  Yes.

15        A.  I don't really -- I don't remember too much

16   about that office.  In fact, I don't remember how many

17   offices there were.  I want to say maybe there were

18   three, maybe as many as four rooms there.  But I don't

19   remember to say like what was in that room other than

20   there was no computer in that room that I remember.

21        Q.  Was the door locked, to your recollection?

22        A.  Of the doors that were locked, there were a few

23   doors that were locked.  And I don't remember if all of

24   them were locked down there or, yeah, I'm not positive if

25   that door was locked.

William Sasiske

BARKLEY
Court Reporters

1    Q.  Okay.  Would it be fair to say that, as you sit

2  here today, you don't have a real memory of searching

3  each of those offices as a distinct event?

4         MS. ELLIS:  Objection, vague.

5         THE WITNESS:  What do you mean by a distinct

6  event?  For each office?

7  BY MS. GRANICK:

8    Q.  Well, I'd like to go through and ask you about

9  the search of each office to the extent that you remember

10  it.  So maybe we'll just do it that way, and we cannot

11  really save time by doing them as a group.

12         So the first office I think you said you didn't

13  remember whether or not that door was locked, but there

14  was not a computer in that office.  Is that correct?

15    A.  Yeah, I don't remember there being a computer in

16  there.  I'm pretty sure there wasn't.

17    Q.  Do you remember a sign on the door?

18    A.  No, I don't remember a sign.

19    Q.  Anything else about that office that you might

20  remember?

21    A.  So I remember one of the offices, and I don't

22  remember if it was that office or one next to it, had --

23  it had a lot of needles in it, like hypodermic needles

24  and that.  I don't remember if it was somebody said

25  something like, oh, there was a needle exchange here or

107

BARKLEY
Court Reporters

1   this is a room used for a needle exchange or something

2   like that.  I feel like I remember that, but I'm not

3   positive it was that room or if was like the room next to

4   it or something.  So I'm not real sure.

5       Q.  Do you remember whether one of those offices had

6   a sign on the door that said East Bay Prisoner Support?

7       A.  Yes, I remember one of the offices having that

8   sign.

9       Q.  And was that door locked?

10      A.  I believe it was, yes.

11      Q.  What did you do when you came upon the door with

12  the sign East Bay Prisoner Support on it?

13      A.  Well, I didn't do anything when I came to those

14  doors.  They had been opened by another officer in terms

15  of the locks.  So I didn't come to it when it was a

16  locked door other than maybe during the security sweep

17  and going past it.  We didn't try to go into locked

18  spaces while we were sweeping through the property.

19          But when I came to that door it had already been

20  opened.

21      Q.  Okay.  Do you know who opened the East Bay

22  Prisoner Support door?

23      A.  I remember that Detective MacAdam did some

24  documentation of locked doors and which doors were

25  locked, and I'm not positive, but I think he was the

108

William Sasiske

BARKLEY
Court Reporters

1   person who either opened locks or helped maybe was with

2   more than one person.

3        But I think it was his -- he who wrote or did

4   some sort of photographs documenting the condition of

5   locks or how they were removed, something like that.

6        Q.  Okay.  So by the time you came to the East Bay

7   Prisoner Support office, the lock had already been

8   removed and the door was open.  Is that correct?

9        A.  Yes, at least unlocked.  I don't remember if the

10  door was closed.  It needed to be opened when I came

11  down, but it had been unlocked.  And some of the locks

12  were removed in different ways.  I think some of the

13  locks didn't need to be damaged.  It was like the way the

14  latch was, maybe just a screw that needed to be removed

15  to take the latch off rather than breaking the lock, and

16  there may have been one or more doors where the lock

17  couldn't be removed in that way where it was cut.  But I

18  don't remember exactly which door was used, which

19  technique to unlock it, but.

20       Q.  Okay.  What do you remember about when you came

21  to the East Bay Prisoner Support office in terms of your

22  entry into it?

23       A.  Well, like I said, it was not locked at the time

24  that I came to it.  And, again, kind of like I said

25  before I wasn't sure if it was like somebody else who

109

BARKLEY
Court Reporters

1    directed my attention, like there's a computer in this

2    room, or if I was just walking through and saw in the

3    room and saw like, hey, there's a computer in there.  So

4    I went inside.

5         Either way I went inside to seize the computer,

6    and as I remember, I believe there was also a flash drive

7    in that room, and I know we seized a flash drive and I

8    think it was from the East Bay Prisoner Support room that

9    had the sign on the door.

10        And so I went in like I did with the other

11   computers, took a photograph, unplugged it if it was

12   plugged in, and moved it out into the central area.

13        Q.  Did you look through any of the documents or

14   other papers in that office?

15        A.  No.

16        Q.  All you did was take the computer out and the

17   flash drive?

18        A.  Correct.

19        Q.  Okay.  When you took the computer out of the

20   East Bay Prisoner Support office, did you -- what did you

21   examine or note about the computer before taking it out

22   of the office, if anything?  Was it just there's a

23   computer, so you seized it or did you do any other kind

24   of assessment of the computer while it was there in the

25   office?

William Sasiske

BARKLEY
Court Reporters

1          MS. ELLIS:  Objection, vague.

2          THE WITNESS:  Yeah.  Are you asking --

3    BY MS. GRANICK:

4      Q.  Did you look to see whether the computer was

5    connected to the Internet?

6      A.  I don't remember if I looked to see.  I would

7    have disconnected any cords it was connected to power

8    supply or internet connection or keyboard cord or

9    anything that was attached to the back.  So I would have

10   just removed those cords.  So I don't remember if I saw

11   an Internet connection or not.

12     Q.  And you didn't search through the office for any

13   kind of patron logs or sign-up sheets for using computers

14   or anything of that nature?

15         MS. ELLIS:  Objection, asked and answered.

16         THE WITNESS:  I did not.

17   BY MS. GRANICK:

18     Q.  And let's talk about the -- you searched some --

19   you went into other offices along the Long Haul as you

20   were looking for computers?

21     A.  Like I said, I don't remember -- I know I

22   probably looked in them.  I don't know how much I walked

23   into the office or just was in the hallway and looked in

24   the door.

