EXHIBIT 8

1                UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3                  SAN FRANCISCO DIVISION

4

5    LONG HAUL, INC. and EAST BAY        )
     PRISONER SUPPORT,                   )
6                                        )
                         Plaintiffs,     )
7                                        )
         v.                              )   No. C 09-00168-JSW
8                                        )
     UNITED STATES OF AMERICA; MIGUEL    )
9    CELAYA; KAREN ALBERTS; WILLIAM      )
     KASISKE; WADE MacADAM; TIMOTHY      )
10   ZUNIGA; MIKE HART; LISA SHAFFER;    )
     and DOES 1 - 25,                    )
11                                       )
                         Defendants.     )
12   _____)

13

14

15

16

17        DEPOSITION OF LISA SHAFFER, taken on behalf

18    of Plaintiffs, at One Market Street, 32nd Floor, San

19    Francisco, California, commencing at 9:22 a.m.,

20    Wednesday, July 28, 2010, before Donna J. Blum,

21    Certified Shorthand Reporter, No. 11133.

22

23

24

25

                              2

BARKLEY
Court Reporters

```
 1       A.   Six years.

 2       Q.   Have you --

 3            What position do you currently have with the

 4   FBI?

 5       A.   I'm a special agent.

 6       Q.   Have you had that same position the entire six

 7   years you were with the FBI?

 8       A.   Yes.

 9       Q.   And you participated in the August 28 -- excuse

10   me, the August 27, 2008, search of the Long Haul

11   premises.  Correct?

12            MR. LEE:  Just object, it's vague as to

13   "participate."

14   BY MR. ZIMMERMAN:

15       Q.   Did you participate in a search on August 27,

16   2008?

17            MR. LEE:  Same objection.

18            THE WITNESS:  Yes.

19   BY MR. ZIMMERMAN:

20       Q.   Can you characterize what activities you

21   participated in on August 27, 2008, just generally?

22       A.   Which part?

23       Q.   Well, obviously, we'll be getting into detail on

24   it in a little bit, so I'll circle back to that.

25            Do you have a specific area of expertise with
```

Lisa Shaffer

BARKLEY
Court Reporters

1       Q.  And when you say "they," who are you referring

2   to?

3       A.  UC Berkeley.

4       Q.  The UC Berkeley Police Department --

5       A.  Police department, correct.

6       Q.  Okay.

7           MR. LEE:  Let him finish the question all the

8   way and then answer.

9           THE WITNESS:  Okay.

10  BY MR. ZIMMERMAN:

11      Q.  How did you come to participate in the

12  investigation that led to the August 27, 2008, search of

13  the Long Haul premises?

14          MR. LEE:  That assumes facts not in evidence,

15  lacks foundation.

16  BY MR. ZIMMERMAN:

17      Q.  Did you participate in the investigation that

18  led up to the August 27, 2008, search of the Long Haul

19  premises?

20      A.  No.

21      Q.  How was it that you came to participate in the

22  execution of the search warrant?

23      A.  I was contacted by Sergeant Alberts from UC

24  Berkeley Police Department.

25      Q.  Okay.  Do you remember when that was when you

14

Lisa Shaffer

1   were contacted by Karen Alberts?

2        A.   Probably in early August, middle of August.

3        Q.   And how did Karen Alberts contact you?

4        A.   The first time was by phone.

5        Q.   Okay.  And what did you discuss with her on that

6   -- during that conversation?

7        A.   I remember her saying that they were going to

8   get a search warrant and if we would be able to help in

9   that.

10        MR. ZIMMERMAN:  Can you read back that answer

11   please?

12        (Record read.)

13   BY MR. ZIMMERMAN:

14        Q.   What did you understand the -- Karen Alberts

15   asking you for help to mean?

16        A.   They needed assistance in conducting the search.

17        Q.   And what did you -- what did you understand

18   needing assistance to mean?

19        MR. LEE:  This is at the time of the phone call?

20        MR. ZIMMERMAN:  This is at the time of the phone

21   call.

22        MR. LEE:  Thank you.

23        THE WITNESS:  We would go and help them at the

24   Long Haul and help them search the premises.

25   BY MR. ZIMMERMAN:

15

Lisa Shaffer

BARKLEY
Court Reporters

1    the Privacy Protection Act?

2         A.   No.

3         Q.   At the time of the search of the Long Haul

4    premises on August 27, 2008, were you aware of the Long

5    Haul Info Shop?

6         A.   I'd heard about it.

7         Q.   And what had you heard?

8         A.   That activists would go there for meetings,

9    discussions, hang out.

10        Q.   Do you remember who you heard such information

11   from?

12        MR. LEE:   I can't tell, but it's possible that

13   that would require her to divulge protected information.

14   If it does, I'm instructing her not to answer the

15   question.

16        THE WITNESS:   I believe some of it may have been

17   from UC Berkeley PD.

18   BY MR. ZIMMERMAN:

19        Q.   Okay.  And at the time of the same search, were

20   you aware of the East Bay Prisoner Support?

21        A.   No.

22        Q.   At the time of the search were you aware of

23   Slingshot?

24        A.   No.

25        Q.   Okay.  Besides the information that was given to

23

Lisa Shaffer

BARKLEY
Court Reporters

1  you by UC Berkeley Police Officers, did you -- were you

2  aware of any other information regarding the Long Haul

3  Info Shop at the time of the raid?

4       A.  No.

5       Q.  So if I'm understanding your testimony about

6  Slingshot correctly, would it be correct to say that you

7  were not aware that Slingshot was a publication at the

8  time of the search?

9       A.  I was aware that it was a publication.

10      Q.  Okay.

11      A.  I'm sorry, yes.

12      Q.  What did you know about Slingshot at the time of

13  the raid?

14      A.  I didn't know much about it other than it was

15  just a publication of news articles.

16      Q.  And where did you gain that information?

17      A.  I don't remember who had told me about it.

18      Q.  Did you believe that you were told that

19  Slingshot was a publication or --

20          Well, let's start with that question.

21          Do you believe that your information about

22  Slingshot was based on the fact that someone had told you

23  that Slingshot was a publication?

24      A.  Yes.

25      Q.  Had you read any material published by Slingshot

                              24

BARKLEY
Court Reporters

1    Q.  Okay.  What approximate dates did you have

2  conversations with Karen Alberts about your requested

3  assistance with the August 27 search?

4         MR. LEE:  Asked and answered.

5         Are these the conversations she's already

6  testified about?

7         MR. ZIMMERMAN:  Correct.  I don't believe she

8  mentioned specific dates.

9         MR. LEE:  I'm sure she did.  I was listening.

10        THE WITNESS:  The first time maybe around

11  August, beginning of August.  The second e-mail was, I

12  believe, a week before the search.

13  BY MR. ZIMMERMAN:

14    Q.  Did you have any other communication with anyone

15  besides Karen Alberts at the Berkeley Police prior to the

16  August 27 search?

17    A.  In regards to the search?

18    Q.  Yes.

19    A.  I don't believe so, no.

20    Q.  Did you receive any materials in preparation for

21  the August 27 search prior to August 27?

