# EXHIBIT 12

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4

5    LONG HAUL, INC. and EAST BAY      )
     PRISONER SUPPORT,                 )
6                                      )
                     Plaintiffs,       )
7                                      )
          v.                           )   No. C 09-00168-JSW
8                                      )
     UNITED STATES OF AMERICA; MIGUEL  )
9    CELAYA; KAREN ALBERTS; WILLIAM    )
     KASISKE; WADE MacADAM; TIMOTHY    )
10   ZUNIGA; MIKE HART; LISA SHAFFER;  )
     and DOES 1 - 25,                  )
11                                     )
                     Defendants.       )
12   _____)

13

14

15

16        DEPOSITION OF KAREN ALBERTS, taken on behalf

17     of Plaintiffs, at One Market Street, 32nd Floor, San

18     Francisco, California, commencing at 9:00 a.m.,

19     Tuesday, August 3, 2010, before Donna J. Blum,

20     Certified Shorthand Reporter, No. 11133.

21

22

23

24

25

Karen Alberts

**BARKLEY**
*Court Reporters*

```
1    APPEARANCES OF COUNSEL:

2    For Plaintiffs:

3                   JENNIFER STISA GRANICK, ESQ.
                    MARICA HOFMANN, ESQ.
4                   ELECTRONIC FRONTIER FOUNDATION
                    454 Shotwell Street
5                   San Francisco, California 94110
                    415-436-9333
6                   Email:  jennifer@eff.org

7    For Defendants University of California:

8                   SARA L. ELLIS, ESQ.
                    SCHIFF HARDIN, LLP
9                   235 South Wacker Drive, Suite 6600
                    Chicago, Illinois 60606
10                  312-258-5834
                    Email:  sellis@schiffhardin.com
11
                    WILLIAM CARROLL, ESQ.
12                  SCHIFF HARKIN, LLP
                    One Market, Spear Street Tower
13                  Thirty-Second Floor
                    San Francisco, California 94105
14                  415-901-8700
                    Email:  wcarroll@schiffhardin.com
15
     For Defendants United States of America:
16
                    JONATHAN LEE, Assistant U.S. Attorney
17                  NEILL T. TSENG, Assistant U.S. Attorney
                    U.S. DEPARTMENT OF JUSTICE
18                  UNITED STATES ATTORNEY'S OFFICE
                    450 Golden Gate Avenue
19                  9th Floor
                    San Francisco, California 94102
20                  415-436-6996
                    Email:  neill.tseng@usdoj.gov
21
     Also Present:
22
            Richard Harper, law student
23
            Bahrad Sokhansanj, law student
24

25

26
                            3
```

BARKLEY
Court Reporters

1                              I N D E X

2      EXAMINATION BY                                    PAGE

3      MS. GRANICK                                         6

4

5

6

7                             E X H I B I T S

8      PLAINTIFFS' EXHIBIT      DESCRIPTION               PAGE

9      A              3-page document entitled "University    22
                      Of California,  Berkeley Police
10                    Department"

11     B              67-page document entitled "Search       24
                      Warrants"
12
       C              2-page photocopy of emails              30
13
       D              2-page photocopy of emails              58
14
       E              2-page document entitled "Search        66
15                    Warrant"

16     F              4-page document entitled "Statement     66
                      Of Probable Cause"
17
       G              1-page photocopy of email               87
18
       H              1-page photocopy of photograph         120
19
       I              1-page photocopy of photograph         120
20
       J              1-page photocopy of photograph         120
21
       K              1-page photocopy of photograph         120
22
       L              1-page photocopy of photograph         120
23
       M              1-page photocopy of photograph         120
24

25

26

                                   4

B A R K L E Y
Court Reporters

1          THE WITNESS:  I don't know if that's necessarily

2     fair.  I made recommendations to send certain detectives

3     to certain types of POST training, formal training.

4     BY MS. GRANICK:

5          Q    Okay.  Was Officer Kasiske one of the officers

6     that you supervised at the -- in 2008 at the time of this

7     incident?

8          A.   He was one of my detectives, yes.

9          Q.   Are you familiar with what Officer Kasiske's

10     training and education was at that point in time?

11          A.   Not off the top of my head.

12          Q.   Do you remember anything about what Officer

13     Kasiske's training was as of that point in time?

14          A.   Not particularly.  I would have to, like, go

15     back and look at the top of his search warrant which

16     explains his training and background.

17          Q.   When your officers write search warrants, are

18     they -- and they put down their training and background,

19     is that supposed to be a comprehensive list of their

20     training or is that a subset of what the officers have

21     been taught?

22          MS. ELLIS:  Objection, compound.

23          THE WITNESS:  I think you asked a couple

24     different questions.  What's the first question?

25     BY MS. GRANICK:

12

Karen Alberts

BARKLEY
Court Reporters

1   BY MS. GRANICK:

2       Q    What did Special Agent Shaffer do when you

3   worked together?

4            MS. ELLIS:  Objection, vague and investigative

5   privilege.

6            So you can answer to the extent that you're not

7   revealing any investigative techniques or the details of

8   any ongoing investigations.

9            THE WITNESS:  We collaborated.

10  BY MS. GRANICK:

11      Q    And what was the nature of that collaboration?

12           MS. ELLIS:  Same objection.

13           THE WITNESS:  Sharing information of things we

14  were working on.

15  BY MS. GRANICK:

16      Q    And did you also -- and did you also involve

17  Special Agent Shaffer in the execution of search

18  warrants?

19      A.   I believe just this one.

20      Q.   This was the only time, to your knowledge, that

21  Special Agent Shaffer participated in the execution of a

22  warrant with the UC police department?

