# EXHIBIT 15

1            UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3             SAN FRANCISCO DIVISION

4

5  LONG HAUL, INC. and EAST BAY        )
   PRISONER SUPPORT,                   )
6                                      )
                      Plaintiffs,      )
7                                      )
        v.                             )  No. C 09-00168-JSW
8                                      )
   UNITED STATES OF AMERICA; MIGUEL    )
9  CELAYA; KAREN ALBERTS; WILLIAM      )
   KASISKE; WADE MacADAM; TIMOTHY      )
10 ZUNIGA; MIKE HART; LISA SHAFFER;    )
   and DOES 1 - 25,                    )
11                                     )
                      Defendants.      )
12 _____)

13

14

15

16        DEPOSITION OF WADE MacADAM, taken on behalf

17    of Plaintiffs, at One Market Street, 32nd Floor, San

18    Francisco, California, commencing at 12:53 p.m.,

19    Monday, November 15, 2010, before Donna J. Blum,

20    Certified Shorthand Reporter, No. 11133.

21

22

23

24

25

BARKLEY
Court Reporters

1        Q.  Did you participate in the search of the Long

2   Haul premises on August 27, 2008, as part of your job

3   duties?

4        A.  Yes.

5        Q.  Were you wearing a uniform that identified you

6   as law enforcement?

7        A.  Yes.

8        Q.  Do you remember what the other officers

9   participating in that search were wearing?

10       A.  Specifically, no.  I believe Corporal Zuniga and

11  I were the only two in full police uniform.

12       Q.  Do you know why you were the only two in full

13  police uniform?

14           MS. ELLIS:  Objection; speculation.

15           THE WITNESS:  I don't recall.

16  BY MS. HOFMANN:

17       Q.  Okay.  When you arrived at the Long Haul

18  premises, could you please describe how you entered the

19  building?

20       A.  A neighbor gave us access to a door, a back door

21  that led into a little entryway to her property and the

22  Long Haul.

23       Q.  And was the door to the Long Haul that you

24  entered in the back of the building?

25       A.  Yes.

45

BARKLEY
Court Reporters

1    interior environment prior to the search and then do it

2    at the end of the search so if anybody says anything was

3    missing or anything was damaged.

4         Q.  So once the protective sweep was finished, what

5    did you do next?

6         A.  I do not recall.  I do recall that I was tasked

7    with opening the rooms that were locked.

8         Q.  All of the rooms that were locked?

9         A.  To complete the protective sweep, yes.

10        Q.  So who gave you that task?

11        A.  I do not recall.

12        Q.  So once you were given that task, what did you

13   do next?

14        A.  For your word "next," I don't recall what I did

15   next.  I know that I did open the three rooms down below

16   and assist with the one room upstairs.

17        Q.  Were all three of the rooms down below locked?

18        A.  With a padlock, yes.

19        Q.  All three had a padlock?

20        A.  From what I can recall.

21        Q.  Which room did you open first?

22        A.  I don't recall.

23        Q.  Did you -- did anybody assist you in opening

24   those three rooms down below?

25        A.  Yes.

50

BARKLEY
Court Reporters

1      Q.  Who assisted you?

2      A.  Corporal Zuniga.

3      Q.  And how did he assist?

4      A.  I believe there was one lock that I wasn't able

5  to remove the screws so he didn't have to cut it, and I

6  believe he assisted with bolt cutters.

7      Q.  Okay.  Did you see signs on any of those three

8  doors?

9          MS. ELLIS:  Objection; asked and answered.

10         THE WITNESS:  Yeah.  I've already told you I

11  didn't.

12  BY MS. HOFMANN:

13     Q.  I think you told me about one.

14     A.  I didn't notice anything on the doors.

15     Q.  Okay.  I'm going to show you a photograph.

16         This does not have a Bates number, but could you

17  please mark that.

18         (Deposition Exhibit No. 14 was marked for

19         identification.)

20  BY MS. HOFMANN:

21     Q.  Does that look familiar to you at all?

22     A.  No.

23     Q.  Do you see the lock, the padlock that's open

24  there?

25     A.  Yes, I see the padlock.

BARKLEY
Court Reporters

1    Q.  Do you recall taking the lock off of this door?

2         MS. ELLIS:  Objection; foundation.

3         THE WITNESS:  I recall removing screws around

4    some of the hardware so the locks wouldn't have to be

5    cut.  I don't remember which door this was.

