SCHIFF HARDIN LLP
WILLIAM J. CARROLL (CSB #118106)
wcarroll@schiffhardin.com
SARAH D. YOUNGBLOOD (CSB #244304)
syoungblood@schiffhardin.com
One Market, Spear Street Tower
Thirty-Second Floor
San Francisco, CA 94105
Telephone:    (415) 901-8700
Facsimile:    (415) 901-8701

SARA L. ELLIS (ILSB #6224868)
sellis@schiffhardin.com
233 South Wacker Drive
Suite 6600
Chicago, IL 60606
Telephone    (312) 258-5800
Facsimile    (312) 258-5600

Attorneys for Defendants
MITCHELL CELAYA, KAREN ALBERTS,
WILLIAM KASISKE, WADE MACADAM and
TIMOTHY J. ZUNIGA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| LONG HAUL, INC., and EAST BAY PRISONER SUPPORT,<br><br>                              Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA; MITCHELL CELAYA; KAREN ALBERTS; WILLIAM KASISKE; WADE MACADAM; TIMOTHY J. ZUNIGA; MIKE HART; LISA SHAFFER; AND DOES 1-25,<br><br>                              Defendants. | Case No.  3:09-cv-0168 JSW<br><br>**DECLARATION OF WILLIAM KASISKE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT/ADJUDICATION** |
|---|---|

1.      I am employed as a police officer at the University of California Police

Department ("UCPD"), and I am a resident of Alameda County, California.  I have

personal knowledge of the facts set forth herein and, if called as a witness, I could and

1   would testify truthfully thereto.

2       2.      I have been employed with UCPD for approximately 7 years.  My current

3   assignment is as a Patrol Officer.

4       3.      For approximately 4 years (2005 to 2009) I served as a Detective in the

5   UCPD's Criminal Investigations Bureau ("CIB").  My duties in this position included

6   applying for and executing search warrants.  At the time I applied for the search warrant

7   at issue in this case, I had drafted and served multiple search warrants.  My immediate

8   supervisor during this time was Sergeant Karen Alberts.

9       4.      From late 2007 through 2008, animal rights activists directed a number of

10  actions against UC Berkeley researchers ("researchers") designed to harass, threaten,

11  and intimidate the researchers and their families.  I participated in the investigation of

12  animal rights activist activities that were the subject of the search warrant at issue in this

13  litigation.

14      5.      To respond to the increasing concern for faculty safety, UCPD created an

15  "Animal Rights Working Group" ("ARWG"), comprised of UCPD officers and members of

16  other law enforcement agencies, that would serve as a repository for information

17  collected on animal rights activist activities, a means of sharing information between

18  agencies, and dedicate a group of UCPD officers to investigate animal rights activist

19  activities directed against UC Berkeley researchers.  In 2008, I was a member of the

20  ARWG, along with Sergeant Karen Alberts, Officer Timothy Zuniga, Special Agent Lisa

21  Shaffer, and Special Agent Mike Hart.  Officer Wade MacAdam was not a member of

22  ARWG.

23      6.      Beginning in late 2007 and continuing through 2008, animal rights activists

24  conducted numerous home demonstrations at the residences of the researchers.  These

25  demonstrations included chalking the researchers' driveways and sidewalks with

26  offensive messages and placing flyers full of incendiary comments where neighbors

27  would find them.  During these demonstrations, animal rights activists chanted slogans

28  meant to frighten and intimidate the researchers, such as "For the animals, we will fight.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2                           CASE NO.  3:09-cv-0168 JSW

DECLARATION OF WILLIAM KASISKE

1  We know where you sleep at night."  Animal rights activists also vandalized the

2  researchers' homes during some of these demonstrations.  As part of our investigation,

3  UCPD officers monitored these home demonstrations, at times followed the

4  demonstrators from researchers' residences, and monitored the internet to find

5  additional information on the location of the demonstrations, when the demonstrations

6  would be occurring, and which groups were responsible for the demonstrations.

7       7.     A group identified as Stop Cal Vivisection supported and claimed

8  responsibility for various home demonstrations, claiming they were taking a radical stand

9  against animal research conducted by UC Berkeley researchers.  Stop Cal Vivisection

10  maintained websites where it disseminated information regarding researchers at UC

11  Berkeley engaged in animal research, listing the researchers' names, home addresses,

12  telephone numbers, and displaying graphic pictures seeking to suggest the researchers

13  were treating animals inhumanely.  Attached as **Exhibit A** is a true and correct copy of

14  redacted version of a posting on Stop Cal Vivisection's website regarding a May 10, 2008

15  vigil (UC000104-UC000117).  The unredacted version of the posting contains researcher

16  names, addresses, and exaggerated descriptions of the researchers' work with animals.

17       8.     Given its role in targeting the homes of UC Berkeley researchers, the

18  ARWG recognized the possibility that Stop Cal Vivisection and/or certain of its members

19  were involved in the unlawful harassment of UC Berkeley researchers.  We sought to

20  collect additional information regarding the group and its activities.  This task was made

21  more complex by the fact that the group repeatedly changed its websites and did not

22  publically identify its leaders, in an apparent attempt to avoid prosecution.  UCPD was

23  able to identify various individuals who were actively involved in Stop Cal Vivisection,

24  based in part on the attendance at the home demonstrations.  Several of these

25  individuals were also identified as taking part in the violent campaign of harassment and

26  intimidation underway against UC faculty engaged in animal research at other

27  campuses.

28       9.     Throughout 2008, there was a growing concern that the safety of UC

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

CASE NO.  3:09-cv-0168 JSW

DECLARATION OF WILLIAM KASISKE

Berkeley researchers and their families were increasingly at risk.  This concern was fed by a series of violent attacks on other UC campuses which included invasions of researchers' homes and firebombing researchers' cars.  Specifically, on August 2, 2008, two fire bombings were reported in Santa Cruz.  An incendiary device was ignited at the home of a UC Santa Cruz researcher while he was home with his family.  A second device burned a vehicle belonging to another UC Santa Cruz researcher.  The other members of the ARWG and I were aware of these attacks as well as similar attacks that occurred against UCLA animal researchers in previous years.

