# EXHIBIT A

1              UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4

5  LONG HAUL, INC. and EAST BAY    )
    PRISONER SUPPORT,            )
6                          )
                Plaintiffs,   )
7                          )
       v.                )  No. C 09-00168-JSW
8                          )
    UNITED STATES OF AMERICA; MIGUEL  )
9  CELAYA; KAREN ALBERTS; WILLIAM    )
    KASISKE; WADE MacADAM; TIMOTHY    )
10 ZUNIGA; MIKE HART; LISA SHAFFER;  )
    and DOES 1 - 25,            )
11                          )
                Defendants.   )
12 _____)

13

14

15

16        DEPOSITION OF JESSE PALMER, taken on behalf

17    of Plaintiffs, at One Market Street, 32nd Floor, San

18    Francisco, California, commencing at 9:35 a.m.,

19    Wednesday, August 4, 2010, before Donna J. Blum,

20    Certified Shorthand Reporter, No. 11133.

21

22

23

24

25

BARKLEY
Court Reporters

Jesse Palmer

1     A.   Just the front door.

2     Q.   Who has -- in 2008, who would have had keys to

3 the locked areas that you described?

4     A.   If somebody was a volunteer with Slingshot,

5 which is upstairs, they would have -- they could -- they

6 would not necessarily but they could have a key to that

7 door.

8        Continuing, if they were a volunteer with the

9 Info Shop Project, which is in the front room, they would

10 not necessarily have a combination to get into the

11 counter area.  If you have that combination, then there

12 is a key to a glass cabinet where books are kept, and

13 there's also a book that has a combination for a place

14 where coffee is kept that's locked and place where

15 audio/visual equipment is kept, which is also locked, and

16 a place where tools and paint, maintenance equipment is

17 kept, which is locked.

18        If you -- the three locked offices downstairs,

19 the back one would have just been members of East Bay

20 Prisoner Support would have had a key.  I don't know

21 whether it was a padlock or a combination but would have

22 had access.

23        The middle office, which is where The Needle

24 Exchange was, would have just been people associated with

25 that group.  And, again, I don't know how they do that.

Jesse Palmer

BARKLEY
Court Reporters

1    very good, and they certainly do not get copies, and it

2    happens very rarely because people know that that's a

3    real no, no.  So it does not happen very much.

4         Q.  And going back to my previous line of

5    questioning about who had access to locked spaces, were

6    there any volunteers of Long Haul that were volunteers of

7    Slingshot?

8         A.  I'm not sure I understand the question, because

9    Slingshot is a project of Long Haul.  So if you are a

10   volunteer for Long Haul -- or, I'm sorry, if you're a

11   volunteer for Slingshot, you are by definition a

12   volunteer for Slingshot -- sorry.  You've got even me

13   confused.

14        If you were a volunteer for Slingshot, you were

15   by definition a volunteer for the Long Haul; however, the

16   converse is not always true.  If you're a volunteer for

17   Long Haul, you don't necessarily work on Slingshot, so.

18        Q.  Were there volunteers for Long Haul who were

19   volunteers for Slingshot?

20        A.  Again, I'm not sure I understand the question

21   because it's the Slingshot is a part of Long Haul.  If

22   you're -- this would be like -- this would be like, you

23   know, if General Motors has Chevrolet, so if you -- if

24   you work for general -- you know, if -- if -- if you are

25   a volunteer for Slingshot, you are by definition a

29

Jesse Palmer

BARKLEY
Court Reporters

1   volunteer for Long Haul.  If you work for Chevrolet, you

2   by definition work for General Motors.  There's no

3   separateness.

4        Q.   Is there --

5             Are there volunteers for Long Haul who were also

6   volunteers of East Bay Prisoner Support?

7        A.   Again, I'm not sure in 2008.  I'm just not sure.

8   But I think it's possible that there was a volunteer --

9   one volunteer who was a Long Haul volunteer who also was

10  with East Bay Prisoner Support.

11       Q.   And were there volunteers for Long Haul who were

12  also volunteers for The Needle Exchange?

13       A.   In 2008?

14       Q.   In August 2008.

15       A.   I don't think so.

16       Q.   In 2008 were there volunteers of Long Haul who

17  were also volunteers of Cycles for Change?

