SCHIFF HARDIN LLP
WILLIAM J. CARROLL (CSB #118106)
wcarroll@schiffhardin.com
SARAH D. YOUNGBLOOD (CSB #244304)
syoungblood@schiffhardin.com
One Market, Spear Street Tower
Thirty-Second Floor
San Francisco, CA 94105
Telephone: (415) 901-8700
Facsimile: (415) 901-8701

SARA L. ELLIS (ILSB #6224868)
sellis@schiffhardin.com
233 South Wacker Drive
Suite 6600
Chicago, IL 60606
Telephone (312) 258-5800
Facsimile (312) 258-5600

Attorneys for Defendants
MITCHELL CELAYA, KAREN ALBERTS,
WILLIAM KASISKE, WADE MACADAM and
TIMOTHY J. ZUNIGA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LONG HAUL, INC., and EAST BAY PRISONER SUPPORT,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA; MITCHELL CELAYA; KAREN ALBERTS; WILLIAM KASISKE; WADE MACADAM; TIMOTHY J. ZUNIGA; MIKE HART; LISA SHAFFER; AND DOES 1-25,<br><br>Defendants. | Case No. 3:09-cv-0168 JSW<br><br>**DECLARATION OF TIMOTHY J. ZUNIGA IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT/ADJUDICATION** |

1. I am employed as a Corporal with the University of California Police Department ("UCPD"), and I am a resident of Alameda County, California. I have personal knowledge of the facts set forth herein and, if called as a witness, I could and

1 would testify truthfully thereto.

2. I have been employed with UCPD for approximately seven years and I have been a law enforcement officer for approximately 14 years.

3. In 2008, I was a member of the Animal Rights Working Group ("ARWG"), which was also known as the Animal Rights Extremism Work Group (AREWG). My understanding is that the primary mission of the group was to investigate incidents and crimes related to animal rights protests and activities.

4. Through my participation in the ARWG, I was aware that UC-Berkeley faculty and staff members were the subject of threatening emails and other threatening and intimidating behavior, allegedly perpetrated by animal rights activists, over a period of time.

5. I investigated or assisted in the investigation of animal rights activist activities that were the subject of or related to the search warrant at issue in this litigation.

6. Beginning in late 2007 and continuing through 2008, animal rights activists conducted numerous home demonstrations at the residences of University of California researchers. These demonstrations included chalking the researchers' driveways and sidewalks with offensive messages and placing flyers full of incendiary comments where neighbors would find them. During these demonstrations, animal rights activists chanted slogans meant to frighten and intimidate the researchers, such as "For the animals, we will fight. We know where you sleep at night." Animal rights activists also vandalized the researchers' homes during some of these demonstrations. As part of its investigation, other UCPD officers and I monitored these home demonstrations, at times followed the demonstrators from researchers' residences, and monitored the internet to find additional information on the location of the demonstrations, when the demonstrations would be occurring, and which groups were responsible for the demonstrations.

7. A group identified as Stop Cal Vivisection supported and claimed responsibility for various home demonstrations, claiming they were taking a radical stand

1  against animal research conducted by UC Berkeley researchers. As part of these efforts,
2  Stop Cal Vivisection maintained websites where it disseminated information regarding
3  researchers at UC Berkeley engaged in animal research, listing the researchers' names,
4  home addresses, telephone numbers, and displaying graphic pictures seeking to suggest
5  the researchers were treating animals inhumanely. Throughout 2008, there was a
6  growing concern -- fed by a series of violent attacks on other UC campuses which
7  included invasions of researchers' homes and firebombing researchers' cars – that the
8  safety of UC Berkeley researchers and their families were increasingly at risk.

9       8. Given its role in targeting the homes of UC Berkeley researchers, the other
10 members of the ARWG and I recognized the possibility that Stop Cal Vivisection and/or
11 certain of its members were involved in the unlawful harassment of UC Berkeley
12 researchers. We sought to collect additional information regarding the group and its
13 activities. This task was made more complex by the fact that the group repeatedly
14 changed its websites and did not publically identify its leaders, in an apparent attempt to
15 avoid prosecution. We were able to identify various individuals who were actively
16 involved in Stop Cal Vivisection, based in part on the attendance at the home
17 demonstrations. Several of these individuals were also identified as taking part in the
18 violent campaign of harassment and intimidation underway against UC faculty engaged
19 in animal research at other campuses.

