SCHIFF HARDIN LLP
WILLIAM J. CARROLL (CSB #118106)
wcarroll@schiffhardin.com
SARAH D. YOUNGBLOOD (CSB #244304)
syoungblood@schiffhardin.com
One Market, Spear Street Tower
Thirty-Second Floor
San Francisco, CA  94105
Telephone:   (415) 901-8700
Facsimile:   (415) 901-8701

SARA L. ELLIS (ILSB #6224868)
sellis@schiffhardin.com
233 South Wacker Drive
Suite 6600
Chicago, IL  60606
Telephone    (312) 258-5800
Facsimile    (312) 258-5600

Attorneys for Defendants
MITCHELL CELAYA, KAREN ALBERTS,
WILLIAM KASISKE, WADE MACADAM and
TIMOTHY J. ZUNIGA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LONG HAUL, INC., and EAST BAY PRISONER SUPPORT,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA; MITCHELL CELAYA; KAREN ALBERTS; WILLIAM KASISKE; WADE MACADAM; TIMOTHY J. ZUNIGA; MIKE HART; LISA SHAFFER; AND DOES 1-25,<br><br>Defendants. | Case No.  3:09-cv-0168 JSW<br><br>**DECLARATION OF KAREN ALBERTS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT/ADJUDICATION** |

1.      I am employed as a police sergeant at the University of California Police

Department ("UCPD"), and I am a resident of Contra Costa County, California.  I have

personal knowledge of the facts set forth herein and, if called as a witness, I could and

1   would testify truthfully thereto.

2       2.      I have been employed with University of California Police Department

3   ("UCPD") for approximately 23 years.

4       3.      For approximately three years (2006 to 2009) I served as a Sergeant in the

5   UCPD's Criminal Investigations Bureau ("CIB").  My duties in this position included

6   supervising the detectives that were part of CIB, including then Detective William

7   Kasisike.  I was responsible for reading, reviewing, and approving the reports of the

8   officers within CIB, as well as their search warrant applications.

9       4.      As a member of ARWG, I participated in the investigation of the

10  threatening emails received by a UC-Berkeley researcher in June of 2008.  These

11  threatening emails were the culmination of a pattern of harassment, threats, and

12  intimidation directed at UC-Berkeley researchers over a period of months from animal

13  rights activists.

14      5.      Beginning in late 2007 and continuing through 2008, animal rights activists

15  conducted numerous home demonstrations at the residences of University of California

16  researchers.  These demonstrations included chalking the researchers' driveways and

17  sidewalks with offensive messages and placing flyers full of incendiary comments where

18  neighbors would find them.  During these demonstrations, animal rights activists chanted

19  slogans meant to frighten and intimidate the researchers, such as "For the animals, we

20  will fight.  We know where you sleep at night."  Animal rights activists also vandalized the

21  researchers' homes during some of these demonstrations.  As part of its investigation,

22  other UCPD officers and I monitored these home demonstrations, at times followed the

23  demonstrators from researchers' residences, and monitored the internet to find

24  additional information on the location of the demonstrations, when the demonstrations

25  would be occurring, and which groups were responsible for the demonstrations.

26      6.      A group identified as Stop Cal Vivisection supported and claimed

27  responsibility for various home demonstrations, claiming they were taking a radical stand

28  against animal research conducted by UC Berkeley researchers.  As part of these efforts,

1    Stop Cal Vivisection maintained websites where it disseminated information regarding

2    researchers at UC Berkeley engaged in animal research, listing the researchers' names,

3    home addresses, telephone numbers, and displaying graphic pictures seeking to suggest

4    the researchers were treating animals inhumanely.  Throughout 2008, there was a

5    growing concern -- fed by a series of violent attacks on other UC campuses which

6    included invasions of researchers' homes and firebombing researchers' cars – that the

7    safety of UC Berkeley researchers and their families were increasingly at risk.

