MELINDA HAAG (SBN 132612)
United States Attorney
JOANN M. SWANSON (SBN 88143)
Assistant United States Attorney
Chief, Civil Division
JONATHAN U. LEE (SBN 148792)
NEILL T. TSENG (CSBN 220348)
Assistant United States Attorneys
Northern District of California

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102
    Telephone:   (415) 436-6909 (Lee)
    FAX:         (415) 436-7169

Attorneys for the UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| LONG HAUL, INC. and EAST BAY PRISONER SUPPORT,<br><br>               Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA; MITCHELL CELAYA; KAREN ALBERTS; WILLIAM KASISKE; WADE MACADAM; TIMOTHY J. ZUNIGA; MIKE HART; LISA SHAFFER; AND DOES 1-25,<br><br>             Defendants. | Case No. 09-00168 JSW<br><br>**DECLARATION OF LISA SHAFFER** |

I, Lisa Shaffer, declare as follows:

1. I am a Special Agent employed by the Federal Bureau of Investigation (FBI). I make this declaration from my own personal knowledge. If called as a witness, I could and would competently testify to the contents of this declaration.

1

*Long Haul, Inc., et al. v. United States of America, et al.*
U.S. District Court Action 09-00168 JSW

2. I began my law enforcement career in 1999, when I went to work for the New Mexico State Police from 1999 to 2004. I joined the FBI in 2004. After attending the FBI's Academy, I went to work in the FBI's Seattle office in late 2004. I moved to the FBI's Oakland Office in 2008.

3. During my time working in the FBI's Oakland Office, I worked on domestic terrorism matters, including animal rights terrorism. I was assigned to the FBI's Joint Terrorism Task Force (JTTF). The JTTF included law enforcement officers from local agencies, such as Mike Hart.

4. I began to work on animal rights issues and cases in approximately February 2008. Before the search of the Long Haul, I became aware that UC-Berkeley staff reported receiving threatening e-mails, and it was my understanding that the messages discussed animal rights issues and made threats against UC-Berkeley staff for their work or research with animals. I was aware that these email threats occurred over a lengthy period of time and that some of the e-mails included threats of physical harm to the recipients.

5. Before the search of the Long Haul, I understood that Long Haul was an activist organization in Berkeley holding or facilitating activities such as meetings, discussions, and recreational activities (such as movie screenings).

6. In mid-August 2008, I received a phone call from Sergeant Karen Alberts, who asked if I would assist the University of California Berkeley Police Department with a search of the Long Haul premises. I told Sgt. Alberts that I would ask my supervisor Special Agent David Strange for permission. A few days later, I received an email from Sgt. Alberts asking me if I could still help with the search. I informed Sgt. Alberts that David Strange had told me I could assist with the search by the University of California Berkeley Police Department.

2

7. I did not participate in the investigation that led up to the August 27, 2008 search of the Long Haul premises. When Sgt. Alberts contacted me by phone in mid-August to request my assistance with the execution of the search warrant at the Long Haul, I understood that by then the University of California Berkeley Police Department had investigated the threatening emails and determined that the Long Haul was their source.

8. I did not participate in the drafting of the search warrant that led up to the August 27, 2008 search of the Long Haul premises. My understanding is that Detective Bill Kasiske drafted the search warrant application.

9. Other than the phone call and email from Sgt. Alberts, I did not have any other communication with the UC Berkeley Police Department about the search of the Long Haul premises until the morning of the search itself.

10. On the morning of the August 27, 2008 search of the Long Haul premises, I attended a briefing meeting at the UC Berkeley Police Department. At this meeting, I learned about what was going to happen at the search. UCBPD Detective Kasiske ran the meeting and told us about why we were there, the crime, the investigation he had done, and where we would be going on the search. Detective Kasiske told us about the threatening emails sent to professor researchers at UC Berkeley, and he showed us some of the emails at the meeting.

11. At this same pre-search meeting, Detective Kasiske provided a copy of the search warrant, which I looked at. He also provided a copy of the Statement of Probable Cause, which I also reviewed. My recollection is that the Statement of Probable Cause was attached to the Search Warrant.

