```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                 SAN FRANCISCO DIVISION

 4

 5  LONG HAUL, INC., and EAST   )
    BAY PRISONER SUPPORT,       )
 6                              )
              Plaintiffs,       )
 7                              )
    vs.                         )  No.  C 09-00168-JSW
 8                              )
    UNITED STATES OF AMERICA;   )
 9  MIGUEL CELAYA; KAREN        )
    ALBERTS; WILLIAM KASISKE;   )
10  WADE MacADAM; TIMOTHY       )
    ZUNIGA; MIKE HART; LISA     )
11  SHAFFER,                    )
                                )
12            Defendants.       )
                                )
13  _____)

14

15

16             30(b)(6) DEPOSITION OF

17            JEFFREY PATRICK LYONS, JR.

18       Held at the Law Offices of SchiffHardin

19    One Market Street, San Francisco, California

20        Wednesday, September 22, 2010, 9:09 a.m.

21

22

23

24

25  REPORTED BY:  ELAINA BULDA-JONES, RPR, CSR #11720
```

2

1  attorney objects, you will still need to answer the
2  question unless she specifically instructs you not
3  to answer.
4           Because we're using a court reporter, you
5  will have to answer everything in words.  So you
6  can't shake your head or nod or say "uh-huh" or
7  "huh-uh," because it's difficult to get that on the
8  record.
9           The other thing is that even if you think
10 that you know what I'm going to ask you, you need to
11 wait until I'm done asking the question before you
12 answer so that we're not talking over each other
13 because she can't get it all down.
14          Does that sound fair?
15    A.   Yes.
16    Q.   And if there is ever a question that you
17 don't understand, then you can ask me to clarify the
18 question or tell me that you don't understand the
19 question.
20          If you don't do that, I'm going to assume
21 that you understand it; is that fair?
22    A.   Yes.
23    Q.   So you are here as the designated
24 representative for East Bay Prisoner Support; is
25 that correct?

1  A.  Yes.
2  Q.  Do you know why you were chosen as the
3  designated representative?
4  A.  Yes.
5  Q.  Why were you chosen?
6  A.  I assume because I'm a member of East Bay
7  Prisoner Support and founder of East Bay Prisoner
8  Support.
9  Q.  Okay.  Who participated in the decision to
10 designate you as the representative?
11 A.  Probably me and attorneys, and the other
12 members of East Bay Prisoner Support.
13 Q.  Okay.  And who are those other members?
14 A.  Max and Chloe.
15 Q.  And is it Max Harris?
16 A.  Yes.
17 Q.  And Chloe Watlington?
18 A.  Watlington.
19 Q.  Okay.  What did you do to prepare for the
20 deposition?
21 A.  I spoke with my attorneys.  I went through
22 what files we had both physically and on computers.
23 And went through e-mail -- what e-mails still
24 existed, and what else -- I probably looked at the
25 MySpace page.



```
 1   question.
 2       Q.   Did the three of you ever talk about
 3   whether to friend a particular organization on
 4   MySpace?
 5       A.   We typically accepted friendship requests
 6   from anybody we deemed not spam.
 7       Q.   And did you solicit or ask to -- or make
 8   friendship requests to other organizations?
 9       A.   Probably.
10       Q.   Did you talk about whether you would make
11   a friendship request to other organizations between
12   yourselves?
13       A.   No.
14       Q.   Who was responsible for East Bay Prisoner
15   Support's MySpace page?
16       A.   I was.  I think Max and I, but I think I
17   was.
18       Q.   And do you know whether East Bay Prisoner
19   Support made a friendship request to Stop Cal
20   Vivisection or whether it was Stop Cal Vivisection
21   made a friend request -- made a request to East Bay
22   Prisoner Support?
23       A.   I don't know which.
24       Q.   Did East Bay Prisoner Support ever provide
25   any money to Stop Cal Vivisection?
```

30 (b) (6) Of Jeffrey Patrick Lyons, Jr.



1    Q.   Do you know whether she was the person
2  that picked up the East Bay Prisoner Support
3  property?
4    A.   She was.
5    Q.   Okay.  And does this refresh your
6  recollection that the property was returned to East
7  Bay Prisoner Support in September of 2008?
8         MS. GRANICK:  Objection.  Assumes facts
9  not in evidence.
10        THE WITNESS:  This paper on the top says,
11 "Date:  9/18/08."
12 BY MS. ELLIS:
13   Q.   Okay.  I'm asking you, does it refresh
14 your recollection as to when the property was
15 returned --
16   A.   Oh, no.
17   Q.   -- the East Bay Prisoner Support property?
18   A.   Like I said, I -- I vaguely remember it
19 being returned in September, so that seems
20 consistent.
21   Q.   Okay.  Were you present when the search
22 warrant was executed?
23   A.   No.
24   Q.   When did you learn that the search warrant
25 had been executed?

1      A.   I got a phone call.
2      Q.   When did you get the phone call?
3      A.   Um, I don't know what time. The day of
4 the raid probably towards the end of it.
5      Q.   Towards the end of the day or the --
6      A.   Of the raid.
7      Q.   So about before noon?
8      A.   Yeah.
9      Q.   Okay. Before 10:00 a.m.?
10     A.   Couldn't say.
11     Q.   But before noon on the day that the search
12 warrant was executed?
13     A.   I believe so.
14     Q.   Who called you?
15     A.   Max.
16     Q.   And what did Max say to you during this
17 phone call?
18     A.   That the -- that our office in the Long
19 Haul was being raided.
20     Q.   Did you know, was Max present when the
21 warrant was executed?
22     A.   I don't know.
23     Q.   Had -- by the time Max called you, had he
24 been over to the Long Haul?
25         MS. GRANICK: Objection. Calls for

30 (b) (6) Of Jeffrey Patrick Lyons, Jr.

