**EXHIBIT A**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

LONG HAUL, INC. and EAST BAY )
PRISONER SUPPORT, )
                                  )
              Plaintiffs, )
                                  )
   v. )    No. C 09-00168-JSW
                                  )
UNITED STATES OF AMERICA; MIGUEL )
CELAYA; KAREN ALBERTS; WILLIAM )
KASISKE; WADE MacADAM; TIMOTHY )
ZUNIGA; MIKE HART; LISA SHAFFER; )
and DOES 1 - 25, )
                                  )
              Defendants. )
_____ )

     DEPOSITION OF WILLIAM SASISKE, taken on behalf of Plaintiffs, at One Market Street, 32nd Floor, San Francisco, California, commencing at 9:04 a.m., Tuesday, July 27, 2010, before Donna J. Blum, Certified Shorthand Reporter, No. 11133.

William Sasiske

BARKLEY
Court Reporters

1  member of the command staff, a lieutenant or a captain
2  would review it.
3       Lieutenant Wing was the lieutenant who was
4  directly overseeing the investigations, so he would have
5  been the most logical person would be the person who I
6  usually present search warrants to.  Although there were
7  times if Lieutenant Wing was busy or away or something
8  like that, it could be presented to a different member of
9  the senior staff.  But he would be the most likely
10 person.
11     Q.  Did you before the search notify the Berkeley
12 public information office that you were going to conduct
13 the search?
14     A.  I did not.
15     Q.  Okay.  Before seeking the search warrant did you
16 consider alternative means of getting access to the
17 patron identification information that you were seeking?
18       MS. ELLIS:  Objection, vague.
19       THE WITNESS:  I suppose I considered if there
20 were any alternatives.
21 BY MS. GRANICK:
22     Q.  Okay.  Did you consider subpoenaing the
23 information from Long Haul?
24     A.  No.  That didn't seem like a good idea.
25     Q.  Why didn't that seem like a good idea?

William Sasiske

1      A.   Well, as I talked about before, Long Haul was
2  supporting or cooperating with allowing the Stop Cal
3  Vivisection Group to host fund raiser, to go to their
4  facility.  So you couldn't know if Long Haul itself was
5  -- members of Long Haul were members of that group
6  possibly or if they worked together or if members of the
7  group or members of Long Haul vice versa, it wouldn't be
8  practical to serve a subpoena in that event because if
9  the two were affiliated, there could be a real skiff of
10 evidence being destroyed or concealed if Long Haul once
11 served with the subpoena could pass that information on
12 to the Stop Cal Vivisection people or work with them in
13 not cooperating with the subpoena.
14     Q.   So Long Haul, to your knowledge, prior to the
15 execution of the warrant was a place where a lot of
16 different activist groups would have meetings and events.
17 Is that right?
18     A.   I don't know about a lot or how you'd define a
19 lot.  But there were multiple groups that I believed had
20 meetings there or used the space.
21     Q.   Those meetings were reflected on the event
22 calendar which you had looked at on a couple of
23 occasions?
24     A.   Yeah.
25     Q.   And Stop Cal Vivisection had had a fundraiser

84

William Sasiske

BARKLEY
Court Reporters

1   there that you were aware of prior to this execution of
2   the warrant.  Right?
3       A.  Yes.
4       Q.  So you didn't have any reason to believe that
5   Long Haul was associated with Stop Cal Vivisection any
6   more than they were associated with any of the other
7   groups that used the place as a meeting area.  Correct?
8       A.  I didn't know who was the Long Haul or who
9   managed the Long Haul or who was responsible for its
10  upkeep, so I didn't know if -- which groups, members of
11  Long Haul belonged to or which members of groups belonged
12  to the Long Haul.  It wasn't clear.
13      Q.  Okay.  You did know that Jesse Palmer was a
14  person who was involved in the Long Haul organization.
15  Is that right?
16      A.  I could make that assumption.  I knew that his
17  name was on the Internet connection, so he was the name
18  of the subscriber for the Internet source there.
19      Q.  Did you consider contacting Jesse Palmer and
20  asking him if they kept this kind of information and if
21  so whether he would voluntarily provide it?
22      A.  No.
23      Q.  Why didn't you consider that?
24      A.  Again, for the same reasons.  I didn't know if
25  Jesse Palmer was possibly a member of any of the other

