# EXHIBIT B

1        UNITED STATES DISTRICT COURT

2       NORTHERN DISTRICT OF CALIFORNIA

3          SAN FRANCISCO DIVISION

4

5  LONG HAUL, INC. and EAST BAY      )
   PRISONER SUPPORT,                 )
6                                    )
                       Plaintiffs,   )
7                                    )
        v.                           )   No. C 09-00168-JSW
8                                    )
   UNITED STATES OF AMERICA; MIGUEL  )
9  CELAYA; KAREN ALBERTS; WILLIAM    )
   KASISKE; WADE MacADAM; TIMOTHY    )
10 ZUNIGA; MIKE HART; LISA SHAFFER;  )
   and DOES 1 - 25,                  )
11                                   )
                       Defendants.   )
12 _____   )

13

14

15

16       DEPOSITION OF KAREN ALBERTS, taken on behalf

17   of Plaintiffs, at One Market Street, 32nd Floor, San

18   Francisco, California, commencing at 9:00 a.m.,

19   Tuesday, August 3, 2010, before Donna J. Blum,

20   Certified Shorthand Reporter, No. 11133.

21

22

23

24

25

                        2

BARKLEY
Court Reporters

1    reviewed regarding the June e-mails?

2        A.  I believe I do.  I believe that was the stalking

3    case.  I'd have to look at the paperwork.

4        Q.  And you remember the report about the stalking

5    case?

6        A.  It was a while ago, but I remember parts of it.

7        Q.  Do you remember whether there were any -- how

8    many reports did you review regarding the June e-mails?

9        A.  I don't know.  I'd have to look at all the -- I

10   mean depends upon your definition of reports, if it were

11   search warrants and included all that kind of stuff.

12       Q.  Okay.  Do you remember what the investigation of

13   those June e-mails revealed with regards to who may have

14   sent them?

15       A.  I believe those two came back to the Long Haul.

16       Q.  Okay.  In March when the IP address came back to

17   the Long Haul, had you heard about the Long Haul before

18   that date in March?

19       A.  Yes, I had.

20       Q.  When had you heard about the Long Haul?

21       A.  I had known about the Long Haul for a while and

22   their affiliation with our -- some of our known and

23   unknown animal rights activists.  We had actually

24   followed some of our activists to the Long Haul after

25   they had participated in some home demonstrations.  And

53

Karen Alberts

BARKLEY
Court Reporters

1   we were aware that they had hosted or the Long Haul had

2   hosted a fund raising event for the Stop Cal Vivisection

3   group I think was their name.  So we -- I was very

4   familiar that they were affiliated with our animal rights

5   activists.

6       Q.  So when was -- so you had no -- I asked you when

7   you had heard about the Long Haul, and you said you'd

8   known about the group about the Long Haul for a while?

9       A.  Prior to the June --

10      Q.  Prior to the March e-mails.

11      A.  Yeah, I believe -- yes, I knew about them prior

12   to the March e-mails.

13      Q.  Okay.  What was your -- what was Long Haul, as

14   far as you understood, at that time?

15      A.  It was a gathering point for activists from all

16   different causes, a meeting place, a social gathering

17   point where they held fund raisers, community meetings,

18   stuff like that.

19      Q.  Okay.  What else, if anything, did you know

20   about Long Haul at that time?

21      A.  At what time?

22      Q.  In March.

23      A.  I'm sure at that point, I can't say for sure,

24   but we had looked at their website.  So we knew that they

25   offered free public computer access to people.

54

1   at the Long Haul?

2        A.  I don't remember the date of it.  I know it was

3   a fundraising event for the Stop Cal Vivisection group.

4        Q.  I'm sorry?

5        A.  Group.

6        Q.  And what was Stop Cal Vivisection?

7        A.  I don't really know.  It was some sort of

8   anonymous organization who claimed -- well, who -- how

9   would you say it.  Were posting things on the Internet

10  about our faculty members who were involved in animal

11  research, posting personal information, derogatory things

12  about those researchers.

13       Q.  When you say that -- and, I'm sorry, let me just

14  make sure.

15       Okay.  When you said that Long Haul had an

16  affiliation with a known and unknown animal rights

17  activists, other than some individuals being followed

18  from home demonstrations to the Long Haul and the Stop

19  Cal Vivisection fundraiser being held at the Info Shop,

20  are there any other facts that you are aware of about

21  that affiliation?

22       A.  Maybe postings on the Internet.  I couldn't be

23  specific.  But like advising the fundraiser on the Long

24  Haul's website, that type of thing.

25       Q.  Okay.  Other than that, anything else?

56

BARKLEY
Court Reporters

1      A.  Not specifically that I can think of other than

2  information on the Internet that I knew there was a

3  crossover and affiliation, not just with animal rights

4  activists but other groups as well.

5      Q.  In August of 2008 did you know what Slingshot

6  was?

7      A.  I knew.  I knew of the publication Slingshot.  I

8  hadn't known about it years earlier.  I hadn't heard

9  about it in many years.