25         The spaces were small, like maybe like a large

                              111

BARKLEY
Court Reporters

1  closet or something in terms of size.  So I wasn't

2  allowed to go into necessarily.  So as far as whether I

3  went in or just stood in the hallway and looked in, I

4  can't remember for certain because that was the only room

5  I needed to go into and take something out of.  So it's

6  possible I didn't go around and look at other rooms, but

7  I don't remember.

8      Q.  Do you remember anything else about the East Bay

9  Prisoner Support office and your activities inside it?

10      A.  There's nothing else that I can think of that I

11  did in there.

12      Q.  Okay.  Let's talking about the office that is

13  upstairs in the loft, not the Internet room but on the

14  other side.

15      A.  The east.

16      Q.  Is that the eastern side?

17      A.  Yes.

18      Q.  So the eastern side.  So describe for me the --

19  your going up into that area?

20      A.  Okay.  So that -- well, that loft area sort of

21  had two segments.  There was a lounge area.  I don't know

22  how to describe it.  I think there was a sofa or a couple

23  of sofa in that room, maybe a table or something.  I'm

24  not a hundred percent sure.  And then there was a door,

25  and there was on the other side of that door was where I

112

William Sasiske

BARKLEY
Court Reporters

1   -- like an office-type space.  There was kind of a

2   countertop, and it was open sort of overlooked the

3   downstairs like it was the loft-type space.  So it wasn't

4   a sealed room.  It was open to where you could drop down

5   into the room below from that area.

6        Q.  Was that door locked when you came to it?

7        A.  When I came to it, it was not locked, it was my

8   understanding.  I believe that the door was originally

9   locked, but, again, I wasn't the person who was removing

10  and opening locks.  So I'm pretty certain that it was

11  locked, but I didn't unlock it.

12       Q.  Do you know who was the officer who unlocked

13  that particular door?

14       A.  No.  Other than, again, like I said, similar to

15  the other doors I believe Detective MacAdam detailed

16  which locks were removed, and I think maybe that one was

17  included with the other locks, but I don't remember for

18  certain if it was him or if he was working with somebody

19  else.  I'm not sure.

20       Q.  Did you see a sign over that door that said

21  Slingshot?

22       A.  I don't remember seeing a sign over the door at

23  the time.

24       Q.  Was there any time where you saw the sign over

25  the door that said Slingshot?

113

William Sasiske

BARKLEY
Court Reporters

1          MS. ELLIS:  During the execution --

2          MS. GRANICK:  During the execution of the search

3    warrant.

4          THE WITNESS:  Oh, no.

5    BY MS. GRANICK:

6      Q.  Did you look in the -- inside the office through

7    that door, did you see copies of newspaper that said

8    Slingshot across the top in that office?

9      A.  No, I don't remember seeing that.

10     Q.  Did you look through any of the files in the

11   filing cabinet or stacks of paper in that office or

12   anything -- anybody paper, documentary or paper stuff

13   like that while you were in there?

14     A.  No, I did not.

15     Q.  Did you take the computers that were in that

16   office?

17     A.  Yes.

18     Q.  Okay.  Did you look to see whether those

19   computers were connected to the Internet?

20     A.  Again, I don't remember.  I believe there was

21   something in terms of something plugged in at least power

22   cord.  Whether it had an Internet cord or not, I'm not

23   completely sure.  Just as I did with the other computers,

24   I would have removed any attachments or cords connected

25   to the computer and photographed it and then moved it

114

BARKLEY
Court Reporters

1   down to that central area.

2       Q.  And did you know when you were taking those

3   computers that that was office used by Slingshot for its

4   publication activity?

5       A.  No, I did not know that.

6       Q.  Did you learn that at any point in time while

7   you were executing the search warrant?

8       A.  No.

9       Q.  Do you remember anything else about your

10  activities in that particular office on this day?

11      A.  No.  I didn't spend a lot of time there other

12  than to go in and unplug the computers and remove them.

13          Oh, there was some -- in addition to computers

14  and computer storage devices, there was the warrant

15  specified also diskettes or I guess storage devices for

16  electronic diskettes or CDs, DVDs, things like that.  I

17  believe there were recovered a number of I think it was

18  90 different such devices throughout the premises, and I

19  believe there were some in that room that I picked up

20  when collecting them when I was there at the time getting

21  computers, and I probably went back and forth carrying

22  them down, but I think I removed some from that room as

23  well.

24      Q.  For those CDs did you have any reason to believe

25  that patron logs might be stored on those?

115

BARKLEY
Court Reporters

1    A.  I recognized it could have been a possibility

2 that they could be stored there.  There wasn't anything

3 specifically I could say that told me that they were.

4 But a log could be stored on a CD or a diskette, yes.

5    Q.  Is that because a log could be stored on any

6 digital media or was there something specific about these

7 CDs and DVDs that made that a possibility?

8         MS. ELLIS:  Objection, assumes facts not in

9 evidence.

10        THE WITNESS:  You know, there were items that we

11 were searching for in the search warrant, and they

12 enforced us (sic) -- why we were taking them.  I'm not

13 sure if that answers your question but --

14 BY MS. GRANICK:

15    Q.  Okay.  But after you got the computers and the

16 storage media out of the Slingshot office, what did you

17 do?

18    A.  Well, again, I don't remember the chronology,

19 whether I was in Slingshot office as you're referring to

20 it as I --

21         You mean the upstairs office.  Right?

22    Q.  Oh, I understand we're out of order here.

23    A.  Right.  When you say after that --

24    Q.  After you went into the offices upstairs and

25 downstairs and took the computers out of those offices,

116

BARKLEY
Court Reporters

1   what did you do?

2       A.  By the time I had gotten the computers out of

3   all the spaces and had photographed them and taken them

4   out and then part of that process was documenting the --

5   we provide an inventory of the items seized.  So

6   documented the make and model if known of the computer

7   and the serial number.

8           So that was part of what I was doing, as I was

9   going along I was cataloging each item.  And I don't

10  remember exactly, but it probably would have been as I

11  photographed and before I actually moved it I probably

12  would have done that as I discovered each one.  And as I

13  moved each one noting it down the details about it to

14  identify information.  So just to add that I had that

15  too.

16          But after all that was assembled in the

17  downstairs area, as I remember from that point we were

18  pretty much done with anything that needed to be done.