22    A.  No.

23    Q.  Okay.  So is it true that you had a pre-search

24  meeting with other police -- Berkeley Police Officers

25  prior to the search on August 27?

26

BARKLEY
Court Reporters

1    A.  It would have been the morning of it.

2    Q.  Where did that meeting take place?

3    A.  UC Berkeley Police Department.

4    Q.  And what was the purpose of that meeting?

5    A.  It was a briefing --

6        MR. LEE:  Calls for speculation.

7        THE WITNESS:  It was a briefing about what was

8    gonna happen.  I think it was Detective Kasiske who ran

9    it, told us a little bit about the case, the

10   investigations, and where we would be going.

11   BY MR. ZIMMERMAN:

12   Q.  What did Detective Kasiske tell you about the

13   case?

14   A.  I believe it was in regards to threatening

15   e-mails that were sent to Berkeley researchers, professor

16   researchers.

17   Q.  Do you remember what the dates of those

18   threatening e-mails were?

19   A.  I don't remember.

20   Q.  Who else was present at that meeting?

21   A.  Sergeant Karen Alberts, Detective Kasiske,

22   Officer Zuniga, Mike Hart, and I think Officer MacAdam.

23       MR. ZIMMERMAN:  I'd like to give the witness the

24   exhibit that's been marked as Exhibit E.

25       (Discussion off the record.)

27

Lisa Shaffer

BARKLEY
Court Reporters

1    A.  Yes.

2    Q.  What materials did Detective Kasiske inform you

3  were to be seized during the August 27 search of the Long

4  Haul premises?

5    A.  I believe computers, there were hard drives, log

6  books, anybody who may have used the computers, may have

7  said something about CDs or electronic material.

8    Q.  Besides computers, hard drives, log books, CDs,

9  and other electronic storage materials, was there

10  anything else that Detective Kasiske informed you was to

11  be seized during the August 27 search?

12    A.  Not that I remember.

13    Q.  What areas did Detective Kasiske inform you were

14  to be searched at the Long Haul premises?

15    A.  I don't remember him saying any specific area.

16    Q.  Okay.  Did Detective Kasiske inform you that any

17  areas were off limits as part of the search?

18    A.  No.

19    Q.  Did Detective Kasiske inform you that the Long

20  Haul premises might contain offices that belonged to

21  other persons or entities?

22    A.  No.

23    Q.  Did Detective Kasiske provide any instruction

24  regarding what to do if -- if during the search offices

25  were discovered that belonged to other entities or

36



1    persons?

2        A.  No.

3        Q.  At the time of the raid, were you aware of any

4    particular reason that the Berkeley Police chose

5    August 27 as the date to search the Long Haul premises?

6        A.  I don't know why they picked that date.

7            MR. ZIMMERMAN:  Can we go off record for a

8    second.

9            (Break taken.)

10           (Deposition Exhibit I was marked for

11           identification.)

12           MR. ZIMMERMAN:  Back on the record.

13       Q.  Besides attending the meeting on the morning of

14   August 27, did you do anything else to prepare for the

15   August 27 search?

16       A.  No.

17       Q.  You familiar with the Animal Rights Working

18   Group at the Berkeley Police?

19       A.  Yes.

20       Q.  What can you tell me about the Animal Rights

21   Working Group?

22       A.  It was a group of law enforcement agencies that

23   was put on by UC Berkeley Police Department.  We come in

24   and talk about instances that had occurred at animal

25   researchers' homes, ways we could assist them.  They

37

Lisa Shaffer

BARKLEY
Court Reporters

1      A.  I don't remember exactly what time it was.

2      Q.  Okay.  Did you attempt to contact anyone

3   associated with Long Haul in order to obtain entry to the

4   Long Haul premises?

5      A.  No.

6      Q.  Did you witness any of the other officers who

7   participated in the search attempt to contact anyone

8   associated with Long Haul to obtain entry into the

9   premises?

10      A.  No.

11      Q.  How did the officers -- rephrase that.

12          How did you obtain entry into the Long Haul

13   premises?

14      A.  Through the back.

15      Q.  Was the door unlocked?

16      A.  There was -- the door that we were at, the back,

17   I believe it may have been locked.

18      Q.  And how -- how did the officers obtain entry

19   through this locked door?

20      A.  I think they were able to open it from the

21   outside because it wasn't a door that went into the Long

22   Haul.  It was a separate door.  So I think they were just

23   able to open it from the inside.

24      Q.  Did you witness any officer break a lock to

25   obtain entry through -- into the Long Haul?

                            49

                        Lisa Shaffer

1       A.   No.

2       Q.   -- in the Long Haul?

3            I'll ask that more clearly.

4            Was any person found in the Long Haul during the

5   protective sweep?

6       A.   No.

7       Q.   Once the protective sweep was over, what did you

8   do next?

9       A.   I just stood off to the side.  Detective MacAdam

10  was doing some videotaping, so we were just trying to

11  stay out of the way.

12      Q.   And how long did you stand off to the side?

13      A.   Maybe a minute or two.  However long it took him

14  to videotape.

15      Q.   So Detective MacAdam was videotaping the search.

16  Is that correct?

17      A.   As I remember it, yes.

18      Q.   And you waited for Detective MacAdam to

19  videotape the premises as you stood to the side.  Is that

20  correct?

21      A.   Yes.

22      Q.   What did you do next?

23      A.   After he was done I believe we went up to the

24  front with Sergeant Alberts.  There was a counter up

25  front.  I think that's where we began searching.  There

51

BARKLEY
Court Reporters

1  was a shelf underneath the counter.  I think there was

2  what I thought was a log book, looked like a log book.  I

3  looked through the first four pages, closed the book, and

4  put it right back.

5      Q.  What did you -- what was on the three, four

6  pages that you looked at in the log book?

7      A.  I don't remember what was written in it.

8      Q.  Did you seize the log book as part of the

9  search?

10      A.  No.

11      Q.  What happened to the log book?

12      A.  I put it back where I found it.

13      Q.  And why did you put it back?

14      A.  I believe there was nothing in there of value we

15  were looking for.

16      Q.  Did you have particular instructions for things

17  that you were in particular to look for as part of the

18  search?

19      A.  No.

20      Q.  What was your understanding of what your -- of

21  what you were to do as part of the search?

22      A.  To search for the items that were listed in the

23  search warrant.

24      Q.  And did the items to be searched include log

25  books?

Lisa Shaffer

BARKLEY
Court Reporters

1  paper, Exhibit I, and indicated half of that.

2  BY MR. ZIMMERMAN:

3      Q.  Did you know at the time what was on those cards

4  that Sergeant Alberts was looking on?

5      A.  No.

6      Q.  Did you -- did you determine afterwards what

7  those cards were?

8      A.  No.

9      Q.  Was Sergeant Alberts --

10         Did Sergeant Alberts look at anything else

11  besides those cards that you were aware of?

12      A.  I'm not aware of.

13      Q.  Any other officers in that -- that were in that

14  room besides Sergeant Alberts at that time?

15      A.  No.

16      Q.  So what did you do next?

17      A.  Well, I stood aside waiting after I'd looked at

18  the book and then Officer Zuniga had called me up

19  upstairs.