23      A.   I believe so.

24      Q.   Other than sharing information and this -- this

25  assistance with the execution of the warrant on Long

36

BARKLEY
Court Reporters

1    A.  Not specifically that I can think of other than

2  information on the Internet that I knew there was a

3  crossover and affiliation, not just with animal rights

4  activists but other groups as well.

5    Q.  In August of 2008 did you know what Slingshot

6  was?

7    A.  I knew.  I knew of the publication Slingshot.  I

8  hadn't known about it years earlier.  I hadn't heard

9  about it in many years.

10    Q.  What did you know about Slingshot at that time?

11    A.  I was a foot patrol officer on Telegraph Avenue

12  like '89, beginning of '90, and it was a publication that

13  was out on the street.

14    Q.  When you say "publication," what do you mean?

15    A.  Like any other free flyers or publications that

16  people could pick up and read.

17    Q.  Like a newspaper, a newsletter, something of

18  that nature?

19    A.  I wouldn't call it a newspaper.  More of a

20  publication.

21    Q.  Okay.  And it was a physical -- it was printed

22  on physical paper?

23    A.  Correct.

24    Q.  And did you have any information about any

25  connection between Long Haul and Slingshot?

57



1          MS. ELLIS:  Objection.

2    BY MS. GRANICK:

3          Q.  -- in August of 2008?

4          A.  Not until after I was served with this lawsuit.

5          Q   You did not know that Slingshot was published

6    out of the Long Haul Info Shop in August of 2008?

7          A.  No, I did not.

8          Q.  You didn't know that there was any connection

9    between -- I guess I asked that.

10          I'm going to mark please Bates No. 614 and 615.

11          (Deposition Exhibit D was marked for

12          identification.)

13    BY MS. GRANICK:

14          Q   This document is dated February 19, 2008, and

15    appears to be an e-mail.

16          A.  I see it.

17          Q.  Do you recognize this?

18          A.  Yes, I do.

19          Q.  What is it?

20          A.  It's an e-mail from Officer Zuniga to myself.

21          Q.  Did you -- have you seen this e-mail before?

22          A.  Yes.

23          Q.  Did you see this e-mail in February of 2008?

24          A.  Yes, I did.

25          Q.  Did you -- this e-mail, is this e-mail about the

                        58

                   Karen Alberts

1   Slingshot publication?  In February of 2008 did you know

2   this e-mail was about the Slingshot publication?

3        A.  I didn't know it was about their publication.

4        Q.  Uh-huh.  What did you think it was about with

5   regards to Slingshot, if anything?

6        A.  Just that the Long Haul maintained I guess on

7   their site a list of contacts or different groups that

8   they may be affiliated with.

9        Q.  Okay.

10       A.  And it appears Slingshot was one of those

11  contacts.

12       Q.  Did you have an understanding in February of

13  2008 what that affiliation consisted of?

14       A.  No.  I didn't really pay that much attention, to

15  be honest with you.

16       Q.  Did you have any information about where

17  Slingshot was published from?

18       A.  When?

19       Q.  In August of 2008.

20       A.  Not until after this lawsuit.

21       Q.  Not until after the lawsuit?

22       A.  (Moves head up and down.)

23       Q.  Okay.  What else, if anything, did you know

24  about Slingshot in August of 2008?

25       A.  I knew nothing about Slingshot.  I knew there

59

BARKLEY
Court Reporters

1      Q.  And did you review that statement of probable

2  cause?

3      A.  Yes.

4      Q.  Was the -- did Officer Kasiske seek the search

5  warrant a month approximately a month after he got the IP

6  address information back from the ISP?

7      A.  I'd have to go look at the dates that he

8  received the response and the date he authored it.  Could

9  have been.

10     Q.  Sitting here today you don't remember anything

11  special about the investigation with regards to delay

12  about the execution of the search warrant?

13         MS. ELLIS:  Objection, assumes facts not in

14  evidence.

15         THE WITNESS:  What do you mean about the delay?

16  BY MS. GRANICK:

17     Q.  You don't remember whether there was a delay or

18  any discussions surrounding delay?

19     A.  I do remember a discussion with him about the

20  delay, and it was due to the ongoing tree sitting protest

21  we had.

22     Q.  Okay.  Were you aware at the time, tell me what

23  you did as sergeant with regards to approving the

24  application for a search warrant?

25     A.  I reviewed the probable cause -- statement of

63

1    probable cause, the search warrant.  This is my normal

2    protocol.  I make the corrections on it.  Then I pass it

3    on to my lieutenant who at that point I believe was Doug

4    Wing.  He makes any corrections he sees fit, hands it

5    back down to me, I take a look, give it back to Bill.  He

6    makes the corrections and gives it back to me, and I make

7    sure the corrections were made.  And then he goes and

8    gets it signed by the judge.

9         Q.  Do you remember what date you reviewed the

10   search warrant application and the statement of probable

11   cause?

12        A.  Not off the top of my head.

13        Q.  Do you remember how many days approximately it

14   was before the execution of the warrant?

15        A.  I don't recall specifically because it was a

16   crazy time, but it was probably within a day or two.

17        Q.  Do you review the search warrant applications

18   and the statements of probable cause for -- for

19   information other than correcting the spellings and

20   grammar and punctuation?

21        A.  Yes.

22             MS. ELLIS:  Objection, asked and answered.

23   BY MS. GRANICK:

24        Q.  And what did you review this particular search

25   warrant and statement of probable cause for?



1    A.  Well, content to see if it meets the elements

2  necessary for a judge to decide whether or not we had

3  probable cause to obtain a search warrant.

4    Q.  Why did you believe that you had probable cause

5  to obtain the search warrant at that time?

6        MS. ELLIS:  Objection, calls for a legal

7  conclusion.

8        MR. LEE:  Overbroad.

9        THE WITNESS:  I can only review what facts we

10  have on hand to make sure they're contained within the

11  probable cause statement and search warrant, and it's the

12  judge's decision as to whether or not to grant the actual

13  search warrant.