6    BY MS. HOFMANN:

7    Q.  Do you recall going into this office?

8         MS. ELLIS:  Objection; assumes facts not in

9    evidence, foundation.

10        THE WITNESS:  I recall going into the offices

11   downstairs.

12   BY MS. HOFMANN:

13   Q.  Okay.  Could you tell me what you saw in those

14   offices?

15   A.  No, because I was going through as a protective

16   sweep to see if there's anybody inside, and that was my

17   main focus.

18   Q.  Was there anything that caught your eye in any

19   of those offices?

20        MS. ELLIS:  Objection; vague.

21        THE WITNESS:  You'd have to go office by office.

22   I don't know exactly what you're asking.

23   BY MS. HOFMANN:

24   Q.  Do you remember seeing any computers that were

25   of interest in any of those offices?

52

BARKLEY
Court Reporters

1          MS. ELLIS:  Objection; vague.

2          THE WITNESS:  I don't recall the contents in

3    each office.

4    BY MS. HOFMANN:

5      Q.  In any of those offices do you remember seeing

6    papers or correspondence that you thought might be of

7    special interest to Agent Shaffer?

8          MS. ELLIS:  Objection; asked and answered.

9          THE WITNESS:  After I did the protective sweep

10   and there was no one inside, people were asking me if

11   there was anything, and I would tell them that they can

12   go in and search the room.  I don't recall anything

13   specific.

14   BY MS. HOFMANN:

15     Q.  So after you took the locks off of those three

16   doors downstairs, what happened next?

17     A.  I entered the rooms.

18     Q.  And then what?

19     A.  Reported that there was no one in the room.

20     Q.  Okay.  And then what happened?

21     A.  Told the team that they were available to be

22   searched.

23     Q.  Do you recall if anybody searched those rooms?

24     A.  I do not recall.

25     Q.  Did you ever realize during the search that

53

BARKLEY
Court Reporters

1   there was a tenant of Long Haul occupying one of those

2   offices?

3           MS. ELLIS:  Objection; assumes facts not in

4   evidence, foundation, vague.

5           THE WITNESS:  There was nobody in the building.

6   BY MS. HOFMANN:

7       Q.  But did you recognize that one of those offices

8   belonged to an entity that was not Long Haul?

9           MS. ELLIS:  Objection; vague, assumes facts not

10  in evidence, foundation.

11          THE WITNESS:  Can you rephrase the question?

12          I noticed that there were offices in the

13  building.  I don't understand your question.

14  BY MS. HOFMANN:

15      Q.  Who did you think those offices belonged to?

16      A.  They looked like administrative offices or

17  storage areas.

18      Q.  What made you think they were administrative

19  offices?

20      A.  One had a desk possibly and just based off

21  seemed like a locked office.

22      Q.  Did you see anything in those offices that gave

23  you a sense of who might have occupied them?

24          MS. ELLIS:  Objection; vague.

25          THE WITNESS:  Again, I was doing a protective

54

BARKLEY
Court Reporters

1  sweep looking for people.  I did not go outside of the

2  protective sweep.

3       Q.  Okay.  After you told officers that those rooms

4  were available to search, what did you do next?

5       A.  I believe I went upstairs and opened another

6  office door.

7       Q.  Okay.  Were you videotaping your ascent up those

8  stairs?

9       A.  I don't recall.

10       MS. ELLIS:  Objection; vague as to time.

11  BY MS. HOFMANN:

12       Q.  When you reached that office upstairs, did you

13  see a sign above it?

14       A.  Not that I recall.  There was stuff over all the

15  walls.  I didn't really pay attention.

16       Q.  Okay.  And that door was locked?

17       A.  Which door?

18       Q.  The door to the office upstairs.

19       A.  Yes.

20       MS. ELLIS:  Objection; assumes facts not in

21  evidence.

22       Q.  Did you help to remove the lock?

23       A.  The lock was not removed.

24       Q.  That door remained locked through the search of

25  the Long Haul premises?

BARKLEY
Court Reporters

1      A.  I don't know the status of the lock, if it was

2  locked or unlocked.  The door was opened.

3      Q.  Okay.  Just to make sure I understand, you did

4  not help to take the lock off of that door, the door of

5  the upstairs office.  Is that correct?

6      A.  From what I recall, the lock was not removed

7  from the door.  The door was pried open.

8      Q.  The door was pried open.  Okay.  Did you go

9  inside that office?