10.     Attached as **Exhibit B** is a true and correct copy of a notice posted by Stop Cal Vivisection on Indybay.org regarding "a day of demonstrations" to be held on January 27, 2008 (UC000219).  This email was printed on January 23, 2008 as part of ARWG's investigation of animal rights activists' activities and was retained in the investigation file.

11.     Attached as **Exhibit C** is a true and correct copy of the redacted version of a June 3, 2008 article posted by Stop Cal Vivisection on Indybay.org (UC000204).  This email was printed on June 4, 2008 as part of ARWG's investigation of animal rights activists' activities and was retained in the investigation file.  In this article, Stop Cal Vivisection takes responsibility for recent demonstrations at researchers' homes and threatens that more are to come.

12.     Attached as **Exhibit D** is a true and correct copy of an announcement from Stop Cal Vivisection regarding home demonstrations planned for June 14, 2008 (UC000879-UC000881).  I received this announcement in an email dated June 10, 2008 and retained this email as part of the ARWG investigation file.

13.     Prior to the execution of the search warrant, I was aware that Long Haul was an activist organization and that the Long Haul premises were used by groups or organizations to hold meetings, discussions, fundraising and recreational activities.  I was aware of this information through my work at UCPD.

14.     It was my understanding, prior to the execution of the search warrant, that

Long Haul was an "infoshop" that distributed newspapers and zines.

15.     I did not visit or examine the inside of the Long Haul premises before August 27, 2008.

16.     I reviewed the Long Haul website prior to the execution of the search warrant.  In my review of Long Haul's website, there was no information leading me to believe that there were any tenants located within the premises.  In fact, I was not aware that the Long Haul premises contained multiple tenants until after the filing and service of this lawsuit.

17.     The website did contain a list of "Projects Meeting at the Long Haul"; however, there was nothing on the website that indicated that any of them have offices at the Long Haul premises.  There was no information on the website that indicated that offices were available for rent, how to rent office space at Long Haul, or the amount Long Haul requested in rent.

18.     From my review of the Long Haul website, I did learn that Long Haul had computers for the public to use to access the internet.

19.      Prior to the filing of the lawsuit in this matter, I was not aware that that Long Haul rented any of its office space to tenants.

20.     As part of our investigation into harassment of UC researchers by animal rights activists, other UCPD officers and I monitored activists during home demonstrations.  On at least three occasions, UCPD officers followed participants in the home demonstrations back to Long Haul.

21.     Attached as **Exhibit E** is a true and correct copy of the redacted version of the Crime Report for Case No. 08-00377 (UC000807-UC000845).  This Crime Report documents UCPD's surveillance of animal activists" home demonstrators on January 27, 2008.  On that day, numerous animal rights demonstrators met at the Ashby BART station and traveled in two vehicles to multiple locations where they protested at the private residences of UC employees.  The demonstrators exhibited signs, chanted, marched, and chalked sidewalks.  During the surveillance, Officer Zuniga monitored an

1   animal rights activist leaving a home demonstration at a UC-Berkeley faculty member's

2   home and being dropped off on Hillegas at Ashby Avenue in Berkeley.  The

3   demonstrator then walked west, toward the Ashby BART station and entered Long Haul.

4   Additionally, three of the home demonstrators were observed by Lieutenant Alex Yao

5   and me in the area of Shattuck Avenue, Prince Street, and Woosley Street in Berkeley.

6   Several of the demonstrators were believed to have entered the Long Haul at that time.

7   22.   On another occasion, the animal rights activists had planned to gather at

8   the Ashby BART station for a day of home demonstrations.  I, along with other officers,

9   intended to conduct surveillance of these demonstrations.  However, due to a low

10   turnout, the home demonstrations were called off.  One of the people that had shown up

11   for the demonstrations was someone we had previously identified as an animal rights

12   activist and a key member of Stop Cal Vivisection.  I assisted with surveillance on this

13   person who was observed going from the Ashby BART station to Long Haul.

14   23.   Additionally, on January 9, 2008, Peter Young, a prominent animal rights

15   activist, gave a speech and showed a movie called "Behind the Mask" at Long Haul.

16   Attached as **Exhibit F** is a true and correct copy of a posting on Indybay.org discussing

17   Young's presentation at Long Haul (UC000674-UC000678).  The event followed the

18   recent release of Young from prison, where he had served a sentence for crimes relating

19   to his animal rights activities.

20   24.   In April, 2008, the ARWG learned from its monitoring of Stop Cal

21   Vivisection's web postings that the group (at the time using the name Stop UCB

22   Vivisection) was planning to host a fundraiser at Long Haul on April 20, 2008.  The

23   announcement of the April 20, 2008 Stop Cal Vivisection fundraiser claims that it was

24   necessary to defray legal costs.  I believe this was referring to the legal costs of its

25   members who were facing criminal prosecution for their alleged attacks on UC Santa

26   Cruz researchers engaged in animal research.  I conducted surveillance of the

27   fundraiser at Long Haul on April 20, 2008, in order to obtain additional information

28   regarding Stop Cal Vivisection's membership.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6                           CASE NO.  3:09-cv-0168 JSW

DECLARATION OF WILLIAM KASISKE

25.     Additionally, while monitoring websites dedicated to animal rights activists, UCPD officers found articles written by Stop Cal Vivisection and other animal rights activists.  These articles were sharply critical of the "vivisection" activities by researchers on the UC Berkeley campus and described the activities of Stop Cal Vivisection and other animal activists.

26.     I reviewed an article written by Stop Cal Vivisection that was posted on Stop Cal Vivisection's MySpace page.  The article was noted as being from Slingshot, but it did not actually link to the Slingshot webpage.  I did not review the Slingshot website prior to the execution of the search warrant.

27.     I was aware prior to the execution of the search warrant that Slingshot was the name of an online publication.  I was not aware that Slingshot publishes a newspaper until after the filing and service of this lawsuit, and I did not review a copy of the Slingshot newspaper until after the filing and service of this lawsuit.   Prior to the filing of this lawsuit, I was not aware who published "Slingshot."

28.     I was unaware at the time of the execution of the search warrant that Slingshot was located at the Long Haul premises.  I was also unaware that Slingshot was published out of the Long Haul premises.  I was unaware at the time of the execution of the search warrant that Slingshot claimed to be "sponsored" by Long Haul.

29.     Long Haul's website only stated that Slingshot is a project, among a list of other projects, which meet at the Long Haul.