18       A.   I don't think so.

19       Q.   Going back to Exhibit 9 if you go to Bates

20  No. 10.

21       A.   Bates ten or page ten?

22       Q.   Bates ten.  Sorry.  Article two.  It states

23  "Objectives and Purposes."  Correct?

24       A.   Correct.

25       Q.   And can you read what the objectives and

30

BARKLEY
Court Reporters

1      A.   I don't know all the people who created it.   I

2    wasn't there.   But I do know that David Wildcat and Nick

3    Frabicilo were founders.

4      Q.   And were they members of Long Haul at the time?

5      A.   No.

6      Q.   In 1988 when Slingshot was founded, what was the

7    relationship between Slingshot and Long Haul, if there

8    was one?

9      A.   At the moment of creation I don't think there

10   was any relationship at all.

11     Q.   Did there come to be a relationship between the

12   two organizations?

13     A.   I know that Slingshot had some benefits, fund

14   raising benefits at the Long Haul probably in 1988 or

15   '89, but Slingshot did not have its office at Long Haul

16   until 1993.

17     Q.   I'm going to show you what's been marked as

18   Deposition Exhibit 32.

19          (Deposition Exhibit No. 32 was marked for

20          identification.)

21   BY MS. ELLIS:

22     Q.   Do you recognize that document?

23     A.   Yes.

24     Q.   What is that?

25     A.   This is a letter to a bank authorizing opening

75

Jesse Palmer

BARKLEY
Court Reporters

1  of a bank account in Slingshot's -- you know, using the

2  name Slingshot under the Long Haul tax ID number.

3      Q.  And you were the authorized check signer on that

4  account?

5      A.  Correct.

6      Q.  And you opened that account.  Correct?

7      A.  Correct.

8      Q.  The fourth line down states, "This bank account

9  shall accept checks to Long Haul or our fiscally

10  sponsored group Slingshot Newspaper Collective."

11          What was meant by the term "fiscally sponsored

12  group"?

13          MS. GRANICK:  Objection, calls for speculation.

14          THE WITNESS:  This is a little bit of a muddled

15  area of the law actually, but it's -- I mean, I think

16  what's meant is that it's essentially a dba that Long

17  Haul is going -- has a project that's called the

18  Slingshot Newspaper Collective and that, you know,

19  publishes a paper called Slingshot and it's -- however it

20  is under the Long Haul tax ID.  It files its taxes under

21  the Long Haul tax ID.

22  BY MS. ELLIS:

23      Q.  So in 1998 was Slingshot filing taxes?

24      A.  No.

25      Q.  Okay.  Has Slingshot ever filed taxes?

76

BARKLEY
Court Reporters

1          A.   No.   Except to the extent that any income that

2     is through Long Haul, you know, all the income goes

3     through the Long Haul's tax ID.  So prior to 1998 it

4     didn't.

5          Q.   So any income that Slingshot obtains goes back

6     to Long Haul?

7          A.   Correct.

8          Q.   And is reflected then on Long Haul's tax

9     returns?

10         A.   Correct.

11         Q.   When did Slingshot have this relationship?  When

12    did that relationship with Long Haul start?

13              MS. GRANICK:  Objection, vague.  Which

14    relationship?

15              MS. ELLIS:  The relationship of being a fiscally

16    sponsored group.

17              THE WITNESS:  I believe in 1993.

18    BY MS. ELLIS:

19         Q.   When long -- when Slingshot moved its offices

20    into Long Haul?

21         A.   (Moves head up and down.)

22              MS. GRANICK:  You have to answer verbally.

23              THE WITNESS:  Oh, correct.

24    BY MS. ELLIS:

25         Q.   And prior to that Long -- Slingshot was not a

77

Jesse Palmer

BARKLEY
Court Reporters

1   physically sponsored group of Long Haul.  Correct?

2       A.   Correct.

3       Q.  What was the basis of the decision to make

4   Slingshot a physically sponsored group of Long Haul?

5       A.   You mean in 1993?

6       Q.   Uh-huh.

7       A.   I'm not sure I fully remember.  I think the main

8   reason is that Slingshot had been sponsored by the

9   University of California at Berkeley, and everybody had

10   graduated, and there was no way to -- because we had an

11   office at Eshleman Hall and that office was not viable

12   anymore because there were no students involved in the

13   group, so we needed to find a new office and Long Haul

14   had an office.  So it made sense that the physical

15   trappings of the project would also be taken on by this

16   other organization.