20      9. Prior to the execution of the search warrant, I was aware that Long Haul
21 was an activist organization and that the Long Haul premises were used by groups or
22 organizations to hold meetings, discussions, fundraising and recreational activities. I
23 was aware of this information through my work at UCPD.

24      10. It was my understanding, prior to the execution of the search warrant, that
25 Long Haul was an "infoshop" that sold and distributed newspapers and zines.

26      11. I was not aware that the Long Haul premises contained multiple tenants
27 until after the filing and service of this lawsuit.

28      12. I believe that I had reviewed the Long Haul website at some point prior to

the execution of the search warrant. I did not review the website at any time immediately prior to the execution of the search warrant or for the express purpose of preparing for the execution of the search warrant.

13. In my review of Long Haul's website, there was no information leading me to believe that there were any tenants located within the premises.

14. I do not recall reviewing any statement on Long Haul's website that said Slingshot was among the "individual collectives of the Long Haul" nor do I recall reviewing the page of the Long Haul website that contained a link to Slingshot.

15. From my review of the Long Haul website, I did learn that Long Haul had computers for the public to use to access the internet.

16. I did not visit or examine the inside of the Long Haul premises before August 27, 2008.

17. As part of our investigation into harassment of UC researchers by animal rights activists, other UCPD officers and I monitored activists during home demonstrations. On at least three occasions, UCPD officers followed participants in the home demonstrations back to Long Haul.

18. Specifically, on January 27, 2008, numerous animal rights demonstrators met at the Ashby BART station and traveled in two vehicles to multiple locations where they protested at the private residences of UC employees. The demonstrators exhibited signs, chanted, marched, and chalked sidewalks. I monitored an animal rights activist leaving a home demonstration at a UC-Berkeley faculty member's home and being dropped off on Hillegas at Ashby Avenue in Berkeley. The demonstrator then walked west, toward the Ashby BART station and entered Long Haul.

19. Additionally, through my work on the ARWG, I am aware of an instance, prior to the execution of the search warrant and after the January 27, 2008 home demonstrations, when there were not enough individuals to participate in a home demonstration and people went from the Ashby BART station to Long Haul after determining that home demonstrations would not occur

20. Through my work on the ARWG, I am aware that Long Haul hosted an event featuring a prominent animal rights activist, Peter Young, in January 2008. The event followed the recent release of Young from prison, where he had served a sentence for crimes relating to his animal rights activities. Young gave a talk at Long Haul and showed a movie about his animal rights activities.

21. I also know that Stop Cal Vivisection held a fundraiser at Long Haul in April of 2008. Attached as **Exhibit A** is a true and correct copy of an email message forwarded from FBI Special Agent Mike Klinke to me on April 11, 2008, which announces the April 20, 2008 Stop Cal Vivisection Fundraiser at Long Haul (UC000595-UC000596). The email states that the film "Dealing Dogs" (a documentary of the efforts of an animal rights activist) will be shown and that "100% of donations will go to defray legal costs." UCPD officers conducted surveillance of the Long Haul fund-raiser, in order to obtain additional information regarding Stop Cal Vivisection's membership.

22. I am aware that a number of threatening and harassing emails were sent to UC-Berkeley researchers throughout the Spring and Summer of 2008. Through my work on the ARWG, I am aware that many of these emails originated from an IP address that was traced back to the Long Haul premises.

23. As a result of the UCPD's investigation, the ARWG believed that the emails under investigation had originated from Long Haul. We believed the emails were sent from the Long Haul either by a patron using one of Long Haul's public access computers, or by a person affiliated with Long Haul. We did not know which individual or individuals were sending the threatening emails or which computers in particular had been used to send the threatening emails.