8         7.     Given its role in targeting the homes of UC Berkeley researchers, the other

9    members of the ARWG and I recognized the possibility that Stop Cal Vivisection and/or

10   certain of its members were involved in the unlawful harassment of UC Berkeley

11   researchers.  We sought to collect additional information regarding the group and its

12   activities.  This task was made more complex by the fact that the group repeatedly

13   changed its websites and did not publically identify its leaders, in an apparent attempt to

14   avoid prosecution.   We were able to identify various individuals who were actively

15   involved in Stop Cal Vivisection, based in part on the attendance at the home

16   demonstrations.  Several of these individuals were also identified as taking part in the

17   violent campaign of harassment and intimidation underway against UC faculty engaged

18   in animal research at other campuses.

19        8.     Prior to the execution of the search warrant, I was aware that Long Haul

20   was a gathering point for activists and was used by groups or organizations to hold

21   meetings, discussions, fundraising and recreational activities.  I was aware of this

22   information through my work at UCPD.

23        9.     It was my understanding, prior to the execution of the search warrant, that

24   Long Haul was an "infoshop" where newspapers and other publications were available to

25   the public.

26        10.    I did not visit or examine the inside of the Long Haul premises before

27   August 27, 2008.

28        11.    I believe that I reviewed the Long Haul website at some point prior to the

DECLARATION OF KAREN ALBERTS

1   execution of the search warrant.  I did not review the website at any time immediately

2   prior to the execution of the search warrant or for the express purpose of preparing for

3   the execution of the search warrant.

4         12.    In my review of Long Haul's website, there was no information leading me to

5   believe that there were any tenants located within the premises.  In fact, I was not aware

6   that the Long Haul premises contained multiple tenants until after the filing and service

7   of this lawsuit.

8         13.    I do not recall reviewing any statement on Long Haul's website that said

9   Slingshot was among the "individual collectives of the Long Haul" nor do I recall reviewing

10   the page of the Long Haul website that contained a link to Slingshot.

11         14.    From my review of the Long Haul website, I did learn that Long Haul had

12   computers for the public to use to access the internet.

13         15.    Prior to the filing of the lawsuit in this matter, I was not aware that that

14   Long Haul rented any of its office space to tenants.

15         16.    As part of our investigation into harassment of UC researchers by animal

16   rights activists, other UCPD officers and I monitored activists during home

17   demonstrations.  On at least three occasions, UCPD officers followed participants in the

18   home demonstrations back to Long Haul.

19         17.    Specifically, on January 27, 2008, numerous animal rights demonstrators

20   met at the Ashby BART station and traveled in two vehicles to multiple locations where

21   they protested at the private residences of UC employees.  The demonstrators exhibited

22   signs, chanted, marched, and chalked sidewalks.  I am aware, and was aware prior to

23   the execution of the search warrant, that Officer Zuniga monitored an animal rights

24   activist leaving a home demonstration at a UC-Berkeley faculty member's home and

25   being dropped off on Hillegas at Ashby Avenue in Berkeley.  The demonstrator then

26   walked west, toward the Ashby BART station and entered Long Haul.  Additionally, I am

27   aware, and was aware prior to the execution of the search warrant, that three of the

28   home demonstrators were observed by Lieutenant Alex Yao and Detective Kasiske in

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

CASE NO.  3:09-cv-0168 JSW

DECLARATION OF KAREN ALBERTS

the area of Shattuck Avenue, Prince Street, and Woosley Street in Berkeley.  Several of the demonstrators were believed to have entered the Long Haul at that time.

18.   Additionally, through my work on the ARWG, I am aware of an instance, prior to the execution of the search warrant and after the January 27, 2008 home demonstrations, when there were not enough individuals to participate in a home demonstration and people went from the Ashby BART station to Long Haul after determining that home demonstrations would not occur.

19.   Through my work on the ARWG, I knew that Peter Young, a known animal rights activist who had recently been released from prison, showed a movie entitled, "Behind the Mask," at Long Haul in January of 2008.  He also spoke about his animal rights activities prior to his movie presentation.