12. It was my understanding, based on the information I heard at this meeting, that Long Haul allowed computer users to access and use e-mail and the internet and that one or more

3

*Long Haul, Inc., et al. v. United States of America, et al.*
U.S. District Court Action  09-00168 JSW

computers at Long Haul had been identified as having been used to send threatening e-mails to UC Berkeley staff. It was also my understanding, based on the information I heard at the pre-search meeting, that a person or persons using one or more computers at the Long Haul premises was likely sending threatening e-mails to UC-Berkeley staff and it was unknown whether the computer-generated threats were sent by any particular computer or computer user.

13. I provided the following assistance to UCBPD during the execution of the search warrant. First, for much of the time period involved with the execution of the search warrant, I stood by and waited while others conducted the search.

14. Later, I briefly examined what appeared to be a log book of some kind, flipping through 4-5 pages, before closing the log book. The log book I looked at briefly was visible in the shelving area, not in a locked shelf or cabinet.

15. Then, I was called by Officer Zuniga to a room to look at photographs, which I recognized because of my knowledge of the Seattle, Washington area. I looked at approximately 5-6 photos of scenes of downtown Seattle, including one of an old police vehicle, that Officer Zuniga showed me. I did not look through any files of photographs.

16. Next, I looked through files in a bottom drawer of a file cabinet, flipping briefly through photocopies of newspaper articles before closing the drawer.

17. Then, I walked into a very small room, and I saw issues of a magazine on a shelf. The magazines were shelved in a way that I could not see the name of the publication. I then left that room.

4

18. Thereafter, I looked at some books and articles in a plastic container underneath a table that was outside the small room mentioned above and I flipped through the books and articles very briefly.

19. Next, I was called to another very small office area on the ground floor by another officer, who I believe was Officer MacAdam. This was a small room off the hallway. The room appeared to me to be a copy room. I saw a copier, a table, and a stack of papers. I looked at two envelopes on the top of the stack of papers. I concluded the envelopes were either addressed to or from prisoners. I then left that small room.

20. That was the end of my assistance in the search of the premises. My activity at the scene lasted approximately 10-15 minutes total.

21. When I was looking at items during the search, I was trying to determine whether they were within the warrant's description of items to seize.

22. I did not seize anything. None of the materials I viewed during the search were seized.

23. I did not view or search any computer or electronic data storage device in connection with this search.

24. I did not copy or retain a copy of any of the items seized in the search.

25. My involvement with the execution of the search warrant ended when I helped to carry seized items to the law enforcement vehicles outside the Long Haul premises on the day of the search. I do not know specifically what was in those boxes because I did not examine any materials seized, either during or after the execution of the search warrant.

26. At the time of the August 27, 2008 search, I was generally aware of a publication called "Slingshot," but I had not read anything published in it and I did not know that Slingshot was located on, connected to or published out of the Long Haul premises.

<pre>

27. At the time of the August 27, 2008 search, I was not aware of an entity or group called East Bay Prisoner Support, and I was not aware that there was an East Bay Prisoner Support office located at the Long Haul premises. I did not learn that East Bay Prisoner Support is a publisher of information until after the filing and service of this lawsuit.

28. I recently reviewed the statement of facts portion of the motion for summary judgment filed by the plaintiffs. The motion makes inaccurate statements about me.

29. First, on page 2, lines 22-23, plaintiffs' motion states that the office in the loft "contained an archive of back issues of the newspaper" and it gives a page cite from my deposition. The "newspaper" referred to in the motion is the Slingshot. This is not accurate because as my deposition testimony makes clear, I saw some publications on the wall with the binders facing out and I could not see their front covers. I do not know what the names of the publications I saw were.

30. Second, on page 6, lines 9 to 15, plaintiffs' motion says the raid team "cut locks from cabinets behind the front desk, looked through the log of individuals who borrowed books from Long Haul's library, and searched Long Haul's log of book sales, both of which were stored there." The motion again lists my deposition testimony and an interrogatory response as supporting evidence. This statement is not accurate. I did not cut any locks. I did not see any locks cut. I did look at what I thought was a log book, briefly, in the front room area. My interrogatory response says I flipped through a log book. My deposition testimony says I looked at what I thought was a log book, looked at the first four pages, and then put it back because it was not what we were looking for.