BARKLEY
Court Reporters

```
 1   speculation.
 2   BY MS. ELLIS:
 3        Q.   If you know?
 4        A.   I don't know.
 5        Q.   Do you know where Max was calling you
 6   from?
 7        A.   His cell phone.
 8        Q.   Do you know where Max was when he was
 9   calling you on his cell phone?
10        A.   Not exactly, no.
11        Q.   Okay.  Do you know whether Max had been
12   inside the East Bay Prisoner Support office before
13   he had called you?
14        A.   Before that day or --
15             MS. GRANICK:  Objection.
16   BY MS. ELLIS:
17        Q.   No, before he made the phone call to you.
18        A.   No, he hadn't.
19        Q.   He had not gone into the office?
20        A.   No.
21        Q.   Did you go to the office that day?
22        A.   Yes.
23        Q.   At what time did you get there?
24        A.   Don't remember.
25        Q.   Was it before 5:00 p.m.?
```

83

1     A.    Yep.

2     Q.    Was it before noon?

3     A.    Don't remember.

4     Q.    Was it between noon and 5:00 p.m.?

5     A.    Must have been.

6     Q.    Were there any other people at the East
7  Bay Prisoner Support office when you arrived?

8     A.    At it or in it?

9     Q.    In it, inside the office?

10    A.    When I got there, there were people there.
11 I'm not clear on the question.

12    Q.    Yeah, when you arrived, were there any
13 other people inside the East Bay Prisoner Support
14 office?

15    A.    I don't remember.

16    Q.    Were there people at the Long Haul space
17 when you arrived?

18    A.    Yes.

19    Q.    Was it open for business?

20    A.    I would imagine not.

21    Q.    Was the front door open or closed?  Was it
22 locked or unlocked, the front door?

23    A.    I don't remember.  I think it was open.  I
24 mean, I remember there were people there who were.

25    Q.    Did anybody have to let you in or were you

84

```
 1   able to just walk in?
 2        A.   I don't remember.
 3        Q.   When you got there, what did -- when you
 4   got to the Long Haul space, what did you do first?
 5        A.   I don't remember.  I went into the office.
 6        Q.   What did you see when you went into the
 7   office?
 8        A.   I saw -- I noticed damage to the door.
 9        Q.   Can you describe the damage?
10        A.   Not exactly.  It looked like a -- looked
11   like someone had attempted to force entry into the
12   office.
13        Q.   Was the door still on its hinges?
14        A.   Was it still what?
15        Q.   On its hinges.
16        A.   Yes.
17        Q.   Was the door able to close?
18        A.   I assume.
19        Q.   Was the door able to open fully?
20        A.   Yes.
21        Q.   Did the damage just -- was it only located
22   on the door jamb and then the door itself?
23        A.   I don't remember.
24        Q.   What was the extent of the damage; what
25   did you see?
```

85



```
 1        A.   I don't remember.  I remember noticing
 2   that, like I said, forced entry had been attempted
 3   with some means that was like a pry bar or something
 4   like that.  And then I guess after -- I concluded
 5   that they ultimately unscrewed the latch to the
 6   door.
 7        Q.   How did you conclude that?
 8        A.   The screws were out of the door.
 9        Q.   Were they taped up next to the door?
10        A.   I believe so.
11        Q.   And was the damage to the wood on the door
12   side or damage to the wood on the door jambs side or
13   both?
14        A.   I don't remember specifically.  I remember
15   getting a feeling that whoever had tried to open the
16   door had clumsily damaged an unnecessary amount of
17   door, and I don't remember what was damaged.  I just
18   remember considering that they unscrewed the latch,
19   I remember noting the damage and not understanding
20   why that had happened, considering it wasn't the
21   means by which they gained entry.
22        Q.   How much of the door was damaged?
23        A.   I don't remember.
24        Q.   Was it 10 percent of the door?
25             MS. GRANICK:  Objection.  Vague.  Calls
```

86

30 (b) (6) Of Jeffrey Patrick Lyons, Jr.



```
 1  disturbed?
 2       A.   I don't recall specifically noting that
 3  box being disturbed or, you know.  I remember
 4  everything was moved around.
 5       Q.   Do you remember whether it appeared that
 6  someone had looked through that box?
 7       A.   I don't know.
 8       Q.   What was contained on the computer in that
 9  office?
10       A.   I don't recall exactly.
11       Q.   What did you use the computer for?
12       A.   Um, we had gotten the computer so that we
13  could organize our information about our
14  distribution materials and whatever files would have
15  been used in our operation.
16       Q.   What were they?  What did you use it for?
17       A.   I mean, we had -- again, I don't remember
18  what exactly was on it.
19       Q.   Did you have a list of prisoners that you
20  sent CDs to?
21       A.   No.
22       Q.   Did you have lists of Zines that you would
23  make available to prisoners?
24       A.   Probably.
25       Q.   Did you have correspondence to prisoners
```

30 (b) (6) Of Jeffrey Patrick Lyons, Jr.