85

William Sasiske

BARKLEY
Court Reporters

1  groups that met at the Long Haul including Stop Cal
2  Vivisection. I didn't know if he worked with them or
3  would give them information about my investigation.
4      Q. Okay. Okay. Let me show you Bates No. 442
5  which is our number 17 and has been marked as Exhibit G.
6  So let me show you Exhibit G.
7      Let me show you Exhibit G there. Do you
8  recognize that?
9      A. Yes.
10     Q. What is this? Let me just describe it. It
11 appears to me to be an e-mail from Kasiske at Berkeley
12 dot EDU dated Friday March 21, 2008. So what is this
13 document?
14     A. What this was, I received an e-mail
15 correspondence from Sonic Dot Net regarding the e-mail,
16 the harassing e-mails that professors received in March
17 2008, and they send me a message telling me in response
18 to my subpoena to them telling me who was the subscriber
19 to that IP address, and then I forwarded that information
20 on to a supervisor, Sergeant Karen Alberts.
21     Q. Okay. And is this a true and correct copy of
22 the e-mail that you sent to Sergeant Alberts?
23     A. Yes.
24     Q. Okay. So the first line of the e-mail reads,
25 "Somehow I'm not surprised that the IP address comes back

```
 1  to the Long Haul."
 2         Can you tell me what you mean by that?
 3      A.  Well, I knew at the time that animal rights
 4  activists members of that group Stop Cal Vivisection had
 5  gone to the Long Haul in the course of home
 6  demonstrations and were using the Long Haul as a place to
 7  go.  So I was not surprised when harassing e-mails
 8  originated from the Long Haul.
 9      Q.  When you and other officers followed people from
10  home demonstrations, they all went somewhere, right, and
11  people --
12      A.  You mean after they left the home administrator?
13      Q.  Yes.
14      A.  Well, yes, they didn't stay there, yes.
15      Q.  Some people went home?
16      A.  I don't --
17         MS. ELLIS:  Objection, speculation.
18  BY MS. GRANICK:
19      Q.  Did you see some people go to coffee shops?
20      A.  I don't remember seeing anybody going to coffee
21  shops.
22      Q.  People -- what -- why was it not a surprise that
23  the IP address came back to Long Haul when people left
24  home demonstrations and went to all kinds of places?
25         MS. ELLIS:  Objection, includes information not
```

87

William Sasiske

BARKLEY
Court Reporters

```
 1  question pending.
 2          THE WITNESS:  Yeah, like I said --
 3          MS. ELLIS:  There is no question pending.
 4  BY MS. GRANICK:
 5      Q.  So can you explain to me why it's -- what's so
 6  unsurprising about Long Haul?
 7          MS. ELLIS:  Objection, asked and answered.
 8          MS. GRANICK:  Well, can we go off the record for
 9  a second?
10          (Discussion off the record.)
11  BY MS. GRANICK:
12      Q.  Was there any other reason other than that you
13  saw people go back to Long Haul that you found the fact
14  the IP address traced to there unsurprising?
15      A.  No.
16      Q.  "Maybe if we go over there and ask them really
17  nicely, they will tell us who was using their computer
18  room that night, ha, ha."
19          What did you mean by that?
20      A.  Well, this statement is sarcastic in nature,
21  meaning that I did not believe that anybody there would
22  tell us who was using their computer room that night.
23      Q.  Why not?
24      A.  Because of the reason that I said earlier that I
25  didn't know who was responsible for running the Long
```

1  Haul, and if those people supported Stop Cal Vivisection
2  Group or if they were even involved as members of the
3  group, to go there and ask them for that information
4  would reveal what was going on with our investigation.
5  And I wouldn't want to have members of Stop Cal
6  Vivisection group know what was going on with our
7  investigation.
8      Q.  You didn't know whether members of Long Haul
9  would or would not inform Stop Cal Vivisection?
10     A.  I didn't know for certain whether they would or
11 not, but that was a precaution that I would need to take
12 that they could do that.
13     Q.  Were -- was Long Haul any more likely than any
14 other establishment to fail to comply with a subpoena or
15 other valid legal process in your opinion?
16     A.  Than any other establishment?
17         MS. GRANICK:  Yes.
18         MS. ELLIS:  Objection, vague and foundation.
19         THE WITNESS:  Well, I guess I'll just go back to
20 what I said is that the Long Haul was a place where
21 animal rights activists were going, and I didn't know if
22 -- who was running the Long Haul and if those people were
23 supporting or involved in the group Stop Cal Vivisection
24 and if they would assist them or share information with
25 them if a subpoena was served.