10      Q.  What did you know about Slingshot at that time?

11      A.  I was a foot patrol officer on Telegraph Avenue

12  like '89, beginning of '90, and it was a publication that

13  was out on the street.

14      Q.  When you say "publication," what do you mean?

15      A.  Like any other free flyers or publications that

16  people could pick up and read.

17      Q.  Like a newspaper, a newsletter, something of

18  that nature?

19      A.  I wouldn't call it a newspaper.  More of a

20  publication.

21      Q.  Okay.  And it was a physical -- it was printed

22  on physical paper?

23      A.  Correct.

24      Q.  And did you have any information about any

25  connection between Long Haul and Slingshot?

57

BARKLEY
Court Reporters

1    anyone else who was associated with the Long Haul.

2        Q.   Where in this search warrant affidavit does it

3    say "employee of Long Haul"?

4        A.   I'd have to read it.   I don't know if it does.

5        Q.   Okay.

6        A.   You want me to -- this?   You want me to read the

7    whole thing?

8        Q.   Well, it's a true and correct copy of the

9    document that you reviewed back in August of 2008?

10       A.   As far as I know.

11       Q.   Okay.

12       A.   Did you want me to read it?

13       Q.   No.   The document will speak for itself.

14       A.   Okay.

15       Q.   Did you -- in the paragraphs that are under

16   opinions and conclusions on the last page of the

17   document, when you approved this document saying that a

18   search could reveal logs or sign-in sheets, what was your

19   understanding of what logs or sign-in sheets meant?

20       A.   Any type of, like it says here, written, typed,

21   electronic document which may indicate any type of usage

22   on a given date and type of any computer whether it be

23   individual or -- we had no idea what type of records the

24   Long Haul kept.   We had no idea if any of our known

25   activists were actual employees of the Long Haul or were

                              71

BARKLEY
Court Reporters

1   just associated.  We knew they were affiliated.  But we

2   didn't -- we had no idea of knowing.

3       Q.  When you say you knew they were affiliated, what

4   do you mean in this context by affiliated?

5       A.  Everything we discussed before about the fact

6   that they had hosted events or participated in hosted

7   events at the Long Haul.  We had followed them there

8   after some of the home demonstrations and seen them go

9   inside.  We had never actually been inside.

10      Q.  Now, when you say events, are you referring to

11  anything other than the Stop Cal Vivisection fundraiser

12  that we already discussed?

13      A.  No.

14      Q.  Okay.

15          MS. ELLIS:  Can we take a quick two-minute

16  break?

17          MS. GRANICK:  Sure.

18          (Break taken.)

19          MS. GRANICK:  Back on the record.

20          THE WITNESS:  I would just like to clarify one

21  thing.  I think I misspoke when you asked if there were

22  any other events.  There was another event had happened a

23  while ago where they had Peter Young actually speak at

24  the Long Haul, and he's a very well-known animal rights

25  activist who just got out of prison.

72

BARKLEY
Court Reporters

1   not in evidence and mis-characterizes her testimony.

2          THE WITNESS:  I'm sorry, what was the question?

3          (Record read.)

4          THE WITNESS:  Well, we would have no way of

5   knowing until they had been searched by forensic experts.

6   BY MS. GRANICK:

7      Q    Before seeking the search warrant, did you

8   discuss with Officer Kasiske alternatives to a warrant to

9   further the investigation of who sent the June e-mails?

10         MS. ELLIS:  Objection, vague.

11         THE WITNESS:  Like what?

12   BY MS. GRANICK:

13     Q.   Like a subpoena.

14     A.   We wouldn't have.  I may have discussed it with

15   him, but I'm not sure.  I mean, that wouldn't be

16   something we would normally do under these circumstances.

17     Q.   Did you discuss with Officer Kasiske asking Long

18   Haul to voluntarily turn over any patron logs they might

19   have?

20     A.   No.  I'll -- and I'll tell you for both the last

21   question and this one, that's something we wouldn't do

22   because we had no idea if anyone from the Long Haul, as

23   an employee, they could have been the one who actually

24   sent the e-mails.  So we would never have provided a

25   subpoena or just gone to them voluntarily because they

86

BARKLEY
Court Reporters

1    could have destroyed evidence at that point or gotten rid

2    of computers or logs or anything that could have helped

3    us identify the person who had sent the e-mails.

4         Q.   Do you know whether or not there are subpoenas

5    that you can serve which require the recipient to give

6    information to the police immediately?

7              MS. ELLIS:  Objection, vague.

8              THE WITNESS:  What do you mean?

9    BY MS. GRANICK:

10        Q    Are you familiar with subpoenas that an

11   investigative agency can serve which require the

12   recipient of the subpoena to give over the relevant

13   information immediately?