19  So once that was complete we began moving the items out

20  to the vehicles to transport them away.

21      Q.  Okay.  So is there anything else that you did

22  during the execution of the warrant?

23      A.  No, I don't think so.

24      Q.  Do you know who, if anyone, searched the front

25  area of Long Haul?

117

BARKLEY
Court Reporters

1      A.  No, I don't know specifically.  Other people

2   were involved maybe, and I'm not even sure how -- if

3   people -- normally what people would do someone would

4   say, okay, I'm checking this area so other officers would

5   know, okay, that officer is checking that area, I don't

6   have to.

7           So -- and I'm not sure because I was looking for

8   computers I'm not sure who did it or who said they were

9   check that area or I don't remember in either case.

10     Q.  Okay.  Do you know who, if anyone, searched the

11  Slingshot office or the office on the eastern side, the

12  office on the eastern side?

13     A.  The loft.

14     Q.  Other than what you described your activities

15  were?

16     A.  What I'm remember was when I went in to get the

17  computers out of there, Sergeant Alberts and Special

18  Agent Shaffer were in that room and were I believe

19  looking for any logs or papers in that room, but if

20  you're asking who searched that room, that's who I saw in

21  there when I went through to get the computers.

22     Q.  Okay.  Do you know whether it was Alberts,

23  Shaffer, or some other officer who cut the lock off that

24  door?

25     A.  No, I don't know.  It's what I said before about

118

BARKLEY
Court Reporters

1       Q.   Is this an accurate copy of the form that you

2   filled out?

3       A.   Yes.

4       Q.   What is this?

5       A.   This is a request for analysis computer forensic

6   analysis through the name title at the top, Silicon

7   Valley Regional Computer Forensic Laboratory.

8       Q.   Is this a document that you fill out to get them

9   to do forensic analysis of computers and digital media

10  that you've seized?

11      A.   Yes.

12      Q.   Okay.  So I want to direct your attention to box

13  sort of maybe a little less than halfway down and over to

14  the -- over to the right side of the paper where it says

15  privileged information, and then next to that it says

16  this includes any material specified under the privacy

17  protection act, for example, any material intended for

18  publication such as books, articles, or computer

19  programs, and there's a yes and no box there.

20           And did you write in that area the words "not

21  sure"?

22      A.   Yes.

23      Q.   When you wrote "not sure," did that mean that --

24  what did that mean?

25      A.   I don't remember exactly why I wrote that other

132

BARKLEY
Court Reporters

1      MS. ELLIS:  You know what, before you start can

2  we take a quick five-minute break.  There's something

3  here I have to take care of.

4      MS. GRANICK:  Certainly.

5      MS. ELLIS:  Thanks.

6      (Break taken.)

7      MS. GRANICK:  Back on the record.

8   Q.  Okay.  So I'm going to show you what's been

9  marked as Exhibit L which is Bates number -- do you have

10  it there, which is Bates number UC 381 to 387.  Do we

11  have another copy of that for me?  Do you recognize this?

12   A.  Yes.

13   Q.  Okay.  What is this?

14   A.  This is documentation provided to Silicon Valley

15  Regional Computer Forensic Laboratory to assist them with

16  their searching of the computers that we provided to

17  them.

18   Q.  Okay.  And is this a true and correct copy of

19  the e-mail that you sent?

20   A.  Yes.

21   Q.  You sent this to Sergeant Alberts on August 29,

22  2008?

23   A.  Yes.

24   Q.  I want to direct your attention to the second

25  page of the exhibit Bates No. 38 2 labeled at the bottom

135

BARKLEY
Court Reporters

1    page one of six.

2            Okay.  On the paragraph, the second paragraph

3    down in the middle slightly towards the top there's the

4    sentence that begins, "In an effort to prioritize the

5    seized evidence," do you see where I'm looking?

6        A.  Yes.

7        Q.  It says that -- or in this document you wrote in

8    an effort to prioritize the seized evidence you've

9    identified six computers as being the most likely

10   computers that the suspect would have used and that these

11   computers were the ones located in Internet room.  Is

12   that correct?

13       A.  Yes.

14       Q.  And you believed that these computers were most

15   likely to be the ones that the suspect would have used.

16   Why?

17       A.  Well, to explain why it was six, just a little

18   bit of background, the lab required us to limit the

19   number of computers that they would analyze.  They're

20   very busy, and they didn't want very many -- they

21   couldn't take all the computers.  They said you need to

22   cut it down to a smaller number.

23            So there were a couple possibilities to keep in

24   mind as far as which computer somebody might have used to

25   send out these threatening e-mail messages.

136

William Sasiske

BARKLEY
Court Reporters

1          Keep in mind the information we had was that the

2     IP address from the e-mail messages came from the

3     facility or the building, the location of the Long Haul

4     Info Shop.  So it could have been from any computer in --

5     within the Long Haul.  So it was a possibility that a

6     suspect could have been the person using computers in the

7     internet room as it was labeled or it's a possibility

8     that any of the other computers could have about used to

9     send the messages including somebody who was management

10    or a member of or belonging to the Long Haul itself using

11    any of the computers there.

12         Q.  Let me stop you for a second.  It wouldn't be

13    possible --

14              MS. ELLIS:  He needs to finish his answer.

15              MS. GRANICK:  I mean, it's a narrative.  Go

16    ahead.

17              THE WITNESS:  Okay.  So, I'm sorry, I lost track

18    a little bit there.

19    BY MS. GRANICK:

20         Q.  I could do --

21              MS. ELLIS:  She can read back where you were.

22              (Record read.)

23              THE WITNESS:  Okay.  So the possibility of it

24    being somebody who was involved with the Long Haul or

25    somebody who was involved with animal rights causes

137

BARKLEY
Court Reporters

1    whether it was Stop Cal Vivisection Group specifically or

2    somebody who identified with animal rights causes could

3    have been people sending these e-mails.

4         So as well as the possibility that somebody who

5    didn't have access to other places but that could have

6    used this room labeled the Internet room.  There were six

7    computers.  There were 11 computers in that room and when

8    I was going through there were six that seemed to be

9    actually plugged in or had connections to them.  I think

10   a number were set to the side that maybe looked like they

11   weren't used as often or as recently.  So those six stood

12   out from that room as being the most likely.  And in

13   terms of why it was computers from that room versus any

14   of the other rooms was just sheer probability I suppose

15   that more people may have traveled through that room than

16   other rooms if that was the room that was as they

17   referred to as their public room.