20      Q.  And what did you do in response to Sergeant --

21  or to Zuniga calling you?

22      A.  I went upstairs to see what he needed.

23      Q.  And what did he say that he needed?

24      A.  He didn't say he needed.  I walked in -- I

25  walked up to where he was inside an office, and he began

                        55

BARKLEY
Court Reporters

1  to show me some photographs.

2      Q.  Okay.  And can you describe those photographs?

3      A.  They were photographs of Seattle, one of a

4  police car.  The others that I remember looking at were

5  during a war demonstration that was held in Seattle.

6          (Discussion outside the record.)

7  BY MR. ZIMMERMAN:

8      Q.  Did Detective Zuniga indicate to you why he had

9  selected these photographs for you to look at?

10     A.  I believe he said because I had just come from

11  the Seattle office.

12     Q.  Did he say anything else?

13     A.  I don't remember if he did.

14     Q.  Were photographs on the list of items to be

15  searched that was included with the search warrant?

16     A.  I don't remember if they were.

17     Q.  What did you do after reviewing the photographs

18  that Detective Zuniga showed you?

19     A.  When we were in the office, he was at the file

20  cabinet looking at the photos, I had opened up the bottom

21  file cabinet.

22     Q.  Okay.  Can you describe the room that this took

23  place in?

24     A.  It was kind of a small office.  I only saw it

25  kind of went again like in an L shape, so I only saw the

56

Lisa Shaffer

BARKLEY
Court Reporters

1      A.  No.

2      Q.  Did you find any CDs in this drawer?

3      A.  No.

4      Q.  Is there any particular reason that you looked

5  in -- scratch that.

6          Did you have any reason to believe that there

7  would be log books in this file cabinet?

8          MR. LEE:  Objection; overbroad, legal

9  conclusion.

10         THE WITNESS:  There could be.

11  BY MR. ZIMMERMAN:

12     Q.  Was there anything about the room that led you

13  to believe that it was more likely than not there would

14  be log books in this file cabinet?

15     A.  He appeared to be some type of manager's office,

16  so it's possible it could have been.

17     Q.  Other than after looking in the file cabinets,

18  what did you do next?

19     A.  Then I walked around Zuniga.  He was standing by

20  the file cabinets.  I walked around him and then walked,

21  walked a little bit further in.  I saw on the wall some

22  publications and then walked out.

23     Q.  Do you remember what publications there were up

24  on the wall?

25     A.  I just saw them.  I didn't seal the front cover

59

BARKLEY
Court Reporters

1  of them or anything.  They were all on the --

2      Q.  Could you describe the way the publications

3  existed on the wall?

4      A.  They weren't -- it's not like the cover was

5  facing you.  They were on the sides, so they were just

6  (indicating).

7      Q.  Would it be fair to describe them as --

8          Well, how would you describe the way in which

9  they were organized, if you can recall?

10     A.  They were just lined up from -- with the binder

11 part facing out and then the pages where you open up

12 facing towards the wall.

13     Q.  So do you remember how many, roughly how many

14 publications there were on the wall when you were in that

15 room?

16     A.  There were quite a few.  I couldn't give you an

17 exact number.

18     Q.  Were there more than ten?

19     A.  Yes.

20     Q.  Were there more than 50?

21     A.  Probably not.

22     Q.  Let me try smaller increments.  How about were

23 there more than 25?

24     A.  Probably around there, around that number.

25     Q.  All right.  Would it be accurate to -- to

60

BARKLEY
Court Reporters

1    describe -- to describe them as archival copies?

2        A.  Sure.

3        Q.  The way in which they were -- it appeared that

4    they were organized?

5        A.  Yes, yes.

6        Q.  Is that -- okay.

7            And after looking at those publications did you

8    do anything else in the room?

9        A.  No.

10       Q.  Okay.  So after you walked out of the room, what

11   did you do next?

12       A.  When I walked out there was an open space just

13   outside.  There was a plastic container underneath the

14   table, and I looked inside that.

15       Q.  And what did you find inside the container?

16       A.  There were books.  There were copies of news

17   articles.

18       Q.  Do you remember the titles of any of the books

19   that you saw in that container?

20       A.  I don't remember any of them.

21       Q.  Do you remember just generally what the subject

22   matter was for any of the books?

23       A.  I don't remember.

24       Q.  Okay.  How about the news articles, do you

25   remember what the subject matter was for any of the news

Lisa Shaffer



1      Q.  Okay.  So back to this -- this room that you

2  just referred to that had papers and a copy machine --

3      A.  Uh-huh.

4      Q.  -- is there anything else that you can recall

5  about -- about the inside of that room?

6      A.  No.

7      Q.  Did it -- did it appear to be an office, for

8  example, with a desk that someone might sit in to -- to

9  do whatever kind of work?

10      A.  I don't remember a desk.  I just remember a

11  table.

12      Q.  Okay.  And why had Detective MacAdam called to

13  you that room?

14      A.  When he came down, he pointed to the papers on

15  the floor and said there may be something of interest on

16  there to me.

17      Q.  Do you know what he -- know what he meant by

18  something that might have been something of interest to

19  you?

20      A.  No.  He just said that in pointing to the stack.

21      Q.  Did you look at the pile of papers?

22      A.  I looked at the first two items on the top of

23  the pile.

24      Q.  And what were they?

25      A.  They were envelopes that were either from

64

Lisa Shaffer

BARKLEY
Court Reporters

1  inmates or to inmates.

2      Q.  Okay.  Approximately how many pages were in this

3  stack of papers that you just referred to?

4      A.  I only looked at the envelopes.

5      Q.  So let me make sure I understand this.  So where

6  was the stack of envelopes situated?

7      A.  They were on top of the pile -- there were more

8  piles, but they were on top.

9      Q.  And this was on the table or this was on the

10  floor?

11      A.  On the floor.

12      Q.  And why did you only look at two?

13      A.  They were from prisoners that had nothing to do

14  with why we were there.  And so I didn't look any

15  further.

16      Q.  Did you do anything else -- did you look at any

17  other items inside that room?

18      A.  No.

19      Q.  Okay.  Did you have any further conversation

20  with Detective MacAdam about -- during the time that you

21  were in that room?

22      A.  No.

23      Q.  Did you see any computers in that room at the

24  point in which Detective MacAdam had called you there?

25      A.  No.

65

1      Q.  Okay.  So what did you do after that?

2      A.  After that I walked out of there and met up with

3  Mike Hart, and we were just standing around.

4      Q.  Did you have any conversation with -- with Mike

5  Hart at that point?

6      A.  I think so.

7      Q.  Do you happen to recall what the subject matter

8  was of that conversation?

9      A.  I don't remember.

10     Q.  Okay.  Okay.  What did you do after that?

11     A.  Mike and I just stood around and waited for the

12 officers to finish up.

13     Q.  Approximately how long did you wait there?

14     A.  Maybe five, ten minutes.

15     Q.  And at that time other officers were continuing

16 to conduct the search inside at the Long Haul premises?

17     A.  Yes.

18     Q.  Why was it that they were continuing to search

19 and you -- and you weren't?