14  BY MS. GRANICK:

15    Q.  Did you in August of 2000 -- of 2008, were you

16  aware that there were multiple office spaces in the Long

17  Haul Info Shop?

18    A.  I'm sorry, did you say before?

19    Q.  Yes.  Before August of 2008.

20    A.  Before the date of the search warrant?

21    Q.  Yeah, before the date that the search warrant

22  was executed.

23    A.  Was I aware there were multiple offices?

24    Q.  (Moves head up and down.)

25    A.  No, I was not.

65

Karen Alberts

BARKLEY
Court Reporters

1  anyone else who was associated with the Long Haul.

2      Q.  Where in this search warrant affidavit does it

3  say "employee of Long Haul"?

4      A.  I'd have to read it.  I don't know if it does.

5      Q.  Okay.

6      A.  You want me to -- this?  You want me to read the

7  whole thing?

8      Q.  Well, it's a true and correct copy of the

9  document that you reviewed back in August of 2008?

10     A.  As far as I know.

11     Q.  Okay.

12     A.  Did you want me to read it?

13     Q.  No.  The document will speak for itself.

14     A.  Okay.

15     Q.  Did you -- in the paragraphs that are under

16 opinions and conclusions on the last page of the

17 document, when you approved this document saying that a

18 search could reveal logs or sign-in sheets, what was your

19 understanding of what logs or sign-in sheets meant?

20     A.  Any type of, like it says here, written, typed,

21 electronic document which may indicate any type of usage

22 on a given date and type of any computer whether it be

23 individual or -- we had no idea what type of records the

24 Long Haul kept.  We had no idea if any of our known

25 activists were actual employees of the Long Haul or were

71

BARKLEY
Court Reporters

1    context?

2         A.  Anyone who worked there, anyone who goes in

3    there, any -- anyone we've seen go in there.  I mean,

4    anyone who uses or used a computer inside the Long Haul,

5    be it an employee or not an employee, could have been the

6    one who sent the threatening e-mails.  We had no idea

7    who.

8         Q.  And yet you thought that Jesse Palmer would help

9    you get into the Long Haul even though he could have been

10   the one to send the e-mails?

11        A.  We felt that he may have had a key to get into

12   the Long Haul since he was affiliated with that address.

13        Q.  What else, if anything, was discussed at the

14   briefing meeting on the morning of the 27th?

15            MS. ELLIS:  Other than what she's already

16   testified to?

17            MS. GRANICK:  Yes.

18            THE WITNESS:  I don't recall anything else,

19   anything of significance.

20   BY MS. GRANICK:

21        Q   What role --

22            So after that meeting, did the officers from

23   that meeting go to the Long Haul space?

24        A.  Yes.

25        Q.  And you were there too.  Is that correct?

94

Karen Alberts

**BARKLEY**
Court Reporters

1      A.  Correct.

2      Q.  Okay.  Did you act as supervisor during the

3  execution of the search warrant?

4      A.  Yes.

5      Q.  And with regards to executing search warrants,

6  what does the supervisor do?

7      A.  I pretty much monitor everything going on to

8  make sure everything goes as planned.

9      Q.  What did you do when you got to the Long Haul

10 premises?

11         MS. ELLIS:  Objection, calls for a narrative.

12         THE WITNESS:  Can you clarify that?

13 BY MS. GRANICK:

14     Q   What did you do when you got to the Long Haul

15 premises?

16     A.  I stood outside to see if we could gain entry.

17     Q.  And were you able to gain entry?

18     A.  Eventually we were.

19     Q.  And how did you do that?

20     A.  Initially we couldn't get in through the front

21 door, so I contacted -- there was a business next door,

22 to see if they by chance had a key because the business

23 was closed or the Long Haul was closed.  And they said

24 that they both had the same landlord.  So they got on the

25 phone to attempt to contact the landlord for me to see if

                              95

BARKLEY
Court Reporters

1    he or she could bring down a key to the location.  And

2    then I think someone in the back actually felt they may

3    have had a key, so they were looking for a key.  And they

4    invited one of my officers or a couple of them through

5    their business to go to the rear of -- there's a set of

6    businesses there, to the rear of the Long Haul.  And one

7    of my detectives was able to gain entry because it wasn't

8    very well secured.

9        Q.  Did you remain in the front on the sidewalk at

10   that time or did you go with the officers to gain entry

11   initially through the back?

12       A.  No, I went to the back as well.

13       Q.  Okay.  When you went to the back, were you part

14   of the initial set of officers that entered the Long Haul

15   or had other officers already entered?

16       A.  I was at the back of the line.

17       Q.  Okay.  What did you do next?

18       A.  We went in, secured the building, made sure no

19   one was inside, and then everybody stepped outside so

20   Officer MacAdam or Detective MacAdam could videotape the

21   premises.

22       Q.  Did Detective MacAdam videotape the -- when

23   Detective MacAdam was videotaping the premises, was he

24   the only officer inside the Long Haul Info Shop?

25       A.  I couldn't tell you for sure.  We usually try to

Karen Alberts

BARKLEY
Court Reporters

1      Q.  Uh-huh.

2      A.  So I pretty much kind of focused on them while

3   everyone else commenced the searching.

4      Q.  When you say "focused on," what do you mean?

5      A.  Trying to communicate with them, letting them

6   know a little bit about what was going on.

7      Q.  Did you go back outside?

8      A.  I did.

9      Q.  Okay.

10      A.  A couple of times.

11      Q.  So you entered the front office, and then you

12   noticed that people had gathered?

13      A.  At some point.

14      Q.  Okay.  What did you do while you were in the

15   front office before you noticed that people had gathered,

16   if anything?

17      A.  I started looking around for some of the items

18   on the search warrant.