10     A.  Yes.

11     Q.  And what did you see?

12     A.  I'll tell you what I didn't see, I didn't see

13  any people.  That was my protective sweep.

14     Q.  Did you see any computers?

15     A.  I don't recall.

16     Q.  Did you see any photographs?

17         MS. ELLIS:  Objection; vague.

18         THE WITNESS:  I don't remember the contents of

19  the room.

20  BY MS. HOFMANN:

21     Q.  Filing cabinets?

22     A.  There was a file cabinet I want to say to the

23  left of the interior, and I looked around that to see if

24  there was someone behind it.

25     Q.  Okay.  Did you open the file cabinet?

Wade MacAdam

BARKLEY
Court Reporters

1     A.  No.

2     Q.  Were there any other officers with you while you

3 were in that room?

4     A.  Yes.  Corporal Zuniga and I went into that room

5 together.

6     Q.  What did you see him doing in that room?

7     A.  I don't recall.  He searched one side for

8 people.  I searched the other side for people.  I don't

9 know what he was doing.

10     Q.  And what did you do next?

11     A.  I do not recall.  I was assisting all of them as

12 needed.

13     Q.  Did Corporal Zuniga stay in that room after you

14 left?

15     A.  I don't recall.

16     Q.  After you were in the room that was the office

17 upstairs, what did you do?

18     A.  I don't recall.  I remember I was called up to

19 the front to cut a padlock to a cabinet.

20     Q.  Okay.  Did you open the cabinet?

21     A.  I believe I did.

22     Q.  What was in the cabinet?

23     A.  I don't recall.  I just cut the lock.

24     Q.  Who asked you to cut the lock?

25     A.  I don't recall who was searching that area.

BARKLEY
Court Reporters

1  from upstairs?

2       A.  I don't recall.

3       Q.  After the computers were lined up and you

4  videotaped them, you say that you probably left the

5  building.  What would you have done after you left the

6  building?  Or rather what did you do after you left the

7  building?

8       A.  Since I was in uniform, I was standing next to

9  the vehicle that was being stored with the property and I

10  was providing vehicle security.

11      Q.  And when you say the property, do you mean the

12  items that were seized during the search at the Long

13  Haul?

14      A.  Yes.

15      Q.  Okay.  And what were you doing to provide

16  security?

17      A.  Keeping people away from the vehicle.  There

18  were a few pedestrians outside.

19      Q.  Okay.  And is this when you -- when you spoke to

20  other individuals outside the Long Haul?

21      A.  There was one that I knew, and I recall

22  interacting with him.  But the other people that might

23  have been yelling just bounced off me.  I was just

24  providing security.

25      Q.  How did you know the one man that you just

67

BARKLEY
Court Reporters

# EXHIBIT 16

1   SCHIFF HARDIN LLP
    WILLIAM J. CARROLL (CSB #118106)
2   wcarroll@schiffhardin.com
    SARAH D. YOUNGBLOOD (CSB #244304)
3   syoungblood@schiffhardin.com
    One Market, Spear Street Tower
4   Thirty-Second Floor
    San Francisco, CA  94105
5   Telephone:   (415) 901-8700
    Facsimile:    (415) 901-8701
6
    SARA L. ELLIS (ILSB #6224868)
7   sellis@schiffhardin.com
    233 South Wacker Drive
8   Suite 6600
    Chicago, IL  60606
9   Telephone    (312) 258-5800
    Facsimile     (312) 258-5600
10
    Attorneys for Defendants
11  MITCHELL CELAYA, KAREN ALBERTS,
    WILLIAM KASISKE, WADE MACADAM and
12  TIMOTHY J. ZUNIGA

13

14                UNITED STATES DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16

17  LONG HAUL, INC., and EAST BAY          Case No.  3:09-cv-0168 JSW
    PRISONER SUPPORT,
18                                          **DEFENDANT WADE MACADAM'S**
                   Plaintiffs,              **RESPONSES TO PLAINTIFFS'**
19                                          **REQUESTS FOR ADMISSION**
    v.
20
    UNITED STATES OF AMERICA;
21  MITCHELL CELAYA; KAREN
    ALBERTS; WILLIAM KASISKE; WADE
22  MACADAM; TIMOTHY J. ZUNIGA;
    MIKE HART; LISA SHAFFER; AND
23  DOES 1-25,

24                 Defendants.

25  PROPOUNDING PARTY:  Plaintiffs LONG HAUL, INC. and EAST BAY PRISONER

26                      SUPPORT

27  RESPONDING PARTY:   Defendant WADE MACADAM

28  SET NUMBER:         ONE

1   MacAdam further objects to this request to the extent that it assumes facts not in

2   evidence.  MacAdam further objects to this request on the ground that it seeks

3   information equally available to the requesting party.  MacAdam further objects to this

4   request to the extent that it calls for a legal conclusion.  MacAdam further objects to this

5   request to the extent that it seeks information protected from disclosure by the attorney-

6   client privilege and/or the attorney work-product doctrine.