30.     Prior to the execution of the search warrant, I did not know what East Bay Prisoner Support ("EBPS") was.  I had seen the name "East Bay Prisoner Support" listed as a "friend" on Stop Cal Vivisection's Myspace page.  However, I was unaware at the time of the execution of the search warrant that EBPS was located at the Long Haul premises.  Further, I was unaware that EBPS claimed to disseminate a newspaper, book, broadcast, or other similar form of public communication to the public.

31.     I did not review the EBPS website prior to the execution of the search warrant.

32.    I did not have any knowledge about EBPS's relationship with Long Haul prior to the execution of the search warrant.

33.    I first became aware of EBPS's claim to disseminate information to the public after the filing and service of this lawsuit.

34.    In March, May and June of 2008, various UC Berkeley researchers received a series of threatening and intimidating emails sent from anonymous animal rights activists. As detailed below, these emails culminated in a series of messages sent to a UC researcher in June, 2008 which featured threats of bodily harm aimed at the researcher. This escalating series of threatening emails constituted the basis for the search warrant at issue in this case.

35.    In March, 2008, two U.C. Berkeley researchers received harassing and threatening emails that appeared to be from animal rights activists. The researchers forwarded these emails to me to investigate. The investigation of these emails was assigned Case No. 08-01225, and a true and correct copy of the redacted version of the Crime Report for the case is attached hereto as **Exhibit G** (BATES No. UC000234-UC000246).

36.    The March, 2008 emails were sent from email addresses that had been created with false names, which I believe was done so the senders could retain their anonymity. However, by reviewing the header information from the forwarded emails, I determined the messages came from the same IP address (208.106.103.213). I then obtained a court order requiring the internet service provider, Sonic.net, to identify the name of the subscriber for the IP address 208.106.103.213. On March 21, 2008, Sonic.net identified the subscriber as "Jessy Palmer," whose address was identified as 3124 Shattuck Avenue in Berkeley. I recognized this as the address for the Long Haul Infoshop, a place where animal rights activists were known to hold meetings.

37.    After consulting with Sergeant Alberts, I did not seek a warrant based on the March, 2008 emails because the harassment did not rise to the level of a felony.

38.    Attached as **Exhibit H** is a true and correct copy of the redacted version of

1   the Crime Report for Case No. 08-01900, (BATES No. UC001185 – UC001197), which,

2   in part, involved my investigation of harassing emails sent to two UC researchers on May

3   14, 2008.  The headers of these emails identified the IP address of the sender(s) as

4   208.106.103.213.  From my previous investigation of the March, 2008 emails, I

5   recognized this IP address as the one registered to a "Jessy Palmer" at 3124 Shattuck

6   Ave., Berkeley, CA (Long Haul).

7           39.     Attached as **Exhibit I** are true and correct copies of the redacted versions

8   of the June 15, 2008 emails sent to a University of California researcher (BATES No.

9   UC000254-UC000266).  The content of these emails was provided in the Statement of

10  Probable Cause for Judge Judith Ford's review prior to issuance of the search warrant

11  and was also available for the officers executing the search warrant to review at the

12  briefing meeting.  Copies of these emails were attached to the Crime Report I prepared

13  for UCPD Case No. 08-02544.

14          40.     The researcher who received these emails had received harassing emails

15  in March, 2008 and had also been the target of vandalism and demonstrations at her

16  home.  The June 15, 2008 emails contained the same themes as the earlier emails, but

17  were significantly more graphic and threatening, specifically threatening to do "MUCH

18  worse" to the researcher than what was happening in UCLA.  I believed that this threat

19  was referencing the arsons (including planting of incendiary devices) and other vandalism

20  that had taken place at the homes of UCLA animal researchers and was an effort to

21  further intimidate the U.C. Berkeley researchers.

22          41.     The June 15, 2008 emails were once again sent with an anonymously

23  created email account, one which incorporated the victim's name and used the gmail

24  email service.  I therefore obtained a court order on June 16, 2008 requiring Google to

25  disclose the IP address from which these emails originated.   A true and correct copy of

26  the redacted version of the June 16, 2008 Court Order I served on Google, Inc. is

27  attached hereto as **Exhibit J** (Bates No. UC000267-UC000268).  A copy of this court

28  order was attached to the Crime Report I prepared for UCPD Case No. 08-02544.

42.     Google responded to the court order on July 9, 2008 and disclosed the IP address used by the anonymous account on June 15, 2008 to be 208.106.103.213 (the same IP address as the one used to send the harassing emails in March and May). Attached as **Exhibit K** is a true and correct copy of the redacted version of Google, Inc.'s July 9, 2008 response and attachments (Bates No. UC000269-UC000271).  A copy of this response was attached to the Crime Report I prepared for UCPD Case No. 08-02544.

43.     On July 22, 2008, I served a court order on Sonic.net to obtain the subscriber information for IP address 208.106.103.213.  Attached as **Exhibit L** is a true and correct copy of the redacted version of this court order (Bates No. UC000272-UC000273).  A copy of this court order was attached to the Crime Report I prepared for UCPD Case No. 08-02544.

44.     Attached as **Exhibit M** is a true and correct copy of the email I received on July 24, 2008 from Sonic.net (BATES No. UC000274-UC000275).  This email was sent in response to my July 22, 2008 subpoena to Sonic.net and was attached to the Crime Report I prepared for UCPD Case No. 08-02544.  In this response, Sonic.net identifies Jessy Palmer as the subscriber registered under the IP address 208.106.103.213 and the listed address is 3124 Shattuck Avenue, Berkeley, CA.  Based on my prior investigations, I recognized this address to be that of the Long Haul Infoshop.

45.     As a result of our investigations, the ARWG believed that the emails under investigation had originated from Long Haul.  We believed the emails were sent from the Long Haul either by a patron using one of Long Haul's public access computers, or by a person affiliated with Long Haul.  We did not know which individual or individuals were sending the threatening emails or which computers in particular had been used to send the threatening emails.

46.     In view of Long Haul's ties with Stop Cal Vivisection, and its other ties with animal rights activists, there was reason to believe that a person associated with Long Haul may have been primarily responsible or given assistance to the individual or

1   individuals responsible for sending the threatening and harassing emails which were the

2   subject of the search warrant.  The other members of the ARWG and I did not know

3   whether animal rights activists who were observed at home demonstrations and seen

4   going in and out of the Long Haul were employees or volunteers of the Long Haul who

5   would have had access to some or all of the computers located within the Long Haul

6   premises and would have had the motivation to destroy or alter any evidence located on

7   the hard drives of those computers.