17       Q.  So Slingshot is considered a tenant of Long

18   Haul?

19       A.   No.  Slingshot does not pay rent to Long Haul.

20   Slingshot is considered a project of Long Haul.

21       Q.  When did you first become involved with

22   Slingshot?

23       A.   1988.

24       Q.  When Slingshot was founded?

25       A.   I was not there at the founding, but I got

78

BARKLEY
Court Reporters

1          MS. GRANICK:  Objection, vague, calls for

2     speculation, overbroad.

3          THE WITNESS:  I don't know.  I don't think I

4     have any information one way or another about this

5     document.

6          MS. ELLIS:  I'm going to turn your attention

7     then to Exhibit 22.

8              (Deposition Exhibit No. 22 was marked for

9              identification.)

10    BY MS. ELLIS:

11        Q.  Have you ever seen this document before?

12        A.  I don't think so, no.

13        Q.  At the top of the document Bates number UC 243,

14    it states Dane, D-a-n-e, Jasper, 11:51 a.m, 3/21/2008,

15    subpoena response.  Correct?

16        A.  Yep, yes.

17        Q.  And in the body of this document it states, "I

18    certify under penalty of perjury that the attached is

19    correct to the best of my knowledge."  Correct?

20        A.  That seems correct, yes.

21        Q.  And if you turn to the next page Bates stamped

22    UC 244, it states "Account Information."  Correct?

23        A.  Yes.

24        Q.  Then it states "Service Location Information"

25    further down the page.  Correct?

                          137

Jesse Palmer

BARKLEY
Court Reporters

1     A.  Yes.

2     Q.  And the first name listed is Jesse, J-e-s-s-y?

3     A.  Correct.

4     Q.  And the last name is Palmer, P-a-l-m-e-r.  Is

5 that correct?

6     A.  Correct.

7     Q.  The address is 3124 Shattuck Avenue.  Correct?

8     A.  Correct.

9     Q.  The city is Berkeley.  Correct?

10     A.  Correct.

11     Q.  The state is California.  Correct?

12     A.  Correct.

13     Q.  And the zip code is 94705.  Correct?

14     A.  Yes.

15     Q.  The address that's listed there is the same

16 address as the Long Haul.  Correct?

17     A.  Correct.

18     Q.  And the name that's listed there is "Jessy

19 Palmer."  Correct?

20     A.  It's a wrong spelling, but it looks like

21 somebody's attempt to spell my name.

22     Q.  And does Long Haul in March of 2008, did Long

23 Haul have -- use Sonic Net as its Internet provider?

24     A.  I think so, yes.

25     Q.  And was the internet account opened in your

138

BARKLEY
Court Reporters

1    name?

2         A.   I think -- I mean, based on this, yes.

3         Q.   And do you have any reason to believe that this

4    information is incorrect?

5         A.   No.

6              MS. ELLIS:   Now, are you aware that in March of

7    2008 UC researchers had received e-mails that they

8    believed to be harassing relating to animal research

9    activity?

10             MS. GRANICK:   Objection, vague as to time and

11   calls for speculation and overbroad.

12             THE WITNESS:   I found this out in the wake of

13   the police raid, yes.

14   BY MS. ELLIS:

15        Q.   Are you aware that the e-mails that were sent to

16   these researchers in March of 2008 were traced back to

17   computers using the IP address associated with the Long

18   Haul?

19             MS. GRANICK:   Objection, assumes facts not in

20   evidence, vague as to time, calls for speculation,

21   overbroad.

22             THE WITNESS:   That's what I've been told.

23   BY MS. ELLIS:

24        Q.   And do you have any reason to believe that that

25   information is not correct?

139

BARKLEY
Court Reporters

1          MS. GRANICK:  Same objections.

2          THE WITNESS:  No.

3     BY MS. ELLIS:

4          Q.  I'm going to turn your attention to Deposition

5     Exhibit 24.  Actually, I'll give you 25.

6               (Deposition Exhibit No. 25 was marked for

7               identification.)