24. In view of Long Haul's ties with Stop Cal Vivisection, and its other ties with animal rights activists, there was reason to believe that a person associated with Long Haul may have been primarily responsible or given assistance to the individual or individuals responsible for sending the threatening and harassing emails which were the subject of the search warrant. The other members of the ARWG and I did not know

whether animal rights activists who were observed at home demonstrations and seen going in and out of the Long Haul were employees or volunteers of the Long Haul who would have had access to some or all of the computers located within the Long Haul premises and would have had the motivation to destroy or alter any evidence located on the hard drives of those computers.

25. The execution of the search warrant was intended to aid in identifying the individual who sent the threatening emails and/or the computer from whence they came.

26. I was aware prior to the execution of the search warrant that Slingshot was the name of an online publication. I was not aware that Slingshot publishes a newspaper until after the filing and service of this lawsuit, and I did not review a copy of the Slingshot newspaper until the filing of this lawsuit. Prior to the filing of this lawsuit, I was not aware who published "Slingshot."

27. I reviewed the Slingshot webpage on or before February 19, 2008, more than six months before the search of Long Haul. At that time, I reviewed Slingshot's "Radical Contact List." I do not recall seeing or taking note of anything on the page that suggested to me that Slingshot was published from 3124 Shattuck Avenue, Berkeley, CA.

28. Attached as **Exhibit B** is a true and correct copy of the Slingshot Radical Contact list that I reviewed on Slingshot's website in February, 2008 (UC000140). This is a list prepared by Slingshot and which contains Long Haul's name and address among a list of many other "radical" organizations. Nothing on this list indicated any closer connection between Long Haul and Slingshot than as between Slingshot and any of the other "Radical Contacts" on the list.

29. In a February 19, 2008 email to Sergeant Alberts, I commented that "On their home page they claim an affiliation with the Long Haul on 3124 Shattuck Avenue here in Berkeley." Attached as **Exhibit C** is a true and correct copy of my email to Sergeant Alberts (UC000614).

30. I am informed and believe that the Declaration of Matthew Zimmerman

submitted in support of Plaintiffs' Motion for Summary Judgment represents to the Court that in this email to Sergeant Alberts that I "acknowledge[ed] that Slingshot is in some way affiliated with Long Haul." (Zimmerman Dec., 13:1-2). Additionally, I am informed and believe that Plaintiffs have represented in their motion that I "knew that Slingshot was a publication and that Slingshot and Long Haul were connected." (Plaintiffs' Memorandum of Points and Authorities, 6:28-7:4). However, the email states, and the truth is, that on the Slingshot home page Slingshot <u>claimed</u> an affiliation with Long Haul. I did not confirm or disprove this claim, nor did I obtain any information with regard to what the nature of the affiliation may have been. My review of the Slingshot website, and sending of the information to Sergeant Alberts pre-dated the sending of the first set of harassing emails that linked back to Long Haul in March 2008. I do not recall being aware of an "affiliation" between Long Haul and Slingshot when Long Haul was searched in August 2008.

31. I was unaware at the time of the execution of the search warrant that Slingshot was located at the Long Haul premises. I was unaware at the time of the execution of the search warrant that Slingshot claimed to be "sponsored" by Long Haul.

32. Prior to the execution of the search warrant, I did not know what East Bay Prisoner Support ("EBPS") was. I believe that I may have seen flyers with the name "East Bay Prisoner Support" on them prior to the execution of the search warrant. However, I was unaware at the time of the execution of the search warrant that EBPS was located at the Long Haul premises. Further, I was unaware that EBPS claimed to disseminated a newspaper, book, broadcast, or other similar form of public communication to the public.

33. I did not review the EBPS website prior to the execution of the search warrant.

34. I first became aware that EBPS claims to disseminate information to the public after the filing and service of this lawsuit.

35. I did not prepare or assist in the preparation of the search warrant or the

1 Statement of Probable Cause in support of the search warrant.

2 36. In the morning the day of the execution of the search warrant, August 27,
3 2008, I attended a briefing meeting lead by Detective William Kasiske. During this
4 meeting, Kasiske explained where the team was going and reviewed the terms of the
5 warrant. He described how the team would gain entry to the building, and described the
6 scope of the warrant. Kasiske gave an overview of the investigation, described the
7 timing and content of the threatening emails and told the team how he had traced them
8 back to Long Haul.