20.   I am informed and believe that the Declaration of Matthew Zimmerman submitted in support of Plaintiffs' Motion for Summary Judgment represents to the Court that my discovery responses state that I "participated in monitoring activities at the Long Haul." (Zimmerman Dec., 12:15-16).  In fact, my discovery responses state, and the truth is that I conducted surveillance on the Long Haul premises during a fundraiser by Stop Cal Vivisection.  I observed the individuals enter the Long Haul premises to attend the fundraiser, but did not enter the premises myself.  It is my understanding that the purpose of this fundraiser was to defray legal costs of some of Stop Cal Vivisection's members who had engaged in criminal activity.  I did not engage in general "monitoring activities" of the Long Haul.

21.   Through my work with the ARWG, I am aware that in March, May and June of 2008, various UC Berkeley researchers received a series of threatening and intimidating emails sent from anonymous animal rights activists.  As detailed below, these emails culminated in a series of messages sent to a UC researcher in June, 2008 which featured threats of bodily harm aimed at the researcher.  This escalating series of threatening emails constituted the basis for the search warrant at issue in this case.

22.   I was aware of Detective Kasiske's investigation into the harassing emails

1   UC-Berkeley researchers received in March of 2008 from animal rights activists.

2   Detective Kasiske informed me that he traced the origin of the harassing emails to an IP

3   address which was registered to Jessy Palmer at 3124 Shattuck Avenue in Berkeley,

4   California. I knew this address to be the address for the Long Haul. I consulted with

5   Detective Kasiske and we determined that we could not seek a search warrant for the

6   computers located at the Long Haul premises which sent these harassing emails

7   because the criminal act of sending the harassing emails did not rise to the level of a

8   felony, a condition precedent to seeking a search warrant.

9          23.    In June of 2008, Detective Kasiske informed me that a UC-Berkeley

10  researcher, who had previously been the target of animal rights activists, received a

11  series of threatening emails. The content of these emails contained threats of bodily

12  harm and explicit references to violent acts committed against UC researchers at other

13  campuses. I conferred with Detective Kasiske and we believed that these threats rose to

14  the level of felony criminal activity in violation of California's anti-stalking statute. I

15  approved Detective Kasiske's decision to obtain a search warrant for the Long Haul

16  premises.

17         24.    Detective Kasiske drafted the search warrant, the exhibits, and his

18  Statement of Probable Cause. I reviewed these documents for content and accuracy. I

19  provided these documents to my direct supervisor for his review. After Detective

20  Kasiske edited the documents, pursuant to review by his chain of command, I approved

21  his decision to move forward with the search warrant application and present the search

22  warrant and accompanying materials to a judge for approval.

23         25.    The execution of the search warrant was intended to aid in identifying the

24  individual who sent the threatening emails and/or the computer(s) from whence they

25  came.

26         26.    As a result of our investigation, the ARWG believed that the emails under

27  investigation had originated from Long Haul. We believed the emails were sent from the

28  Long Haul either by a patron using one of Long Haul's public access computers, or by a

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6                    CASE NO.  3:09-cv-0168 JSW

DECLARATION OF KAREN ALBERTS

person affiliated with Long Haul.  We did not know which individual or individuals were sending the threatening emails or which computers in particular had been used to send the threatening emails.

27.     In view of Long Haul's ties with Stop Cal Vivisection, and its other ties with animal rights activists, there was reason to believe that a person associated with Long Haul may have been primarily responsible or given assistance to the individual or individuals responsible for sending the threatening and harassing emails which were the subject of the search warrant.  The other members of the ARWG and I did not know whether animal rights activists who were observed at home demonstrations and seen going in and out of the Long Haul were employees or volunteers of the Long Haul who would have had access to some or all of the computers located within the Long Haul premises and would have had the motivation to destroy or alter any evidence located on the hard drives of those computers.

28.     Anyone affiliated with Long Haul, from a regular member to someone from the public that rarely used the internet access, could have sent the threatening emails that we were investigating.  We had no way of knowing who it was, which is why we were seeking evidence to help us determine the identity of the sender(s).  However, due to the fact that the IP address of multiple emails traced back to Long Haul, we knew that the sender had some affiliation with Long Haul, no matter how strong or weak.   Anyone who used the computers inside Long Haul, be it a member or not, could have been the person who sent the threatening emails.  We had no idea who.