31. Third, on page 6, lines 21-28, the motion says "the raid team broke open the locked, labeled door of the Slingshot office and seized the Slingshot computers, which contained hundreds of

6

*Long Haul, Inc., et al. v. United States of America, et al.*
U.S. District Court Action  09-00168 JSW
</pre>

documents prepared as part of creating the newspaper" and it again lists my deposition testimony. But my deposition testimony only says that I assisted UC Berkeley to take out the computers to the cars, which took a couple of minutes. I did not say at my deposition that I broke open the locked, labeled door of the Slingshot office or seized the Slingshot computers, because that is not the case.

32. Fourth, on page 7, lines 1 to 2, the motion says defendants Alberts and Hart knew that Slingshot was a publication and that Slingshot and the Long Haul were connected, and then the motion lists my deposition testimony as support. This is not accurate. I did not testify at my deposition about what others knew about Slingshot. At my deposition, I told plaintiffs' attorney that I was generally aware of Slingshot's existence before the search but I was not aware that Slingshot had an office at the Long Haul's premises. I did not know Slingshot and Long Haul were connected at the time of the search.

33. Fifth, on page 7, lines 5-12, the motion says I "personally searched the Slingshot filing cabinets, including files, folders and documents stored therein…[and] Zuniga …called [me] to examine more closely a photo he recognized as being taken in Seattle." The motion lists my deposition testimony as support, my deposition testimony was different. I did not search photos. When Officer Zuniga called me into the room, he showed me a few photos. I identified the location of the photos as Seattle, Washington, where I had been working previously for the FBI. I looked in one drawer of a cabinet in that office. I was looking for hard drives, electronic storage devices, or log books, all of which in my experience may be contained in filing cabinets.

34. Sixth, on page 8, lines 5 to 6, the emotion says the "raid team left the EBPS mail in one jumbled pile upon exiting the Long Haul premises after the raid" and it cites to my deposition

7

testimony and discovery response). The motion makes similar statements on page 15, line 6 ("Shaffer, and probably others, looked through EBPS's mail and left it in a jumbled pile on the floor") and page 18, line 17 ("Officers also went through EBPS mail"). As I said in my deposition and my discovery responses, I went into a small room off the hallway on the ground floor. It appeared to be a copy room to me. There was a table, a copy machine and a stack of paperwork. It did not appear to be an office out of which anything was published. The entire room was approximately 6 feet by 8 feet in size. I looked at two envelopes. I could see from the information on the outside of the envelopes that they were sent from or to prisoners. I did not look inside the envelopes. I put them down and left the room. I did not disturb or look at anything else in that room.

35. Finally, on page 18 of the motion, lines 21 to 28, plaintiffs make a series of statements about my participation in the search of the Long Haul. None of the statement is accurate or supported by the evidence plaintiffs have cited. For example, the motion says Defendant Alberts discussed the search warrant with me "early in the investigation." Alberts did not discuss the search warrant with me other than to ask me if I could assist UCBPD. That discussion was not "early" in the investigation, but instead UCBPD investigated the threatening emails, traced them back to Long Haul and then determined a search warrant was appropriate for them to seek. This part of the motion also claims I searched the "photo file" in the Slingshot office, looked through prisoner mail in the EBPS office and helped seize and remove computers. The motion lists several passages of my deposition testimony as support for these statements. Unfortunately for plaintiffs, these statements are not accurate. I did not search any file of photos. I did look at photos Officer Zuniga showed to me. I did not look

8

through prisoner mail.  I did look at the outside of two envelopes that appeared to be addressed to or from prisoners.  I did not seize or help to seize computers.  My understanding is that Detective Kasiske determined what computers to seize and took them to a staging area.  I helped to carry the computers from that point to the vehicles outside.

I declare under penalty of perjury that the foregoing is true and accurate and that I have executed this declaration on February 14, 2011, in Oakland, California.

                                               /s/*Lisa Shaffer*/  
                                               LISA SHAFFER

9