1       THE WITNESS: My answer might be similar,
2 although, again, with the private entity as opposed to
3 government you have maybe other considerations like who
4 is in the coffee shop and who do they associate with,
5 things like that.
6 BY MS. GRANICK:
7     Q. So would it be fair to say that you chose to use
8 a search warrant as opposed to a subpoena or to simply
9 ask for voluntary -- voluntary disclosure of the
10 information you were seeking because of the people that
11 associated at the Long Haul?
12       MS. ELLIS: Objection, vague, speculation,
13 foundation.
14       THE WITNESS: Because of the people associated
15 with the Long Haul? What do you mean?
16 BY MS. GRANICK:
17     Q. Let me try to ask you more broadly.
18       Tell me the factors that led to your decision
19 that you had to use a search warrant and couldn't ask
20 really nicely or use a subpoena to get this information
21 from the Long Haul.
22       MS. ELLIS: Objection, asked and answered.
23       THE WITNESS: Okay. Well, like I mentioned, I
24 was familiar that the Long Haul had allowed Stop Cal
25 Vivisection to host a fundraiser at their premises, that

William Sasiske

BARKLEY
Court Reporters

1   they allowed members to use the facility, that members of
2   that group did go to the Long Haul on multiple occasions.
3   So I didn't know whether or not anybody who was a member
4   of Long Haul, whatever that is or who the membership with
5   Long Haul was possibly involved with membership or
6   support of Stop Cal Vivisection Group or the other way
7   around, if anybody in Stop Cal Vivisection participated
8   as a membership and management of the Long Haul.
9          So because I couldn't be sure of that or
10  confident of that, I needed to get the search warrant as
11  opposed to asking for the information which would
12  disclose our investigation.
13  BY MS. GRANICK:
14      Q.  What led you to believe that these e-mails
15  either March or June had been sent by someone affiliated
16  with Stop Cal Vivisection?
17          MS. ELLIS:  Objection, it mis-characterizes his
18  testimony and it assumes facts not in evidence.
19          THE WITNESS:  Without getting into the details
20  of what was going on with investigations, there were --
21  there was a large increase in activity surrounding animal
22  rights activism and harassment starting in September or
23  approximately of 2007 when we took many, many police
24  reports about these home demonstrations that I mentioned,
25  vandalism, threats made against professors, and it was

1   DEPOSITION OFFICER'S CERTIFICATE

2

3   STATE OF CALIFORNIA    }
                           }   ss.
4   COUNTY OF MARIN        }

5

6           I, Donna J. Blum, hereby certify:

7           I am a duly qualified Certified Shorthand

8   Reporter in the State of California, holder of

9   Certificate Number CSR <u>11133</u> issued by the Court

10  Reporters Board of California and which is in full force

11  and effect.  (Fed. R. Civ. P. 28(a)).

12          I am authorized to administer oaths or

13  affirmations pursuant to California Code of Civil

14  Procedure, Section 2093(b) and prior to being examined,

15  the witness was first duly sworn by me.  (Fed. R. Civ.

16  P. 28(a), 30(f)(1)).

17          I am not a relative or employee or attorney or

18  counsel of any of the parties, nor am I a relative or

19  employee of such attorney or counsel, nor am I

20  financially interested in this action.  (Fed. R. Civ. P.

21  28).

22          I am the deposition officer that

23  stenographically recorded the testimony in the foregoing

24  deposition and the foregoing transcript is a true record

25                          / / /

BARKLEY
Court Reporters

1 | of the testimony given by the witness.  (Fed. R. Civ. P.
2 | 30(f)(1)).
3 |       Before completion of the deposition, review of
4 | the transcript [XX] was [  ] was not requested.  If
5 | requested, any changes made by the deponent (and
6 | provided to the reporter) during the period allowed, are
7 | appended hereto.  (Fed. R. Civ. P. 30(e)).
8 |
9 | Dated: <u>august 11, 2010</u>
10 | _____
11 |
12 |
13 |
14 |
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |

143

BARKLEY
Court Reporters