14        A.   No.

15        Q.   You weren't aware of any such subpoenas

16   requiring immediate delivery of information back in

17   August of 2008?

18             MS. ELLIS:  Objection, asked and answered.

19             THE WITNESS:  Not that I can recall.

20   BY MS. GRANICK:

21        Q    Other than the IP address, did you have any

22   other information that caused you to -- well, let me --

23   I'm sorry.  Nevermind.  I'll withdraw that.

24             Let's mark Bates 442 please.

25             (Deposition Exhibit G was marked for

87

Karen Alberts

BARKLEY
Court Reporters

1    MS. ELLIS:  Objection, vague.

2    THE WITNESS:  What do you mean by surprised?

3 BY MS. GRANICK:

4    Q    When -- what was your understanding of what

5 Officer Kasiske meant when he said, "Somehow I'm not

6 surprised that the IP address comes back to the Long

7 Haul"?

8    MS. ELLIS:  Objection, speculation.

9    THE WITNESS:  Yeah, I can't speculate as to what

10 he was thinking when he wrote that.

11 BY MS. GRANICK:

12    Q    What did you think when you read it?

13    A    That he wasn't surprised because we knew of the

14 strong affiliation between our animal rights activists

15 and the Long Haul.

16    Q    Why do you say strong?

17    A    Because we had seen them go in to the Long Haul

18 on numerous occasions and attend a fund raising event as

19 well as attending the Peter Young event that was hosted

20 at the Long Haul.

21    Q    You had seen people attend the Peter Young event

22 that was hosted at the Long Haul?

23    A    No.

24    Q    Okay.

25    A    We had knowledge that they had attended.

89

Karen Alberts

BARKLEY
Court Reporters

1   person on the IP address.  I didn't know if he really had

2   any affiliation or not.

3       Q.  Okay.  Did -- was -- did you believe that Jesse

4   Palmer could be instrumental in gaining access to records

5   about who might have used the computers at the Long Haul

6   to send the e-mails you were investigating?

7            MS. ELLIS:  Objection, vague.

8            THE WITNESS:  What do you mean by that?

9            MS. GRANICK:  Could you re-read it please?

10           (Record read.)

11           THE WITNESS:  Could you clarify that?

12  BY MS. GRANICK:

13       Q   Yeah.  You -- the team discussed that Jesse

14  Palmer might help gain entry to the Long Haul.  Did the

15  team discuss that Jesse Palmer might help you gain the

16  information you were looking for in this investigation?

17       A.  No.

18       Q.  Why not?

19       A.  Because he could have been the one who sent the

20  e-mails.

21       Q.  On what basis did you believe that?

22       A.  Because we didn't know who sent them.  Anyone

23  affiliated with the Long Haul could have sent these

24  e-mails.  We had no idea who it was.

25       Q.  And what do you mean by affiliated in that

93

BARKLEY
Court Reporters

1    context?

2        A.  Anyone who worked there, anyone who goes in

3    there, any -- anyone we've seen go in there.  I mean,

4    anyone who uses or used a computer inside the Long Haul,

5    be it an employee or not an employee, could have been the

6    one who sent the threatening e-mails.  We had no idea

7    who.

8        Q.  And yet you thought that Jesse Palmer would help

9    you get into the Long Haul even though he could have been

10   the one to send the e-mails?

11       A.  We felt that he may have had a key to get into

12   the Long Haul since he was affiliated with that address.

13       Q.  What else, if anything, was discussed at the

14   briefing meeting on the morning of the 27th?

15           MS. ELLIS:  Other than what she's already

16   testified to?

17           MS. GRANICK:  Yes.

18           THE WITNESS:  I don't recall anything else,

19   anything of significance.

20   BY MS. GRANICK:

21       Q   What role --

22           So after that meeting, did the officers from

23   that meeting go to the Long Haul space?

24       A.  Yes.

25       Q.  And you were there too.  Is that correct?

94

BARKLEY
Court Reporters

1          DEPOSITION OFFICER'S CERTIFICATE

2

3   STATE OF CALIFORNIA      }
                             }      ss.
4   COUNTY OF MARIN          }

5

6          I, Donna J. Blum, hereby certify:

7          I am a duly qualified Certified Shorthand

8   Reporter in the State of California, holder of

9   Certificate Number CSR 11133 issued by the Court

10  Reporters Board of California and which is in full force

11  and effect.  (Fed. R. Civ. P. 28(a)).

12         I am authorized to administer oaths or

13  affirmations pursuant to California Code of Civil

14  Procedure, Section 2093(b) and prior to being examined,

15  the witness was first duly sworn by me.  (Fed. R. Civ.

16  P. 28(a), 30(f)(1)).

17         I am not a relative or employee or attorney or

18  counsel of any of the parties, nor am I a relative or

19  employee of such attorney or counsel, nor am I

20  financially interested in this action.  (Fed. R. Civ. P.

21  28).

22         I am the deposition officer that

23  stenographically recorded the testimony in the foregoing

24  deposition and the foregoing transcript is a true record

25                    / / /

                      155

BARKLEY
Court Reporters

1   of the testimony given by the witness.  (Fed. R. Civ. P.

2   30(f)(1)).

3          Before completion of the deposition, review of

4   the transcript [xx] was [  ] was not requested.  If

5   requested, any changes made by the deponent (and

6   provided to the reporter) during the period allowed, are

7   appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9   Dated: August 16_____, 20 10

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

156