18        So just based on probability that might have

19   been the most likely.

20   BY MS. GRANICK:

21   Q.  Is it possible for a computer to send an e-mail

22   when it's not connected to the Internet?

23        MS. ELLIS:  Objection, foundation, speculation,

24   calls for facts not in evidence.

25        THE WITNESS:  In my experience with computers,

138

William Sasiske

BARKLEY
Court Reporters

1   it couldn't send an e-mail at the moment it's not

2   connected to the Internet.

3   BY MS. GRANICK:

4       Q.  Why would you seize computers that were not used

5   recently if you are investigating who sent e-mail threats

6   a month before the -- or two months before the warrant

7   was executed?

8           MS. ELLIS:  Objection, vague and

9   mis-characterizes his testimony.

10          THE WITNESS:  Yeah.  What do you mean by

11  computers that were not used recently?

12  BY MS. GRANICK:

13      Q.  Well, you said that there were computers you

14  took from the Internet room that did not appear to have

15  been used recently.  Is that correct?

16      A.  I don't remember the exact words I used, but I

17  suppose that, yeah, there were computers in that room

18  that were set to the side or didn't look like they were

19  in use at the moment that we served the warrant.

20      Q.  Uh-huh.  And you seized those computers at the

21  time even though they didn't look like they were in use.

22  Is that correct?

23      A.  Yes, we seized the computers.

24      Q.  And let's go to the end part of this paragraph.

25  The remaining three computers were seized from office

139

William Sasiske

BARKLEY
Court Reporters

1  areas that seemed more likely to belong to individual

2  groups rather than available for public use.  What did

3  you mean by individual groups in that sentence?

4      A.  Rather than anybody walking off the street,

5  somebody that has some membership with Long Haul or other

6  groups that Long Haul supported or affiliated with.

7      Q.  What did you think those groups were?  Which

8  groups were you referring to?

9      A.  I wasn't referring to any specific group other

10 than just that they were computers set aside.

11     Q.  Were you referring to East Bay Prisoner Support?

12     A.  No.  Like I said, I wasn't meaning to refer to

13 any specific group.

14     Q.  You weren't referring to Slingshot as a separate

15 group from Long Haul?

16     A.  I wasn't referring to Slingshot at all.

17     Q.  In the second part of the sentence rather than

18 available for public use, does that mean that these three

19 computers, as far as you understood, were not made

20 available to the public?

21     A.  I didn't know for certain because I didn't know

22 how they operated inside the Long Haul.  What I knew was

23 that Long Haul advertised on the website that they had an

24 Internet room, and there was a sign on the western loft

25 that read Internet room.  So seemed more likely that that

140

BARKLEY
Court Reporters

EXHIBIT 7

1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4

5   LONG HAUL, INC. and EAST BAY        )
    PRISONER SUPPORT,                   )
6                                       )
                       Plaintiffs,      )
7                                       )
         v.                             )   No. C 09-00168-JSW
8                                       )
    UNITED STATES OF AMERICA; MIGUEL    )
9   CELAYA; KAREN ALBERTS; WILLIAM      )
    KASISKE; WADE MacADAM; TIMOTHY      )
10  ZUNIGA; MIKE HART; LISA SHAFFER;    )
    and DOES 1 - 25,                    )
11                                      )
                       Defendants.      )
12  _____)

13

14

15

16

17          DEPOSITION OF TIMOTHY ZUNIGA, taken on behalf

18      of Plaintiffs, at One Market Street, 32nd Floor, San

19      Francisco, California, commencing at 12:58 p.m.,

20      Wednesday, July 28, 2010, before Donna J. Blum,

21      Certified Shorthand Reporter, No. 11133.

22

23

24

25

                              2

BARKLEY
Court Reporters

1   was working on.

2       Q.  So was all of your work there related to animal

3   rights investigations or rather investigations into

4   animal rights activism?

5       A.  In my capacity with the group, yes.

6       Q.  Are you familiar with Long Haul?

7           MS. ELLIS:  Objection, vague.

8           THE WITNESS:  Yes.

9   BY MS. HOFMANN:

10      Q.  Were you familiar with it prior to the

11  August 27, 2008, search?

12      A.  Yes.

13          MS. ELLIS:  Objection, vague.

14          THE WITNESS:  Yes.

15  BY MS. HOFMANN:

16      Q.  Can you recall how you first became familiar

17  with it?

18          MS. ELLIS:  Objection, vague.

19          THE WITNESS:  Specifically as to when and how,

20  no.

21  BY MS. HOFMANN:

22      Q.  On January 27, 2008, did you follow an

23  individual from an animal rights protest at a professor's

24  home to the Long Haul?

25      A.  I don't recall a specific date, but I did follow

                            20

BARKLEY
Court Reporters

1     A.  I knew that.  I apologize.  The question again

2  please.

3          (Record read.)

4          THE WITNESS:  I knew that there was an

5  investigation that indicated e-mails involved in a

6  criminal instance, there was evidence indicating e-mails

7  had originated from there, that location.

8  BY MS. HOFMANN:

9     Q.  Okay.  Did you ever look at the Long Haul

10  website prior to the August 27, 2008, search?

11     A.  Yes, I believe I did.

12     Q.  Okay.  Did you know that it had a room with

13  publicly accessible computers?

14     A.  At what point?

15     Q.  Before the search did you know that -- before

16  the August 27, 2008, search, did you know that the Long

17  Haul had a room with publicly accessible computers?

18     A.  I know, I believe I knew they had computers,

19  publicly accessible computers.

20     Q.  Okay.  Before the August 27, 2008, search, were

21  you aware that Long Haul had multiple tenants?

22     A.  No, ma'am.

23     Q.  Okay.  Before the 2008 -- sorry.  Before the

24  August 27, 2008, search, had you heard of Slingshot?

25     A.  Yes, ma'am.

26

Timothy Zuniga

BARKLEY
Court Reporters

1    Sandbrook at UCLA discovered this website which seems to

2    authored by one of our animal activists or someone very

3    close to them." Is that correct?