20     A.  There was no other places.  I mean, that one

21 office had already been searched.  There was nothing else

22 -- no other place for me to go to do any other searches.

23     Q.  Okay.  And so after waiting there approximately

24 five to ten minutes, what did you do next?

25     A.  Assisted UC Berkeley to take out the computers

66

Lisa Shaffer

1    to the cars.

2         Q.  Okay.  Approximately how long did that take?

3         A.  Couple minutes.

4         Q.  Besides computers -- did you help take computers

5    out -- out of the Long Haul space?

6         A.  To the cars, yes.

7         Q.  Did you assist in taking anything else out to

8    the cars?

9         A.  No.

10        Q.  So if I understand you correctly, you searched,

11   you went in to the front room of the Long Haul where you

12   looked at a log book.  Is that correct?

13        A.  Correct.

14        Q.  And you also looked in an office or in a room

15   upstairs at which you -- in which you opened a file

16   cabinet after talking to Detective Zuniga.  Is that

17   correct?

18        A.  Correct.

19        Q.  And you looked at -- you looked inside one

20   additional office downstairs after Detective MacAdam

21   called you down to look at a specific pile of papers on

22   the floor.  Is that correct?

23        A.  Correct.

24        Q.  Did you look in any other room --

25            Did you enter any other room as part of the

67

Lisa Shaffer

BARKLEY
Court Reporters

EXHIBIT 9

1   JOSEPH P. RUSSONIELLO (SBN 44332)
    United States Attorney
2   JOANN M. SWANSON (SBN 88143)
    Chief, Civil Division
3   JONATHAN U. LEE (SBN 148792)
    Assistant United States Attorney
4   450 Golden Gate Avenue, 9th Floor
    San Francisco, California 94102-3495
5   Telephone:    (415) 436-6909 (Lee)
    Facsimile:    (415) 436-6748
6   Email:        jonathan.lee@usdoj.gov

7   ATTORNEYS FOR FEDERAL DEFENDANTS

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11  LONG HAUL, INC. AND EAST BAY          )   No. C 09-0168 JSW
    PRISONER SUPPORT,                     )
12                                        )
           Plaintiffs,                    )
13                                        )   **DEFENDANT LISA SHAFFER'S**
    v.                                    )   **RESPONSE TO PLAINTIFF'S FIRST**
14                                        )   **SET OF INTERROGATORIES**
    UNITED STATES OF AMERICA;             )
15  VICTORIA HARRISON; KAREN              )
    ALBERTS; WILLIAM KASISKE; WADE        )
16  MACADAM; TIMOTHY J. ZUNIGA;           )
    MIKE HART; LISA SHAFFER; AND          )
17  DOES 1-25.                            )
                                          )
18         Defendants.                    )
                                          )
19  _____)

20                 **RESPONSES TO INTERROGATORIES**

21  **INTERROGATORY NO. 1:**

22         Identify all training you received prior to the August 27, 2008, regarding obtaining and

23  executing search warrants and otherwise conducting searches and seizures, including but not

24  limited to searches and seizures for premises unaffiliated with the University of California,

25  Berkeley.

26  **RESPONSE:**

27         Objection: This interrogatory is vague and overbroad.  Notwithstanding this objection,

28  this defendant responds that she received training in conducting searches and seizures at the New

    Mexico State Police Academy during approximately July to November 1999 and at the FBI

staff and it was unknown whether the computer-generated threats were sent by any particular computer or computer user. Additionally, this defendant had no knowledge at the time of the execution of the search warrant that Slingshot and/or EBPS were located on the Long Haul premises.

**INTERROGATORY NO.8:**

Identify all items, including photographs, originally located in the Slingshot office that you examined in connection with or after the raid.

**RESPONSE:**

This defendant responds that she did not participate in the drafting of or have first hand knowledge of the statement referenced in the interrogatory before the date of the search of the Long Haul premises. This defendant provided the following assistance to UCBPD during the execution of the search warrant. First, for much of the time period involved with the execution of the search warrant, this defendant stood and waited while others conducted the search. Later, this defendant recalls briefly examining a log book of some kind, flipping through 4-5 pages, before closing the log book. Then, this defendant recalls being called by Officer Zuniga to a room to look at photographs, which she recognized because of her knowledge of the Seattle, Washington area. She looked at approximately 5-6 photos of scenes of downtown Seattle, including one she recalls as a photo of an old police vehicle. Next, this defendant recalls looking through files in a bottom drawer of a file cabinet, flipping briefly through photocopies of newspaper articles before closing the drawer. Then, this defendant recalls walking into a very small room, noting and seeing issues of "Slingshot," and then leaving that room. Thereafter, this defendant recalls that she looked at some books and articles in a plastic container underneath a table that was outside the small room referred to above and she flipped through the books and articles very briefly. Next, this defendant was called to another area by she believes Officer Macadam, where she entered what appeared to be a copy room, and she looked at two envelopes that she concluded were either addressed to or from prisoners, before she left the room. This defendant did not seize any materials. Her assistance as described above was brief, lasting approximately 10-15 minutes total. This defendant did not examine any materials seized during

or after the execution of the search warrant. This defendant did not retain any of the items seized or a copy of any of the items seized, although this defendant assisted in the carrying of seized items, including computer equipment, to law enforcement vehicles parked outside the premises.

**INTERROGATORY NO. 9:**

Identify all dates on which you visited or examined the Long Haul premises before the date of the raid and the reason for each such visit or examination.

**RESPONSE:**

Objection: this interrogatory is vague and overbroad. Notwithstanding this objection, this defendant responds that she did not visit or examine the Long Haul premises before the execution of the search warrant described in the complaint.

**INTERROGATORY NO. 10:**

Identify all information that you had in your possession regarding Long Haul, EBPS, Slingshot, and the Long Haul premises prior to the raid and how you came into possession of that information.

**RESPONSE:**

Objection: this interrogatory is vague. Notwithstanding this objection, this defendant responds that she had an understanding that Long Haul was an activist organization in Berkeley holding or facilitating activities such as meetings, discussions, and recreational activities, which she learned from local law enforcement, probably UCBPD. This defendant had no information about EBPS. This defendant had heard of Slingshot, which she understood was a publication, but she had no more specific information than that and she cannot recall the source of her understanding. This defendant did not have specific information about the Long Haul premises, other than her general understanding that it held or facilitated activities, as mentioned above, including movies.

**INTERROGATORY NO. 11:**

Identify all facts relating to or regarding when you ascertained that the Long Haul premises contained multiple tenants.