19      Q.  Okay.  Tell me what you did to look for the

20   items on the search warrant while in the front office?

21      A.  There were some handwritten logs, notebook-type

22   things.  So I started opening them up and reading them.

23      Q.  Okay.  Where were those located?

24      A.  They were all over.  You know, there was a

25   couple -- there was a desk and a -- there was like an

                              98

                         Karen Alberts

BARKLEY
Court Reporters

1   L-shaped counter I think.  And there were -- you know,

2   lots of papers and paperwork and notebooks and things of

3   that nature.  So I was looking for any in the potential

4   logs or documents that were listed in the search warrant

5   which hopefully could help us identify some of the people

6   who sent these e-mails.

7           I searched I think there was like a I guess you

8   call a recipe card box either on the counter or on the

9   desk or on one of the shelves which contained like cards

10  to see if they had any notes on it that could be

11  beneficial.

12      Q.  Okay.  Where were the papers that you searched

13  in the front room located?  Were they on the -- were the

14  papers that you searched in the front room on the desk or

15  were they in locked cabinets or both or neither?

16          MS. ELLIS:  Objection, compound, assumes facts

17  not in evidence.

18          THE WITNESS:  Can you break that down for me?

19  BY MS. GRANICK:

20      Q.  Yeah.  When you searched logs in the front

21  office, where were they located?

22      A.  All over.

23      Q.  Okay.  So can you identify for me what logs you

24  found where and looked at?

25      A.  No, because I didn't seize any of them.  None of

                            99

Karen Alberts

BARKLEY
Court Reporters

1    them ended up being relevant.  I mean, so part of what we

2    do when we go in on a search warrant is search.  In this

3    case we were searching paperwork, and so wherever

4    paperwork was I started to read it.

5        Q.  Were any of these logs labeled with titles?

6        A.  I believe one of them might have been like a

7    lending log or a lending -- they had a library, extensive

8    archive library there.  So one of them could have been

9    labeled that, but I can't say for sure.

10       Q.  Did you look at that document?

11       A.  I did.

12       Q.  And what did you see?

13       A.  People's names, dates of what I'm assuming is

14   when they checked stuff out.

15       Q.  Where was that item located?

16       A.  Somewhere in that front office area around the

17   desk.  I can't really say for sure.

18       Q.  Why did you think that a document labeled

19   lending log would have information about who sent the

20   June e-mails?

21           MS. ELLIS:  Objection, vague.

22           THE WITNESS:  What do you mean?

23   BY MS. GRANICK:

24       Q   Why did you think that the document you reviewed

25   that said lending log would assist you in determining who

100



1      Q.   Who was in there?

2      A.   Officer Zuniga.

3      Q.   Was that the area where you saw the Slingshot

4  publication?

5      A.   Somewhere up in that area, yes.

6      Q.   Did you see the Slingshot banner over the door

7  in that loft area?

8          MS. ELLIS:  Objection, assumes facts not in

9  evidence.

10          THE WITNESS:  What Slingshot banner?

11  BY MS. GRANICK:

12      Q.   Did you see any signs that said "Slingshot" when

13  you were in that area?

14      A.   There may have been.  I don't remember one off

15  the top of my head.

16      Q.   Did you see any officers up there other than

17  Officer Zuniga?

18      A.   At the time I went up there, no.

19      Q.   Did you -- when you were in that area, did you

20  see any cutting of locks or opening of doors or?

21      A.   No.

22      Q.   The door -- did you see a door up there?

23      A.   Yeah.  The door, there was a door on the street

24  side I think facing the street.

25      Q.   Was that door already open when you got up

110

BARKLEY
Court Reporters

1  there?

2      A.  Yes.

3      Q.  What did you see Officer Zuniga doing?

4      A.  Just searching.

5      Q.  What was he searching?

6      A.  I think when I --

7          MS. ELLIS:  Objection, speculation.

8          THE WITNESS:  I don't know what he was

9  searching, but he was inside the small office area,

10 inside that door.

11 BY MS. GRANICK:

12     Q   And could you see what he had in his hands?

13     A.  No.  I wasn't looking.

14     Q.  How did you know he was searching?

15     A.  Because you could hear movement.  I mean, that

16 was his job.  That was what all the detectives' job was

17 at that point was to search.

18     Q.  And could you tell what he was looking at?

19     A.  I don't recall at the time when I first got up

20 there.

21     Q.  Could you tell whether he was looking at

22 documents?

23     A.  Could have been looking at documents.  I think

24 there was some photographs up there, that type of thing.

25     Q.  What did you see him doing with regards to

111

BARKLEY
Court Reporters

1    photographs?

2         MS. ELLIS:  Objection, assumes facts not in

3    evidence.

4         THE WITNESS:  I don't recall if I actually saw

5    him going through photographs.  I remember some

6    discussion about photographs at some point.

7    BY MS. GRANICK:

8         Q.  What was that discussion?

9         A.  I remember him telling Agent Shaffer that he had

10   seen some photographs of potential protests up in

11   Seattle.

12        Q.  And what were the -- did he -- what were the

13   potential protests?

14        MS. ELLIS:  Objection, speculation.

15        THE WITNESS:  I don't know.

16   BY MS. GRANICK:

17        Q.  What else did he tell Agent Shaffer?

18        A.  I just --

19        MS. ELLIS:  Objection, speculation.

20        THE WITNESS:  Yeah, I don't know.

21   BY MS. GRANICK:

22        Q   So he -- so Zuniga told Special Agent Shaffer

23   that there were potential protests -- there were

24   photographs of potential photographs in Seattle.  Is that

25   correct?

BARKLEY
Court Reporters

1   not see anyone else up there.  I know Agent Shaffer was

2   up there at some point, but I don't know whether she was

3   searching or not.

4        Q.  Did you see anyone other than Officer Kasiske in

5   the loft on the other side of the space towards the back

6   of the building?