7        Subject to and without waiving the foregoing general and specific objections,

8   MacAdam responds as follows:  Denied.

9   **REQUEST FOR ADMISSION NO. 20:**

10        Admit that defendants or their agents made copies of Plaintiffs' data following the

11   raid.

12   **RESPONSE TO REQUEST FOR ADMISSION NO. 20:**

13        MacAdam objects to this request on the grounds that it is vague and ambiguous

14   as the term "Defendants'" and understands that term to refer specifically to defendants

15   Mitchell Celaya, Karen Alberts, William Kasiske, Wade Macadam and Timothy J. Zuniga

16   (collectively, "University Defendants").  MacAdam further objects to this request on the

17   grounds that it is vague and ambiguous as to the terms "agents," "copies," and "data."

18   MacAdam further objects to this request to the extent that it assumes facts not in

19   evidence.  MacAdam further objects to this request to the extent that it calls for a legal

20   conclusion.  MacAdam further objects to this request on the ground that it is compound.

21   MacAdam further objects to this request on the ground that it is overbroad and unduly

22   burdensome.  MacAdam further objects to this request on the ground that it is

23   argumentative, prejudicial, and misleading as to the use of the term "raid."  MacAdam

24   further objects to this request to the extent it seeks information protected from disclosure

25   by the attorney-client privilege and/or the attorney work-product doctrine.

26        Subject to and without waiving the foregoing general and specific objections,

27   MacAdam responds as follows:  MacAdam admits that the University of California

28   Berkeley Police Department made copies of the hard drives and a flashdrive that were

1    seized from the Long Haul premises..

2    **REQUEST FOR ADMISSION NO. 21:**

3        Admit that defendants or their agents have retained copies of Plaintiffs' data taken

4    during the raid.

5    **RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

6        MacAdam objects to this request on the grounds that it is vague and ambiguous

7    as the term "Defendants'" and understands that term to refer specifically to defendants

8    Mitchell Celaya, Karen Alberts, William Kasiske, Wade Macadam and Timothy J. Zuniga

9    (collectively, "University Defendants").  MacAdam further objects to this request on the

10    grounds that it is vague and ambiguous as to the terms "agents," "retained," "copies,"

11    "data, and "taken."  MacAdam further objects to this request to the extent that it assumes

12    facts not in evidence.  MacAdam further objects to this request to the extent that it calls

13    for a legal conclusion.  MacAdam further objects to this request on the ground that it is

14    compound.  MacAdam further objects to this request on the ground that it is overbroad

15    and unduly burdensome.  MacAdam further objects to this request on the ground that it

16    is argumentative, prejudicial, and misleading as to the use of the term "raid."  MacAdam

17    further objects to this request to the extent it seeks information protected from disclosure

18    by the attorney-client privilege and/or the attorney work-product doctrine.

19        Subject to and without waiving the foregoing general and specific objections,

20    MacAdam responds as follows:  MacAdam admits that the University of California

21    Berkeley Police Department made copies of the hard drives and a flashdrive that were

22    seized from the Long Haul premises and have retained these copies which is are

23    governed by a stipulation entered into between the parties to this litigation.

24    **REQUEST FOR ADMISSION NO. 22:**

25        Admit that you did not object to the search plan presented by Kasiske on the

26    morning of the raid.

27    **RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

28        MacAdam objects to this request on the ground that it is vague and ambiguous as

1   Wade MacAdam.  MacAdam further objects to this request on the grounds that it is

2   vague and ambiguous as to the term "entered."  MacAdam further objects to this request

3   to the extent it seeks information protected by the investigation privilege.  MacAdam

4   further objects to this request on the ground that it is argumentative, prejudicial, and

5   misleading as to the use of the term "raid."