8       47.     Anyone affiliated with Long Haul, from a regular member to someone from

9   the public that rarely used the internet access, could have sent the threatening emails

10  that we were investigating.  We had no way of knowing who it was, which is why we

11  were seeking evidence to help us determine the sender.  However, due to the fact that

12  the IP address of multiple emails traced back to Long Haul, we knew that the sender had

13  some affiliation with Long Haul, no matter how strong or weak.   Anyone who used the

14  computers inside Long Haul, be it a member or not, could have been the one who sent

15  the threatening emails.

16      48.     After conferring with my supervisor, Sergeant Alberts, I decided to seek a

17  search warrant to search the Long Haul premises for evidence related to the sending of

18  these threatening emails.

19      49.     I prepared a search warrant application for all of the computers and

20  electronic storage devices located at the Long Haul, as well as logs that would identify

21  computer users at the Long Haul.  Prior to applying for the warrant, I reviewed Long Haul's

22  website in order to confirm the Long Haul's current street address and to acquaint myself

23  with the physical structure of the building.  In my review of Long Haul's website, there was

24  no information leading me to believe that there were any tenants located within the

25  premises.  For example, the photograph appearing on the website did not reflect any

26  signage to indicate that any organization other than Long Haul was housed in the

27  building.

28      50.     Attached as **Exhibit N** is a true and correct copy of the redacted version of

1   the Statement of Probable Cause that I submitted to Judge Judith Ford in conjunction

2   with my application for a Search Warrant on August 26, 2008 (BATES No. UC000278-

3   UC000281).   The Statement of Probable Cause was also attached to the Crime Report I

4   prepared for UCPD Case No. 08-02544.

5   　　　　51.　　I provided Judge Ford with the information as I knew it at the time of the

6   application for the search warrant.  The purpose of the search warrant was to find

7   evidence that would lead investigators to the persons who were responsible for sending

8   the threatening emails.

9   　　　　52.　　The Statement of Probable Cause included, but was not limited to, the

10  following facts in support of the warrant application:  (1) A general description of the

11  ongoing harassment of the researchers by animal rights activists; (2) A description of

12  harassment occurring from September, 2007 through March, 2008 against the

13  researcher and other faculty members, including a series of harassing emails; (3) A

14  description of subsequent threatening emails, which included threats of bodily harm,

15  sent in June, 2008 to the researcher who received threatening emails in March, 2008,

16  and which prompted me to designate the crime under investigation as felony stalking; (4)

17  The fact that the same IP address was used to send the threatening March and June

18  emails I investigated; (5) The description of the steps I took to trace the IP address used

19  to send all of the March and June threatening emails and the fact that Sonic.net

20  identified the subscriber of the IP address as Jessy Palmer at 3124 Shattuck (Long

21  Haul).; and, (6) The fact that Long Haul was a resource and meeting place for radical

22  activists and that animal rights activists were known by UCPD to have held meetings at

23  the Long Haul.

24  　　　　53.　　Additionally, in the statement of probable cause, I referred to the broader

25  context of harassment and intimidation of researchers at UC Berkeley and other

26  campuses.  I noted that for several months many researchers were targeted by animal

27  rights activists, and that UCPD "has taken numerous reports of vandalism and noisy

28  demonstrations that have taken place at the private residences of the researchers" and

1    reports of harassing email messages and phone calls.  I also referred to the fact that the

2    researchers were aware of similar attacks that occurred against UCLA animal

3    researchers during the previous year.  Additionally, the statement referred to two fire

4    bombings reported in Santa Cruz on August 2, 2008, one at the home of a UC Santa

5    Cruz researcher (while he was home with his family), and a second one which burned a

6    vehicle belonging to another UC Santa Cruz researcher.

7         54.    The Statement of Probable Cause was not intended to list every single

8    email message or every single case involving animal rights activism.

9         55.    The Statement of Probable Cause included an "Opinions and Conclusions"

10   section, in which I:  (1) Asserted that seizure of the computers was necessary because

11   information on the computers was likely to assist in identifying the sender of the subject

12   emails, and because, due to the complexity of searching the computers, the search

13   would have to be conducted off-site.  I noted that a search of the computers at the Long

14   Haul could reveal information the suspect stored on the computers, websites the suspect

15   accessed, or other email accounts the suspect used, and that such information would

16   aid in identifying the suspect; and, (2) Furnished a basis for seizure of additional

17   materials (logs and sign-in sheets) which may identify the users of certain public

18   computers known to be available for use at Long Haul.  Based on my training and

19   experience, I was aware that establishments that offer public computer access often

20   have some type of system for patrons to sign in or register to use the computers.  I noted

21   that "[a] search of the Long Haul's premises could reveal logs or sign-in sheets indicating

22   which patrons used the computers on particular dates. This information would aid in

23   identifying the suspect who sent the threatening email messages using the Long Haul's

24   computers."

25        56.    I sought to broaden -- not narrow --  the scope of the warrant, by specifying

26   the need to search for such logs or sign-in sheets *in addition to* the search for and

27   seizure of all computers.

28        57.    The execution of the search warrant was intended to aid in identifying the

1   individual who sent the threatening emails and/or the computer(s) from whence they

2   came.

3       58.     At the time I presented the search warrant, I met with Judge Ford in person

4   and was available to answer any questions or concerns regarding the search warrant

5   application.

6       59.     Judge Ford reviewed the search warrant, the accompanying affidavit, the

7   search warrant exhibits, and the Statement of Probable Cause before she authorized the

8   search of the Long Haul premises.

9       60.     Attached as **Exhibit O** is a true and correct copy of the Search Warrant

10  and Exhibits issued by Judge Judith Ford on August 26, 2008 (UC000276-UC000277).

11      61.     The search warrant identifies the places to be searched as "The premises,

12  structures, rooms, receptacles, outbuildings, associated storage areas, and safes

13  situated at:  The Long Haul Infoshop, 3124 Shattuck Avenue, Berkeley, CA.  This is a

14  single-story brick building on the west side of Shattuck Avenue.  It has a red sign above

15  the door that reads, 'Long Haul Infoshop.'  The front door is glass."