8     BY MS. ELLIS:

9          Q.  Have you ever seen this document before?

10         A.  I don't think so.

11         Q.  At the top of the document it states "Superior

12    Court of California, County of Alameda."  Correct?

13         A.  Yes.

14         Q.  In the box it states "Court Order Subpoena for

15    Information."  Correct?

16         A.  Yes.

17         Q.  It's directed to Sonic dot Net Incorporated?

18         A.  Yes.

19         Q.  And it's regarding subscriber information for IP

20    address 208 --

21         MS. GRANICK:  Objection, you're just asking him

22    to confirm what the document says as he sits here and

23    looks at it today?

24         MS. ELLIS:  Yes.

25         MS. GRANICK:  Okay.  You can read the document

140

BARKLEY
Court Reporters

1    as well as any of us.  Go ahead.

2              THE WITNESS:  Well --

3    BY MS. ELLIS:

4        Q.  It states, "subscriber information for IP

5    address 208 dot 106 dot 103 dot 213."  Correct?

6        A.  Correct.

7        Q.  And that's the same IP address that was the

8    subject of the March subpoena.  Correct?

9        A.  Correct.

10       Q.  And this is dated July 22, 2008.  Correct?

11             MS. GRANICK:  Objection, vague, calls for

12   speculation.

13             MS. ELLIS:  At the bottom.

14             THE WITNESS:  That's what it looks like to me.

15   BY MS. ELLIS:

16       Q.  I'm going to direct your attention then to

17   Exhibit 25B.

18             (Deposition Exhibit No. 25B was marked for

19             identification.)

20   BY MS. ELLIS:

21       Q.  Have you ever seen this document before?

22       A.  I don't think so, no.

23       Q.  And at the top of the document it states, "Dane

24   Jasper, 1:17 p.m. July 24, 2008, forward subpoena for

25   records UCB."  Correct?

141

Jesse Palmer

**BARKLEY**
*Court Reporters*

1      A.  Yes.

2      Q.  And at the bottom of this document Bates stamped

3   UC 274 it states first name "Jessy"?

4      A.  Yes.

5      Q.  At the second page of this document UC 275 it

6   states last name Palmer?

7      A.  Yes.

8      Q.  The service address is 3124 Shattuck Avenue?

9      A.  Yes.

10     Q.  The city is Berkeley?

11     A.  Yes.

12     Q.  The state is California?

13     A.  Yes.

14     Q.  And the zip code is 94705.  Correct?

15     A.  Yes.

16     Q.  That address is the same address as the Long

17  Haul.  Correct?

18     A.  Correct.

19     Q.  And that references when it says "Jessy Palmer,"

20  it references you.  Correct?

21     A.  I have to assume, yes.

22     Q.  And in June of 2008 Long Haul still used Sonic

23  Net as its internet service provider?

24     A.  Correct.

25     Q.  And you have no reason to believe that any of

142

BARKLEY
Court Reporters

1    the information located in this response is incorrect?

2         A.   No.

3         Q.   Are you aware that in June of 2008 e-mails were

4    sent to a professor at the University of California

5    Berkeley who did research on animals?

6         A.   I've been --

7              MS. GRANICK:   Objection, vague as to time, calls

8    for speculation.   And, yeah, vague as to time, calls for

9    speculation, assumes facts not in evidence.

10             THE WITNESS:   I've been -- I heard that after

11   the police raid, yes.

12   BY MS. ELLIS:

13        Q.   And that the subject of those e-mails had to do

14   with the professor's research on animals.   Is that

15   correct?

16             MS. GRANICK:   Objection, assumes facts not in

17   evidence, vague as to time, confusing and compound.

18             THE WITNESS:   I believe that I heard that it had

19   something to do with animals.

20   BY MS. ELLIS:

21        Q.   What did you hear about those, the e-mails that

22   were sent to that particular researcher?

23             MS. GRANICK:   Objection, vague, assumes facts

24   not in evidence.

25             THE WITNESS:   That's a broad question.   There

143

Jesse Palmer

BARKLEY
Court Reporters

1      Q.  Do you remember that the text of the e-mails

2  were threatening in nature?