9 37. As part of the briefing meeting I was given access to and reviewed the
10 search warrant. I had a copy of the search warrant in my possession during the
11 execution of the search warrant. Additionally, it is my pattern and practice to review the
12 statement of probable cause during the briefing meeting for the execution of a search
13 warrant.

14 38. When we arrived at Long Haul to execute the search warrant, we observed
15 that there was only one entrance at the front of the building and it was locked. The Long
16 Haul did not appear to be open for business. I do not recall seeing any signs on the
17 front of the building indicating the presence of any tenant other than Long Haul, nor were
18 there multiple mailboxes suggesting multiple tenants. The name on the front of the
19 building stated "Long Haul Infoshop."

20 39. The team gained access to the building by going through the neighbor's
21 office into the back and opening the back door of the Long Haul.

22 40. I am informed and believe that the Declaration of Matthew Zimmerman
23 submitted in support of Plaintiffs' Motion for Summary Judgment represents to the Court
24 that I testified during deposition that I was not at Long Haul when the team initially
25 entered the building. (Zimmerman Dec., 6:15-17). However, my testimony was actually
26 that I was not at the back door when it was first opened. I did arrive at Long Haul at the
27 same time as the rest of the team, and I maintained security at the front of the building
28 while several team members went to the back to attempt to gain entry. Once the back

door was opened, I was called to the back to join the team.

41. After gaining entry, we conducted a protective sweep of the premises. Officer MacAdam videotaped the entry into the building and the condition of the premises prior to the search.

42. On the ground floor of the building their was a bathroom, a small kitchen area, and an area with tables and chairs. The walls were covered with posters and signs addressing varied and miscellaneous causes and events. Along the south wall of the main floor were magazines, papers, and books. There was a small hallway leading to the front area of the building with three locked doors. The front (east) of the building contained the Shattuck street entrance, a counter, and shelving displaying various magazines and periodicals. Behind the counter were locked cabinets. There were additional, varied posters and signs on the open wall spaces in the front of the building.

43. There were two loft areas visible from the ground floor with staircases leading up to them. The western loft had a room that housed a number of computers with a sign on the door that read, "Internet Room." The eastern loft area had a couch and long table and a room with a locked door. The walls in the loft area were filled with more posters and signs.

44. At no time during the search did I observe anything that made me believe the building contained separate tenants. I did not observe separate mailboxes, separate entrances, separate phone or DSL lines, or any other indicia of tenants separate from Long Haul.

45. After the premises were secure, I assisted Officer MacAdam with opening the locked offices. I remember removing at least one lock and assisting with prying at least one door opening.

46. I then assisted with the search of the premises for computers and other items identified in the warrant, including electronic processing and/or storage devices; and documents containing information identifying patrons who used the Long Haul computers.

47. The interior walls of Long Hall were covered in signs and posters. I do not recall seeing either the "Slingshot" banner or the "East Bay Prisoner Support" sign that plaintiffs claimed were there at the time of the execution of the warrant.

48. All of the offices within Long Haul appeared to be administrative offices or storage areas. There was nothing about the offices that indicated to me that they were separate offices. There were no separate mailboxes, entrances, or doorbells, nor were there any permanent signs or other indications that would alert someone to the multi-tenant character of a location.

49. Prior to and during the execution of the search warrant, I was not aware that there was any sort of publishing activity occurring at or out of the Long Haul. There was nothing in the Long Haul premises during the execution of the search warrant that alerted me to the possibility of publishing activities (i.e., no printing press, no industrial printers, etc.). The rooms that Plaintiffs allege were the sites of publishing activity looked like nothing more than administrative offices or storage areas.

50. I may have gone to the front area of Long Haul at some point during my search. I do not recall seeing issues of Slingshot in that area.

51. I did not search the room that Plaintiffs refer to as the "Internet Room." At most, I helped with the manual task of carrying the computers from that room.