29.     I am informed and believe that the Declaration of Matthew Zimmerman submitted in support of Plaintiffs' Motion for Summary Judgment represents to the Court that my discovery responses, incorrectly cited to, state that I was aware of Slingshot at the time of the execution of the search warrant.  (Zimmerman Dec., 12:13-14).  It is true that I was aware that Slingshot was a publication that published articles written by or about activism, anarchists, and animal rights activists, however my response also states that I did not know that Slingshot was a newspaper and I was not aware of who

1   published Slingshot.

2         30.      I had seen a publication called "Slingshot" when I was on foot patrol in the

3   late 80s/early 90s, but I had not seen that publication for many years prior to the

4   execution of the search warrant.  My recollection of Slingshot as it existed when I first

5   saw it was more in the form of a free flyer or publication, not as a newspaper.  I was not

6   aware that Slingshot publishes a newspaper until after the filing and service of this

7   lawsuit.

8         31.      I am informed and believe that the Declaration of Matthew Zimmerman

9   submitted in support of Plaintiffs' Motion for Summary Judgment represents to the Court

10  that in an email Officer Zuniga stated that he "knew of a connection between Long Haul

11  and Slingshot."  (Zimmerman Dec., 13:10-11).  Additionally, I am informed and believe

12  that Plaintiffs have represented in their motion that I "knew that Slingshot was a

13  publication and that Slingshot and Long Haul were connected."  (Plaintiffs' Memorandum

14  of Points and Authorities, 6:28-7:4).  However, in the email Officer Zuniga only stated

15  that on the Slingshot home page they <u>claimed</u> an affiliation with Long Haul.  It is my

16  understanding that Officer Zuniga did not confirm or disprove this claim, nor did he

17  obtain any information with regard to what the nature of the affiliation may have been.  I

18  did not have an understanding prior to the execution of the search warrant regarding

19  what the claimed affiliation was.

20        32.      Prior to the filing of the lawsuit in this matter, I did not know that Slingshot

21  was published out of Long Haul's building at 3124 Shattuck Avenue in Berkeley,

22  California.  I was unaware at the time of the execution of the search warrant that

23  Slingshot claimed to be "sponsored" by Long Haul.

24        33.      Prior to the execution of the search warrant, I did not know what East Bay

25  Prisoner Support ("EBPS") was.  I believe that I may have heard the name prior to the

26  execution of the search warrant.  However, I was unaware at the time of the execution of

27  the search warrant that EBPS was located at the Long Haul premises.  Further, I was

28  unaware that EBPS claimed to disseminate a newspaper, book, broadcast, or other

similar form of public communication to the public.

34.     I did not review the EBPS website prior to the execution of the search warrant.

35.     I first became aware that EBPS claims to disseminate information to the public after the filing and service of this lawsuit.

36.     In the morning the day of the execution of the search warrant, August 27, 2008, I attended a briefing meeting lead by Detective Kasiske.  During this meeting, Kasiske explained where the team was going and reviewed the terms of the warrant.  He described how the team would gain entry to the building, and described the scope of the warrant.  Kasiske gave an overview of the investigation, described the timing and content of the threatening emails and told the team how he had traced them back to Long Haul.

37.     During the briefing meeting, the search warrant and the Statement of Probable Cause were available for team members to review.

38.     Shaffer, Hart, and MacAdam were part of the search warrant team to provide extra manpower.

39.     Prior to entering the Long Haul to execute the search warrant, we had no idea how information was retained by Long Haul and what type of records Long Haul kept, if any.

40.     The search warrant was intended to and did authorize the search and seizure of any and all computers located within the Long Haul.  This was my understanding both prior to and after the execution of the search warrant.

41.     The reason we sought and obtained a search warrant for any and all computers is because we believed that any computer located in the Long Haul could have generated the threatening emails because the IP address came back to that location, on multiple occasions.  The scope of the search was for any and all computers that could have sent those emails, whether used by a member of the "public," someone associated with Long Haul, or, as it turned out, a tenant of Long Haul that was using the

1   same DSL line with the same IP address.