4        A. That is what I see the e-mail is saying, yes.

5        Q. Okay. Is it clear from that e-mail what website

6    is being referred to?

7        A. I see an e-mail address on the text, and I

8    believe that to be the one he's referring to.

9        Q. The text above in the e-mail above?

10       A. In the first paragraph.

11       Q. Okay. All right. Well, let's talk about that

12   e-mail now.

13           So this is the one that you sent on February 19,

14   2007, to Karen Alberts. Correct?

15       A. I believe so.

16       Q. Okay. Could you please read the first sentence

17   of that e-mail?

18       A. "On their home page they claim an affiliation

19   with the Long Haul on 3124 Shattuck Avenue here in

20   Berkeley."

21       Q. Okay. And the second sentence refers to a URL.

22   Is that correct? A link to a website.

23       A. Yes, ma'am.

24       Q. And the link to the website is HTTP colon slash

25   slash Slingshot dot TAO dot CA slash RC list dot PHP. Is

                                29

BARKLEY
Court Reporters

1   that correct?

2        A.  Yes, ma'am.

3        Q.  Do you know what that link refers to?

4            MS. ELLIS:  Objection, vague.

5            THE WITNESS:  It refers to Slingshot.

6   BY MS. HOFMANN:

7        Q.  So in February 2008 were you aware that

8   Slingshot had an affiliation with the Long Haul?

9        A.  Yes.

10       Q.  Okay.  Okay.  We are done with this one.

11       A.  With this item?

12       Q.  Yes, with this item.  Thank you.

13           Did you ever see the Slingshot newspaper before

14   the August 27, 2008, search?

15       A.  No, ma'am.

16       Q.  Okay.  Had you ever seen the Slingshot website

17   prior to the August 27, 2008, search?

18       A.  Yes, ma'am.

19       Q.  Okay.  Had you ever read any articles on that

20   website?

21       A.  I believe so.

22       Q.  Okay.  Do you remember what the articles were

23   about?

24       A.  No, ma'am, not specifically.

25       Q.  Okay.  Prior to the August 27, 2008, search had

                          30

BARKLEY
Court Reporters

1    you ever heard of East Bay Prisoner Support?

2        A.  I'd heard of them.

3        Q.  Okay.  Did you know what it was?

4        A.  I'd have to say no.

5        Q.  Okay.  So just to clarify, just so that I

6    understand you heard the name but you weren't sure what

7    it was?

8        A.  I did not know what they stated themselves to

9    be.

10       Q.  Okay.  Great.  Did you have any reason to

11   believe that Slingshot was connected to animal rights

12   activism?

13           MS. ELLIS:  Objection, foundation, vague.

14           THE WITNESS:  Rephrase please.

15   BY MS. HOFMANN:

16       Q.  Before the August 27, 2008, search you were

17   familiar with Slingshot the publication.  Did you have --

18   and we've established that you knew that it claimed an

19   affiliation with Long Haul.

20           Did you have any reason to believe that it was

21   involved in activism before -- I'm sorry, in animal

22   rights activism?

23           MS. ELLIS:  Objection, vague and

24   mis-characterizes his testimony and assumes facts not in

25   evidence.

                              31

BARKLEY
Court Reporters

```
 1              THE WITNESS:  You said publication?

 2              MS. HOFMANN:  Yes.

 3              THE WITNESS:  I don't believe that at the time

 4   in question I knew that they had a newspaper publication.

 5   I knew of an online.

 6   BY MS. HOFMANN:

 7        Q.  Online publication?

 8        A.  Okay, so online, yes.  I'm sorry.  Continue.

 9        Q.  Let's try this question another way.

10        A.  Okay.

11        Q.  Had you read any Slingshot articles that made

12   reference to animal rights activism?

13              MS. ELLIS:  Objection, vague and foundation.

14   Prior to the search or at any time?

15              MS. HOFMANN:  Prior to the search.

16              THE WITNESS:  I believe so.

17   BY MS. HOFMANN:

18        Q.  Okay.  Do you remember what those articles said?

19        A.  No, ma'am.

20        Q.  Okay.  So you mentioned that you had heard about

21   EBPS before the August 27, 2008, search.  Can you explain

22   what you'd heard about it?

23        A.  About it, I don't recall hearing about their

24   purpose.  I recall hearing or seeing flyers posted with

25   their name on it.
```

32

BARKLEY
Court Reporters

1          (Record read.)

2          MS. ELLIS:  And I would also have an objection

3   as to speculation, and I think that it's too confusing

4   using "you" to refer to the team.  Either "you" should be

5   Officer Zuniga and then if you want to ask about what the

6   team did, then you can ask about the team.

7          MS. HOFMANN:  What word would you prefer I use

8   for "the team"?

9          MS. ELLIS:  Just "the team."

10         MS. HOFMANN:  "The team."

11         MS. ELLIS:  Yeah, that's fine.

12  BY MS. HOFMANN:

13     Q.  Did the team consider going into the Long Haul

14  through the front door?

15         MS. ELLIS:  Objection, foundation, speculation.

16         THE WITNESS:  My recollection is I was not

17  involved.  I do not recall being involved in a discussion

18  of that nature at that point that you're asking about.

19  BY MS. HOFMANN:

20     Q.  Okay.  But ultimately the team entered the Long

21  Haul through the back door.  Is that correct?

22     A.  Yes, ma'am.

23     Q.  Was the door locked the back door -- was the

24  back door locked when the team arrived at the back door?

25     A.  I --

43

BARKLEY
Court Reporters

1          MS. ELLIS:  Objection, foundation, speculation.

2          THE WITNESS:  I was not there when the team made

3     initial entry at that point.

4     BY MS. HOFMANN:

5          Q.  When did you arrive?  When did you enter the

6     building?

7          A.  Some --

8          MS. ELLIS:  Objection, vague.

9          THE WITNESS:  Subsequent to the -- subsequent to

10    the team acquiring the rear access.

11    BY MS. HOFMANN:

12         Q.  Okay.  How long afterward -- how long after the

13    team entered the building did you enter the building?

14         MS. ELLIS:  Objection, foundation, speculation.

15         THE WITNESS:  I don't know precisely at what

16    point they physically entered.