EXHIBIT 10

1            UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3           SAN FRANCISCO DIVISION

4

5  LONG HAUL, INC. and EAST BAY    )
   PRISONER SUPPORT,           )

6                         )
              Plaintiffs,    )

7                         )
    v.                 )  No. C 09-00168-JSW

8                         )
   UNITED STATES OF AMERICA; MIGUEL  )

9  CELAYA; KAREN ALBERTS; WILLIAM    )
   KASISKE; WADE MacADAM; TIMOTHY    )

10 ZUNIGA; MIKE HART; LISA SHAFFER;   )
   and DOES 1 - 25,            )

11                        )
              Defendants.    )

12 _____)

13

14

15

16

17        DEPOSITION OF KATHRYN MILLER, taken on behalf
   of Defendants, at One Market Street, 32nd Floor, San

18 Francisco, California, commencing at 1:20 p.m.,
   Wednesday, November 10, 2010, before Donna J. Blum,

19 Certified Shorthand Reporter, No. 11133.

20

21

22

23

24

25

                      2

BARKLEY
Court Reporters

1   been working for three or four issues may or may not even

2   have been given a key.

3   BY MS. ELLIS:

4       Q.  But if that person had been given a key...

5       A.  Yeah, I'm not sure.  People are usually really

6   good about giving back their key.  There isn't -- I don't

7   think there's a formal process.  I'm not the one who

8   keeps track of Slingshot keys, so I don't know.  Usually

9   people just hand it in if they don't want to be involved

10  anymore.

11      Q.  But you don't know whether individuals that no

12  longer work on Slingshot still have a key?

13      A.  I don't -- I don't know.

14      Q.  Now, you were saying that the articles for a

15  particular Slingshot issue end up on the computer before

16  the layout occurs.  Do you know how --

17          First of all, do you know what the process is

18  that those articles would end up on the computer in the

19  Slingshot office?

20      A.  Yeah.  The people -- okay.  So if somebody is

21  here, you know, in our office writing, they would write

22  on that computer.  So that's one way.

23          Another way is if someone is not local, they

24  would e-mail it in to the computer.  And there are times

25  when we print something from someone who's handwritten

48

Kathryn Miller

BARKLEY
Court Reporters

1    something.  So someone has transcribe it on to the

2    computer.  And those are three ways that I know of that

3    things get on to the computer.

4        Q.  And how soon before you do the layout process

5    are all the articles on the computer?

6        A.  Well, that varies.  We try -- we shoot for about

7    two weeks before the issue goes to press.  Some things

8    are there.  Some things get e-mailed like right after

9    we're done with an issue, someone will e-mail something

10   so it'll be sitting there for three months.  Other things

11   are just written the day of so.  There's a little bit of

12   flexibility with that.

13       But we have an editing meeting that we do two

14   weeks -- I believe it's two weeks before the issue gets

15   put to bed, and most things are on the computer then.

16       Q.  Who decides what articles are included in a

17   particular issue?

18       A.  We have a consensus process so we have to

19   consense on what those things are.  So everyone --

20   everyone who is a -- everyone who's working on a

21   particular issue decides for that issue.

22       Q.  Okay.  Are you aware that Stop Cal Vivisection

23   had an article in the spring 2008 issue of Slingshot?

24       A.  Was I aware then or am I aware now?

25       Q.  Both.

49

BARKLEY
Court Reporters

1      Q.  Do you know which office the police officer went

2   into?  It's hard to remember specifically what I was

3   seeing at the time because afterwards I know they went

4   into all three of the offices because they all had their

5   locks or the door ripped off, whichever.  So I don't

6   recall exactly which office, when I was looking through

7   the door I don't remember which one it was, but one of

8   them.

9      Q.  And then the officers in the Info Shop, what did

10  you see those officers doing?

11     A.  We have a front counter that's locked with pad

12  locks and then there's a side counter that's open, and I

13  could see them kind of pulling stuff out of the side

14  cabinet and kind of going through that.

15     Q.  And did you see anything else?

16     A.  No.

17     Q.  How long did you stand at the window looking in?

18     A.  I'm not sure.  It could have been 20 minutes.

19  It could have been 40 minutes.  I'm not really sure.

20  And, yeah, I don't remember how long I was standing

21  there.

22     Q.  Do you know how long the police officers were

23  there?

24     A.  Let's see, I don't remember exactly when the

25  time the phone call came but from the time the phone call

67

BARKLEY
Court Reporters

1    warrant?

2         A.  Me personally, no.

3         Q.  And when the officers at either point told you

4    that you needed to leave, did any of those officers draw

5    their guns?

6         A.  No.

7         Q.  So you spoke to Sergeant Alberts you think?

8         A.  Uh-huh.

9         Q.  Who was the other officer that you spoke to?

10        A.  I'm not -- I don't recall that person's name.

11        Q.  Was it a man or a woman?

12        A.  I'm pretty sure it was a man, but I'm not

13   entirely certain.

14        Q.  Do you remember what this person looked like?

15        A.  No.

16        Q.  And after the officers left and you went in the

17   front, what did you see?

18        A.  They -- the -- we have a sign-up sheet for

19   taking out the books from the library, and it was left

20   open on the counter.  They, of course, had cut the locks

21   off the our main cabinet and the coffee cabinet.  So

22   there was locks, broken locks.

23             They left the search warrant afterwards, of

24   course, on the counter.

25        Q.  Did you look at the search warrant?

                              74

BARKLEY
Court Reporters

1    Q.  And when you went inside the Slingshot office,

2  what did it look like?

3    A.  Well, they had taken the computers.

4    Q.  And do you know how many computers?

5    A.  Like I said, I'm pretty sure there were two.  I

6  know definitely there were at least two.  There might

7  have been a third one at that time.  I can't recall.  And

8  I just remember how dusty it was behind the computers.

9  And we have a filing cabinet that's right inside the

10  door, and they had taken out the file.  We have a file

11  labeled photos, and they had taken out the photo file and

12  left it like open on the desk.

13        And I don't really know what other files they

14  looked at, but they at least looked at the photo file or

15  at least they took it out of the cabinet.  I just -- you

16  know, the Slingshot office is not normally really

17  pristine, but it was messier than usual.

18    Q.  And is the Slingshot office normally somewhat

19  disorganized?

20        MS. GRANICK:  Objection; vague.

21        You can answer.

22        THE WITNESS:  Disorganized.  It's functional,

23  but it's to -- some people would consider it

24  disorganized; some people maybe not.

25  BY MS. ELLIS:

76

BARKLEY
Court Reporters

# EXHIBIT 11

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4

5  LONG HAUL, INC., and EAST  )
   BAY PRISONER SUPPORT,      )
6                             )
              Plaintiffs,     )
7                             )
   vs.                        )   No.  C 09-00168-JSW
8                             )
   UNITED STATES OF AMERICA;  )
9  MIGUEL CELAYA; KAREN       )
   ALBERTS; WILLIAM KASISKE;  )
10 WADE MacADAM; TIMOTHY      )
   ZUNIGA; MIKE HART; LISA    )
11 SHAFFER,                   )
                              )
12            Defendants.     )
                              )
13 _____)

14

15

16             30(b)(6) DEPOSITION OF

17          JEFFREY PATRICK LYONS, JR.

18      Held at the Law Offices of SchiffHardin

19    One Market Street, San Francisco, California

20      Wednesday, September 22, 2010, 9:09 a.m.

21

22

23

24

25 REPORTED BY:  ELAINA BULDA-JONES, RPR, CSR #11720

                         2

BARKLEY
Court Reporters

1   been working for three or four issues may or may not even

2   have been given a key.