7        A.  Yes.

8        Q.  Who?

9        A.  I believe Officer MacAdam was up there helping

10  bring stuff down.

11       Q.  Anybody else?

12       A.  Not that I can remember.  But people were up and

13  down, so I couldn't really say for sure.

14       Q.  Did you see any officers in the office that was

15  marked with the sign "East Bay Prisoner Support"?

16       A.  No.

17       Q.  Do you know if any officers -- do you know which

18  officers searched that space?

19            MS. ELLIS:  Objection, assumes facts not in

20  evidence.

21            THE WITNESS:  As I said earlier, I don't know

22  who searched it.

23  BY MS. GRANICK:

24       Q   Do you know what -- what Officer Mike Hart did

25  during the execution of the warrant?

Karen Alberts

BARKLEY
Court Reporters

1      A.   Predominantly he stayed outside to watch over

2  our vehicles.  A large crowd had gathered, and I actually

3  had to call some -- a marked patrol unit from campus to

4  come also help watch over our cars.

5      Q.   Do you know whether Officer Hart entered the

6  Long Haul space?

7           MS. ELLIS:  Objection, vague as to time.

8           THE WITNESS:  When?

9  BY MS. GRANICK:

10     Q.   Any point during the execution of the warrant.

11     A.   I think towards the end he may have assisted in

12 carrying stuff out.  I'm not positive of that, but he

13 might have.

14     Q.   Do you know whether any of the documents that

15 officers reviewed during the search were sales logs?

16     A.   No.

17     Q.   Do you know whether any officer during the

18 search looked through envelopes of cash?

19     A.   I think I might -- I think there might have been

20 a cash box up front.  I don't remember if it was a cash

21 drawer, if it was one of those card boxes I talked about

22 earlier.  There was like a little petty cash thing.

23 There was very little cash in it.

24     Q.   Is it your recollection that you are the officer

25 who looked through that?

132

Karen Alberts

BARKLEY
Court Reporters

1       A.  There may have been others, but I remember

2   seeing some like a little petty cash like thing in the

3   front office.

4       Q.  And do you know whether any officers looked at

5   mail in the East Bay Prisoner Support Group office?

6       A.  I'm sorry.  What was the --

7       Q.  Do you know whether any officers looked at mail?

8       A.  No.

9       Q.  Letters in the East Bay Prisoner Support Group

10  office?

11      A.  No, no, I don't.

12      Q.  Were any computer sign-in logs found during the

13  search?

14      A.  Not to my knowledge.

15      Q.  There -- Officer MacAdam made a videotape of the

16  search.  Is that correct?

17      A.  No.  He made a videotape of the premises before

18  the search and after the search.

19      Q.  Okay.

20      A.  I believe.

21      Q.  Okay.  And there was a police report written

22  about the search by Officer Kasiske.  Is that correct?

23      A.  Correct.

24      Q.  I believe Officer Kasiske also took some

25  photographs of the items that were ceased from the

133

BARKLEY
Court Reporters

1    premises.  Is that correct?

2        A.  Correct.

3        Q.  Other than the videotape, the photographs, and

4    the report, were there other reports or records made

5    about the execution the search warrant?

6            MS. ELLIS:  Objection, vague.

7            THE WITNESS:  Can you clarify that?

8    BY MS. GRANICK:

9        Q.  Yeah.  Any photos, videos, written reports, or

10   other documentation that reflects what happened during

11   the execution of the search warrant at the Long Haul

12   premises?

13       A.  I think the inventory is included as part of the

14   report.  So, nothing else that I can recall.

15       Q.  Did you have a copy of the search warrant during

16   the execution of the warrant and the conduct of the

17   search?

18       A.  I believe I did.

19       Q.  Did you have a copy of the statement of probable

20   cause with you during execution of the search warrant?

21       A.  That I don't know.

22       Q.  Was there a copy of the statement of probable

23   cause at the pre-search breaching meeting?

24           MS. ELLIS:  Objection, vague.

25           THE WITNESS:  What do you mean?  The briefing

134

Karen Alberts

BARKLEY
Court Reporters

1   took place in our office, so.

2   BY MS. GRANICK:

3       Q   Did you have a copy of the statement of probable

4   cause at that meeting?

5       A.  I don't --

6           MS. ELLIS:  Objection, foundation.

7           THE WITNESS:  What do you mean?

8   BY MS. GRANICK:

9       Q.  Did you have a copy of the statement of probable

10  cause at that meeting?

11          MS. ELLIS:  Same objection.

12          THE WITNESS:  I don't know if I had one in my

13  possession.  There may have been one on my desk.

14  BY MS. GRANICK:

15      Q.  Did you look at it during the meeting?

16      A.  No.  I had looked at it plenty before then.

17      Q.  Did other officers look at it during the

18  meeting?

19      A.  I don't know.

20          MS. ELLIS:  Objection, speculation.

21  BY MS. GRANICK:

22      Q   At some point after the execution of the warrant

23  did -- did you or Officer Kasiske ask the court to seal

24  the warrant and the statement of probable cause?

25      A.  Yes.

135

BARKLEY
Court Reporters

1      A.  I believe so.

2      Q.  What happened to the computers that were not

3  sent to the lab but were seized that day?

4          MS. ELLIS:  Objection, foundation.

5          THE WITNESS:  What do you mean?

6  BY MS. GRANICK:

7      Q.  What happened to those?

8      A.  When?

9      Q.  After the search.

10     A.  After the search warrant?

11     Q.  Yeah, after they were seized, they were not sent

12  to the lab?

13     A.  Right.  I believe I'd have to go -- I don't know

14  when she actually did it, but Nicole Miller actually

15  copied, I believe, the hard drives from the computers,

16  and then the computers were ultimately returned back to

17  the members of the Long Haul.