6          Subject to and without waiving the foregoing general and specific objections,

7   MacAdam responds as follows:  Admitted.

8   **REQUEST FOR ADMISSION NO. 25:**

9          Admit you cut or removed locks from the Slingshot and EBPS offices in the Long

10  Haul infoshop.

11  **RESPONSE TO REQUEST FOR ADMISSION NO. 25:**

12         MacAdam objects to this request on the ground that it is vague and ambiguous as

13  to the term "you," and understands that term to refer specifically and solely to Defendant

14  Wade MacAdam.  MacAdam further objects to this request on the grounds that it is

15  vague and ambiguous as to the terms "cut," "removed," and "locks."  MacAdam further

16  objects to this request to the extent it seeks information protected by the investigation

17  privilege.  MacAdam further objects to this request on the ground that it is vague as to

18  time.  MacAdam further objects to this request on the ground that it is compound.

19  MacAdam further objects to this request on the ground that it assumes facts that are not

20  in evidence.

21         Subject to and without waiving the foregoing general and specific objections,

22  MacAdam responds as follows:  MacAdam admits that he cut the locks on some doors

23  and removed hardware from other doors so as not to cut the locks on those doors.  After

24  reasonable investigation, MacAdam lacks knowledge or information sufficient to admit or

25  deny whether these doors belonged to what has been defined as the "Slingshot office" or

26  the "EBPS office" as defined in these requests.

27  **REQUEST FOR ADMISSION NO. 26:**

28         Admit that the Silicon Valley Regional Computer Forensics Lab ("SVRCFL")

# EXHIBIT 17

MELINDA HAAG (SBN 132612)
United States Attorney
JOANN M. SWANSON (CSBN 88143)
Chief, Civil Division
JONATHAN U. LEE (CSBN 148792)
NEILL T. TSENG (CSBN 220348)
Assistant United States Attorneys
450 Golden Gate Avenue, 9th Floor
San Francisco, California 94102-3495
Telephone:    (415) 436-7200
Facsimile:    (415) 436-6748
E-mail:       jonathan.lee@usdoj.gov
              neill.tseng@usdoj.gov

Attorneys for Federal Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| LONG HAUL, INC. and EAST BAY PRISONER SUPPORT,<br><br>               Plaintiffs,<br><br>    vs.<br><br>UNITED STATES OF AMERICA;<br>MITCHELL CELAYA; KAREN ALBERTS;<br>WILLIAM KASISKE; WADE MACADAM;<br>TIMOTHY J. ZUNIGA; MIKE HART; LISA<br>SHAFFER; AND DOES 1-25,<br><br>               Defendants. | Case No. 09-00168 JSW<br><br>**DEFENDANT MIKE HART'S RESPONSE TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION** |

**REQUESTING PARTY:**    LONG HAUL, INC. and EAST BAY PRISONER SUPPORT

**RESPONDING PARTY:**    MIKE HART

**SET NO.:**              ONE

1

term "café night."  Notwithstanding this objection, this responding party lacks information sufficient to allow it to admit or deny this request and on that basis denies the request.

REQUEST FOR ADMISSION NO. 9:

Admit that at the time of the raid, you did not know that on January 27, 2008 a demonstrator was followed from a home demonstration protesting UC Berkeley animal research practices to the Long Haul.

RESPONSE TO REQUEST FOR ADMISSION NO. 9:

Admitted.

REQUEST FOR ADMISSION NO. 10:

Admit that at the time of the raid, you had no information that any animal rights activists were visitors to the Long Haul Infoshop.

RESPONSE TO REQUEST FOR ADMISSION NO. 10:

Denied.

REQUEST FOR ADMISSION NO. 11:

Admit that at the time of the raid you knew Slingshot was a publication.

RESPONSE TO REQUEST FOR ADMISSION NO. 11:

Admitted.

REQUEST FOR ADMISSION NO. 12:

Admit as of August 2008 the Slingshot publication stated it was published out of Long Haul.

RESPONSE TO REQUEST FOR ADMISSION NO. 12:

This responding party lacks information sufficient to allow it to admit or deny this request and on that basis denies the request.

6

REQUEST FOR ADMISSION NO. 23:

Admit that you reviewed the search warrant.

RESPONSE TO REQUEST FOR ADMISSION NO. 23:

This responding party admits he looked at the search warrant on the morning of the search.

REQUEST FOR ADMISSION NO. 24:

Admit you entered the Long Haul Infoshop located at 3124 Shattuck Avenue, Berkeley, CA.