16      62.     The search warrant identifies the property to be seized as "Any written,

17  typed, or electronically stored documents, papers, notebooks, or logs containing names

18  or other identifying information of patrons who used the computers at the Long Haul

19  Infoshop.  All electronic data processing and storage devices, computers and computer

20  systems including, but not limited to, central processing units, external hard drives, CDs,

21  DVDs, diskettes, memory cards, PDAs, and USB flash drives."  Additionally, the search

22  warrant states that "Search of all of the above items is for files, data, images, software,

23  operating systems, deleted files, altered files, system configurations, drive and disk

24  configurations, date and time, and unallocated and slack space, for evidence.  With

25  respect to computer systems and any items listed above, the Peace Officers are

26  authorized to transfer the booked evidence to a secondary location prior to commencing

27  the search of the items.  Furthermore, said search may continue beyond the ten-day

28  period beginning upon issuance of this Search Warrant, to the extent necessary to

1    complete the search on the computer systems and any items listed above."

2         63.    I described the items to be seized as precisely as I could within the search

3    warrant, given the nature of the computer equipment and the ability to store evidence of

4    the threatening email messages on a variety of storage media or electronic files.

5         64.    I specifically incorporated the Statement of Probable Cause into the Search

6    Warrant.  I intended that the warrant and the Statement of Probable Cause support the

7    seizure of all computers and electronic storage devices located at Long Haul.  I did not

8    limit the items to be seized pursuant to the warrant or the Statement of Probable Cause

9    to solely the public access computers.  Instead, I made specific mention of these

10   computers to establish probable cause to search for any logs, sign in sheets, or other

11   documents that would identify the users of the public access computers during the time

12   periods when the researcher received the threatening emails.

13        65.    I am informed and believe that the Declaration of Matthew Zimmerman

14   submitted in support of Plaintiffs' Motion for Summary Judgment represents to the Court

15   that I testified at deposition that I did not know how storage media would contain patron

16   logs.  (Zimmerman Dec., 5:13-14).  In fact, my testimony was, and the truth is, that I

17   recognized that it was a possibility that logs could be stored on such devices.

18        66.    I am informed and believe that Plaintiffs have stated in their Motion for

19   Summary Judgment that the "affidavit does not offer any basis for a belief that such

20   hardware, including non-writeable media devices such as music CDs and movie DVDs,

21   might contain patron logs."  (Plaintiffs' Memorandum of Points and Authorities, 4:26-28).

22   However, the truth is that the Statement of Probable Cause and the Search Warrant did

23   not limit the search of the storage devices to patron logs but instead authorized the

24   search of those items for evidence of the crimes under investigation, including the

25   source of the threatening emails and patron logs.

26        67.    I believed, and my training and experience supports this belief, that

27   external storage devices serve as an extension of the hard drives inside computers.

28   Due to the ease with which such information can be transferred electronically from the

1   computer's hard drive to an external storage device, it is necessary to include such

2   storage devices within the scope of a search for electronic information that exists (or at

3   one time existed) in the computer's hard drive.  I believed that any electronic storage

4   devices within Long Haul could possibly contain information to identify the senders of the

5   threatening emails, archived emails, backup files from the computers being seized, or

6   any other downloaded files that could aid in our investigation of the threatening emails.

7   68.    On the morning of August 27, 2008, I gathered the warrant team together

8   at UCPD for a briefing regarding the execution of the search warrant.  Attached as

9   **Exhibit P** is a true and correct copy of the Criminal Investigations Bureau Briefing Form

10   and attachments that I completed in preparation for the execution of the search warrant

11   on Long Haul (UC000186-UC000190).  The attachments to the briefing form included a

12   picture of the Long Haul (obtained from the Long Haul website), the search warrant and

13   exhibits, and a map of the route to the nearest hospital.

14   69.    It is my practice to not attach the Statement of Probable Cause to briefing

15   forms because people bring them along during the search warrant service and they

16   could very easily be dropped somewhere, thereby revealing the confidential information

17   relating to the investigation contained therein.

18   70.    The members of the warrant team were Alberts, Zuniga, MacAdam,

19   Shaffer, Hart and me.  All of the warrant team members were present at the briefing

20   meeting.  UCPD had requested the assistance of Shaffer and Hart because they were

21   members of the ARWG and we needed more people to assist in executing the warrant.

22   Zuniga and MacAdam were also assigned to assist in executing the warrant because

23   more manpower was needed.

24   71.    I led the briefing meeting and explained where the team was going and

25   reviewed the terms of the warrant with them.  I described how the team would gain entry

26   to the building, for what items the team should search pursuant to the terms of the

27   warrant, and what items the team should seize pursuant to the terms of the warrant.  I

28   gave a synopsis of the investigation, described the timing and content of the threatening

1   emails and told the team how I had traced the emails back to Long Haul.  During the

2   briefing meeting, the search warrant and the Statement of Probable Cause were

3   available for team members to review.

4       72.   I am informed and believe that the Declaration of Matthew Zimmerman

5   submitted in support of Plaintiffs' Motion for Summary Judgment and Plaintiffs' Motion for

6   Summary Judgment represent to the Court that I testified during deposition, which is

7   incorrectly cited to, that I did not brief officers participating in the execution of the search

8   warrant "on which parts of the Long Haul's premises belonged to other tenants" or "areas

9   that were off limits" or which ones were to be searched.  (Zimmerman Dec., 4:22-23,

10  4:26-27; Plaintiffs' Memorandum of Points and Authorities, 5:15-17).  While I did testify

11  that I didn't recall discussing the possibility of multiple offices being present, this is

12  because I had no reason to believe that there were in fact any "separate offices"

13  belonging to tenants within Long Haul.  I also had no reason to believe that any areas

14  were "off limits."  There was probable cause to search the entire premises of Long Haul

15  due to the fact that the IP address of multiple emails had been traced back to the

16  building.

17      73.   Prior to entering the Long Haul to execute the search warrant, we had no

18  idea how information was retained by Long Haul and what type of records Long Haul

19  kept, if any.

20      74.   The search warrant was intended to and did authorize the search and

21  seizure of any and all computers located within the Long Haul.  This was my

22  understanding both prior to and after the execution of the search warrant.