3      A.  Yes.

4      MS. GRANICK:  My objection is calls for

5  speculation, calls for a legal conclusion.  And his

6  answer is yes.

7  BY MS. ELLIS:

8      Q.  And are you aware that these particular e-mails

9  that were sent to this researcher in June were traced

10  back to a computer at Long Haul?

11      MS. GRANICK:  Objection, assumes facts not in

12  evidence, vague as to time.

13      THE WITNESS:  I believe that's what the -- the

14  support for the search warrant alleged, and that's what I

15  heard.

16  BY MS. ELLIS:

17      Q.  And do you have any reason to believe that the

18  information tracing these e-mails back to the Long Haul

19  was incorrect?

20      MS. GRANICK:  Same objections.

21      THE WITNESS:  I don't have any reason to either

22  believe or disbelieve it.  I don't.  It's outside of my

23  area of knowledge.

24  BY MS. ELLIS:

25      Q.  I'm going to turn your attention to Deposition

146

BARKLEY
Court Reporters

1    were actually searched?

2        A.  No.

3        Q.  And was anyone at Long Haul ever made aware of

4    which of the computers at Long Haul that were seized were

5    actually searched?

6        MS. GRANICK:  Objection, calls for legal

7    conclusion.  Same objection applies to the previous

8    question.

9        You can answer.

10       THE WITNESS:  Not that I know of.

11   BY MS. ELLIS:

12       Q.  Do you have any reason to believe that the

13   computers taken from the Slingshot office and the East

14   Bay Prisoner Support office were not searched by any

15   defendant?

16       MS. GRANICK:  Objection, calls for a legal

17   conclusion, assumes facts not in evidence.

18       THE WITNESS:  I have no knowledge of -- I don't

19   know.

20   BY MS. ELLIS:

21       Q.  Now going back to Exhibit 17 this is the tax

22   return for Long Haul for 2008.  Correct?

23       A.  Correct.

24       Q.  And if you go to the second to last page of that

25   exhibit it states "attachments, part one, line ten."  Is

159

Jesse Palmer

BARKLEY
Court Reporters

1    that correct?

2        A.   Yeah, "attachments part one, line ten."

3        Q.   And is it your understanding that this document

4    reflects all the grants that were paid to different

5    organizations by Long Haul in fiscal year 2008?

6        A.   Yes.

7        Q.   And if you go to the third box down it reflects

8    that Long Haul provided East Bay Prisoner Support $75.

9    Is that correct?

10       A.   Correct.

11       Q.   Do you remember when, at what point in time Long

12   Haul provided this grant to East Bay Prisoner Support?

13       A.   No, beyond 2008, no, I don't know.

14       Q.   Do you know what the grant was for?

15       A.   It was a general grant, no.

16       Q.   Do you know what East Bay Prisoner Support used

17   the grant for?

18       A.   We assume paper copies and stamps.

19       Q.   The tenth box down states "SCV" and the amount

20   of grant was for $50.

21       A.   Correct.

22       Q.   What does SCV stand for?

23           MS. GRANICK:   Objection, calls for speculation.

24   BY MS. ELLIS:

25       Q.   You did draft you prepared this tax return.

Jesse Palmer

BARKLEY
Court Reporters

1  Right?

2      A.  I did.

3      Q.  Okay.  What does did SCV stand for?

4      A.  I think it probably stands for -- I'm not sure I

5  remember.

6      Q.  Is it possible that it stands for Stop Cal

7  Vivisection?

8      A.  Yeah, it's possible.

9      Q.  And do you remember whether Long Haul gave Stop

10  Cal Vivisection a grant of $50 in 2008?

11      A.  I think that's true.

12      Q.  And the address for Stop Cal Vivisection is

13  listed at 3124 Shattuck Avenue, Berkeley, California

14  44705.  That's the same address as the Long Haul.  Right?

15      A.  Except for the typo, yeah.

16      Q.  Why was the address for Stop Cal Vivisection

17  listed as the Long Haul address?

18      A.  Because I believe they had a dinner event, and

19  so when -- when people have a dinner event and they get a

20  grant out of that event and we don't have an address for

21  them, then we just put that address because that's where

22  it was, that's where the event was.