52. I am informed and believe that the Declaration of Matthew Zimmerman submitted in support of Plaintiffs' Motion for Summary Judgment represents to the Court that I testified during deposition that I searched the EBPS office and cabinets. (Zimmerman Dec., 6:20-22). However, my testimony was actually that I searched the office located in the eastern loft area which Plaintiffs describe as the "Slingshot office." I did not search the EBPS office.

53. I was not aware of the existence of an "EBPS office" at any time during the execution of the search warrant. There was no indication that East Bay Prisoner Support was a distinct organization and was paying rent to Long Haul for its use of this tiny room. I believed the room that is claimed to be the "EBPS office," like the other

rooms along the hallway, was used by Long Haul as office and/or storage space. There was no indication that the room was being used for any publishing activities.

54. I do not recall seeing a sign on the door to the EBPS office that said "East Bay Prisoner Support" at the time of the execution of the search warrant.

55. I was not aware of the existence of a "Slingshot office" at any time during the execution of the search warrant. There was no indication that Slingshot was operating out of the building or that it was in any way distinct from Long Haul. There was no indication that the room claimed to be the "Slingshot office" was being used for any publishing activities.

56. I am informed and believe that the Declaration of Matthew Zimmerman submitted in support of Plaintiffs' Motion for Summary Judgment represents to the Court that a picture Plaintiffs' counsel presented during my deposition depicts a closed door with a "Slingshot" sign above it. (Zimmerman Dec., 13:3-7). I recall reviewing this photo during my deposition and I recognize the door in the picture; however, I do not recall seeing the sign above the door at the time of the execution of the search warrant. I am informed and believe that this picture was taken by Plaintiffs' counsel after the execution of the search warrant and I cannot authenticate that the picture accurately reflects the exact condition of the space at that date and time the search warrant was executed.

57. I assisted with the search of the upstairs office or "Slingshot office." The small room had no sign on the door and was cluttered with boxes, papers and files. The room appeared to include storage space for old publications, which is what we expected to see in a place self-described as a "lending library." I searched the room for items listed in the warrant, including a brief search of a file cabinet located just inside the door. The cabinet was an unorganized jumble of documents and miscellaneous items. While searching through it, I came across some photographs which I briefly perused and noticed that one of them appeared to be of a protest in Seattle and looked as if it may have evidence of criminal activity. I consulted Agent Shaffer because she had previously been assigned to the FBI's office in Seattle. She came into the room, looked

at the photographs, and handed them back to me. Believing the photographs to be irrelevant to my search, I placed them off to the side and completed my search of the room. I did not leave the photos in any particular order and didn't pay attention to which photo was on top.

58. I am informed and believe that the Declaration of Matthew Zimmerman submitted in support of Plaintiffs' Motion for Summary Judgment represents to the Court that I testified that I called Agent Shaffer upstairs into an office. (Zimmerman Dec., 6:26). However, my testimony, which was not correctly cited, was actually that I do not recall calling Agent Shaffer, but that she did join me upstairs at some point.

59. I did not find anything responsive to the search warrant, other than the computers and electronic storage devices, during my review of items in the room located in the eastern loft area or "Slingshot office."

60. I did not encounter anything during the search that indicated that Slingshot was published out of the Long Haul premises. Items that one would expect to see from a printing facility – printing press or, at a minimum, several printers – were not present in the Slingshot space, nor anywhere in Long Haul. I was not aware that the eastern loft room was used in the publication of Slingshot. There was no apparent indication that this room was being used for any publishing activities.

61. I assisted the warrant team with assembling all of the seized items in the back room towards the kitchen on the ground floor. We then took the computers and other electronic storage devices out of the premises through the back door to the cars and ultimately back to UCPD.

62. I did not seize any items that were not described in the search warrant nor exceed the scope of the search warrant. I acted in good faith at all times during the execution of the search warrant.

63. My only other involvement with this case was to return some of the seized property to Christopher Henning when he came to UCPD on September 30, 2008.

///

I declare under penalty of perjury under the laws of the State of California that the information contained in the Declaration of Timothy J. Zuniga In Support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment and Defendants' Cross-Motion for Summary Judgment/Adjudication is true and correct.

Executed on February 11, 2011, in Berkeley, California.

_____
Timothy J. Zuniga