2        42.    It never occurred to me that there could be a computer or other storage

3   devices where the emails couldn't possibly have been generated from or where

4   identifying information couldn't possibly be stored.  We had no way of knowing what was

5   on the computers and storage devices until they were searched by forensic experts.

6        43.    When we arrived at Long Haul to execute the search warrant, we observed

7   that there was only one entrance at the front of the building and it was locked.  The Long

8   Haul did not appear to be open for business.  I do not recall seeing any signs on the

9   front of the building indicating the presence of any tenant other than Long Haul, nor were

10  there multiple mailboxes suggesting multiple tenants.

11       44.    The name on the front of the building stated "Long Haul Infoshop."

12       45.    The team gained access to the building by going through the neighbor's

13  office into the back and opening the back door of the Long Haul.  Long Haul's back door

14  was not very well secured.

15       46.    After gaining entry, we conducted a protective sweep of the premises.

16  Officer MacAdam videotaped the entry into the building and the condition of the

17  premises prior to the search.

18       47.    There were a variety of signs and banners advocating various causes and

19  organizations displayed throughout the entire interior of the premises.

20       48.    On the ground floor of the building their was a bathroom, a small kitchen

21  area, and an area with tables and chairs.  The walls were covered with posters and signs

22  addressing varied and miscellaneous causes and events.  Along the south wall of the

23  main floor were magazines, papers, and books.  There was a small hallway leading to

24  the front area of the building with three locked doors.  The front (east) of the building

25  contained the Shattuck street entrance, a counter, and shelving displaying various

26  magazines and periodicals.  Behind the counter were locked cabinets.  There were

27  additional, varied posters and signs on the open wall spaces in the front of the building.

28       49.    There were two loft areas visible from the ground floor with staircases

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10                          CASE NO.  3:09-cv-0168 JSW

DECLARATION OF KAREN ALBERTS

1   leading up to them.  The western loft had a room that housed a number of computers.

2   The eastern loft area had a couch and long table and a room with a locked door.  The

3   walls in the loft area were filled with more posters and signs.

4        50.    The interior walls of Long Hall were covered in signs and posters.  I do not

5   recall seeing the "Slingshot" banner that plaintiffs claimed was there at the time of the

6   execution of the warrant.

7        51.    At no time during the search did I observe anything that made me believe

8   the building contained separate tenants.  There were no separate mailboxes, separate

9   entrances, separate phone or DSL lines, or any other indications of tenants separate

10   from Long Haul.

11        52.    All of the offices within Long Haul appeared to be administrative offices or

12   storage areas.  There was nothing about the offices that indicated to me that they were

13   separate offices.  There were no separate mailboxes, entrances, or doorbells, nor were

14   there any permanent signs or other indicia that would alert someone to the multi-tenant

15   character of a location.

16        53.    Prior to and during the execution of the search warrant, I was not aware

17   that there was any sort of publishing activity occurring at or out of the Long Haul.  There

18   was nothing in the Long Haul premises during the execution of the search warrant that

19   alerted me to the possibility of publishing activities (i.e., no printing press, no industrial

20   printers, etc.).  The rooms that Plaintiffs allege were the sites of publishing activity looked

21   like nothing more than administrative offices or storage areas.

22        54.    I initially focused on a search of the front room, which included locked

23   cabinets.  I looked through handwritten logs and notebooks believing that they could be

24   or could contain items listed on the search warrant.  I searched through a recipe card

25   box that contained cards to see if they had notes that were responsive to the search

26   warrant.   I did not take any notes about my review of these items.

27        55.    As part of my search of the front room, I reviewed a handwritten document

28   labeled "Lending Log" because without reviewing it I had no way of knowing if it actually

was a lending log.  Additionally, without reviewing it I couldn't know whether it was referencing the lending of books, other items, or computer use.  I also had no way of knowing without reviewing the log whether one of the pages may have contained information on computer usage.  I did not take any notes about the information I reviewed in this log and I did not seize this log.

56.    In this front room there were a lot of what appeared to be archived publications and historical articles.  I don't specifically recall seeing any copies of Slingshot in the front room.  I believed that, as an "infoshop," Long Haul was engaged in the lending, sale, or distribution of books, 'zines, or newspapers.  I did not believe that Long Haul was engaged in the production or publishing of any such materials.