17    BY MS. HOFMANN:

18         Q.  Uh-huh.

19         A.  So I can't really be sure.

20         Q.  Were you part of the team at that point?

21         MS. ELLIS:  Objection, vague.

22         THE WITNESS:  Of the -- the ARG team, yes,

23    Animal Rights Group.

24    BY MS. HOFMANN:

25         Q.  That's not what I meant.  I meant the search

44

1    team, the team of people who performed the search at the

2    Long Haul.

3         A.  Yes, ma'am.

4         Q.  Okay.  So you entered the building along with

5    the rest of that team.  Is that right?

6              MS. ELLIS:  Objection, foundation, speculation,

7    vague.

8              THE WITNESS:  I -- I was not there when they

9    initially entered.  At some point I was directed to go

10   join them subsequent to their finding this entry.

11   BY MS. HOFMANN:

12        Q.  Okay.  How long after they entered the building

13   did you enter the building?

14             MS. ELLIS:  Objection, foundation, speculation.

15             THE WITNESS:  I'm really not sure.  Again, I was

16   not physically there when they physically entered.

17   BY MS. HOFMANN:

18        Q.  Okay.  Could you describe what you did after you

19   entered the Long Haul through the back door?  What was

20   the first thing you did?

21        A.  Met up with the team and performed, assisted in

22   performing a protective sweep of the building.

23        Q.  And did you -- did you walk through the hallway

24   to the front room to perform that sweep?

25             MS. ELLIS:  Objection, vague.

45

Timothy Zuniga

BARKLEY
Court Reporters

1      Q.  Okay.  Were you in the room that was the one

2  that had computers in it that were available to visitors

3  of Long Haul?

4        MS. ELLIS:  Objection, vague.

5        THE WITNESS:  Possibly at some point, yes.

6  BY MS. HOFMANN:

7      Q.  Okay.  Do you -- did you assist with the search

8  of that room?

9        MS. ELLIS:  Objection, vague.

10       THE WITNESS:  A little more specific please.

11  BY MS. HOFMANN:

12      Q.  Did you --

13      A.  In what way assist?

14      Q.  Well, did you -- did you help to take computers

15  out of that room?

16      A.  No, ma'am.

17      Q.  Okay.

18      A.  Correction.  I -- I certainly would not have

19  been involved in the technical removal of the computers.

20      Q.  Okay.

21      A.  But the physical pick the stuff from point A to

22  point B, I'm sure I probably -- I -- might have been

23  something like that, so.

24      Q.  Okay.  Do you remember looking for logs in that

25  room, logs that would indicate that people had used those

48

Timothy Zuniga



1    computers?

2         A.   Since I'm not certain which the Internet room

3    is, I'd have to say I'm not -- I don't -- I don't know.

4         Q.   So when I discuss the Internet room, I am

5    talking about a room that was up a set of stairs and on

6    the other side of the office space from the Slingshot

7    office.  Does that help?

8         A.   Forgive me.  I'm just trying to picture this in

9    my mind.  The most honest answer I can give is I don't

10   recall one way or the other if I might have.  It is

11   possible.  I don't remember.

12        Q.   Okay.  Did you ever enter a room that had a sign

13   on it that said East Bay Prisoner Support?

14        A.   I don't recall doing so, ma'am.

15        Q.   Okay.  Did you ever see the sign that said East

16   Bay Prisoner Support?

17        A.   I don't recall seeing the sign.

18        Q.   Okay.

19        A.   As you described, no.

20        Q.   Okay.  Did you help to take the lock off the

21   door of that office?

22        A.   Of which office, ma'am?

23        Q.   Well, let me ask you this:  Did you help to

24   remove the locks from any doors within the Long Haul

25   premises?

49

Timothy Zuniga


BARKLEY
Court Reporters

1        A.  Yes, ma'am.

2        Q.  How many how locks?

3        A.  At least one.

4        Q.  At least one.

5            Could you explain how you removed it?

6        A.  I -- I can't recall specifically if I removed a

7    lock or if I forced entry to a door.  I can't remember

8    which.

9        Q.  Could you explain the difference?

10       A.  This might be different for some.  When you say

11   remove the lock, visually that indicates to me a padlock

12   or similar, and using a tool like bolt cutters or a

13   screwdriver to cut or pry the lock off.  And I can't

14   remember if I did that or used physical force to open the

15   door --

16       Q.  Okay.

17       A.  -- on this instance.  I can't remember which I

18   might have done.

19       Q.  Would it be fair to say that you did one of

20   those two things for at least one lock?

21       A.  Yes, it's possible I did one or the other.

22       Q.  Okay.  For one lock, for more than one lock?

23       A.  I recall one lock.  I don't know if I did any

24   other lock.  If I was involved in any other, I don't

25   recall.

50

Timothy Zuniga

BARKLEY
Court Reporters

1    Q.  Okay.  So I'm going to show you something marked

2  Exhibit L, which is this picture (indicating).

3        Do you recognize this?

4    A.  No, ma'am.

5    Q.  Okay.

6    A.  I recognize the door, but I don't recognize the

7  sign.

8    Q.  Did you see that door during the search?

9    A.  I remember walking by the area that this door is

10  in.

11    Q.  Okay.  Do you recall whether you removed or

12  forced entry -- removed the lock or forced entry through

13  that door?

14    A.  I don't recall this -- I don't recall doing that

15  in this area.

16    Q.  Okay.  And you do not recall seeing that sign.

17  Is that correct?

18    A.  Yes, ma'am.

19    Q.  Okay.  Do you recall going up a set of stairs to

20  an office in the upper loft area of the premises?

21    A.  That could be a couple of -- if you could

22  rephrase.  There's a couple of memories that could fit

23  that.  I don't know which specifically.

24    Q.  Let me ask you this:  Is there a room that you

25  recall searching?

51

BARKLEY
Court Reporters

1      A.  Yes, ma'am.

2      Q.  Okay.  Could you describe how you got to that

3  room please?

4      A.  Upstairs -- it's up the stairs leading towards

5  the more east, eastern part of the space.

6      Q.  Okay.  And could you describe that space up the

7  stairs?

8      A.  In what context?

9      Q.  Well, when you got to the top of the stairs

10  could you tell me what that space up there looked like?

11     A.  I remember some furniture and then the -- it was

12  the door to another room.