3   BY MS. ELLIS:

4       Q.  But if that person had been given a key...

5       A.  Yeah, I'm not sure.  People are usually really

6   good about giving back their key.  There isn't -- I don't

7   think there's a formal process.  I'm not the one who

8   keeps track of Slingshot keys, so I don't know.  Usually

9   people just hand it in if they don't want to be involved

10  anymore.

11      Q.  But you don't know whether individuals that no

12  longer work on Slingshot still have a key?

13      A.  I don't -- I don't know.

14      Q.  Now, you were saying that the articles for a

15  particular Slingshot issue end up on the computer before

16  the layout occurs.  Do you know how --

17          First of all, do you know what the process is

18  that those articles would end up on the computer in the

19  Slingshot office?

20      A.  Yeah.  The people -- okay.  So if somebody is

21  here, you know, in our office writing, they would write

22  on that computer.  So that's one way.

23          Another way is if someone is not local, they

24  would e-mail it in to the computer.  And there are times

25  when we print something from someone who's handwritten

48

BARKLEY
Court Reporters

1    something.  So someone has transcribe it on to the

2    computer.  And those are three ways that I know of that

3    things get on to the computer.

4        Q.  And how soon before you do the layout process

5    are all the articles on the computer?

6        A.  Well, that varies.  We try -- we shoot for about

7    two weeks before the issue goes to press.  Some things

8    are there.  Some things get e-mailed like right after

9    we're done with an issue, someone will e-mail something

10   so it'll be sitting there for three months.  Other things

11   are just written the day of so.  There's a little bit of

12   flexibility with that.

13           But we have an editing meeting that we do two

14   weeks -- I believe it's two weeks before the issue gets

15   put to bed, and most things are on the computer then.

16       Q.  Who decides what articles are included in a

17   particular issue?

18       A.  We have a consensus process so we have to

19   consense on what those things are.  So everyone --

20   everyone who is a -- everyone who's working on a

21   particular issue decides for that issue.

22       Q.  Okay.  Are you aware that Stop Cal Vivisection

23   had an article in the spring 2008 issue of Slingshot?

24       A.  Was I aware then or am I aware now?

25       Q.  Both.

49

BARKLEY
Court Reporters

1    Q.  Do you know which office the police officer went

2    into?  It's hard to remember specifically what I was

3    seeing at the time because afterwards I know they went

4    into all three of the offices because they all had their

5    locks or the door ripped off, whichever.  So I don't

6    recall exactly which office, when I was looking through

7    the door I don't remember which one it was, but one of

8    them.

9        Q.  And then the officers in the Info Shop, what did

10   you see those officers doing?

11       A.  We have a front counter that's locked with pad

12   locks and then there's a side counter that's open, and I

13   could see them kind of pulling stuff out of the side

14   cabinet and kind of going through that.

15       Q.  And did you see anything else?

16       A.  No.

17       Q.  How long did you stand at the window looking in?

18       A.  I'm not sure.  It could have been 20 minutes.

19   It could have been 40 minutes.  I'm not really sure.

20   And, yeah, I don't remember how long I was standing

21   there.

22       Q.  Do you know how long the police officers were

23   there?

24       A.  Let's see, I don't remember exactly when the

25   time the phone call came but from the time the phone call

67

Kathryn Miller

BARKLEY
Court Reporters

1  warrant?

2      A.  Me personally, no.

3      Q.  And when the officers at either point told you

4  that you needed to leave, did any of those officers draw

5  their guns?

6      A.  No.

7      Q.  So you spoke to Sergeant Alberts you think?

8      A.  Uh-huh.

9      Q.  Who was the other officer that you spoke to?

10     A.  I'm not -- I don't recall that person's name.

11     Q.  Was it a man or a woman?

12     A.  I'm pretty sure it was a man, but I'm not

13  entirely certain.

14     Q.  Do you remember what this person looked like?

15     A.  No.

16     Q.  And after the officers left and you went in the

17  front, what did you see?

18     A.  They -- the -- we have a sign-up sheet for

19  taking out the books from the library, and it was left

20  open on the counter.  They, of course, had cut the locks

21  off the our main cabinet and the coffee cabinet.  So

22  there was locks, broken locks.

23         They left the search warrant afterwards, of

24  course, on the counter.

25     Q.  Did you look at the search warrant?

74

Kathryn Miller

BARKLEY
Court Reporters

1      Q.  And when you went inside the Slingshot office,

2   what did it look like?

3      A.  Well, they had taken the computers.

4      Q.  And do you know how many computers?

5      A.  Like I said, I'm pretty sure there were two.  I

6   know definitely there were at least two.  There might

7   have been a third one at that time.  I can't recall.  And

8   I just remember how dusty it was behind the computers.

9   And we have a filing cabinet that's right inside the

10  door, and they had taken out the file.  We have a file

11  labeled photos, and they had taken out the photo file and

12  left it like open on the desk.

13          And I don't really know what other files they

14  looked at, but they at least looked at the photo file or

15  at least they took it out of the cabinet.  I just -- you

16  know, the Slingshot office is not normally really

17  pristine, but it was messier than usual.

18      Q.  And is the Slingshot office normally somewhat

19  disorganized?

20          MS. GRANICK:  Objection; vague.

21          You can answer.

22          THE WITNESS:  Disorganized.  It's functional,

23  but it's to -- some people would consider it

24  disorganized; some people maybe not.

25  BY MS. ELLIS:

Kathryn Miller

BARKLEY
Court Reporters

1           UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4

5   LONG HAUL, INC., and EAST   )
    BAY PRISONER SUPPORT,       )
6                               )
             Plaintiffs,        )
7                               )
    vs.                         )   No.  C 09-00168-JSW
8                               )
    UNITED STATES OF AMERICA;   )
9   MIGUEL CELAYA; KAREN        )
    ALBERTS; WILLIAM KASISKE;   )
10  WADE MacADAM; TIMOTHY       )
    ZUNIGA; MIKE HART; LISA     )
11  SHAFFER,                    )
                                )
12           Defendants.        )
                                )
13  _____)

14

15

16            30(b)(6) DEPOSITION OF

17         JEFFREY PATRICK LYONS, JR.

18      Held at the Law Offices of SchiffHardin

19    One Market Street, San Francisco, California

20     Wednesday, September 22, 2010, 9:09 a.m.

21

22

23

24

25  REPORTED BY:  ELAINA BULDA-JONES, RPR, CSR #11720

                         2

BARKLEY
Court Reporters

1   trying to get at.

2   BY MS. ELLIS:

3       Q.    So do you understand what I'm asking you?

4       A.    Not exactly.  We are a loose organization.

5       Q.    Okay.  Do you -- does the organization pay

6   taxes?

7       A.    No.

8       Q.    Does the organization exist as a named

9   entity in that you are on the lease somewhere as an

10  organization?

11      A.    We're an organization.  I'm not -- I'm not

12  really clear on what you are asking.

13      Q.    So if you -- hypothetically, if tomorrow

14  you, Max, and Chloe decided, we don't want to do

15  this anymore, you could just decide not to do it

16  anymore and you wouldn't have to go through any

17  other steps to disband the organization; is that

18  correct?