18     Q.  Was the data copied from the hard drives

19  searched by anyone other than the lab?

20          MS. ELLIS:  Objection, assumes facts not in

21  evidence.

22          THE WITNESS:  What computers are you talking

23  about?

24  BY MS. GRANICK:

25     Q.  The data that copied -- that Nicole Miller

148

BARKLEY
Court Reporters

1    copied from the computers?

2        A.  Which computers?

3        Q.  From any of the computers that Nicole Miller

4    copied data from, what happened to that data?

5        A.  I'd have to go back and read her report.  I

6    don't -- I don't think she -- I'd have to -- I don't know

7    whether she copied any of the original six.  I think the

8    lab might have done that, not her.  The other ones I

9    believe she copied, and I'd have to refresh my memory and

10   then those copies have never been searched, they were

11   just stored.

12       Q.  So your recollection is that the -- the data

13   from machines that did not get sent to the lab was simply

14   stored and not searched?

15           MS. ELLIS:  Objection, asked and answered.

16           THE WITNESS:  I'll clarify that.  Yes, it's my

17   belief that no other computers have been -- or hard

18   drives have been searched other than the ones that went

19   to the lab.

20   BY MS. GRANICK:

21       Q   Now, Sergeant Alberts, I believe you said that

22   you had reviewed your interrogatory answers prior to the

23   deposition today?

24       A.  Correct.

25       Q.  And as one of the interrogatories that we asked

                            149

Karen Alberts                                

| | |
|---|---|
| **From:** | tzuniga@berkeley.edu |
| **Sent:** | Tuesday, February 19, 2008 12:21 PM |
| **To:** | kalberts@berkeley.edu |
| **Subject:** | Re: [Fwd: Activist Website Article - Berkeley/LA Connection] |

>Sarg,
>      On their home page they claim an affiliation with The Long Haul on
>3124 Shattuck Ave here in Berkeley. They have a "Radical contact
>list" on their site (http://slingshot.tao.ca/rclist.php)
>
>I made a list of locations here in Berkeley, Oakland, San Franciscco and
>Santa Cruz in case we need this for reference in furture or current
>investigations. I put it in the N drive under AREWG/Subjects and
>Victims/Slingshot Radical Contact list.
>
>Please contact me with any questions. Thank you.

Corporal Timothy J. Zuniga
Crime Prevention Unit
UC Berkeley Police Department
1 Sproul Hall
Berkeley, Ca 94720
Phone 510-642-3722
Fax 510-642-6434

This e-mail communication and any attachments may contain confidential
and privileged, or otherwise protected, information for the use of the
designated recipients named above only. If you are not the intended
recipient, you are hereby notified that you have received this
communication in error and that any review, disclosure, dissemination,
distribution or copying of it or its contents is prohibited and
unauthorized. If you have received this communication in error, please
notify me immediately by replying to this message and deleting it from
your computer. Thank You.

> FYI!
>
> Karen
>
> ---------------------------- Original Message ----------------------------
> Subject: Activist Website Article - Berkeley/LA Connection
> From:    "Richard C. Van Sluyters" <rcvs@berkeley.edu>
> Date:    Tue, February 19, 2008 11:30 am
> To:      Animal Issues Committee:;
> Cc:      Animal Issues Committee-copies:;
> --------------------------------------------------------------------------
>
> Dear Colleagues,
>
> John Sandbrook at UCLA discovered this website, which seems to be
> authored by one of our animal activists or someone very close to
> them. It contains a number of interesting statements, including a
> comparison of the campaign against research at UC Berkeley to that
> against UCLA. If any of us had any doubts about whether the two
> campaigns are not at least watching each other, this should dispel
> them.
>
> I've forwarded it to UCPD, OGC and the FBI as well.
>
> -Rick



EXHIBIT 28
3/10 D
Alberts

UC 000614

> --
> Richard C. Van Sluyters, OD, PhD
>       Professor and Associate Dean for Student Affairs,
>            School of Optometry
>       Chair, Animal Care and Use Committee
>       University of California
>       Berkeley, CA 94720-2020
>
>       Associate Dean's Office: (510) 642-9537
>       ACUC Office: (510) 642-8855
>       Personal: (510) 642-1235
>       Facsimile: (510) 642-2281
>
> --
> Sergeant Karen Alberts
> UC Berkeley Police Department
> Criminal Investigations Bureau
> 1 Sproul Hall
> Berkeley, CA 94720
> (510) 642-6760 (24 hr. number)
> (510) 642-0482 (Voice Mail)
> (510) 642-6434 (Fax)
>

UC 000615

| From: | kasiske@berkeley.edu |
|-------|----------------------|
| Sent: | Friday, March 21, 2008 3:20 PM |
| To: | kalberts@berkeley.edu |
| Subject: | [Fwd: Subpoena response] |
| Attach: | Capture3-21-2008-11.46.40 AM.jpg |

Hi Karen,

Somehow I'm not surprised that the IP address comes back to the Long Haul.
Maybe if we go over there and ask them really nicely, they will tell us
who was using their computer room that night (ha ha).

Bill

--------------------------- Original Message ---------------------------
Subject: Subpoena response
From:   "Dane Jasper" <dane@corp.sonic.net>
Date:   Fri, March 21, 2008 11:51 am
To:     kasiske@berkeley.edu
------------------------------------------------------------------------

I certify under penalty of perjury that the attached is correct to the
best of my knowledge.

On 3/19/2008, the IP 208.106.103.213 was allocated to the individual and
location on the attached.