RESPONSE TO REQUEST FOR ADMISSION NO. 24:

Admitted.

REQUEST FOR ADMISSION NO. 25:

Admit you carried computers out of Long Haul and placed them in waiting police cars.

RESPONSE TO REQUEST FOR ADMISSION NO. 25:

Admitted.

REQUEST FOR ADMISSION NO. 26:

Admit that the Silicon Valley Regional Computer Forensics Lab ("SVRCFL") searched Long Haul computers following the raid.

RESPONSE TO REQUEST FOR ADMISSION NO. 26:

This responding party lacks information sufficient to allow it to admit or deny this request and on that basis denies the request.

REQUEST FOR ADMISSION NO. 27:

Admit that the SVRCFL is an agent of the Federal Bureau of Investigation.

# EXHIBIT 18

```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN FRANCISCO DIVISION

 4

 5   LONG HAUL, INC., and EAST   )
     BAY PRISONER SUPPORT,       )
 6                               )
                 Plaintiffs,     )
 7                               )
     vs.                         )   No.  C 09-00168-JSW
 8                               )
     UNITED STATES OF AMERICA;   )
 9   MIGUEL CELAYA; KAREN        )
     ALBERTS; WILLIAM KASISKE;   )
10   WADE MacADAM; TIMOTHY       )
     ZUNIGA; MIKE HART; LISA     )
11   SHAFFER,                    )
                                 )
12               Defendants.     )
     _____)
13

14

15

16

17                  DEPOSITION OF

18                    MAX HARRIS

19      Held at the Law Offices of SchiffHardin

20     One Market Street, San Francisco, California

21      Wednesday, September 22, 2010, 1:37 p.m.

22

23

24

25   REPORTED BY:  ELAINA BULDA-JONES, RPR, CSR #11720
```

2

BARKLEY
Court Reporters

1      A.   Yeah.

2      Q.   When were you allowed in to the Long Haul

3  space?

4      A.   I don't remember.

5      Q.   Did you go in that morning?

6      A.   Yes.

7      Q.   After the police left?

8      A.   Yes.

9      Q.   What did you see when you went inside?

10      A.   I saw some damage to -- the thing I

11  concretely remember is that the -- a hinge was --

12  the hinge was pried open at the EBPS office and that

13  the door was screwed up, messed up.

14      Q.   How was the door messed up?

15      A.   I don't remember specifically.

16      Q.   Was the door off its hinges?

17      A.   I don't remember.

18      Q.   Can you describe the damage to the door?

19      A.   Not -- no.

20      Q.   What did the office look like inside?

21      A.   There was stuff strewn about.

22      Q.   What stuff?

23      A.   Things were missing -- papers and various

24  items.

25      Q.   What items?

BARKLEY
Court Reporters

1     A.   I don't remember, office supplies.  I

2   don't remember exactly.

3     Q.   Was the computer missing?

4     A.   Yes.

5     Q.   What else was missing?

6     A.   Some disks -- some disks, a flash -- I

7   remember some disks and some other computer

8   equipment, but not too specifically.

9     Q.   Was it a flash drive?

10    A.   Yes.

11    Q.   What was on the flash drive?

12    A.   I don't remember.

13    Q.   What was on the computer?

14    A.   Besides EBPS files, I don't remember.

15    Q.   What was in the EBPS files?

16    A.   I don't remember, correspondence, e-mails,

17  things like that, documents we wrote.

18    Q.   What documents did you write?

19        MS. GRANICK:  Objection.  Vague.

20        THE WITNESS:  Various documents over time.

21  BY MS. ELLIS:

22    Q.   What were the nature of the documents --

23  what was the nature of the documents?

24    A.   Something having to do with what services

25  we were providing or what information we were

71

1   the distribution list, the names and addresses of

2   the prisoners, and perhaps --

3           MS. GRANICK:  Let her finish.

4           THE WITNESS:  I'm sorry.

5   BY MS. ELLIS:

6       Q.  -- a copy of an article that was going to

7   be published in a magazine?

8           MS. GRANICK:  Objection.  Misstates his

9   testimony.  Asked and answered.

10  BY MS. ELLIS:

11      Q.  Was there anything else on there?

12      A.  I don't understand what you were saying.

13      Q.  So you told me that -- I asked you what

14  was on the computer, right?