23      75.   The reason we sought and obtained a search warrant for any and all

24  computers is because we believed that any computer located in the Long Haul could

25  have generated the threatening emails because the IP address came back to that

26  location.  The scope of the search was for any and all computers that could have sent

27  those emails, whether used by a member of the "public," someone associated with Long

28  Haul, or, as it turned out, a tenant of Long Haul that was using the same DSL line with

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

CASE NO.  3:09-cv-0168 JSW

DECLARATION OF WILLIAM KASISKE

1   the same IP address.

2          76.     It never occurred to me that there could be a computer or other storage

3   devices where the emails couldn't possibly have been generated from or where

4   identifying information couldn't possibly be stored.  We had no way of knowing what was

5   on the computers and storage devices until they were searched by forensic experts.

6          77.     Attached as **Exhibit Q** is a true and correct copy of the redacted version of

7   the Crime Report for Case No. 08-02544 (UC000247-UC000253).  This report does not

8   include the referenced attachments (many of the attachments are separately attached to

9   this declaration).  This report covers the June 2008 threatening emails and the execution

10  of the search warrant on Long Haul on August 27, 2008.

11         78.     When we arrived at Long Haul to execute the search warrant, we observed

12  that there was only one entrance at the front of the building and it was locked.  The Long

13  Haul did not appear to be open for business.  I do not recall seeing any signs on the

14  front of the building indicating the presence of any tenant other than Long Haul, nor were

15  there multiple mailboxes suggesting multiple tenants.

16         79.     The name on the front of the building stated "Long Haul Infoshop."

17         80.     The team gained access to the building by going through the neighbor's

18  office into the back and opening the back door of the Long Haul.  Long Haul's back door

19  was not very well secured.  The door had a chain which was just sort of draped over.  It

20  appeared that the chain was intended for using a padlock to lock the door shut, but the

21  chain wasn't actually locked and was just sitting between the door and the wall next to

22  the door.  The chain just fell down when the door was opened slightly.

23         81.     I am informed and believe that the Declaration of Matthew Zimmerman

24  submitted in support of Plaintiffs' Motion for Summary Judgment represents to the Court

25  that my I testified during deposition that the search term entered Long Haul through its

26  "secured back door" and that we "forcibly gained entry to Long Haul's premises."

27  (Zimmerman Dec., 5:4-5 and 5:10).  In fact, my testimony was, and the truth is, that the

28  back door of Long Haul was not "secure."  Instead, it was closed with a very loose fitting

1   chain that fell off when the door was opened slightly.

2       82.    While some of the team, including myself, was gaining entry to Long Haul

3   through the back door, some of the members of the team remained in the front to keep

4   the front secure.

5       83.    After gaining entry, we conducted a protective sweep of the premises.

6   Officer MacAdam videotaped the entry into the building and the condition of the

7   premises prior to the search.

8       84.    There were a variety of signs and banners advocating various causes and

9   organizations displayed throughout the entire interior of the premises.

10       85.    On the ground floor of the building there was a bathroom, a small kitchen

11   area, and an area with tables and chairs.  The walls were covered with posters and signs

12   addressing varied and miscellaneous causes and events.  Along the south wall of the

13   main floor were magazines, papers, and books.  There was a small hallway leading to

14   the front area of the building with three locked doors.  The front (east) of the building

15   contained the Shattuck street entrance and a counter.  Behind the counter were locked

16   cabinets.  There were additional, varied posters and signs on the open wall spaces in

17   the front of the building.

18       86.    There were two loft areas visible from the ground floor with staircases

19   leading up to them.  The western loft had a room that housed a number of computers

20   with a sign on the door that read, "Internet Room."  The eastern loft area had a couch

21   and long table and a room with a locked door.  The walls in the loft area were filled with

22   more posters and signs.

23       87.    The interior walls of Long Hall were covered in signs and posters.  I do not

24   recall seeing the "Slingshot" banner that plaintiffs claimed was there at the time of the

25   execution of the search warrant.

26       88.    At no time during the search did I observe anything that made me believe

27   the building contained separate tenants.  All of the offices within Long Haul appeared to

28   be administrative offices or storage areas.  There was nothing about the offices that

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19

CASE NO.  3:09-cv-0168 JSW

DECLARATION OF WILLIAM KASISKE

indicated to me that they were separate offices.  There were no separate mailboxes, entrances, phone lines, DSL lines, or doorbells nor were there any permanent signs or other indications that would alert someone to the multi-tenant character of a location.

89.     Prior to and during the execution of the search warrant, I was not aware that there was any sort of publishing activity occurring at or out of the Long Haul.  There was nothing in the Long Haul premises during the execution of the search warrant that alerted me to the possibility of publishing activities (i.e., no printing press, no industrial printers, etc.).  The rooms that Plaintiffs allege were the sites of publishing activity looked like nothing more than administrative offices or storage areas.

90.     I am informed and believe that Plaintiffs have cited to my deposition testimony for the proposition that all of the interior locks were cut or crowbarred. (Plaintiffs' Memorandum of Points and Authorities, 6:5-7).  The truth is, and my testimony supports this, that I did not have any involvement in unlocking any of the interior rooms of Long Haul.

91.     My focus during the search was to find computers and electronic storage devices.  I searched the entire premises, locating eleven computers in the western loft room, two computers in the eastern loft room, and one computer in a room located along the ground floor hallway.

92.     I first went upstairs into the western loft after the protective sweep was completed and MacAdam was finished videotaping the condition of the premises.  I believe that there was a cardboard or paper sign that said "Internet room."

93.     I located the computers, computer paraphernalia and data storage devices in this area and took pictures of many of the items before moving them.  I then disconnected and unplugged the computers and moved each computer to a central staging area downstairs.

94.     I am informed and believe that the Declaration of Matthew Zimmerman submitted in support of Plaintiffs' Motion for Summary Judgment represents to the Court that I testified at deposition that six computers were removed from Long Haul's "Internet

1  room." (Zimmerman Dec., 5:25-26).  In fact, my testimony was, and the truth is, that

2  eleven computers were removed from the "Internet room" and only six of those eleven

3  were sent to the lab to be reviewed.

4      95.    Attached as **Exhibit R** is a true and correct copy of the Inventory and

5  Affidavit on Search Warrant which details the items seized from the Long Haul premises

6  during the execution of the search warrant (UC 000284-UC000286).