23      Q.  Did you ever ask anyone from Stop Cal

24  Vivisection for an address in preparing this tax return?

25      A.  I probably did not.. I did not.

161

BARKLEY
Court Reporters

1    Q.   Do you know whether Terry Compost did?

2    A.   She did not.

3    Q.   And do you know what this $50 is used for?

4    A.   I do not.

5    Q.   Now, in -- we spoke about this dinner event that

6    occurred in April of 2008.   Correct?

7              MS. GRANICK:   Assumes facts not in evidence.

8              THE WITNESS:   I'm not sure.   But we don't keep

9    records.   That is possible.

10   BY MS. ELLIS:

11   Q.   Do you know what the purpose of Stop Cal

12   Vivisection was in 2008?

13             MS. GRANICK:   Are you asking him as Long Haul's

14   representative or individually?

15   BY MS. ELLIS:

16   Q.   This whole deposition is just Long Haul's

17   representative.

18   A.   I mean, I don't know.   I think that's the

19   answer.   Other than the name speaking for itself.

20   Q.   Did Stop Cal Vivisection want to or was it

21   opposed to vivisection activities by Berkeley

22   researchers?

23             MS. GRANICK:   Objection, calls for speculation.

24             THE WITNESS:   I mean, I'm not sure I know, but

25   the name implies that.

162

Jesse Palmer

BARKLEY
Court Reporters

1   do you recognize that?

2          MS. GRANICK:  Meaning as he sits here today or?

3   BY MS. ELLIS:

4      Q.  As you sit here today, do you recognize it?

5      A.  I haven't seen this before.

6      Q.  Okay.  Are you familiar with the East Bay India

7   Media site?

8      A.  I mean, I know it exists.

9      Q.  And the title says "Stop Cal Vivisection cafe

10  night at the Long Haul."  Correct?

11     A.  Correct.

12     Q.  And was there a Stop Cal Vivisection cafe night

13  at the Long Haul on Sunday April 20?

14     A.  I don't know what date it was.  I think there

15  was one in 2008.

16     Q.  And the purpose of that cafe night was to raise

17  funds for Stop Cal Vivisection.  Is that correct?

18         MS. GRANICK:  Objection, calls for speculation,

19  assumes facts not in evidence.

20         THE WITNESS:  That and probably to provide

21  information about the campaign.

22  BY MS. ELLIS:

23     Q.  Did you attend that dinner event?

24     A.  No.

25     Q.  Do you know whether members of Long Haul

182

BARKLEY
Court Reporters

```
1              DEPOSITION OFFICER'S CERTIFICATE
2    STATE OF CALIFORNIA   )
                           ) ss.
3    COUNTY OF MARIN       )

4

5

6         I, Donna J. Blum , hereby certify:

7         I am a duly qualified Certified Shorthand

8    Reporter in the State of California, holder of

9    Certificate Number CSR 11133 issued by the Court

10   Reporters Board of California and which is in full force

11   and effect.  (Fed. R. Civ. P. 28(a)).

12        I am authorized to administer oaths or

13   affirmations pursuant to California Code of Civil

14   Procedure, Section 2093(b) and prior to being examined,

15   the witness was first duly sworn by me.  (Fed. R. Civ.

16   P. 28(a), 30(f)(1)).

17        I am not a relative or employee or attorney or

18   counsel of any of the parties, nor am I a relative or

19   employee of such attorney or counsel, nor am I

20   financially interested in this action.  (Fed. R. Civ. P.

21   28).

22        I am the deposition officer that

23   stenographically recorded the testimony in the foregoing

24   deposition and the foregoing transcript is a true record

25                        / / /


                            224
```

Jesse Palmer

BARKLEY
Court Reporters

1   of the testimony given by the witness.   (Fed. R. Civ. P.

2   30(f)(1)).

3        Before completion of the deposition, review of

4   the transcript [XX] was [  ] was not requested.   If

5   requested, any changes made by the deponent (and

6   provided to the reporter) during the period allowed, are

7   appended hereto.   (Fed. R. Civ. P. 30(e)).

8

9   Dated: August 19, 2010

10

11

12   _____

13

14

15

16

17

18

19

20

21

22

23

24

25

225

Jesse Palmer

BARKLEY
Court Reporters