57.    I did not locate any items which the warrant identified for seizure in this front room and I did not seize any items from this front room.

58.    During this time, a small crowd had gathered in front of the building and I went outside to speak with some of them.  I allowed Kathryn Miller, a woman who claimed to work at Long Haul, to come inside to unlock the cabinets behind the front counter.  When Miller insisted that she read the warrant before providing keys to the warrant team, I asked her to leave.  I had no way of knowing at the time who Miller really was and whether she really had any connection to Long Haul.

59.    Miller came into the building a second time, but refused to assist in unlocking the cabinets without first seeing the search warrant and again was asked to leave.  At no time did Miller or anyone else in the crowd with whom I spoke tell me that there were tenants renting rooms inside the building or that publishing activity occurred within the building,

60.    In the eastern loft, I recall that there was lots of paperwork and there were banners and fliers all over.

61.    I do not recall ever seeing a sign over the door to the "Slingshot office" that said "Slingshot" at the time of the execution of the search warrant.

62.    I briefly looked in the "Slingshot office" during the search.  The room was

pretty small, so two people couldn't fit in there at the same really well.  Since Officer Zuniga was already in there, I just peaked in briefly and then stepped out.

63.     The small room had no sign on the door and was cluttered with boxes, papers and files.  The room appeared to include storage space for old publications, which is what we expected to see in a place self-described as a "lending library."

64.     I was not aware of the existence of a "Slingshot office" at any time during the execution of the search warrant.  There was no indication that Slingshot was operating out of the building or that it was in any way distinct from Long Haul.  I did not encounter anything in the room claimed to be the "Slingshot office" that indicated that the room was being used for any publishing activities.  Items that one would expect to see from a printing facility – printing press or, at a minimum, several printers – were not present in the Slingshot space, nor anywhere in Long Haul.  I was not aware that the eastern loft room was used in the publication of Slingshot.  There was no apparent indication that this room was being used for any publishing activities.

65.     I am informed and believe that Plaintiffs have cited to my deposition testimony to support their proposition that "Defendants Zuniga and Shaffer personally searched the Slingshot filing cabinets, including files, folders and documents stored therein."  (Plaintiffs' Memorandum of Points and Authorities, 7:5-8).  In fact, my testimony was, and the truth is, that I did not see either Officer Zuniga or Agent Shaffer actually searching the "Slingshot office,"  I could only hear movement from inside the small office while Officer Zuniga was in there and assumed that he was doing his job and searching the office.

66.     I am informed and believe that the Declaration of Matthew Zimmerman submitted in support of Plaintiffs' Motion for Summary Judgment represents to the Court that I testified that I saw Officer Zuniga examine photographs of activity in Seattle.  (Zimmerman Dec., 9:26-27).  In fact, my testimony was, and the truth is, that I heard Officer Zuniga tell Agent Shaffer about the photographs, but I don't recall actually seeing Officer Zuniga looking at the photographs.

67.     After my brief look at the "Slingshot office," I briefly looked at the loft area at the west side of the building.  In this area I saw Detective Kasiske unplugging computers.  I also saw a lot of CDs/DVDs.

68.     I don't specifically recall seeing a sign that said "Internet Room" in this area.

69.     At no point during the execution of the search warrant did I enter or search the room on the ground floor furthest from the front door.  This is the room that Plaintiffs claim had a sign that said "East Bay Prisoner Support" on it.

70.     I believe that I may have seen a cardboard, handwritten sign that said "East Bay Prisoner Support" on it, but I wouldn't have known whether it was referring to a slogan, a movement, an organization, or had some other meaning.

71.     I was not aware of the existence of an "EBPS office" at any time during the execution of the search warrant.  There was no indication that East Bay Prisoner Support was a distinct organization and was paying rent to Long Haul for its use of this tiny room.  I believed the room that is claimed to be the "EBPS office," like the other rooms along the hallway, was used by Long Haul as office and/or storage space.  There was no indication that the room was being used for any publishing activities.