13     Q.  Was that door locked?

14     A.  Yes, ma'am.

15     Q.  Okay.  I'm going to show you a photograph

16  labeled Exhibit I.  Do you recognize this?

17     A.  Yes, ma'am.

18     Q.  Could you please tell me what that is?

19     A.  That is the door I'm recalling from my memory

20  that we just discussed.

21     Q.  Excellent.  Thank you.

22         Tell me do you recall seeing that banner above

23  the door?

24     A.  No, ma'am.  At the time of the search warrant?

25     Q.  At the time of the search.

52

Timothy Zuniga

BARKLEY
Court Reporters

1       A.  No, ma'am, I do not.

2           MS. ELLIS:  I'm sorry.  What letter is this?

3           MS. HOFMANN:  That is "I."

4       Q.  Did you either remove the lock from that door or

5   force entry to get beyond that door?

6       A.  This is the door in my memory.  I don't remember

7   exactly how but this is the door that my mind is

8   recalling.

9       Q.  Okay.  But you entered that room.  Is that

10  correct?

11      A.  Yes, ma'am.

12      Q.  Okay.  I'm going to show you a photograph marked

13  Exhibit J.  Do you recognize this is that, the interior

14  of that room?

15      A.  It -- it doesn't look familiar to me, ma'am.

16      Q.  Okay.  Could you please tell me what you did

17  when you entered that room?

18          MS. ELLIS:  Objection, vague.

19          THE WITNESS:  At what point, ma'am?

20  BY MS. HOFMANN:

21      Q.  Did you search the cabinets in that room?

22      A.  At some point I began assisting in searching the

23  contents of those cabinets I believe.

24      Q.  Do you remember what you found in those

25  cabinets?

53

Timothy Zuniga

BARKLEY
Court Reporters

1      A.  I remember searching for logs, documents,

2   described in the warrant, and in -- in there I -- there

3   were various items that didn't fit that and I did not --

4   when I saw an item that didn't fit the bill or didn't fit

5   the description in the warrant, I searched on to other

6   items, different items.

7      Q.  Did you find any logs in that office?

8      A.  My recollection is I did not.

9      Q.  Okay.  Did you find any photographs in that

10  office?

11     A.  Yes, ma'am.

12     Q.  How many photographs did you find?

13     A.  I saw a lot of photographs all over the place,

14  both in the cabinet and strewn about.

15     Q.  Did you look through those photographs?

16     A.  Some of them, yes.

17     Q.  What did they show?

18     A.  The photographs that caught my attention, some

19  of them displayed what I believed to be evidence of

20  possible criminal activity not related to what we were

21  searching for.

22     Q.  Okay.  Did you call in Special Agent Shaffer to

23  look at these photographs?

24     A.  I don't recall calling her, but at some point

25  she did join me.

54

BARKLEY
Court Reporters

1      Q.  Okay.  And did she look through those

2  photographs?

3      A.  I showed her some of the photographs, brought

4  them to her attention.

5      Q.  Okay.  Did you seize any of those photographs?

6      A.  No, ma'am.

7      Q.  Okay.  Did you find any computers in that

8  office?

9      A.  My -- my recollection is that there were --

10  there was at least one computer in that office.

11      Q.  Did you seize that computer?

12      A.  Point of clarification, the technical IT.

13      Q.  Right.  I mean like physically take that

14  computer away?

15      A.  I don't remember taking it from that office to

16  another location.  It is possible that at some point when

17  we removed the computers, plural, from the location that

18  that could have been one of the computers I physically

19  removed.

20      Q.  Okay.  Did you find any CDs in that office?

21      A.  I have no recollection of finding any CDs in the

22  office.

23      Q.  Did you find any -- any other computer disks in

24  that office?

25      A.  I have no recollection of finding such items.

55

BARKLEY
Court Reporters

1      Q.  Okay.  Is there anything else you can remember

2   seeing in that office that you thought was responsive to

3   the search warrant?

4      A.  My recollection is to the best of my memory, no.

5      Q.  Okay.  Did you realize at the time of the search

6   that this office was the place that produced the

7   Slingshot publication that you were familiar with?

8          MS. ELLIS:  Objection, vague and assumes facts

9   not in evidence.

10          THE WITNESS:  I'm sorry.  Please read back the

11   question.

12          (Record read.)

13          THE WITNESS:  The answer is no, ma'am.

14   BY MS. HOFMANN:

15      Q.  Did you see anything in the office that said

16   Slingshot?

17      A.  I do not recall seeing anything like that,

18   ma'am.

19      Q.  Did you see any publications stored in that

20   office?

21          MS. ELLIS:  Objection, vague.

22          MS. HOFMANN:  Excuse me.  Let me rephrase.

23      Q.  Did you see any Slingshot publication stored in

24   that office?

25          MS. ELLIS:  Objection, vague.

Timothy Zuniga

BARKLEY
Court Reporters

1      Q.  Did you open the drawers of that cabinet?

2          MS. ELLIS:  Objection, vague.

3          THE WITNESS:  My recollection is at least one

4  drawer was ajar.  But I probably opened a drawer I'm

5  sure.

6  BY MS. HOFMANN:

7      Q.  Did you see photographs inside that drawer?

8      A.  Yes, ma'am.

9          MS. ELLIS:  Inside the drawer that was ajar?

10         MS. HOFMANN:  Inside the drawer that he opened.

11         MS. ELLIS:  He says that he saw a cabinet and

12 that at least one drawer was ajar and may have opened

13 another drawer.  So I'm just trying to clarify which one.

14         MS. HOFMANN:  Okay.

15     Q.  Did you see photographs inside any drawer?

16     A.  Yes, ma'am.

17     Q.  Okay.  Did you remove those photographs from the

18 drawer?

19     A.  Please explain what you mean by "remove."

20     Q.  Well, I'm curious, did you flip through them in

21 the drawer?  Did you pick them up, take them out, and put

22 them on the desk?  How did that work?

23     A.  I don't recall picking those up and putting them

24 on the desk.  I don't recall that.

25     Q.  So did you look through them in the drawer?

63

BARKLEY
Court Reporters

1      A.   That's my recollection.

2      Q.   About how many photographs were in the drawer?

3 Can you remember?

4      A.   I have no idea.

5      Q.   How much time did you spend looking through

6 them?