19      A.    I guess.

20      Q.    Does the organization have a bank account?

21      A.    No.

22      Q.    So in May of 2008, you rented space --

23  East Bay Prisoner Support rented space at Long Haul;

24  is that correct?

25      A.    About that time, yeah.

                            22

BARKLEY
Court Reporters

1        MS. GRANICK:  If you know.

2        THE WITNESS:  Don't.

3   BY MS. ELLIS:

4        Q.   Since either December 2009 or January

5   2010, are you still a member of Long Haul?

6        A.   I don't think so.

7        Q.   Did you return the key to the front door

8   or do you still have that key?

9        A.   I don't have that key.

10       Q.   Do you know whether Chloe still has that

11  key?

12       A.   I don't know.

13       Q.   Do you know whether Max still has the key

14  to the front door?

15       A.   I assume Max does.

16       Q.   Why do you assume Max does?

17       A.   I don't know.

18       Q.   Do you know whether Max is still a member

19  of Long Haul?

20       A.   No.

21       Q.   Do you know whether Chloe is still a

22  member of Long Haul?

23       A.   No.

24       Q.   And what -- when Long Haul had East Bay

25  Prisoner Support as a tenant, what indicated that

53

BARKLEY
Court Reporters

1    that space belonged to East Bay Prisoner Support?

2          A.   A sign.

3          Q.   What type of sign was it?

4          A.   Paper.

5          Q.   Was it -- can you describe the sign?

6          A.   If I remember correctly it said, East Bay

7    Prisoner Support, and maybe -- yeah, I don't

8    remember what else.

9                MS. ELLIS:   I'm going to show you what has

10   been marked as Lyons Exhibit 3.

11               (Whereupon, Exhibit 3 was marked for

12   identification.)

13               THE WITNESS:   Yeah.

14               MS. GRANICK:   I'm sorry, what is our

15   designation for this "M-2" on the side?   Is that

16   what we're calling it in the overall scheme of

17   things?

18               MS. ELLIS:   Yeah, I think so.

19               MS. GRANICK:   Okay.   Thank you.

20   BY MS. ELLIS:

21         Q.   Do you recognize this?

22         A.   Yep.

23         Q.   What is this photograph of?

24         A.   It's a photo of our door with a big, clear

25   sign on it that says "East Bay Prisoner Support."

                            54

BARKLEY
Court Reporters

1    Q.   Okay.  And that sign is made of cardboard,
2  right?

3    A.   Yeah, I -- it looks like it, cardboard,
4  card stock paper, or something.

5    Q.   And it's a handwritten sign?

6    A.   It looks like it.

7    Q.   And is there anything other than this
8  handwritten sign that indicates that this office
9  belongs to East Bay Prisoner Support?

10         MS. GRANICK:  Objection.

11         THE WITNESS:  The lock.

12         MS. GRANICK:  Objection.  Vague.

13         Now you can answer.

14         THE WITNESS:  The lock.

15  BY MS. ELLIS:

16    Q.   And the lock indicates that that office
17  belongs to East Bay Prisoner Support?

18    A.   I -- I would say it indicates that it's a
19  private office that's not available to the public
20  use.

21    Q.   And the search warrant was executed during
22  a time when East Bay Prisoner Support -- or when the
23  Long Haul was not open for business; isn't that
24  correct?

25         MS. GRANICK:  Objection.  Calls for

55

BARKLEY
Court Reporters

1  able to just walk in?

2       A.   I don't remember.

3       Q.   When you got there, what did -- when you

4  got to the Long Haul space, what did you do first?

5       A.   I don't remember.  I went into the office.

6       Q.   What did you see when you went into the

7  office?

8       A.   I saw -- I noticed damage to the door.

9       Q.   Can you describe the damage?

10      A.   Not exactly.  It looked like a -- looked

11 like someone had attempted to force entry into the

12 office.

13      Q.   Was the door still on its hinges?

14      A.   Was it still what?

15      Q.   On its hinges.

16      A.   Yes.

17      Q.   Was the door able to close?

18      A.   I assume.

19      Q.   Was the door able to open fully?

20      A.   Yes.

21      Q.   Did the damage just -- was it only located

22 on the door jamb and then the door itself?

23      A.   I don't remember.

24      Q.   What was the extent of the damage; what

25 did you see?

85



1      A.   I don't remember.  I remember noticing

2   that, like I said, forced entry had been attempted

3   with some means that was like a pry bar or something

4   like that.  And then I guess after -- I concluded

5   that they ultimately unscrewed the latch to the

6   door.

7      Q.   How did you conclude that?

8      A.   The screws were out of the door.

9      Q.   Were they taped up next to the door?

10      A.   I believe so.

11      Q.   And was the damage to the wood on the door

12   side or damage to the wood on the door jambs side or

13   both?

14      A.   I don't remember specifically.  I remember

15   getting a feeling that whoever had tried to open the

16   door had clumsily damaged an unnecessary amount of

17   door, and I don't remember what was damaged.  I just

18   remember considering that they unscrewed the latch,

19   I remember noting the damage and not understanding

20   why that had happened, considering it wasn't the

21   means by which they gained entry.

22      Q.   How much of the door was damaged?

23      A.   I don't remember.

24      Q.   Was it 10 percent of the door?

25           MS. GRANICK:  Objection.  Vague.  Calls

86



1    for speculation.  Asked and answered.

2            THE WITNESS:  Yeah, I don't know.

3    BY MS. ELLIS:

4        Q.   Was the door still usable?

5        A.   After -- after a small repair.

6        Q.   And did you save the receipt for the

7    repair?

8        A.   I repaired it.

9        Q.   Okay.  And what did you do to repair the

10   door?

11       A.   I probably had to re-attach the lock on a

12   different location on the door so that it can be

13   secured again.  That's probably it.  I don't

14   remember.

15       Q.   What else did you see when you went inside

16   the office?

17       A.   When I went inside the office, I

18   immediately noticed a pile of mail -- of our mail

19   that was taken off the shelves in the stacks that it

20   had been in.  And it was disorganized, letters were

21   out of envelopes.  There was a pile on the counter,

22   possibly on the floor.  The mail was definitely

23   strewn about.

24       Q.   How much mail?

25       A.   All of it.  I don't know how much it was.

BARKLEY
Court Reporters

1    A.   That I don't know?

2    Q.   You don't know whether anybody actually

3  read the letters?

4    A.   Yeah -- no, I mean, I guess they could

5  have taken them out of the envelopes and just put

6  them on the counter.  Theoretically it could happen.

7    Q.   Other than the letters being either

8  disorganized on the counter or on the floor, what

9  else did you see?

10    A.   Other things were all moved around, some

11  CDs.

12    Q.   Like what?

13    A.   Everything.  I mean, I could tell that

14  most of the things in the office had been rifled

15  through and moved around.  There was some loose CDs

16  on the -- I think out, that indicated they had been

17  moved around also.  I noticed some CDs had been

18  taken.  I noticed that the computer had been taken.

19  And -- I don't remember specifically.  I do remember

20  a lot in the office was rifled through, messed with.