-Dane Jasper
CEO
Sonic.net



UC 000442

EXHIBIT 13

SCHIFF HARDIN LLP
WILLIAM J. CARROLL (CSB #118106)
wcarroll@schiffhardin.com
SARAH D. YOUNGBLOOD (CSB #244304)
syoungblood@schiffhardin.com
One Market, Spear Street Tower
Thirty-Second Floor
San Francisco, CA  94105
Telephone:   (415) 901-8700
Facsimile:    (415) 901-8701

SARA L. ELLIS (ILSB #6224868)
sellis@schiffhardin.com
233 South Wacker Drive
Suite 6600
Chicago, IL  60606
Telephone   (312) 258-5800
Facsimile    (312) 258-5600

Attorneys for Defendants
MITCHELL CELAYA, KAREN ALBERTS,
WILLIAM KASISKE, WADE MACADAM and
TIMOTHY J. ZUNIGA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LONG HAUL, INC., and EAST BAY PRISONER SUPPORT, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA; MITCHELL CELAYA; KAREN ALBERTS; WILLIAM KASISKE; WADE MACADAM; TIMOTHY J. ZUNIGA; MIKE HART; LISA SHAFFER; AND DOES 1-25, <br><br> Defendants. | Case No.  3:09-cv-0168 JSW <br><br> **DEFENDANT MITCHELL CELAYA'S RESPONSES TO PLAINTIFFS' REQUESTS FOR ADMISSION** |

PROPOUNDING PARTY:  Plaintiffs LONG HAUL, INC. and EAST BAY PRISONER

SUPPORT

RESPONDING PARTY:   Defendant MITCHELL CELAYA

SET NUMBER:       ONE

1  **REQUEST FOR ADMISSION NO. 20:**

2      Admit that defendants or their agents made copies of Plaintiffs' data following the

3  raid.

4  **RESPONSE TO REQUEST FOR ADMISSION NO. 20:**

5      Celaya objects to this request on the grounds that it is vague and ambiguous as to

6  the term "Defendants'" and understands that term to refer specifically to defendants

7  Mitchell Celaya, Karen Alberts, William Kasiske, Wade Macadam and Timothy J. Zuniga

8  (collectively, "University Defendants"). Celaya further objects to this request on the

9  grounds that it is vague and ambiguous as to the terms "agents," "copies," and "data."

10  Celaya further objects to this request to the extent that it assumes facts not in evidence.

11  Celaya further objects to this request to the extent that it calls for a legal conclusion.

12  Celaya further objects to this request on the ground that it is compound. Celaya further

13  objects to this request on the ground that it is overbroad and unduly burdensome.

14  Celaya further objects to this request on the ground that it is argumentative, prejudicial,

15  and misleading as to the use of the term "raid." Celaya further objects to this request to

16  the extent it seeks information protected from disclosure by the attorney-client privilege

17  and/or the attorney work-product doctrine.

18      Subject to and without waiving the foregoing general and specific objections,

19  Celaya responds as follows: Celaya admits that the University of California Berkeley

20  Police Department made copies of the hard drives and a flashdrive that were seized

21  from the Long Haul premises.

22  **REQUEST FOR ADMISSION NO. 21:**

23      Admit that defendants or their agents have retained copies of Plaintiffs' data taken

24  during the raid.

25  **RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

26      Celaya objects to this request on the grounds that it is vague and ambiguous as

27  the term "Defendants'" and understands that term to refer specifically to defendants

28  Mitchell Celaya, Karen Alberts, William Kasiske, Wade Macadam and Timothy J. Zuniga

1  (collectively, "University Defendants"). Celaya further objects to this request on the

2  grounds that it is vague and ambiguous as to the terms "agents," "retained," "copies,"

3  "data, and "taken." Celaya further objects to this request to the extent that it assumes

4  facts not in evidence. Celaya further objects to this request to the extent that it calls for a

5  legal conclusion. Celaya further objects to this request on the ground that it is

6  compound. Celaya further objects to this request on the ground that it is overbroad and

7  unduly burdensome. Celaya further objects to this request on the ground that it is

8  argumentative, prejudicial, and misleading as to the use of the term "raid." Celaya

9  further objects to this request to the extent it seeks information protected from disclosure

10  by the attorney-client privilege and/or the attorney work-product doctrine.

11  　　　　Subject to and without waiving the foregoing general and specific objections,

12  Celaya responds as follows: Celaya admits that the University of California Berkeley

13  Police Department made copies of the hard drives and a flashdrive that were seized

14  from the Long Haul premises and have retained these copies which is are governed by a

15  stipulation entered into between the parties to this litigation.

16  **REQUEST FOR ADMISSION NO. 22:**

17  　　　　Admit that you did not object to the search plan presented by Kasiske on the

18  morning of the raid.

19  **RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

20  　　　　Celaya objects to this request on the ground that it is vague and ambiguous as to

21  the term "you," and understands that term to refer specifically and solely to Defendant

22  Mitchell Celaya. Celaya further objects to this request on the grounds that it is vague

23  and ambiguous as to the terms and phrase "object," "search plan," and "presented."

24  Celaya further objects to this request to the extent that it assumes facts not in evidence.

25  Celaya further objects to this request to the extent it seeks information protected by the

26  investigation privilege. Celaya further objects to this request on the ground that it is

27  argumentative, prejudicial, and misleading as to the use of the term "raid."

28  　　　　Subject to and without waiving the foregoing general and specific objections,

EXHIBIT 14

1              UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4

5   LONG HAUL, INC., and EAST  )
    BAY PRISONER SUPPORT,     )

6                     )
           Plaintiffs,   )

7                     )
    vs.                 )  No.  C 09-00168-JSW

8                     )
    UNITED STATES OF AMERICA;  )

9   MIGUEL CELAYA; KAREN      )
    ALBERTS; WILLIAM KASISKE;  )

10  WADE MacADAM; TIMOTHY     )
    ZUNIGA; MIKE HART; LISA    )

11  SHAFFER,               )
                     )

12         Defendants.   )
    _____)

13

14

15                   30(b)(6)

16              DEPOSITION OF

17        SUPERVISORY SPECIAL AGENT

18             DAVID STRANGE

19     Held at the Law Offices of SchiffHardin

20    One Market Street, San Francisco, California

21    Thursday, December 16, 2010, 2010, 9:33 a.m.

22

23

24

25  REPORTED BY:  ELAINA BULDA-JONES, RPR, CSR #11720

BARKLEY
Court Reporters

                    1    are managing the investigations of the domestic

                    2    terrorism squad, which is called Squad DT4.  And

                    3    it's based in Oakland, covers the entire northern

                    4    district of California from Crescent City to

    09:35   5    Monterey more or less.