15      A.  Uh-huh.

16      Q.  And you told me that you had the

17  distribution list, which was the list of all the

18  magazines that you would send out to prisoners,

19  right?

20      A.  Yes.

21      Q.  You had on there names and addresses of

22  prisoners and a brief description of their case?

23      A.  Yes.

24      Q.  And you had on there you think an article

25  that was going to go into a magazine?

73

BARKLEY
Court Reporters

1        A.   The Zine that we were going to put out.

2        Q.   Did you put out the Zine?

3        A.   Yes.

4        Q.   When did the Zine come out?

5        A.   I don't remember.

6        Q.   Was --

7        A.   But the Zine is the extension of our

8   distribution list.

9        Q.   Well, what is in the Zine?

10        A.   Who we are, what we're about, the services

11   we offer, the titles that we are distributing.

12   Those kind of things, a brief history, a brief --

13   yeah.

14        Q.   What's it called?

15        A.   I don't remember.

16        Q.   How many times was it published?

17             MS. GRANICK:  Objection.  Vague.

18             THE WITNESS:  I think we did it one time.

19   BY MS. ELLIS:

20        Q.   When?

21        A.   I don't remember.

22        Q.   Was it in 2008?

23        A.   Either 2008 or 2009.

24        Q.   Did you notice anything else missing from

25   the East Bay Prisoner Support office other than the

Max Harris

BARKLEY
Court Reporters

1    computer, the flash drive, and some CDs?

2         A.   I don't remember.

3         Q.   After you looked inside that office, did

4    you look around the rest of the Long Haul space?

5         A.   Yes.

6         Q.   What did you see?

7         A.   I know lots of computers were taken

8    upstairs and it also was disheveled.

9         Q.   And where were those computers taken from?

10        A.   Um, the computer room or the -- wherever

11   the computer room was.  I forget if it was upstairs

12   or downstairs, and the Slingshot office also.

13        Q.   And that computer room was a room that the

14   public could come in and use computers and obtain

15   internet access; is that right?

16        A.   Yes.

17        Q.   Was there one DSL line that went to the

18   Long Haul?

19             MS. GRANICK:  Objection.  Calls for

20   speculation.

21             THE WITNESS:  I don't know.

22   BY MS. ELLIS:

23        Q.   Did East Bay Prisoner Support have access

24   to the DSL line at the Long Haul?

25        A.   Yes.

Max Harris

BARKLEY
Court Reporters

1   through --

2        A.   Yes.

3        Q.   -- December of 2009?

4        A.   Yes.

5             MS. GRANICK:  Let her finish.

6             THE WITNESS:  Sorry, yes.

7   BY MS. ELLIS:

8        Q.   When did that computer -- when was that

9   computer put in the office?

10       A.   I don't remember.

11       Q.   Who brought the computer?

12       A.   I don't remember.

13       Q.   Was it purchased by either Patrick, Chloe,

14  or yourself?

15       A.   I know not me.  I don't know.

16       Q.   Was it donated by anyone?

17       A.   I don't know.

18       Q.   Was it a functioning computer?

19       A.   A what, functioning?

20       Q.   Uh-huh, did it work?

21       A.   I don't remember.

22       Q.   How did you, Patrick, and Chloe, access

23  the East Bay Prisoner Support e-mail when the

24  computer -- after the computer was taken?

25       A.   For a while we couldn't.  Really

86

BARKLEY
Court Reporters

1  specifically, I don't -- I don't remember if --

2  sorry, I don't -- I'm going to say I'm not certain

3  about what we did with -- with e-mail.

4         For a while we couldn't use the computer,

5  and what I don't remember is if we ended up using

6  the same computer again or not.

7     Q.   Do you know whether that computer came

8  back to East Bay Prisoner Support, the one that was

9  taken?

10    A.   Yes.

11    Q.   And then you continued to use it?

12    A.   I don't remember.  All right, yeah, I

13  don't remember.

14    Q.   Do you know whether the Slingshot issue

15  that was being worked on in August of 2008 was

16  published on time?

17    A.   No.

18    Q.   You don't know whether it was published on

19  time or not?

20    A.   (Witness shakes head.)

21         MS. GRANICK:  He's shaking his head "no"

22  for the record.

23         THE WITNESS:  Yeah.

24         MS. GRANICK:  You have to answer out loud.

25         THE WITNESS:  Yeah, I said no.

87

Max Harris

BARKLEY
Court Reporters