7      96.    At some point, I did walk through the front area of the building.  I didn't see

8  any computers or electronic storage devices in that area.

9      97.    I don't specifically recall seeing any copies of Slingshot in the front room.  I

10  believed that, as an "infoshop," Long Haul was engaged in the lending, sale, or

11  distribution of books, 'zines, or newspapers.  I did not believe that Long Haul was

12  engaged in the production or publishing of any such materials.

13     98.    I recall seeing a tri-folded cardboard sheet taped to an interior door on the

14  lower level.  The sign had the words "East Bay Prisoner Support" handwritten on it.  I did

15  not know whether the handwritten sign referred to a slogan, a movement, an

16  organization, or had some other meaning.

17     99.    I was not aware of the existence of an "EBPS office" at any time during the

18  execution of the search warrant.  There was no indication that East Bay Prisoner

19  Support was a distinct organization and was paying rent to Long Haul for its use of this

20  tiny room.  I believed the room that is claimed to be the "EBPS office," like the other

21  rooms along the hallway, was used by Long Haul as office and/or storage space.  There

22  was no indication that the room was being used for any publishing activities.

23     100.   I did not review any documents located in the "EBPS office" during the

24  search.  My only activity in the room was to remove the computer and the flash drive.

25     101.   I am informed and believe that Plaintiffs have cited to my deposition

26  testimony in their Motion for Summary Judgment for the proposition that the search team

27  seized EBPS's computer hardware and compact disks "that contained material that had

28  been collected in order to distribute it to the public."  (Plaintiffs' Memorandum of Points

and Authorities, 15:27-16:3).  While it is true that a computer and electronic storage

devices were seized from the "EBPS office," I did not have any reason to believe that

there was information on this equipment that was intended to be distributed to the public.

102.    I do not recall seeing any mail addressed to East Bay Prisoner Support in

the Long Haul premises at any time during the execution of the search warrant.

103.    In the eastern loft, I recall that there was paperwork and there were

banners and fliers all over.

104.    I do not recall ever seeing a sign over the door to the "Slingshot office" that

said "Slingshot" at the time of the execution of the search warrant.

105.    I was not aware of the existence of a "Slingshot office" at any time during

the execution of the search warrant.  There was no indication that Slingshot was

operating out of the building or that it was in any way distinct from Long Haul.  There was

no indication that the room claimed to be the "Slingshot office" was being used for any

publishing activities.

106.    I did not encounter anything during the search that indicated that Slingshot

was published out of the Long Haul premises.  Items that one would expect to see from

a printing facility – printing press or, at a minimum, several printers – were not present in

the Slingshot space, nor anywhere in Long Haul.  I was not aware that the eastern loft

room was used in the publication of Slingshot.  There was no apparent indication that

this room was being used for any publishing activities.

107.    I didn't review any documents in the "Slingshot office."  I merely unplugged

and removed computers and recovered electronic storage devices from the room.  The

room appeared to include storage space for old publications, which is what we expected

to see in a place self-described as a "lending library."

108.    During the execution of the search, I did not observe anything that

indicated to me that there was more than one DSL line.  I similarly did not observe

anything that indicated to me any attempt to split the line and create multiple IP

addresses.

109.   Other members of the warrant team and I assembled all of the seized items in the back room towards the kitchen on the ground floor and inventoried them prior to removing them from the premises.  Once the warrant team finished searching the premises, MacAdam took a final video of the premises to document the condition of the premises at the conclusion of the search.  We took the computers and other electronic storage devices out of the premises through the back door to their cars.  After the computers were loaded into the cars, MacAdam, Shaffer, and Hart had no further involvement with the execution of the warrant or the investigation into the threatening emails.

110.   There were several copies of the Search Warrant present at Long Haul during the search.

111.   Additionally, I believe that the Statement of Probable Cause was at Long Haul during the execution of the search warrant.  It is my usual practice to bring a folder with relevant paperwork with me for use during the service of the warrant.  There is no reason why I would have diverged from usual practice in this instance.

112.   I did not seize any items that were not described in the search warrant nor exceed the scope of the search warrant.  I did not approve the seizure of any items that were not described in the search warrant, and to my knowledge no such items were in fact seized.  I acted in good faith at all times during the application and execution of the search warrant.

113.   On September 18, 2008, I requested a court order to authorize the release of all property seized during the search.  The order was signed, and later that day, I called Seth Chazin, an attorney representing the Long Haul to inform him that some of the seized property was available to be released.  On September 19, 2008, six computers from the western loft room and two computers from the eastern loft room were retrieved by Chloe Watlington, who I am informed is a member of EBPS.  Attached as **Exhibit S** is a true and correct copy of the Property Receipt signed by Chloe Watlington on September 19, 2008 (UC000297-UC000298).

114.   On September 23, 2008, UCPD finished copying the remaining computer hard drives.  I called Mr. Chazin to advise him that there was more property to retrieve.  On September 30, 2008, Christopher Henning came to UCPD, and Officer Zuniga released the remaining property to him.  Attached as **Exhibit T** is a true and correct copy of the Property Receipt signed by Christopher Henning on September 30, 2008 (UC000299-UC000300).  Given the care and expertise required for the computer search and copying, as well as the workload of the Silicon Valley Regional Computer Forensics Laboratory (the "SVRCF Lab"), the timeframe for returning the computers was reasonable.

115.   Initially, I requested that the SVRCF Lab accept all the computers seized during the search and conduct a forensic examination.  The SVRCF Lab stated that it could only accept a limited number of computers based on workload considerations.  On August 29, 2008, I delivered six computers seized from Long Haul's public internet room to the SVRCF Lab to be forensically examined.  Attached as **Exhibit U** is a true and correct copy the Supplemental Report regarding SVRCF Lab's search of the computers and the results thereof (UC000306-UC000307).

116.   I am informed and believe that the Declaration of Matthew Zimmerman submitted in support of Plaintiffs' Motion for Summary Judgment represents to the Court an attached exhibit represents the search request I submitted to the SVRCF Lab (Zimmerman Dec., 12:25-26).  However, the attachment to Mr. Zimmerman's declaration is only the first page of the true and correct copy of the search list I submitted.  The entire document is actually six pages.  Attached as **Exhibit V** is a true and correct copy of the redacted version of the search terms I submitted to the SVRCF Lab for the review of six computers seized from Long Haul's public internet access room (UC000088-UC000093).