72.     I do not recall seeing any mail addressed to East Bay Prisoner Support in the Long Haul premises at any time during the execution of the search warrant.

73.     I am informed and believe that the Declaration of Matthew Zimmerman submitted in support of Plaintiffs' Motion for Summary Judgment represents to the Court that I testified that "Hart helped to seize computers."  (Zimmerman Dec., 9:28).  In fact, my testimony was, and the truth is, that I am not positive whether or not Hart helped to actually carry computers out of Long Haul.

74.     I am informed and believe that Plaintiffs have cited to my deposition testimony to support their statement that "Hart provided armed guard" during the execution of the search warrant.  (Plaintiffs' Memorandum of Points and Authorities, (25:3-4).  In fact, my testimony was that Hart predominantly stayed outside and watched

1  the cars during the execution of the search warrant.  I do not have any personal

2  knowledge as to whether or not Hart was armed at the time.

3        75.    I am informed and believe that Plaintiffs have stated in their Motion for

4  Summary Judgment that I "testified that [I] did not know or remember whether the

5  [Statement of Probable Cause] was present at the search."  (Plaintiffs' Memorandum of

6  Points and Authorities, 15:27-16:3).  In fact, the first citation to my deposition transcript

7  (135:9-13) is for testimony regarding the Statement of Probable Cause being present at

8  the pre-search briefing and the second citation offered by Plaintiffs (71:6-12) contains no

9  discussion of the Statement of Probable Cause whatsoever.

10        76.    I recall having a copy of the search warrant with me during the search.

11  Additionally, it is custom and practice to have the Statement of Probable Cause on

12  scene during the execution of the search warrant, and I have no reason to believe that

13  this custom and practice wasn't followed in this case.

14        77.    I did not seize any items that were not described in the search warrant nor

15  exceed the scope of the search warrant.  I acted in good faith at all times during the

16  execution of the search warrant.

17        78.    Subsequent to the search, Kasiske informed me that he had requested that

18  the Silicon Valley Regional Computer Forensics Laboratory (the "SVRCF Lab") accept all

19  the computers seized during the search and conduct a forensic examination.  Kasiske

20  informed me that the SVRCF Lab stated that it could only accept a limited number of

21  computers based on workload considerations.  Kasiske informed me that he was

22  sending six computers from the western loft area to the SVRCF Lab because they likely

23  had the most user traffic.  The SVRCF Lab returned the six computers to UCPD after the

24  hard drives were imaged.

25        79.    Kasiske prepared a list of search terms for the SVRCF Lab to use while

26  searching the contents of the six computers.  I reviewed the list of search terms prior to

27  Kasiske submitting them to SVRCF Lab.  This list included the names and contact

28  information for targeted researchers; names and contact information for suspects who

1   had been identified in previous animal rights cases; and terms used by suspects who

2   had previously targeted researchers ("vivisection", etc.)  The search terms submitted by

3   the UCPD and utilized by the SVRCF Lab were limited in scope and calculated to locate

4   material relating to the investigation into the threatening emails.

5          80.     I am informed and believe that the Declaration of Matthew Zimmerman

6   submitted in support of Plaintiffs' Motion for Summary Judgment represents to the Court

7   that I testified that "Defendants returned computers and media to Long Haul after

8   searching them, but retained copies of drives and data." (Zimmerman Dec., 10:4-7).  In

9   fact, my testimony was, and the truth is, that only six computers from the "public internet

10  room" were sent to the SVRCF Lab and were the only ones that were ever searched.

11  The remaining computer hard drives and other storage media were copied by UCPD

12  personnel.  Neither the computers taken from the eastern loft room or the first floor

13  hallway room were ever searched by any agency.  There has never been any search of

14  the contents of these computers.

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1    I declare under penalty of perjury under the laws of the State of California that the

2    information contained in the Declaration of Karen Alberts In Support of Defendants'

3    Opposition to Plaintiffs' Motion for Summary Judgment and Defendants' Cross-Motion

4    for Summary Judgment/Adjudication is true and correct.

5         Executed on February 1_, 2011, in Berkeley, California.

6

7    _____

                              Karen Alberts

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28