7      A.   Looking through?

8      Q.   The photographs.

9      A.   Just the photographs.

10           I can't calculate which portion of time was

11 spent looking at photographs and looking at other items.

12 I would -- I would estimate the time, to the best of my

13 recollection the time I was in the room reviewing items

14 might have been about 15 minutes.

15      Q.   Okay.  Were the photographs in the drawer in a

16 folder?

17      A.   My recollection is everything in there was so

18 disorganized that there might have been some, but I -- my

19 memory is they were just loose.  A lot of them were

20 strewn about.

21      Q.   Was there anything in the drawer aside from

22 photographs?

23      A.   Yes, ma'am.

24      Q.   Like what?

25      A.   Papers.

Timothy Zuniga

BARKLEY
Court Reporters

1     Q.  Okay.  Did you look through those papers?

2     A.  Looked at them, reviewed them to see if they fit

3 the scope of the warrant.

4     Q.  Okay.  Do you have any estimate how many

5 photographs might have been in that drawer?

6     A.  No, ma'am.  My recollection is locked.

7     Q.  Locked.  Do you have any sense how many photos

8 you had a chance to look at?

9     A.  I can say I didn't look at all the photos that I

10 observed, but I don't recall -- I don't think I can

11 accurately recall how many I actually reviewed.

12     Q.  Okay.  Were -- during the time you were in that

13 office, were any of your -- any other members of the

14 search team in that office as well?

15     A.  Yes, ma'am.

16     Q.  Could you please say who?

17     A.  FBI Special Agent Lisa Shaffer.  I believe that

18 Sergeant Alberts, Sergeant Karen Alberts came up there at

19 some point.

20     I can't recall specifically which other officer,

21 but I seem to think someone else came in at some point.

22     At some point I was directed to go elsewhere to

23 assist with something.

24     Q.  When you were reviewing photos, could you please

25 estimate just a rough number how many you saw?  I mean,

Timothy Zuniga

BARKLEY
Court Reporters

1  was it 10?  Was it 20?

2         MS. ELLIS:  Objection, asked and answered.

3         THE WITNESS:  Please clarify what you mean by

4  saw.  As in --

5         MS. HOFMANN:  Not -- how many you reviewed.

6         MS. ELLIS:  Objection, asked and answered.

7         THE WITNESS:  I'm not sure I can accurately

8  recall.

9  BY MS. HOFMANN:

10         Q.  Not even an estimate?

11         A.  To the best of my recollection, I'll approximate

12  50 or less that I reviewed.  Not all of them, you know,

13  were of any -- most of them were not of any relevance to

14  me in the context of my duties.

15         Q.  Okay.  Well, Special Agent Shaffer was in the

16  room with you.  What did you observe her do?

17         A.  I don't think I actually observed her.  I knew

18  she was there.  I believe she was reviewing files as

19  well.

20         Q.  Okay.  Did she review photos other than the ones

21  that you directed her to?

22         A.  I have no idea.

23         Q.  Okay.  Do you know whether she went through the

24  drawers of the cabinet?

25         A.  I can't recall if I saw her doing that or not.

Timothy Zuniga

BARKLEY
Court Reporters

| | |
|---|---|
| **From:** | tzuniga@berkeley.edu |
| **Sent:** | Tuesday, February 19, 2008 12:21 PM |
| **To:** | kalberts@berkeley.edu |
| **Subject:** | Re: [Fwd: Activist Website Article - Berkeley/LA Connection] |

>Sarg,
>      On their home page they claim an affiliation with The Long Haul on
>3124 Shattuck Ave here in Berkeley.  They have a "Radical contact
>list" on their site (http://slingshot.tao.ca/rclist.php)
>
>I made a list of locations here in Berkeley, Oakland, San Franciscco and
>Santa Cruz in case we need this for reference in furture or current
>investigations.  I put it in the N drive under AREWG/Subjects and
>Victims/Slingshot Radical Contact list.
>
>Please contact me with any questions.  Thank you.

Corporal Timothy J. Zuniga
Crime Prevention Unit
UC Berkeley Police Department
1 Sproul Hall
Berkeley, Ca 94720
Phone 510-642-3722
Fax 510-642-6434

This e-mail communication and any attachments may contain confidential
and privileged, or otherwise protected, information for the use of the
designated recipients named above only. If you are not the intended
recipient, you are hereby notified that you have received this
communication in error and that any review, disclosure, dissemination,
distribution or copying of it or its contents is prohibited and
unauthorized. If you have received this communication in error, please
notify me immediately by replying to this message and deleting it from
your computer. Thank You.


> FYI!
>
> Karen
>
> -------------------------- Original Message --------------------------
> Subject: Activist Website Article - Berkeley/LA Connection
> From:    "Richard C. Van Sluyters" <rcvs@berkeley.edu>
> Date:    Tue, February 19, 2008 11:30 am
> To:      Animal Issues Committee:;
> Cc:      Animal Issues Committee-copies:;
> --------------------------------------------------------------------------
>
> Dear Colleagues,
>
> John Sandbrook at UCLA discovered this website, which seems to be
> authored by one of our animal activists or someone very close to
> them.  It contains a number of interesting statements, including a
> comparison of research at UC Berkeley to that
> against UCLA.  If any of us had any doubts about whether the two
> campaigns are not at least watching each other, this should dispel
> them.
>
> I've forwarded it to UCPD, OGC and the FBI as well.
>
> -Rick



EXHIBIT
7/28/10
D
ZUNIGA

> --
> Richard C. Van Sluyters, OD, PhD
>       Professor and Associate Dean for Student Affairs,
>             School of Optometry
>       Chair, Animal Care and Use Committee
>       University of California
>       Berkeley, CA 94720-2020
>
>       Associate Dean's Office: (510) 642-9537
>       ACUC Office: (510) 642-8855
>       Personal: (510) 642-1235
>       Facsimile: (510) 642-2281
>
> --
> Sergeant Karen Alberts
> UC Berkeley Police Department
> Criminal Investigations Bureau
> 1 Sproul Hall
> Berkeley, CA 94720
> (510) 642-6760 (24 hr. number)
> (510) 642-0482 (Voice Mail)
> (510) 642-6434 (Fax)
>

UC 000615