21  It was visible that the office had been searched.

22    Q.   What types of things did you have in the

23  office?

24      MS. GRANICK:  Objection.  Vague.

25  BY MS. ELLIS:

89



1   disturbed?

2      A.   I don't recall specifically noting that

3   box being disturbed or, you know.  I remember

4   everything was moved around.

5      Q.   Do you remember whether it appeared that

6   someone had looked through that box?

7      A.   I don't know.

8      Q.   What was contained on the computer in that

9   office?

10      A.   I don't recall exactly.

11      Q.   What did you use the computer for?

12      A.   Um, we had gotten the computer so that we

13   could organize our information about our

14   distribution materials and whatever files would have

15   been used in our operation.

16      Q.   What were they?  What did you use it for?

17      A.   I mean, we had -- again, I don't remember

18   what exactly was on it.

19      Q.   Did you have a list of prisoners that you

20   sent CDs to?

21      A.   No.

22      Q.   Did you have lists of Zines that you would

23   make available to prisoners?

24      A.   Probably.

25      Q.   Did you have correspondence to prisoners

91

BARKLEY
Court Reporters

1   take a shortcut but --

2            THE WITNESS:  I'm not aware.

3   BY MS. ELLIS:

4       Q.   Are you aware of any facts that would lead

5   you to believe that the flash drive had been

6   searched?

7            MS. GRANICK:  Same objection.

8            THE WITNESS:  Yeah -- no, I'm not aware of

9   those facts.

10  BY MS. ELLIS:

11      Q.   Okay.  Are you aware of any facts that

12  would lead you to believe that the storage devices

13  taken from the East Bay Prisoner Support office had

14  been searched?

15           MS. GRANICK:  Same objections.

16           THE WITNESS:  No, I'm not aware of those

17  facts.

18  BY MS. ELLIS:

19      Q.   Okay.  How did the execution of the search

20  warrant impact East Bay Prisoner Support's ability

21  to communicate with prisoners, if it did?

22      A.   I mean, our ability to communicate with

23  prisoners was definitely interrupted by the raid.

24      Q.   How?

25      A.   In the sense that we had a fair amount of

104

BARKLEY
Court Reporters

1    work to do reorganizing our mail.  Like I said, our

2    mail was organized into different categories based

3    on whether or not it had been responded to or needed

4    response, and we had to go back and check all that.

5    The time it took to do that, the time it took to --

6        Q.   How long did that take?

7        A.   I mean, all tolled, it was a while.

8        Q.   How long is "a while"?

9        A.   A couple weeks, maybe.

10       Q.   A couple weeks working how many hours a

11   week?

12       A.   Oh, I couldn't say.

13       Q.   More than ten hours a week?

14       A.   Oh, no.  Maybe -- no, a few days a week.

15   I can't recall.

16       Q.   Well, can you put an approximation on the

17   amount of hours that it took to reorganize the mail?

18       A.   The mail specifically was probably under

19   five.  We also had the rest of the office.

20       Q.   Okay.  So it took about five hours to

21   reorganize the mail?

22       A.   I would say it took under ten hours to

23   reorganize the mail in the office.

24       Q.   So it took about ten hours total, as an

25   approximation?

105



BARKLEY
Court Reporters

1      A.   Sure.

2           MS. GRANICK:   Can you stop fiddling.

3   BY MS. ELLIS:

4      Q.   About ten hours total to reorganize the

5   mail and reorganize the office, is that your best

6   approximation?

7      A.   That would be my best approximation.

8      Q.   And how long did it take to fix the door?

9      A.   An hour.

10     Q.   How did the execution of the search

11  warrant hamper East Bay Prisoner Support's ability

12  to communicate with any other organizations, if it

13  did?

14     A.   Again, it -- it was a general distraction.

15  We also obviously no longer had a computer for a

16  while.  So that would have definitely inhibited our

17  ability to e-mail people or read e-mails or read

18  information.

19     Q.   Did East Bay Prisoner Support get a

20  computer to replace the one that was taken?

21     A.   Eventually.  For a long time I was using

22  my personal laptop to do that because it was the

23  only other computer available to us.

24     Q.   Did East Bay Prisoner Support solicit a

25  donation of the computer?

106

BARKLEY
Court Reporters

1   warrant, so prior to when the computer was taken?

2        A.   I don't remember.

3        Q.   Between January and May of 2008, before

4   it -- you had an office at Long Haul, did you have a

5   computer that was East Bay Prisoner Support's

6   computer?

7        A.   No.

8        Q.   Did you have an e-mail account for East

9   Bay Prisoner Support during that time period?

10       A.   I believe so.

11       Q.   How did you access it?

12       A.   I don't remember.

13       Q.   Did you use your own personal computer to

14   access it?

15       A.   Presumably.

16       Q.   Did East Bay Prisoner Support believe that

17   the Long Haul space was going to be subject to

18   further police surveillance after the execution of

19   the search warrant?

20       A.   Did we believe there would be further

21   surveillance?

22       Q.   Uh-huh.

23       A.   Yes.

24       Q.   Why?

25       A.   Why did we believe it?  I mean, I don't

110

BARKLEY
Court Reporters

1           MS. GRANICK:  Objection.  Misstates his

2    testimony.  Calls for speculation.

3           Answer if you can.

4           THE WITNESS:  I don't decide what gets

5    raided.  I don't know.

6    BY MS. ELLIS:

7       Q.   Right.  But I'm asking you why you think

8    that the activities that go on at Long Haul, which

9    you say are building community and expressing

10   freedom of speech and discussing people's rights

11   would make it more open to being raided?

12          MS. GRANICK:  Objection.  Asked and

13   answered.

14          Answer if you can.

15          THE WITNESS:  It got raided.  I don't know

16   of coffee shops that get raided.  So without

17   speculating as to why the FBI and U.C. Berkeley --

18   and the police generally do what they do, I can't

19   say.

20   BY MS. ELLIS:

21      Q.   I'm not asking you to speculate why it was

22   raided or why they do what they do.

23          One of the claims in your complaint is

24   that you, East Bay Prisoner Support, believes that

25   this Long Haul space is going to be subject to

114

BARKLEY
Court Reporters

1   police surveillance in the future?

2        A.   Uh-huh.

3        Q.   Right?

4        A.   Correct.

5        Q.   And that you feel damaged, East Bay

6   Prisoner Support feels damaged because of that,

7   right?

8        A.   Yeah, because of lack of privacy.

9        Q.   I'm asking you.  So what -- what's the

10  basis for East Bay Prisoner Support's belief that

11  this Long Haul space is going to be subject to

12  police surveillance in the future?

13            MS. GRANICK:  Objection.  Asked and

14  answered.

15            THE WITNESS:  Yeah, I think I already

16  answered that.

17  BY MS. ELLIS:

18       Q.   Not very clearly where I could understand

19  what your answer was; otherwise, we would have moved

20  on to a different topic.

21       A.   I feel like you keep -- the same question

22  is being asked.

23       Q.   So -- I'm just trying to find out what the

24  basis of your belief is.  Is it that if it was

25  raided once it might be raided again, or did you

115

BARKLEY
Court Reporters