                    6    BY MS. GRANICK:

                    7         Q.   What were your responsibilities back in

                    8    2008?

                    9         A.   The same.

    09:35   10         Q.   Did -- is Agent Lisa Shaffer one of

                    11    your -- one of the people that you supervise?

                    12         A.   Yes.

                    13         Q.   And was she one of the people you

                    14    supervised in 2008?

    09:36   15         A.   Yes.

                    16         Q.   And what about Mike Hart?

                    17         A.   Mike Hart is a task -- was a task force

                    18    officer.  He has since retired and moved on.

                    19         Q.   What does that mean, to be a task force

    09:36   20    officer?

                    21         A.   A task force officer is an employee of

                    22    another agency who assigns that person to the FBI to

                    23    work certain matters.

                    24         Q.   He was an employee of the Alameda County

    09:36   25    Sheriff's Department; is that correct?

                                                9

BARKLEY
Court Reporters

1          A.    Yes, ma'am.

2          Q.    Do you know how he was assigned to work

3    with the FBI?

4          A.    Yes.

09:36  5          Q.    How was he assigned to work with the FBI?

6          A.    He -- his department asked if they could

7    place Mike Hart on the joint terrorism task force

8    and we agreed.

9          Q.    Do you know why they asked if he could be

09:36  10   placed on the task force?

11         A.    The --

12               MR. LEE:  Calls for speculation.

13               THE WITNESS:  I do not know specifically,

14   but I can give you answers as to generally why

09:36  15   agencies want people to be part of a joint terrorism

16   task force.

17   BY MS. GRANICK:

18         Q.    Please do.

19         A.    Most agencies want their people to be

09:37  20   involved in working terrorism investigations of one

21   kind or another because they like to be involved in

22   that and they want to know what threats are against

23   their people and communities and have a pipeline

24   into the FBI.

09:37  25               That's what the task force program

10

BARKLEY
Court Reporters

```
 1  provides.
 2       Q.  Do you -- why did the FBI accept Mike Hart
 3  as a member of the task force?
 4            MR. LEE:  Objection.  It's -- I'm not sure
 5  it's been fairly noticed as a topic as a 30(b)(6)
 6  witness.  So I think I would object that this is not
 7  30(b)(6) testimony.  This is his understanding.  It
 8  may also call for a legal conclusion or personnel
 9  information that is protected from disclosure.
10            THE WITNESS:  Can you repeat the question?
11  BY MS. GRANICK:
12       Q.  Why did the FBI accept Mike Hart on to the
13  task force?
14       A.  Mike Hart was offered by the Alameda
15  County Sheriff's office.  He passed a background
16  investigation and we accepted him.
17       Q.  Okay.  Who participated in the decision to
18  select you as the 30(b)(6) witness?
19       A.  I am unsure.
20       Q.  Do you know why you were chosen to be the
21  30(b)(6) witness?
22            MR. LEE:  Assumes facts not in evidence.
23            THE WITNESS:  I believe it was -- I'm the
24  supervisor of the squad that participated in the
25  events of August 27, 2008.
```

11

BARKLEY
Court Reporters

```
 1    or wear FBI clothes?

 2         A.   Neither.  They wear regular clothes.

 3         Q.   Plain clothes?

 4         A.   Yeah, plain clothes.  We don't have

10:08  5    clothes in the FBI.

 6         Q.   You have jackets?

 7         A.   We dress like this (indicating).

 8         Q.   And you have the jackets that say "FBI" on

 9    the back?

10:08 10         A.   Yes, yes.

11         Q.   Okay.  Was Officer Hart armed at the

12    search?

13         A.   I do not know for a fact.  I have not

14    discussed that with him but I imagine he was.

10:08 15         Q.   And what about Agent Shaffer, was she

16    armed?

17         A.   Yes.

18         Q.   Did she ever take her gun out of its

19    holster during the course of the search?

10:08 20         A.   When I spoke to Agent Shaffer about this

21    she said she did.

22         Q.   She said she did?

23         A.   Yes.

24         Q.   When did she do that?

10:08 25         A.   Upon entry into the Long Haul.
```

36

BARKLEY
Court Reporters

1      Q.   What's the relationship between the

2   Silicon Valley Regional Computer Forensic Lab and

3   the United States?

4      A.   The relationship is that the United States

11:10  5   government has helped fund it and organize it, and

6   other entities provide participation as requested or

7   if they want to do it or not.

8      Q.   And does the U.C. Berkeley police

9   department give funding to the lab?

11:10  10      A.   I do not know if they do or don't.

11      Q.   Do agencies that ask for forensic services

12   from the lab pay per service?

13      A.   I am not aware of the actual details of

14   pay for service and the RCFL.

11:11  15      Q.   Is the lab funded entirely by federal

16   government money?

17      A.   I am not entirely sure about that.

18      Q.   Is the lab considered an agency of the

19   United States?

11:11  20      A.   Define "agency," please.

21      Q.   Like the FBI is an agency.

22           MR. LEE:   I object that the previous

23   30(b)(6) witness we produced who was the director of

24   the lab was the witness who could answer questions

11:11  25   like these most accurately.

72

30 (b) (6) Of David Strange

BARKLEY
Court Reporters