117.   These search terms were created from the ARWG's investigation of and intelligence regarding animal activist activities against University of California researchers.  I created this list of search terms to attempt to determine who had sent the threatening emails on June 15, 2008.  This list included the names and contact

1    information for targeted researchers; names and contact information for suspects who

2    had been identified in previous animal rights cases; and terms used by suspects who

3    had previously targeted researchers ("vivisection", etc.).  I believed that searching for

4    suspect and victim names from other animal rights activist events would aid in the

5    investigation of the threatening emails and might help to identify the sender of the

6    emails.  In drafting these search terms, I was not attempting to obtain information

7    unrelated to the June 15, 2008 emails.  The search terms were limited in scope and not

8    designed to locate any material protected by the Privacy Protection Act or any material

9    not relevant to the investigation into the threatening emails.

10          118.    On October 30 and November 10, 2008, the lab provided me with two Final

11   Examination Reports for the searches of the six computers from the public internet room.

12   Attached as **Exhibit W** (USA0004-USA00007) and **Exhibit X** (USA00001-USA00003) are

13   true and correct copies of the redacted versions of the reports.  These reports state that

14   the lab analyzed the contents of the six computers and while there were links to animal

15   activism generally, the searches had been unable to find any evidence that the

16   computers were used to send threatening email messages to animal researchers.  In

17   addition to the reports, the lab sent a CD with the files that contained one or more of the

18   requested search terms.

19          119.    I reviewed the lab's reports and accompanying CD and created a summary

20   of the results.  Attached as **Exhibit Y** is a true and correct copy of my January 9, 2009

21   email to Sabrina Reich, Karen Alberts, and Lisa Shaffer and the attached search results

22   summary (UC000350-UC000358).  While the files indicated that the computers had been

23   used to access websites related to the movement against UC researchers, the files did

24   not appear to contain information that would indicate who might have sent the

25   threatening messages.

26          120.    Only six of the computers from the "public internet room" were sent to the

27   SVRCF Lab and they were the only computers that were ever searched.  The remaining

28   computer hard drives and other storage media seized from Long Haul were copied by

UCPD personnel.  Neither the computers taken from the eastern loft room or the first floor hallway room were ever searched by any agency.  There has never been any search of the contents of these computers.

121.    Attached as **Exhibit Z** is a true and correct copy of a snapshot of a frame from the video taken by Officer MacAdam documenting the condition of the Long Haul premises before and after the execution of the search warrant on August 27, 2008.  This video has been maintained by UCPD and is part of the case file for Case No. 08-02544. This particular photo shows the interior of the Long Haul premises as it existed when we entered and during the protective sweep.  Some of the multiple signs and banners on the walls of Long Haul are depicted in this photo.

122.    Attached as **Exhibit AA** is a true and correct copy of a snapshot of a frame from the video taken by Officer MacAdam documenting the condition of the Long Haul premises before and after the execution of the search warrant on August 27, 2008.  This video has been maintained by UCPD and is part of the case file for Case No. 08-02544. This particular photo shows the interior of the Long Haul premises and is taken from the western loft space looking over to the eastern loft area.  Once again, the multiple signs and banners on the walls are visible.

123.    Attached as **Exhibit BB** is a true and correct copy of a snapshot of a frame from the video taken by Officer MacAdam documenting the condition of the Long Haul premises before and after the execution of the search warrant on August 27, 2008.  This video has been maintained by UCPD and is part of the case file for Case No. 08-02544. This particular photo shows the door to the "Slingshot office" and demonstrates that there was no sign on the door that said "Slingshot" or in any way indicated a separate office or that there was publishing activity occurring within.

124.    Attached as **Exhibit CC** is a true and correct copy of a snapshot of a frame from the video taken by Officer MacAdam documenting the condition of the Long Haul premises before and after the execution of the search warrant on August 27, 2008.  This video has been maintained by UCPD and is part of the case file for Case No. 08-02544.

This particular photo shows the doorway to the "Slingshot office" and part of the interior of the office.

125.   Attached as **Exhibit DD** is a true and correct copy of a snapshot of a frame from the video taken by Officer MacAdam documenting the condition of the Long Haul premises before and after the execution of the search warrant on August 27, 2008.  This video has been maintained by UCPD and is part of the case file for Case No. 08-02544. This particular photo shows part of the desk in the "Slingshot office."

126.   Attached as **Exhibit EE** is a true and correct copy of a snapshot of a frame from the video taken by Officer MacAdam documenting the condition of the Long Haul premises before and after the execution of the search warrant on August 27, 2008.  This video has been maintained by UCPD and is part of the case file for Case No. 08-02544. This particular photo shows the hallway in the downstairs of the Long Haul premises. The three doors along the hallway are depicted, as are the numerous signs and banners on the doors and the walls of the hallway.

127.   Attached as **Exhibit FF** is a true and correct copy of a snapshot of a frame from the video taken by Officer MacAdam documenting the condition of the Long Haul premises before and after the execution of the search warrant on August 27, 2008.  This video has been maintained by UCPD and is part of the case file for Case No. 08-02544. This particular photo shows the interior of the EBPS office and the fact that there is nothing in the office that indicated that publishing activities were occurring therein nor that the office belonged to a tenant of the Long Haul.

128.   Attached as **Exhibit GG** is a true and correct copy of a snapshot of a frame from the video taken by Officer MacAdam documenting the condition of the Long Haul premises before and after the execution of the search warrant on August 27, 2008.  This video has been maintained by UCPD and is part of the case file for Case No. 08-02544. This particular photo shows the interior of the EBPS office as it existed after the execution of the search warrant.

///

1      I declare under penalty of perjury under the laws of the State of California that the

2  information contained in the Declaration of William Kasiske In Support of Defendants'

3  Opposition to Plaintiffs' Motion for Summary Judgment and Defendants' Cross-Motion

4  for Summary Judgment/Adjudication is true and correct.

5      Executed on February _11_, 2011, in Berkeley, California.

6

7                                     _____

8                                       William Kasiske

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO.  3:09-cv-0168 JSW

DECLARATION OF WILLIAM KASISKE